# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN

THE PEOPLE OF THE STATE OF
MICHIGAN,

      Plaintiff,

v

BP P.L.C.; BP AMERICA INC.; BP ENERGY
COMPANY; BP ENERGY RETAIL
COMPANY LLC; BP PRODUCTS NORTH
AMERICA INC.; CHEVRON CORPORATION;
CHEVRON U.S.A. INC.; EXXON MOBIL
CORPORATION; EXXONMOBIL OIL
CORPORATION; SHELL P.L.C.; SHELL USA,
INC.; SHELL OIL PRODUCTS COMPANY
LLC; EQUILON ENTERPRISES LLC D/B/A
SHELL OIL PRODUCTS US; SHELL
TRADING (US) COMPANY; and AMERICAN
PETROLEUM INSTITUTE,

      Defendants.

_____/

No. _____

HON. _____

MAG. _____

JURY TRIAL DEMANDED

Conspiracy to restrain trade
under the Sherman Act, 15
U.S.C. § 1, and the Clayton Act,
15 U.S.C. §§ 15, 26

Conspiracy to restrain trade
under the Michigan Antitrust
Reform Act, Mich. Comp. Laws
§ 445.772

# TABLE OF CONTENTS

Introduction ................................................................................................ 1

Parties ........................................................................................................ 9

I.     Plaintiff. ............................................................................................ 9

II.    Defendants. ...................................................................................... 10

III.   Co-Conspirators. ............................................................................. 16

Jurisdiction and Venue.............................................................................. 17

Factual Allegations ................................................................................... 20

IV.   The U.S. and Michigan Energy Markets and the Substitutability of
Products in the Markets for Primary Energy and for Transportation
Energy. .......................................................................................... 20

     A.    The Transportation Energy Market in the United States and
Michigan. ............................................................................ 23

     B.    Michiganders' Primary Energy Use. ................................... 25

     C.    Michigan Has Been Unable to Quickly Transition to Renewable
Energy Due to Defendants' Anticompetitive Conduct. ........ 27

V.    Collusion: Defendants Agreed to a Coordinated Strategy to Restrain
Competition from Renewable Energy Alternatives to Fossil Fuels and
Delay the Energy Transition. ........................................................ 29

     A.    Defendants' Motive to Collude Arose from their Early
Understanding of the Negative Externalities of Fossil Fuel Use. ....... 31

     B.    Building Early Infrastructure for Collusion: API's Task Force. ......... 32

     C.    Defendants Expand Conspiracy Means and Methods. .......... 34

VI.   Anticompetitive Coordinated Conduct: Defendants' Continuous
Scheme to Suppress Output of Renewable Energy and Restrain
Competition in the Transportation and Primary Energy Markets. .............. 38

     A.    Defendants Have Conspired to Suppress the Development and
Deployment of Clean Energy Technologies that Would Have
Accelerated Substitution in the Transportation Energy Market. ........ 39

1.  Defendants and Other Cartel Members Suppressed EV Battery and Engine Technologies. ............................................... 40

2.  Defendants Have Coordinated to Restrain the Buildout of Charging Infrastructure Needed to Substitute Electricity for Gasoline at Scale. ................................................................ 48

B.  Defendants Have Conspired to Suppress Output of and Demand for Renewable Alternatives to Fossil Fuels in the Primary Energy Market. ...................................................................... 52

1.  Defendants Have Acted in Concert to Suppress the Development and Deployment of Technologies for Solar Energy to Compete in the Primary Energy Market. .................. 52

2.  Defendants Have Openly Coordinated to Divert "Green" Capital Away from Renewable Energy and Toward Initiatives that Entrench Fossil Fuels. ....................................... 56

3.  Defendants Have Acted in Concert to Deceive Consumers and Thereby Suppress Demand for Renewable Energy. ........... 64

4.  Defendants Have Acted in Concert to Protect the Dominance of Fossil Fuels by Influencing Information-Producing Institutions. ............................................... 78

5.  Exxon Operatives Engaged in Criminal Hacking to Suppress Investigations into Defendants' Anticompetitive Conduct and Evade Accountability. ........................................... 90

VII.  Plus Factors Supporting the Inference of Defendants' Explicit Coordination. ................................................................... 92

A.  Defendants' Conduct Inconsistent with Independent Action. .............. 93

B.  Energy Markets Have Structural Features Conducive to Defendants' Sustained Coordination. ..................................... 96

C.  Defendants' Economic Incentives Favoring Coordinated Restraint. ............................................................. 100

D.  Institutionalized Opportunities for Defendants' Coordination. ......... 101

VIII.  Anticompetitive Effects: Defendants' Conspiracy Suppressed Competition in the U.S. Transportation and Michigan Primary Energy Markets, Leading to Supracompetitive Prices for Energy Products and Reduced Consumer Choice. ........................................... 106

A. But for the Conspiracy, EVs Would Have Reached Scale Years Earlier and Michigan and Its Consumers Would Have Avoided Billions of Dollars in Overcharges on Transportation Energy. .......... 106

B. But for the Conspiracy, Primary Energy Types, Such as Solar and Wind Energy, Would Have Reached Scale Years Earlier and Michigan and Its Consumers Would Have Avoided Billions of Dollars in Overcharges ........................................................................ 109

C. As a Result of the Conspiracy, Michigan Has Suffered, Is Suffering, and Will Continue to Suffer Injuries................................. 111

D. Michigan's Mitigation, Adaptation, and Resiliency Measures. .......... 112

Claims for Relief ................................................................................................ 113

Prayer for Relief................................................................................................ 119

Demand for Jury Trial....................................................................................... 120

**INTRODUCTION**

1.    The People of the State of Michigan ("the State"), by and through its

Attorney General, Dana Nessel, brings this civil enforcement action on behalf of

itself and as *parens patriae* on behalf of the people of the State, pursuant to 15

U.S.C. § 15c(a) and Mich. Comp. Laws §§ 14.28 and 14.101.  Through this Action,

the State seeks to end and obtain appropriate redress for injuries caused by a

conspiracy to delay the transition from fossil fuels to renewable energy in violation

of Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act,

15 U.S.C. §§ 15 and 26, and Section 2 of the Michigan Antitrust Reform Act, Mich.

Comp. Laws § 445.772.  Defendants BP P.L.C., BP America Inc., BP Energy

Company, BP Energy Retail Company LLC, BP Products North America Inc.

(collectively BP); Chevron Corporation, Chevron U.S.A. Inc. (collectively Chevron);

Exxon Mobil Corporation, ExxonMobil Oil Corporation (collectively Exxon); Shell

P.L.C., Shell USA, Inc., Shell Oil Products Company LLC, Equilon Enterprises LLC

d/b/a Shell Oil Products US, and Shell Trading (US) Company (collectively Shell)

(together, Fossil Fuel Defendants) and American Petroleum Institute (API)

(together with Fossil Fuel Defendants, Defendants) have unlawfully colluded to

reduce innovation and output (and thereby increase prices) in the Michigan

transportation energy market and the Michigan primary energy market, causing

antitrust injury to the State and its residents.

2.    Defendants are four of the largest energy companies in the world and

their industry's largest trade association.  The Fossil Fuel Defendants produce fossil

fuels and have at times invested in clean energy products and related technologies,

such as solar power and batteries, that could provide energy to power buildings, infrastructure, and cars as an alternative to fossil fuels.

3.     But for decades, Defendants have conspired with each other to forestall meaningful competition from renewable energy and maintain their dominance in the energy market.  They have done so as a cartel, agreeing to reduce the production and distribution of electricity from renewable sources and to restrain the emergence of electric vehicles (EV) and renewable primary energy technologies in the United States.  To achieve this end, they have abandoned renewable energy projects, used patent litigation to hinder rivals, suppressed information concerning the hidden costs of fossil fuels and viability of alternatives, infiltrated and knowingly misdirected information-producing institutions, surveilled and intimidated watchdogs and public officials, and used trade associations to coordinate market-wide efforts to divert capital expenditures away from renewable energy—all to further one of the most successful antitrust conspiracies in United States history.

4.     Defendants' collusion traces back to approximately 1980, when their own research concluded that continued reliance on fossil fuels would impose staggeringly high and stunningly destructive negative externalities on consumers nationwide, including in Michigan.  Negative externalities are external costs in the form of environmental harms, economic harms, and costs incurred to adapt to or mitigate those harms.  Defendants were aware that clean energy alternatives were feasible and inevitable, and emergence of these alternatives would increase

competition in the transportation and primary energy markets, reducing Defendants' market share and the dominance of those markets with their fossil fuel products. Exxon took an early leading role in the conspiracy. Its scientists concluded that to avoid the most deadly and destructive negative externalities, including climate impacts, clean energy would need to supply at least fifty percent of global energy by 2010. But rather than act on these findings to compete in developing superior clean energy technologies and achieving market penetration, Exxon and the other Defendants chose to collude to protect fossil fuels' dominance.

5.     Defendants have implemented this conspiracy by means of a multifaceted scheme targeting two markets: the United States market for transportation energy products such as gasoline, and the United States market for primary energy products used to heat and cool residential and public buildings. Defendants executed this conspiracy individually and jointly through trade organizations using an array of anticompetitive conduct. For each of these markets, Michigan is the relevant geographic submarket for the purchases at issue in this Complaint.

<u>Transportation Energy</u>

i.    Conspiring to delay the development and deployment of technologies needed for electricity to meaningfully compete with gasoline in the transportation energy market—including battery chemistries and hybrid-electric motors—by shutting down internal research and development programs, withholding commercially viable prototypes, and using capture-and-kill tactics and aggressive patent litigation to restrain rivals from making progress with renewable energy.

ii.   Coordinating to impede consumers' ability to substitute gasoline with electricity by restraining the buildout of infrastructure (*e.g.*, charging networks) needed to support EVs adoption.

<u>Primary Energy</u>

iii.  Conspiring to restrict the development and implementation of renewable energy technologies by capturing key technologies, using patent litigation to suppress competition, and abandoning commercially viable ventures, in order to suppress the growth of competition from renewable energy sources such as solar power.

iv.   Coordinating—through trade organizations and otherwise—to "decapitalise the low carbon space" by divesting of renewable energy and instead diverting supposedly "green" capital toward infrastructure and applications that entrench fossil fuel use, such as natural gas and carbon capture.

v.    Combining and otherwise coordinating, through industry groups and other means, to disseminate misleading public messaging that minimized the risks of fossil fuels, exaggerated their benefits, and cast doubt on the viability of cleaner substitutes in order to delay and suppress demand for renewable energy (*e.g.*, solar, wind, hydropower, geothermal), and for technologies that would increase renewable energy consumption (*e.g.*, EVs, but also as relates to other end-use sectors like home heating).

vi.   Conspiring to infiltrate and knowingly misdirect information-producing institutions in an effort to influence consumer preferences and public discourse about energy products and the climate crisis.

vii.     Undermining public and private efforts to hold Defendants and the cartel accountable for the harms caused by their anticompetitive and deceptive conduct by hiring hackers to surveil, intimidate, and disrupt watchdogs and activists seeking to expose the cartel's anticompetitive conduct through investigations, litigations, and journalism.

6.     Defendants' conduct has all the indicia of what it is: an illicit conspiracy. There is high market concentration among vertically integrated fossil fuel producers. Electrification and the energy transition require the interdependence and interoperability of several key elements—for example, EVs, charging infrastructure, and clean electricity generation—that are subject to Defendants' collective influence. Defendants have exploited institutionalized opportunities for coordination via API and other trade associations and working groups with overlapping executive leadership. They have engaged in conduct inconsistent with their own independent economic self-interests, such as by collectively withdrawing from viable clean energy ventures.

7.     Defendants' ongoing conspiracy to suppress innovation and output, with adverse price effects for energy purchasers, constitutes a *per se* unlawful restraint of trade. For over a century, private, state, and federal enforcers have invoked the antitrust laws to regulate and preserve competition in American energy markets. As the Federal Trade Commission and the Department of Justice recently observed, this regulation "protects Americans from anticompetitive behavior that

reduces the production of domestic energy, raises energy prices for consumers and businesses, and undermines America's energy dominance."[1]

8. The State once again calls upon the antitrust laws for those protections here; by suppressing innovation and investment in renewable energy, EVs, and EV infrastructure, Defendants have reduced the production of renewable energy for transportation and home heating and cooling, raised prices for Michigan consumers, and caused the United States to fall behind China and other foreign markets in the race to pioneer cheaper and cleaner alternatives to fossil fuels.

9. Specifically, by suppressing innovation and investment in renewable energy, EVs, and EV infrastructure, Defendants have artificially reduced the output of electricity as a substitute for gasoline and other energy sources. This restraint not only eliminated competitive pressure that would have lowered prices, but also deprived Michigan consumers of meaningful choice, forcing them to buy primary and transportation energy products at supracompetitive prices and with additional costs in the form of negative externalities.

10. The harmful effects of Defendants' energy collusion go beyond the traditional injuries of higher prices and reduced output. By colluding to delay the energy transition away from fossil fuels, Defendants have deliberately imposed staggering external costs on Michigan and the People of Michigan. The State and the public now bear the burden of those costs, which will continue to grow as long as

---

[1] Statement of Interest of the Federal Trade Commission and the United States of America, at 1, *Texas, et al., v. BlackRock, Inc., et al.,* No. 6:24-cv-00437 (E.D. Tex. May 22, 2025), available at https://perma.cc/PXB9-U77P (created on Dec. 12, 2025).

Defendants continue to use the power of their cartel to eliminate choice in transportation and primary energy.

11.     In the world that would have existed but for Defendants' conspiracy, EVs would not be a fringe technology or a luxury alternative. They would be a common sight in every neighborhood—rolling off assembly lines in Flint, parked in driveways in Dearborn, charging outside grocery stores in Grand Rapids, and running quietly down Woodward Avenue. Reliable and fast chargers would be integrated into new development and ubiquitous at highway rest stops and converted gas stations. A family needing a car would have dozens of affordable electric options, and the renewable energy needed to power EVs efficiently would be supplied at scale—integrated into the grid or delivered through a dedicated 100% renewable network—spurred by public and private investment responding to competitive market signals.

12.     Michiganders would also have additional, renewable energy options for providing primary energy to their homes and businesses, such as solar, wind, hydropower, and geothermal; these options would improve reliability, reduce costs to Michiganders, and reduce reliance on natural gas, fuel oil, and propane.

13.     Fossil fuels would still be used, but they would no longer be the default. In a competitive market, many Michigan residents, especially those in cities and suburbs, would have already stopped relying on or substantially reduced their reliance on gasoline for their daily commutes. Rural households would benefit from improved battery ranges and broader charging access. Homes and businesses

would benefit from reliable sources of energy, such as solar, wind, hydropower, and geothermal. For many consumers, this shift would mean lower monthly energy costs. Critically, it would also mean more choice—consumers could evaluate vehicles based on cost, quality, performance, and environmental impact. Because of Defendants' anticompetitive conduct, Michigan consumers' market choice is constrained by the absence of alternatives to fossil fuels.

14. Instead, Michigan consumers today remain locked in transportation and primary energy markets that have failed to evolve—not because clean alternatives are not viable, but because Defendants have suppressed the conditions for their otherwise-inevitable deployment and adoption.

15. Economic modeling demonstrates that, but for Defendants' conspiracy, Michigan consumers and the State would have avoided billions in overcharges and externalities: (a) EVs would have reached scale years earlier and fuel prices would be significantly lower; (b) renewable primary energy from solar, wind, and other sources would have reached scale years earlier and the prices for primary energy (and the costs consumers pay for energy in home heating and other end-use sectors) would be significantly lower; and (c) the immense costs of externalities caused by fossil fuel products would have been substantially lower.

16. As a result of Defendants' anticompetitive conduct, Michigan suffers and will continue to suffer negative externalities in the form of climate change impacts, rising insurance premiums, depressed home values, and damage to Michigan's economy. These negative externalities inflict new and recurring harms

on the State and its residents and impose substantial costs on the State to address these harms.

17.     Michigan now seeks to hold Defendants accountable for suppressing competition from renewable energy alternatives that should have been widely available long ago and to restore the benefits of a fair and open market for the State's residents.

## PARTIES

### I.     Plaintiff.

18.     The Attorney General of Michigan, Dana Nessel, brings this action on behalf of the People of the State of Michigan as Plaintiff. The Attorney General is Michigan's chief law enforcement officer and is authorized under both state and federal law to bring this action on behalf of the People of the State of Michigan.  *See* 15 U.S.C. § 15c(a); Mich. Comp. Laws §§ 14.28, 14.101.  The Attorney General seeks monetary, equitable, and other relief under federal and state antitrust laws in her sovereign or quasi-sovereign capacities—including relief for actual damages suffered by the State and its people.

19.     Defendants' anticompetitive conduct—delaying and restraining the entry and availability of cleaner substitutes for gasoline and other fossil fuels in the Michigan transportation and primary energy markets, and inflating prices in those markets—has harmed Michigan and its residents.  Both have paid supracompetitive prices for transportation and primary energy—that is, prices

higher than could be sustained in a competitive market—and have been deprived of lower-cost, lower-emission transportation and primary energy alternatives.

20.     The State brings this action, as expressly authorized under federal and Michigan state antitrust laws, on its own behalf and to protect its quasi-sovereign interests (including the integrity of competitive markets and the economic well-being of its residents), as *parens patriae* on behalf of natural persons residing in Michigan injured in their property by reason of Defendants' conduct, and in the public interest.  The State seeks monetary, equitable, and other relief under federal and state law.  15 U.S.C. § 15c(a); Mich. Comp. Laws §§ 445.777, 445.778; *see also* Mich. Comp. Laws §§ 14.28, 14.101.

## II.     Defendants.

21.     Defendant **Exxon Mobil Corporation**—a vertically integrated global energy company—is a New Jersey corporation that is registered to do business in Michigan.  Formerly headquartered in Irving, Texas, since 2022 it has been headquartered in Spring, Texas.  Defendant **ExxonMobil Oil Corporation** is a wholly owned subsidiary of Exxon Mobil Corporation, acts on Exxon Mobil Corporation's behalf, and is subject to Exxon Mobil Corporation's control. ExxonMobil Oil Corporation is a New York corporation headquartered in Spring, Texas, and has been registered to do business in Michigan since 1934.  There are approximately 10,500 Exxon-branded gas stations in the United States, including nearly 600 in Michigan.  Exxon Mobil Corporation, ExxonMobil Oil Corporation, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions

are collectively referred to herein as "Exxon." Where necessary, the Complaint refers to specific Exxon entities by name. [2]

22.     Defendant **Chevron Corporation** is a multinational, vertically integrated energy and chemicals company incorporated in Delaware, with its global headquarters and principal office in San Ramon, California. Defendant **Chevron U.S.A. Inc.**—a wholly owned subsidiary of Chevron Corporation that acts on Chevron Corporation's behalf and is subject to Chevron Corporation's control—is a Pennsylvania corporation with its principal place of business in San Ramon, California, and it is registered to do business in Michigan. In 2001, Chevron Corporation acquired Texaco Inc. to become the second-largest U.S. energy company at that time. There are approximately 8,000 Chevron or Texaco-branded gas stations across the United States. Both Chevron and Texaco have sold gasoline in Michigan through retail gas stations, but neither has a retail gas station in Michigan as of the filing of this Complaint. Chevron Corporation, Chevron U.S.A., Inc. and their predecessors, successors, parents, subsidiaries, affiliates, and

---

[2] Exxon Mobil Corporation was formerly known as, did or does business as, and/or is the successor in liability to Exxon Corporation; ExxonMobil Refining and Supply Company; Exxon Chemical U.S.A.; ExxonMobil Chemical Corporation; ExxonMobil Chemical U.S.A.; ExxonMobil Refining & Supply Corporation; Exxon Company, U.S.A.; Humble Oil & Refining Co.; Standard Oil Company of New Jersey (d/b/a Jersey Standard, Esso, Enco, and Humble); Mobil Corporation; Socony-Vacuum Oil Co.; Socony Mobil Oil Co.; and Standard Oil of New York.

divisions are collectively referred to herein as "Chevron." Where necessary, the Complaint refers to specific Chevron entities by name. [3]

23. Defendant **BP p.l.c.** is a multinational, vertically integrated energy and petrochemical public limited company that is registered in England and Wales, with its principal office in London, England. Defendant **BP America Inc.** is a wholly owned subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP America Inc. is a vertically integrated energy and petrochemical company incorporated in the state of Delaware with its headquarters and principal office in Houston, Texas, and it is registered to do business in Michigan. Defendant **BP Products North America Inc.**—a vertically integrated global energy company—is a subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. BP Products North America Inc. is a Maryland corporation with its principal place of business in Naperville, Illinois, and it is registered to do business in Michigan. Defendant **BP Energy Company**, formerly known as Amoco Energy Trading Corporation, is a subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. It is a Delaware corporation with its principal office in Houston, Texas, and it is registered to do business in Michigan. Defendant **BP Energy Retail Company LLC**, formerly known as EDF Energy Services LLC, is a subsidiary of BP p.l.c. that acts on BP p.l.c.'s behalf and is subject to BP p.l.c.'s control. It is a Delaware corporation with its principal office

---

[3] Chevron Corporation was formerly known as, did or does business as, and/or is the successor in liability to Standard Oil Company of California, Texaco Inc., ChevronTexaco Corporation, and the Hess Corporation.

in Houston, Texas, and it is registered to do business in Michigan. There are approximately 8,500 BP-branded gas stations in the United States, including more than 600 in Michigan. One of BP's brands, Amoco, has over 900 gas stations nationwide, including more than 120 in Michigan. In 2023, BP purchased TravelCenters of America, acquiring a nationwide network of approximately 300 travel centers equipped with fuel pumps, including six in Michigan. BP p.l.c., BP America Inc., BP Products North America Inc., BP Energy Company, BP Energy Retail Company LLC, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "BP." Where necessary, the Complaint refers to specific BP entities by name. [4]

24. Defendant **Shell p.l.c.** (formerly Royal Dutch Shell P.L.C.) is a vertically integrated multinational energy and petrochemical company. Shell p.l.c. is incorporated in England and Wales, with its headquarters and principal office in The Hague, Netherlands. Defendant **Shell USA, Inc.** (formerly Shell Oil Company) is a wholly owned subsidiary of Shell p.l.c. that acts on Shell p.l.c.'s behalf and is subject to Shell p.l.c.'s control. Shell USA, Inc. is incorporated in Delaware, with its principal office in Houston, Texas, and it is registered to do business in Michigan. Defendant **Shell Oil Products Company LLC** is a wholly

---

[4] BP America Inc. was formerly known as, did or does business as, and/or is the successor in liability to Amoco Oil Company; Amoco Production Company; ARCO Products Company; BP Exploration & Oil, Inc.; BP Products North America Inc.; BP Amoco Corporation; BP Oil, Inc.; BP Oil Company; Lightsource bp; Standard Oil Company (Ohio); Standard Oil (Indiana); and Atlantic Richfield Company and its division, ARCO Chemical Company.

owned subsidiary of Shell USA, Inc.,[5] that acts on Shell USA, Inc.'s behalf and is subject to Shell USA, Inc.'s control. It is a Delaware limited liability corporation with its principal office in Houston, Texas, and it is registered to do business in Michigan.

25. Defendant **Equilon Enterprises LLC d/b/a Shell Oil Products US (Shell Oil Products US)** is a wholly owned subsidiary of Shell USA, Inc., that acts on Shell USA, Inc.'s behalf and is subject to Shell USA, Inc.'s control. It is a Delaware limited liability corporation with its principal office in Houston, Texas, and it is registered to do business in Michigan. Defendant **Shell Trading (US) Company** is a wholly owned subsidiary of Shell USA, Inc., that acts on Shell USA, Inc.'s behalf and is subject to Shell USA, Inc.'s control. It is a Delaware corporation with its principal office in Houston, Texas, and it is registered to do business in Michigan. There are approximately 12,000 Shell-branded gas stations in the United States, including 400 Shell-branded gas stations in Michigan. Shell p.l.c., Shell USA, Inc., Shell Oil Products Company LLC, Shell Oil Products US, Shell Trading (US) Company, and their predecessors, successors, parents, subsidiaries, affiliates, and divisions are collectively referred to herein as "Shell." Where necessary, the Complaint refers to specific Shell entities by name.

---

[5] Shell USA, Inc. was formerly known as, did or does business as, is or was affiliated with, and/or is the successor in liability to Shell Oil Company; Shell Oil; Deer Park Refining LP; Shell Oil Products US; Shell Chemical LP; Shell Trading (US) Company; Shell Energy Resources Company; Shell Energy Services Company, L.L.C.; The Pennzoil Company; and Pennzoil-Quaker State Company.

26.     Defendant **American Petroleum Institute** (API) is a national trade association representing the oil and gas industry, created in 1919.  API is a nonprofit corporation based in the District of Columbia and has been registered to do business in Michigan since 1975 "[t]o promote in general the interests of the petroleum industry in all its branches."  With more than 600 members, API is the country's largest petroleum trade association.  Exxon, Chevron, BP, and Shell are currently API members, and they and/or their predecessors-in-interest have been API members during times relevant to this Complaint.  API's purpose is to advance its members' collective business interests, which include increasing consumer consumption of fossil fuels for the financial profit of API's members, including Exxon, Chevron, BP, and Shell.  API coordinates members of the petroleum industry, gathers information of interest to the industry, and disseminates that information to its members.  API acts and has acted as a marketing arm for its member companies, including Exxon, Chevron, BP, and Shell, in Michigan and elsewhere.[6]

27.     Executives from Exxon, Chevron, BP, and Shell have served on the API Executive Committee and/or as API Chairman, essentially serving as corporate officers.  For example, Exxon's CEO served on API's Executive Committee,

_____

[6] The State does not challenge API's petitioning efforts or any First Amendment-protected conduct.  Rather, it is upholding and enforcing Michigan and federal law against API for API's illegal anticompetitive conduct, which has caused injuries in Michigan.  More generally, nothing in this Complaint should be construed as challenging any entities' petitioning efforts or any First Amendment-protected conduct.

including as President and Chairman, for 21 of the 29 years between 1991 and 2020. Multiple high-level executives from Exxon, such as Presidents, Vice Presidents, CEOs, COOs, and Chairmen, served on API's Board in each year between 1994–2002. Chevron's CEO served as API Chairman in 1994, 1995, 1997, 1998, 2003, and 2012. In 2002, Chevron's CEO served as API Treasurer. The Chairman and CEO of Chevron's predecessor Texaco served as API Board Chairman in 2001, and as Treasurer in 1999. Multiple high-level executives from Chevron served on API's Board of Directors in each year between 1994–2002. BP's CEO served as API's Chairman in 1988, 1989, and 1998. Multiple high-level executives from BP served on API's Board of Directors between 1994–2002. The Chairman and CEO of BP's predecessor ARCO served as API Treasurer in 1998 and API Chairman in 1999. Shell's President served as API Treasurer in 1997 and sat on the Board's executive committee from at least 2005–2006. Multiple high-level Shell executives served on API's Board of Directors between 1994–2002.

## III.  Co-Conspirators.

28.     Various other persons, firms, corporations, and entities not named as Defendants, including but not limited to those identified herein, participated as co-conspirators in the unlawful conduct alleged in this Complaint and are collectively referred to as "Co-Conspirators." Defendants are jointly and severally liable for the acts of these Co-Conspirators.

## JURISDICTION AND VENUE

29.     This action arises under Section 1 of the Sherman Antitrust Act, 15

U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, as well as

under Section 2 of the Michigan Antitrust Reform Act ("MARA"), Mich. Comp. Laws

§§ 445.772, 445.777, 445.778.

30.     This Court has subject matter jurisdiction over this action under 28

U.S.C. §§ 1331, 1337, and 1367(a), as well as under 15 U.S.C. § 15c.

31.     All claims raised in this Complaint under federal and state law are

based on a common nucleus of operative facts:  Defendants' anticompetitive

conspiracy and conduct in furtherance thereof.  The entire action commenced by

this Complaint constitutes a single case or controversy that would ordinarily be

tried in one judicial proceeding.  *See* 28 U.S.C. § 1367(a).  The Court therefore has

supplemental jurisdiction over the non-federal claims, specifically under principles

of pendent jurisdiction.  Exercising supplemental jurisdiction here will avoid

unnecessary duplication and multiplicity of actions, and will best promote the

interests of judicial economy, convenience, comity, and fairness.

32.     This Court has personal jurisdiction over each Defendant under

Section 12 of the Clayton Act, 15 U.S.C. § 22, Fed. R. Civ. P. 4(h)(1), and Michigan's

long-arm statute, Mich. Comp. Laws § 600.715.  Each Defendant was and is

authorized to do business in Michigan, was and is registered with the Michigan

Secretary of State, and has transacted business in Michigan, and/or otherwise

purposefully availed itself of the Michigan market through the release, handling,

use, development, design, manufacture, marketing (directly or indirectly),

distribution, and/or sale of transportation and/or primary energy products to the State or to Michigan residents during the relevant time period. At all relevant times, each Defendant engaged in and/or acted upon anticompetitive agreements in or with intended effects in Michigan (including in this District); and/or owned, used, or possessed certain real and tangible property situated within the State. The State's claims arise from or relate to the aforementioned activities, which have had and continue to have substantial anticompetitive effects in Michigan and in this District.

33. Each Defendant is also subject to personal jurisdiction in this State by virtue of its participation in the conspiracy involving conduct or effects in this State: the law considers each member of the conspiracy to be an agent of the others for personal jurisdiction purposes. Defendants' connections to Michigan are sufficient under the Due Process Clause of the U.S. Constitution, and the exercise of personal jurisdiction over Defendants is reasonable.

34. Venue in this District is proper pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, as well as 28 U.S.C. § 1391. A substantial portion of the unlawful acts and effects alleged in this Complaint occurred in this District, and those acts and effects have caused and continue to cause substantial harm to interstate commerce in this District, including harm to the State and to Michigan residents. In addition, one or more Defendants maintain business facilities, have agents, transact business, or are otherwise found within this District.

35.     The State has a strong interest in litigating this matter in this forum. Defendants should have reasonably anticipated being subject to jurisdiction here based on their conduct.  No other forum would better serve the interests of justice or the convenience of parties and witnesses.

# FACTUAL ALLEGATIONS

## IV. The U.S. and Michigan Energy Markets and the Substitutability of Products in the Markets for Primary Energy and for Transportation Energy.

36.     Defendants and their Co-Conspirators are competitors in the energy market.  The energy market has historically been primarily comprised of fossil fuels, which are nonrenewable energy sources like crude oil, natural gas, and coal that emit carbon dioxide ($CO_2$) and other greenhouse gases (GHGs) when combusted.

37.     In contrast, "renewable energy" refers to any form of energy from solar, geophysical, or biological sources that is replenished by natural processes at a rate that equals or exceeds its rate of use.  These include bioenergy, photovoltaic solar, concentrated solar, geothermal energy, hydropower, ocean or tidal energy, and wind energy, as well as the storage of electricity derived from such sources (*e.g.*, in batteries).

38.     The U.S. energy system consists of three components:  (1) primary energy sources, (2) secondary energy sources, and (3) end-use sectors (*e.g.*, energy for transportation).

39.     **Primary energy sources** are extracted or captured directly from the environment.  Examples include fossil fuels (*e.g.*, crude oil, natural gas, coal), renewable sources (*e.g.*, solar radiation, wind power, hydro power, geothermal), and nuclear power.  Fossil fuels have dominated the U.S. primary energy supply since the inception of the cartel in 1979.

40.    **Secondary energy sources** are forms of energy derived from primary energy sources.  They do not occur naturally and must be produced for end-use applications.  Examples include gasoline (refined typically from crude oil and/or natural gas), fuel oil (same), propane (same), and electricity (generated from primary energy sources like nonrenewable fossil fuels and also renewable solar radiation, wind, or hydropower).

41.    Electricity is delivered to U.S. consumers primarily through regional power grids—interconnected transmission networks that draw electricity from a mix of sources, including from fossil fuel plants and renewable energy facilities.  As of 2025, there is a lack of meaningful choice and innovation in the sources of energy available to supply regional power grids.  As a result, no U.S. regional power grid supplies 100% clean electricity on a continuous basis.  Consumers in search of alternatives often must rely on off-grid solutions like microgrids[7] or on-site generation from rooftop solar or wind.

42.    **End-use energy sectors** are segments of the economy where secondary energy sources are consumed, including the transportation, residential, commercial, and industrial sectors.  The end-use sector with the greatest share of energy consumption is the transportation sector.  The residential and commercial

---

[7] A microgrid is a small-scale electricity network that connects local sources of primary energy generation (*e.g.*, solar panels, wind turbines) and energy storage systems to consumers within a defined area.  Grid Deployment Office U.S. Dep't Energy, *Microgrid Overview*, at 2 (2024), available at https://perma.cc/C5Z8-P9D2 (created on Dec. 12, 2025).  A small community that needs electricity but is unwilling or unable to connect to a broader power grid could rely instead on a microgrid.

sectors also demand considerable energy, for purposes including heating, cooling, and lighting.

43.     This Complaint focuses on two nationwide energy markets, with relevant Michigan geographic submarkets for the purchases at issue, as defined below:[8]

- The geographic market is defined as the State of Michigan, or in the alternative, the 83 counties that make up the State of Michigan.

- The Michigan "transportation energy" market is defined as the market for individual consumer and State retail purchases of energy products for fully- or partially-enclosed personal ground transportation vehicles (*i.e.*, automobiles, including sedans, vans, sport utility vehicles (SUVs), and small, non-diesel trucks)—where consumers and the State have two principal options:  (1) gasoline, used to fuel conventional internal combustion engine vehicles and certain hybrid-electric vehicles;[9] and (2) electricity, used to fuel fully electric vehicles and plug-in hybrid vehicles that draw power from both gasoline and external electricity. As used in this Complaint, "electric vehicles" ("EVs") refers to any vehicle that can be fueled with electricity—including both fully electric vehicles and plug-in hybrid-electric vehicles.

- The Michigan "primary energy" market is defined as the market for individual consumer purchases of primary energy products for residential or commercial heating or cooling purposes, and State purchases of primary energy products for use and not for resale, for public heating and cooling purposes, where purchasers have two principal options:  (1) primary energy from fossil fuel sources, such as crude oil and natural gas; and (2) primary energy from renewable energy sources, such as solar, wind, hydro power, and geothermal.

---

[8] State purchases of energy products are limited to purchases for the express and sole benefit of a State-sponsored program or use.

[9] "Hybrid vehicles" combine an internal combustion engine with an electric motor. Most hybrid vehicles rely entirely on gasoline as a fuel and charge their batteries through regenerative braking and engine power.  Plug-in hybrid vehicles, by contrast, can be fueled with electricity from external sources and may operate on either gasoline or electricity.

44. The State brings this action to address Defendants' conduct as a *per se* violation of antitrust laws. The relevant geographic and product markets, to the extent they otherwise may be required for pleading purposes, are the Michigan market for transportation energy, as defined above, and the Michigan market for primary energy, as defined above.

### A. The Transportation Energy Market in the United States and Michigan.

45. As of 2022, there were approximately 7.8 million licensed drivers in Michigan (almost all of whom hold non-commercial driver's licenses), and 9.4 million vehicles registered in the State (approximately 28.8% being automobiles, 68.3% being trucks, and the rest being motorcycles and buses). Of those 9.4 million vehicles, only approximately 180,000 were EVs. That is less than 2%. Those EVs consumed 227,887 megawatt hours of electricity over the course of the year. By contrast, Michigan residents in 2021 bought approximately **11.8 million gallons of gasoline**—the equivalent of nearly 400,000 megawatt hours—**every day**.

46. As of 2025, the State owns or leases 14,761 motor vehicles. Of those, fewer than ten vehicles are EVs. In December 2023, Michigan Governor Gretchen Whitmer issued an Executive Directive to convert the State's light-duty vehicle fleet to zero-emission vehicles by 2033.

47. Gasoline is widely available at retail gas stations across the country, while public charging stations that supply electricity for automobile transportation use remain limited.

48.     Across the United States there are more than 150,000 gas stations. Michigan alone has more than 5,000, almost all of which have numerous pumps.  By contrast, there are only approximately 1,800 individual public EV charging stations across the entire state.

49.     Only 5% of gas stations in the United States are owned or operated by companies with large oil refining operations, such as the Fossil Fuel Defendants. Instead, the vast majority of branded gas stations are owned and operated by independent retailers, who are often licensees or franchisees of the oil refiners' brands.  These retailers purchase and resell gasoline from those brands to consumers.

50.     In Michigan, all Exxon and BP branded gas stations are independently owned.  However, some TravelCenters of America gas stations in Michigan are owned by BP.

51.     Gasoline, mixed-source electricity, and clean electricity are substitutes in the U.S. and the Michigan transportation energy markets—they can be used to power automobiles and meet consumer needs.

52.     Despite that substitutability, gasoline (from fossil fuels) continues to dominate.  Renewables provide less than 10% of the energy consumed in the transportation energy end-use sector, compared with more than 90% provided by petroleum and natural gas.  Nearly all public charging stations sell only mixed-source electricity, primarily pulled from the power grid.  A few companies have started advertising that their charging stations supply electricity exclusively from

renewable sources ("100% clean charging stations"), but upon information and belief even those supply electricity in part from non-renewable sources (which those companies offset by purchasing renewable energy credits). Almost all EV charging that is 100% clean occurs not via public charging stations, but rather via consumers' at-home charging stations supported by their at-home solar panels.[10]

### B. Michiganders' Primary Energy Use.

53. Similarly, the majority of energy that Michiganders consume is generated from fossil fuels. In 2023, only 7.8% of the 2,543 trillion British Thermal Units (BTU) of energy consumed in the State came from renewable sources. In 2024, nearly 70% of Michigan's total electricity generation came from fossil fuels, while renewable energy accounted for just 12%. As of this Complaint, in 2025 renewable energy has accounted for just 9.4% of primary energy generated in Michigan.

54. Renewable primary energy sources are substitutes for fossil fuel primary energy sources in the Michigan primary energy market, and serve the same end-use needs (*e.g.*, for heating and cooling the built environment). Despite

---

[10] In response to growing demand for clean electricity in the U.S. transportation energy market, providers like EVgo and Electrify America have begun offering "100% clean charging." But because the grid typically supplies mixed-source electricity, these companies rely on renewable energy credits to match charging with an equivalent amount of clean electricity generated elsewhere. *See From Coast to Coast, EVgo and eXtend Partners Receive More Than $12.7M in Funding to Expand Fast Charging Infrastructure,* EVGO (OCT. 12, 2023), *available at* https://www.evgo.com/press-release/from-coast-to-coast-evgo-and-extend-partners-receive-more-than-12-7m-in-funding-to-expand-fast-charging-infrastructure/, also available at https://perma.cc/M9QU-TAS2 (created on Dec. 12, 2025).

that substitutability, fossil fuels continue to dominate not just the primary energy market, but also downstream end-use sectors like residential electricity and heating. This is largely because, while fossil fuel primary energy sources are widely available through the electric grid and for heating, access to exclusively renewable energy to electrify and heat Michigan homes and State buildings remains limited.

55.     As of 2024, there were approximately 4.7 million homes in Michigan, and as of 2025 there are 5,300 buildings owned or leased by the State. Almost all of those buildings in Michigan get their electricity from a regional power grid, which supplies mixed-source electricity—in Michigan, renewables make up approximately only 10% of that mix. Regarding home heating, in 2023 approximately 85% of home heating in Michigan came from fossil fuel primary energy sources. Michigan ranks first among all fifty states in terms of residential sector consumption of propane, and even buildings that rely on electricity for heat overwhelmingly get that electricity from the grid's fossil-fuel-dominated mix of primary energy sources. Buildings that get 100% of their electricity and heating from renewable primary energy sources are rare—currently, that is possible only for buildings that can rely exclusively on electricity from a renewable microgrid for all heating and electric needs.

56.     Many of Michigan's municipalities (subdivisions of the state) own public energy utilities. There are dozens of electric utilities in the State that are community owned and run as a division of the local government and which receive state funding from taxpayers. Many of these municipal electric utilities have their

own power plants that they run with primary energy (including from fossil fuel sources) purchased from big energy companies (including Fossil Fuel Defendants and other cartel members).

**C.      Michigan Has Been Unable to Quickly Transition to Renewable Energy Due to Defendants' Anticompetitive Conduct.**

57.      More than two thirds of the electricity in Michigan from utility-scale electricity sources use fossil fuels as their source of primary energy.

58.      Fossil fuel's persistent dominance over energy options in the primary energy market is not due to viability or cost of the energy source.  In 2024, solar accounted for 81.5% of all *new* U.S. electricity generation capacity and led monthly additions for 16 consecutive months.  Wind accounted for 8.3% of all new U.S. electricity generation capacity in 2024, outpacing natural gas.  Together, renewable energy sources comprised 90.5% of new capacity.  As for cost, new utility-scale solar and onshore wind farms produce electricity at less than half the cost of fossil fuels per kilowatt-hour, and Michigan consumers can buy electricity as fuel for about half the cost of gasoline per mile.

59.      Gasoline, natural gas, fuel oil, and propane pose significant negative externalities:  fossil fuel combustion accounts for approximately 80% of manmade GHGs globally.  Those GHGs impose negative externalities in the form of environmental harms, economic costs such as rising insurance premiums, and other costs such as the depression of home values in the State.  The State is also compelled to incur costs to mitigate these harms.  These negative externalities are

not reflected in the market price of the offending product—they are borne by governments and individuals rather than the energy companies that created the GHGs.[11] By way of example only, the estimated external cost of fossil fuel use in the United States in 2016 alone was $186 billion.

60. Electricity—especially clean electricity—is readily competitive with gasoline and other fossil fuels for transportation and for primary energy needs such as home heating because it performs the same function but for about half the cost and with far fewer negative externalities. Mixed-source electricity also offers advantages over gasoline and other fossil fuels (beyond just a lower cost) because its partial reliance on renewables can mitigate negative externalities associated with fossil fuel combustion.

61. Under competitive conditions, electricity—especially clean electricity—would displace a substantial share of gasoline consumption in the transportation energy market due to its many advantages. Similarly, renewable sources of primary energy would displace a substantial share of fossil fuel consumption in the

---

[11] *See, e.g.*, *Environmental and Energy Study Institute Fact Sheet, Fossil Fuel Subsidies: A Closer Look at Tax Breaks and Societal Costs*, ENVIRONMENTAL AND ENERGY STUDY INSTITUTE (July, 29 2019), available at https://perma.cc/73E3-R4JW (created on Dec. 12, 2025) ("There are many kinds of costs associated with fossil fuel use in the form of greenhouse gas emissions and other pollution resulting from the extraction and burning of fossil fuels. These negative externalities have adverse environmental, climate, and public health impacts, and are estimated to have totaled $5.3 trillion globally in 2015 alone. . . . Fossil fuel externalities, including societal costs, environmental costs, health costs are largely overlooked in the processing of incentivizing fossil fuel production through policy mechanisms.") (citing *IMF Survey: Counting the Cost of Energy Subsidies*, INTERNATIONAL MONETARY FUND (July 16, 2015), available at https://perma.cc/W8F9-NMUE (created on Dec. 12, 2025)).

primary energy market, including in Michigan—for example, regarding the primary energy used to power, heat, and cool the built environment—due to renewables' many advantages over fossil fuel primary energy sources.  That has not occurred, however, because Defendants have conspired to artificially eliminate the prerequisite natural competitive conditions, thereby preserving gasoline's and other fossil fuels' dominance despite technological progress and growing consumer interest in cleaner alternatives.

## V.   Collusion:  Defendants Agreed to a Coordinated Strategy to Restrain Competition from Renewable Energy Alternatives to Fossil Fuels and Delay the Energy Transition.

62.   Following the Supreme Court's dissolution of the Standard Oil trust in 1911, Standard Oil's successors and other major oil companies formed the API in 1919 to coordinate efforts to promote the proliferation of fossil fuels.  Over time, API became a central forum for the Fossil Fuel Defendants and their Co-Conspirators to align strategies, share information, and act collectively.  By the late 20th century, the Fossil Fuel Defendants were using API as key infrastructure to advance their conspiracy to suppress innovation and competition from renewable energy alternatives in the U.S. transportation energy market, and by inclusion, the Michigan transportation energy market.  The Fossil Fuel Defendants used API leadership positions and committees to coordinate strategies that protected their fossil fuel products from market competition by renewable energy products despite knowing fossil fuel products were environmentally harmful and commercially vulnerable in a competitive market.

63.     But for the Fossil Fuel Defendants' coordination through API and other means, competitive market conditions would have cultivated renewable energy output and increased competition in the automobile transportation energy market much earlier than has occurred. Indeed, the Fossil Fuel Defendants and their predecessors made early investments in clean energy technology, including solar generation and EV technologies. In a truly competitive market, the Fossil Fuel Defendants would have competed for the advantages of being the first to deploy clean energy technologies. But instead, to maintain the dominance of fossil fuels and their market share, they changed tack and agreed upon a different strategy: to act collectively to restrain the development, adoption, and output of renewable energy alternatives that posed a competitive threat to gasoline and fossil fuel dominance in the national, and by inclusion, the Michigan markets for transportation energy and primary energy.

64.     This conspiracy to suppress competition from renewable energy began to take shape in 1979. That year, Exxon's internal studies concluded that to avoid catastrophic global warming it would be necessary to have renewable energy sources supply at least 50% of global energy by 2010. Just months after Exxon reached that conclusion, API established the "$CO_2$ and Climate Task Force" (Task Force), its first committee addressing fossil fuels and climate harms. Through the Task Force, Exxon shared with competitors proprietary scientific and economic projections and strategic plans regarding climate change and competition from renewable energy alternatives to fossil fuels. After reviewing these and other

materials, Exxon's competitors concurred that—assuming what Exxon called "a competitive scenario"—renewable energy would likely displace gasoline over time.

65.     Rather than compete as leading producers of renewable energy products, the Defendants and their Co-Conspirators conspired to suppress their own output of renewable energy, and restrain output by others, by eliminating the "competitive scenario" necessary for the success of renewable energy.

### A.     Defendants' Motive to Collude Arose from their Early Understanding of the Negative Externalities of Fossil Fuel Use.

66.     As early as the 1950s, Defendants became privately aware that fossil fuel consumption would impose significantly negative externalities on consumers and the natural environment.  At an API symposium in 1959, nuclear physicist Edward Teller warned Defendants and other fossil fuel companies that $CO_2$ emissions from fossil fuels would cause catastrophic global warming, including melting ice caps and submerging coastal cities.

67.     Subsequent studies funded by Defendants and others reinforced Teller's 1959 warning.

68.     By the 1970s, Defendants had amassed extensive evidence linking their fossil fuel products to potentially irreversible negative externalities.  They internally accepted that "scientific opinion overwhelmingly" recognizes the dangers of fossil fuels.  They knew that eventually public awareness of those dangers would shift consumer demand toward clean alternatives, threatening gasoline's dominance in the U.S., and by inclusion the Michigan, transportation energy market.

69.     Defendants became aware of specific evidence long before the public was aware of it and privately concluded that the only means to avoid the negative externalities associated with fossil fuel use was to innovate and develop energy alternatives in both the transportation and primary energy markets.

70.     Exxon scientists internally modeled what it would take to cap atmospheric $CO_2$ buildup at "a relatively safe level" (defined as 50% above pre-industrial levels).  Their conclusion:  **to cap $CO_2$ concentration to 50% above pre-industrial levels, "[b]y 2010 [non-fossil fuels] will have to account for 50% of the energy supplied worldwide."**  Exxon understood these findings to mean that, under competitive conditions, the primary and transportation energy markets would eventually give rise to non-fossil fuel alternatives; these competitive pressures would eventually shift consumer demand away from fossil fuels and toward alternatives.

71.     A self-interested and law-abiding rational firm would have used this insight to innovate and compete in the energy market by offering superior and cheaper energy products to consumers.  Instead, Exxon shared this and other proprietary and competitively sensitive information with Fossil Fuel Defendants Chevron, BP, Shell, and other competitors, including through the API's $CO_2$ and Climate Task Force, formed in 1979—the same year that Exxon shared its report.

**B.     Building Early Infrastructure for Collusion:  API's Task Force.**

72.     The API Task Force convened senior scientists and engineers from major oil companies, including Exxon, Mobil (now Exxon), two BP predecessors

(Amoco and SOHIO), three Chevron predecessors (Texaco, Gulf Oil, and Standard Oil of California), Shell, Phillips, and Sunoco.[12]

73. Task Force members exchanged competitively sensitive information about threats to fossil fuel supply and demand, potential consumer demand for alternatives, and the feasibility of renewable energy market penetration. The Fossil Fuel Defendants' private sharing of competitively sensitive information such as their respective strategic assessments reduced incentives for independent investment in renewable energy, resulting in a collective delay in innovation.

74. Beginning in 1979, Exxon used the Task Force to share its internal research on the competitive threat of a large-scale transition away from fossil fuels. Around the same time, Exxon and the other Fossil Fuel Defendants began retreating from renewable energy investments and instead adopting climate denial strategies to suppress demand for renewable energy.[13]

75. In the early years of the Task Force, Exxon shared information on four critical topics that motivated and shaped Defendants' coordinated, anticompetitive renewable energy suppression strategy:

(1) fossil fuels are a primary driver of climate change (in particular, Exxon shared its strikingly accurate predictions of corresponding increases in $CO_2$ and temperatures);

(2) continuing the unabated use of fossil fuels would cause catastrophic climate impacts with negative externalities in the U.S. amounting to trillions of dollars annually by 2050;

---

[12] Key individuals involved in the Task Force included Henry Shaw from Exxon Research and Engineering's Technology Feasibility Center, and Bruce Bailey, who ran a climate modeling team for Texaco (now Chevron).

[13] *See infra* Section VI(A)(1), VI(B)(1), VI(B)(3).

(3) avoiding such impacts would require shifting half of the global energy supply to renewable energy by 2010; and

(4) under a "a competitive scenario," fossil fuels would achieve a 50% share of the global energy market, which has historically been dominated by fossil fuels, within 50 years.[14]

76.     Through sharing these and other proprietary insights, Defendants reached a consensus to restrain innovation and coordinate efforts to delay the inevitable energy transition.

### C.     Defendants Expand Conspiracy Means and Methods.

77.     By the 1980s, Defendants and their Co-Conspirators expanded their coordinated efforts beyond the API Task Force, initiating a global campaign that enlisted major fossil fuel firms in Europe and the Middle East.  This shift marked a turning point:  from then on, the conspiracy became increasingly sophisticated and global in scope.

78.     A key channel for this global coordination was the International Petroleum Industry Environmental Conservation Association (IPIECA), which facilitated information-sharing between Defendants and their international competitors.  Through IPIECA, Defendants and others aligned strategies to forestall renewable energy market penetration and preserve fossil fuel dominance globally.

---

[14] Henry Shaw and Pat McCall, *Exxon Research and Engineering Company's Technological Forecast: CO2 Greenhouse Effect*, Exxon, at 5 (Dec. 18, 1980), available at https://perma.cc/J2L4-3U4X (created on Dec. 12, 2025).

79.     In 1984, Exxon convened an IPIECA meeting in Texas to recruit more domestic and foreign energy companies into its expanding network of coordination. A former environmental director of a major energy company in Europe described the meeting as a pivotal moment:

> The moment I remember really being alerted to the seriousness of global warming was at an IPIECA meeting in Houston in 1984. **There were representatives from most of the big companies in the world there, and the people from Exxon got us up to speed. . . . [P]erhaps because the stakes seemed to have become too great and a collective response from the profession required, they shared their concerns with the other companies.**[15]

80.     In 1988, Defendants and several Co-Conspirators established an international "Working Group on Global Climate Change" during an IPIECA meeting in Paris. Chaired by Exxon's Duane LeVine, that group became a central forum for aligning industry-wide responses to climate science and the competitive threat posed by renewable energy. For example, a 1990 Working Group document prepared by Defendants outlined plans to preserve fossil fuel dominance through "no regrets" strategies and messaging.[16] Also in 1990, the Working Group circulated a strategy memo authored by LeVine to IPIECA's full membership—which by then included hundreds of oil companies operating on six continents—warning that the international environmental community would soon seek to phase

---

[15] Benjamin Franta, *Big Carbon's Strategic Response to Global Warming, 1950-2020* (Aug. 2022) (Ph.D. dissertation, Stanford University), at 137, available at https://perma.cc/SGJ2-VZAH (created on Dec. 12, 2025) (quoting Interview with Bernard Tramier, Nov. 5, 2020).
[16] *Id.* at 138–39.

out fossil fuels. The memo urged IPIECA members to forestall such efforts by disseminating information downplaying the risks of fossil fuels, which knowingly contradicted their internal research, and by coordinating their strategies to prolong fossil fuel demand and restrain the development and adoption of renewable energy alternatives. Effectively, LeVine was proposing a unified front to delay the energy transition.

81. A senior IPIECA leader in the early 1990s (and former head of a major European energy company) later confirmed that Exxon spearheaded these efforts due to its influence within scientific and industry circles: "Exxon had taken hold of the issue, and that suited us[.] . . . We were a follower of Exxon . . . we agreed that we didn't know enough [scientifically] for emission reductions or [carbon] taxes to be enacted, and we let Exxon do the rest."[17]

82. This pattern continues to the present day, with initiatives like the Oil and Gas Climate Initiative (OGCI), which the Fossil Fuel Defendants use to coordinate their investments, project planning, long-term strategies, and messaging on renewable energy and energy transition. OGCI is "a CEO-led initiative comprised of 12 of the world's leading oil and gas companies," including the Fossil Fuel Defendants and their Co-Conspirators. OGCI is an open cooperation agreement among the CEOs of the Fossil Fuel Defendants and their Co-Conspirators to set (and limit) levels of investment in so-called "low-carbon technologies." As part of OGCI, the Fossil Fuel Defendants and their Co-

---

[17] *Id.* at 142 (quoting Interview with Bernard Tramier, Nov. 24, 2020).

Conspirators launched OGCI Climate Investments LLP ("Climate Investments"), a "specialist decarbonization investor." Through OGCI and Climate Investments, the Fossil Fuel Defendants are coordinating their capital expenditures and diverting capital away from renewable energy, investing in the entrenchment of fossil fuels instead. The purpose of OGCI is to preserve and maintain the Fossil Fuel Defendants' market share and dominance in the primary and transportation energy markets, and to further forestall competitive pressures from renewable alternatives.[18]

83. Defendants also have relied on trade associations like the International Association of Oil and Gas Producers (IOGP) to promote misleading narratives that preserve fossil fuel dominance, including the claim that "[n]atural gas is key to solving climate change."[19]

84. API, IPIECA, OGCI, and IOGP are just a few of the trade associations and other joint ventures led by Defendants that, over nearly five decades, have brought together dozens of fossil fuel companies and industry groups and facilitated their coordination to suppress competition from renewable energy on a global scale. These examples offer only a sampling of the seemingly bottomless alphabet soup of organizations that Defendants have founded, joined, and/or actively participated in to advance their anticompetitive scheme: From 1979 to the present, the cartel has consisted of several energy companies, which have used numerous trade

---

[18] *See infra* Section VI(B)(2).
[19] Marco Alverà, *Natural Gas Is Key to Solving Climate Change*, IOGP (Aug. 8, 2017), available at https://perma.cc/S7LK-DWAJ (created on Dec. 12, 2025).

associations and other joint ventures (*e.g.*, "astroturf" organizations and other front groups, as well as committees, publications, etc.) to coordinate their activities.

85.     Taken together, these trade associations and other joint ventures have enabled Defendants and their Co-Conspirators to (among other things) synchronize assessments of climate risks, monitor each other's scientific and industry outlooks, align their responses to competitive threats, and coordinate their efforts to suppress technologies likely to displace gasoline or other fossil fuels through collusion rather than competition.  As an Exxon senior executive admitted in a 2021 interview, "Did we aggressively fight against some of the science?  Yes[.] . . .  Did we join some of these shadow groups to work against some of the early efforts?  Yes, that's true. . . . We were looking out for our investments[.]"[20]

86.     Defendants have constructed and used this global architecture not to foster innovation, but to **prevent** it—neutralizing renewable energy through suppression, deception, and obstruction, and thereby keeping Michigan consumers locked into expensive gasoline and other fossil fuels.

## VI.     Anticompetitive Coordinated Conduct:  Defendants' Continuous Scheme to Suppress Output of Renewable Energy and Restrain Competition in the Transportation and Primary Energy Markets.

87.     Defendants have, through their concerted and coordinated conduct, engaged in a multifaceted scheme to restrain competition with and maintain the

---

[20] L. Delta Merner et al., *Decades of Deceit: The Case Against Major Fossil Fuel Companies for Climate Fraud and Damages*, UNION OF CONCERNED SCIENTISTS, at 31 (May 2025), available at https://perma.cc/Y2YE-6CLS (created on Dec. 12, 2025).

dominance of fossil fuels—both in the primary energy market and in particular end-use sectors such as the transportation energy market—by suppressing the output of and market availability of renewable energy substitutes. In addition to the information sharing described above, Defendants' coordinated conduct includes a range of activities targeting the markets for transportation energy in particular and for primary energy generally (which has downstream effects in all end-use sectors, including transportation, but also home heating and other sectors), including but not limited to the categories of anticompetitive conduct listed in Paragraph 5 of this Complaint.

A. **Defendants Have Conspired to Suppress the Development and Deployment of Clean Energy Technologies that Would Have Accelerated Substitution in the Transportation Energy Market.**

88. By the early 1980s, Defendants recognized that advances in EV technology such as battery storage, hybrid drivetrains, and clean electricity generation, and competitive pressure from renewable technology, threatened fossil fuel dominance in the transportation and primary energy markets by enabling consumers, including those in Michigan, to shift toward cleaner, lower-cost alternatives to gasoline. To maintain their market share and dominance, the Fossil Fuel Defendants conspired to suppress these technologies and preserve gasoline's dominance in the U.S., and by inclusion the Michigan, transportation energy market.

89.     Starting in the early 1980s, the Fossil Fuel Defendants halted internal research on advanced battery chemistries and hybrid electric motors, withheld market-ready prototypes, and wielded intellectual property rights not defensively but as weapons to stifle innovators with patent litigation.  In recent decades, the Fossil Fuel Defendants have coordinated to suppress the buildout of EV charging infrastructure at their own branded retail locations and elsewhere.  These anticompetitive practices suppressed innovation and output in transportation energy markets, prolonging consumer reliance on gasoline.  In Michigan—where residents depend heavily on personal vehicles and face some of the Midwest's highest fuel prices—these delays caused substantial harm by inflating costs and restricting access to cleaner alternatives with fewer negative externalities.

1.      **Defendants and Other Cartel Members Suppressed EV Battery and Engine Technologies.**

90.     Beginning in the 1970s, Exxon and companies later acquired by Chevron (among other Co-Conspirators) were early developers of key EV technologies, including lithium and nickel-metal hydride batteries and hybrid gas-electric motors.  But instead of advancing these innovations to compete on the merits, they deliberately delayed their development—strategically curtailing breakthroughs that could have enabled EVs to scale up decades earlier.  Through a series of coordinated acts, the Fossil Fuel Defendants deliberately delayed or suppressed the development of key EV technologies—conduct that, if performed independently, would not have been economically rational.

### a.    Exxon's Decision to Kill Its Innovative Battery Programs and Withhold Its Early Hybrid Engine Prototype from Market.

91.    For decades, in coordination with other cartel members, Exxon deliberately restricted the implementation and availability of breakthrough technologies in order to preserve fossil fuel dominance in the transportation energy market.

92.    In 1972, Exxon scientists invented the lithium battery, a foundational technology for today's EVs and distributed solar systems that generate clean electricity at the point of use (*e.g.*, for at-home EV charging).  Recognizing the potential for such large-scale applications, Exxon began developing lithium batteries for the mobile energy storage technologies of the future.

93.    In 1977, Exxon obtained a patent for an electric battery involving graphite, which had potential for EV-applications.

94.    In the late 1970s, Exxon also developed the first hybrid gas-electric vehicle technologies.  Most significantly, in 1978 Exxon publicly showcased its Electrocharger prototype—an electric motor integrated into a hybrid gas-electric propulsion system, installed in a Chrysler Cordoba—explaining in a brochure that the technology "is not in developmental stages:  it is ready now.  The prototype has been engineered, tested, driven, proven."  The brochure also highlighted the innovative prototype's fuel efficiency gains relative to gasoline-only drivetrains:

> This proven prototype makes all the promise of the theoretical full-sized hybrid a driving reality.  The most power-hungry driving conditions are taken in stride.  Yet . . . fuel economy is 50 to 100 percent better than conventional vehicles.  That means federal fuel

economy standards for 1985—and beyond—can be met if production planning begins now.[21]

95. In 1979, Exxon partnered with Toyota to develop a hybrid gas-electric vehicle using a Toyota Cressida chassis. By 1981, they delivered a fully functional prototype, proving hybrid propulsion technology was road-ready sixteen years before Toyota released its Prius in 1997.

96. But Exxon never marketed that innovative hybrid engine technology and consistently has deferred meaningful investment in its lithium-ion and graphite-based battery technologies for EVs. Instead, just months after Exxon delivered the first hybrid vehicle prototype in 1981, Lee Raymond—who eventually led Exxon—took control of Exxon Enterprises Inc. (the company manufacturing the hybrid prototype) and abruptly hit the brakes on these EV and clean energy technology research and development programs. This shift coincided with Exxon's role in initiating the cartel, just shortly after its internal research in 1979 predicted that renewable energy would increasingly become a competitive threat to fossil fuels.

97. Even after hybrid vehicles entered the market, Exxon has continued to suppress the advancement of technologies that would accelerate EV adoption. For example, in 2007 Exxon announced that it had developed a new battery film separator technology that would "make the next generation of hybrid and electric

---

[21] *America Wants a Big Car*, Exxon (1978), available at https://perma.cc/D38T-MTUT (created on Jul. 22, 2025).

vehicles possible." In 2009, Exxon announced a partnership with EV battery supplier Electrovaya to produce the Maya 300, a prototype EV utilizing that technology. But rather than developing the prototype to market, Exxon abandoned the project when it encountered some resolvable regulatory speedbumps. After quickly extinguishing this flash in the pan before capitalizing on the investment, Exxon has not pursued any other EV partnerships.

b.     **Chevron's Decision to Kill Its Innovative NiMH Rechargeable Battery Program and Weaponize Key NiMH Patents to Stifle EV Development.**

98.     Armed with Exxon's competitively sensitive information regarding the competitive pressures on fossil fuels, in the 1990s and 2000s, Chevron also took steps to suppress or delay a critical EV and battery technology. Specifically, Chevron blocked the commercialization of nickel-metal hydride (NiMH) rechargeable batteries—another vital technology for EVs—by acquiring patents merely to restrict the use of NiMH in automobiles (a tactic known as "capture-and-kill").

99.     Invented by Stanford Ovshinsky in the late 1970s, NiMH batteries offered high energy density and rechargeability, making them one of the first commercially viable battery technologies for EVs.[22] In 1994, General Motors acquired a 60% stake in a joint venture with Ovshinsky's Ovonics Battery

---

[22] NiMH batteries had higher energy density than earlier chemistries and, at the time, had already been proven capable of powering full-size passenger vehicles like the GM EV1 and the first-generation Toyota RAV4 EV.

Company, securing key patents for large-format NiMH battery packs suitable for EVs. In October 2000, Texaco acquired General Motors' stake in the joint venture, and six days later Chevron announced its $100 billion acquisition of Texaco, gaining control over approximately 125 NiMH patents. In one patent, Chevron described the batteries as "the ideal battery [for EVs], hybrid vehicles, and other forms of vehicular propulsion."[23]

100. Chevron worked to effectively block major automakers from acquiring and utilizing NiMH batteries. For example, Toyota brought the Prius to market in 1997 and released the RAV4 EV, which was initially available only for fleets, in 1998. The RAV4 EV, which contained a NiMH battery, was slated to be commercially available to consumers in 2001. In March 2001, however, Chevron moved to suppress the threat of an electric alternative to the gasoline-powered vehicles that had long been driving the core of Chevron's transportation energy business. Chevron—through its Ovonics battery company subsidiary—filed a patent infringement suit against Toyota and Panasonic for their use of large-format NiMH batteries in the RAV4 EV. A 2004 settlement restricted Toyota from selling certain NiMH batteries in commercial quantities in North America until June 2010, significantly delaying the proliferation of EVs in the U.S. At least in part due to Chevron's anticompetitive conduct, no new NiMH-based fully electric vehicle was offered in the United States until the Chevron-controlled patents expired.

---

[23] U.S. Patent No. 6,969,567 B1 (filed Nov. 6, 2000).

101.    Chevron worked to effectively block major automakers from acquiring

NiMH batteries.  In 2003, Chevron restructured the Ovonics joint venture as

Cobasys LLC.  Chevron exercised nearly total control over Cobasys.  Chevron

granted Cobasys worldwide exclusive rights to NiMH patents while retaining veto

power over any sale or licensing decisions and reserving rights to seize the

intellectual property if Cobasys stopped producing, marketing, and selling the

NiMH batteries in the way Chevron required.  Chevron-controlled Cobasys imposed

restrictive sales policies requiring buyers to commit to orders exceeding 10,000

units of the NiMH batteries.  At the time, Toyota only had 825 RAV4 EVs—fewer

than 9% of the minimum order threshold.  Cobasys' sales policies had the effect of

prohibiting companies like Toyota from reasonably committing to such a large

minimum order quantity and excluding smaller companies from access altogether.

Chevron, through Cobasys, foreclosed access to NiMH batteries for automotive use,

and as a result, Cobasys ceased manufacturing or licensing such batteries.

102.    Journalist Sherry Boschert exposed these details in her 2007 book,

suggesting that Chevron had deliberately acquired and used NiMH patent licenses

in order to "squelch[] access to large NiMH batteries" and preserve the dominance of

gasoline-powered vehicles.

103.    In October 2007, Chevron and its NiMH subsidiaries faced lawsuits

over their refusal to perform under a contract to supply NiMH batteries to various

companies for use in the InnoVan—an electric delivery vehicle then under

development.  The parties settled in June 2008.

104. Similarly, Mercedes-Benz sued Chevron in 2008 after Cobasys failed to deliver promised NiMH battery packs for the then-in-development ML-450 hybrid SUV. The suit revealed that Chevron had cut off funding to Cobasys, leaving it unable to supply the promised batteries.

105. Although Chevron sold Cobasys in 2009, it retained control over key patents until their expiration in 2020, suppressing for almost two decades the widespread deployment of one of the most commercially mature battery systems available for vehicle electrification at the time.

106. In a 2008 interview, Stanford Ovshinsky reflected on why the NiMH battery technology he invented never reached its full commercial potential: **"[We] made the mistake of having a joint venture with an oil company, frankly speaking. And I think it's not a good idea to go into business with somebody whose strategies would put you out of business, rather than building the business."** His statement underscores the extent to which Chevron's role in the Cobasys joint venture served to restrain further development of the NiMH technology.

### c. ConocoPhillips Abandons Key EV Battery Patents.

107. Cartel Co-Conspirator ConocoPhillips has also followed this familiar playbook of acquiring but not marketing renewable energy technologies. For example, in 2008 ConocoPhillips filed two U.S. patent applications for key EV battery technologies related to "lithium powders" for EV batteries, which it claimed "would inherently improve the electric efficiency of [EVs]." However, the company

46

abandoned those patents in 2013 and 2014, instead deciding to prioritize the production of traditional fossil fuels, in furtherance of the conspiracy. Indeed, the company brazenly stated that even if EVs proliferated, it would continue to focus only on providing oil and natural gas for the underlying electricity.

108. Similarly, in 2011, ConocoPhillips announced a joint venture with plans to invest $300 million in emerging energy technologies, including by partnering with an EV technology company. But in 2014—the same year the Fossil Fuel Defendants' CEOs formed OGCI—the joint venture ended, with fewer deals made than anticipated and no word on how much was actually invested.

109. Also in 2011, rather than developing EV technologies to market, ConocoPhillips began testing vehicles powered with propane (a fossil fuel that emits harmful GHGs, much like gasoline). And in 2015, shortly after abandoning its EV technology patents and partnerships, ConocoPhillips announced that it would begin converting its fleet of trucks from gasoline- to propane-powered engines.

110. In ConocoPhillips's 2024 sustainability report, in which the company analyzed how "accelerated" EV market penetration could impact oil and gas demand, it projected a six percent decline in oil and gas demand by 2050. Seeking to suppress that competitive pressure, ConocoPhillips has chosen instead to continue suppressing EV demand so that the company might "expand fossil fuel production . . . by four to five percent per year through 2032."[24]

---

[24] David Tong & Kelly Trout et al., *Big Oil Reality Check: Aligned in Failure*, OIL CHANGE INTERNATIONAL (May 2024), available at https://perma.cc/5ZAF-PEE7 (created on Dec. 12, 2025).

### 2. Defendants Have Coordinated to Restrain the Buildout of Charging Infrastructure Needed to Substitute Electricity for Gasoline at Scale.

111. Public charging infrastructure is essential for long-distance EV travel and thus for widespread EV adoption. Defendants understood that without such infrastructure, electricity could not meaningfully compete with gasoline in the U.S., and by inclusion the Michigan, transportation energy market. Since at least the 1980s, Defendants have conspired to withhold investment in charging networks and limited the ability of other market entrants to develop them, while coordinating to prioritize investments in fossil fuel infrastructure such as new fueling stations and refinery upgrades. This conduct has raised consumer switching costs, delayed EV adoption, and preserved gasoline's dominance.

112. Exxon acquired patents critical for developing accessible public charging networks but deliberately refrained from using them. For example, in 2005, Exxon filed a U.S. patent application for a "[s]ervice station for serving requirements of multiple vehicle technologies," including "an electric battery recharging system for recharging the batteries of electric driven vehicles."[25] Exxon was granted the patent in 2009 but did not develop any such charging stations, and the patent lapsed in 2021 due to nonpayment of fees. A similar Japanese patent, granted to Exxon in 2012, remains unused and is set to lapse in 2026.

---

[25] U.S. Patent No. 7,523,770 B2 (filed Dec. 12, 2005) available at https://perma.cc/YVA8-52JB (created on Dec. 12, 2025).

113.     Despite holding these patents, Exxon executives have repeatedly disclaimed interest in EV technology.  In 2019, Exxon CEO Darren Woods stated he "doesn't get the point" of EVs,[26] and in 2023, Matthew Crocker, Senior Vice President of Product, Strategy, and New Assets for Exxon's low-carbon solutions business, confirmed Exxon had no plans to invest in charging stations:  "If we were building them we wouldn't be able to bring our unique capabilities into that space."[27]  As of the filing of this Complaint, Exxon continues to refrain from investments in EV charging infrastructure and does not operate any EV charging stations in Michigan.

114.     Other Fossil Fuel Defendants employed a nearly identical strategy in coordination with Exxon.

115.     For example, Chevron announced investments in and partnerships with EV charging companies such as ChargePoint (2018), EVgo (2019), and FreeWire (2022–2024) but never implemented any meaningful expansion of EV charging at its retail gas stations.  Chevron's 2024 corporate sustainability report omitted any reference to EVs or EV charging infrastructure, and the company does not operate any EV charging stations in Michigan.

---

[26] Bridie Schmidt, *Exxon Boss Says He Doesn't Get the Point of Electric Vehicles*, THE DRIVEN (Sept. 25, 2019), available at https://perma.cc/9C74-C67N (created on Dec. 12, 2025).

[27] Nia Williams, *Exxon Working on Direct Air Capture of CO2, Stays out of EV Charging Stations*, REUTERS (Sept. 19, 2023), available at https://perma.cc/A6VT-KA5B (created on Dec. 12, 2025).

116. Shell has likewise delayed EV charger deployment in the United States—a fact that is especially notable when compared with its aggressive expansion overseas. Shell began installing charging stations in the UK and the Netherlands in September 2017. In October 2017, it acquired NewMotion—"Europe's largest electric charging partner with over 30,000 charging points and 80,000 electric car owners using their network"—and the next month it announced a partnership with IONITY to bring EV charging stations to Shell gas stations in Europe. It was not until two years later that Shell opened its first EV charging station in the United States. In 2023, Shell bought Volta Charging, which had a network of 3,000 chargers in the United States—only to dismantle Volta's network in 2025. As of December 2024, Shell operated about 73,000 public chargers globally but only roughly 3,000 in the United States and 20 in Michigan.

117. BP has similarly refused to integrate EV charging at its retail sites in the United States. It operates only 395 charging stalls nationwide and none in Michigan. In February 2025, BP announced it would limit new charging investment to just a few geographic markets and, two months later, cut more than 10% of its global EV-charging workforce.

118. The Fossil Fuel Defendants' collective refusal to embrace growing demand for electricity as fuel by selling it at their branded retail gas stations is contrary to their independent competitive interests: for a long time, each has been well positioned to supply electricity as fuel that more and more consumers are demanding. And that electricity as fuel in Michigan comes largely from Defendants'

50

natural gas in the primary energy market, further enhancing the Fossil Fuel Defendants' economic motivation to embrace it. However, the Fossil Fuel Defendants understood that new entrants in the primary and transportation energy markets would place competitive pressure on the dominance of fossil fuels and reduce the Fossil Fuel Defendants' share of these markets. Accordingly, rather than compete in the primary and transportation energy markets, Defendants coordinated to stifle competition and suppress the supply of electricity as fuel by jointly declining to supply it. In the structurally concentrated U.S. and Michigan transportation energy markets, Defendants had both motive and opportunity to coordinate. Their actions are best understood not as individual responses to market forces, but as mutually reinforcing steps in a coordinated campaign to suppress competition and delay the transition away from gasoline.

119. By jointly declining to build EV charging networks and coordinating through trade associations and other forums to restrain charging infrastructure, the Fossil Fuel Defendants restricted the buildout necessary for electricity to compete with gasoline on equal footing. This market-wide restraint on the availability of electricity as fuel suppressed consumer switching, prolonged fossil fuel dependence, and artificially inflated gasoline demand and prices, forcing Michigan consumers to pay more than they would have in a competitive market where electricity could scale as a viable alternative.

**B. Defendants Have Conspired to Suppress Output of and Demand for Renewable Alternatives to Fossil Fuels in the Primary Energy Market.**

120.    Defendants' coordinated conduct to suppress competition in the market for transportation energy was part of their broader goal to restrain demand for renewable energy and restrain competition in the primary energy market. Accordingly, while Defendants acted to prevent competition from electricity in the transportation energy market, they concurrently conspired to suppress renewable energy from competing in the primary energy market. Defendants deployed a variety of strategies to further the conspiracy:  suppressing solar panel technology and coordinating investments to foreclose renewables from competing in the primary energy market; deceptive marketing campaigns; infiltrating and knowingly misdirecting educational and information-producing institutions; and using hackers to surveil and intimidate watchdogs, advocates, and attorneys general.

121.    Defendants' conduct in each of these categories had downstream anticompetitive effects in each end-use sector, including those for transportation energy and for home heating.

**1.    Defendants Have Acted in Concert to Suppress the Development and Deployment of Technologies for Solar Energy to Compete in the Primary Energy Market.**

122.    In the early 1970s, Exxon and predecessors of Chevron and BP began investing in solar technologies, gaining control over promising innovations before the technology matured.  But rather than develop these technologies to scale,

Defendants suppressed them as part of their broader effort to prevent renewable energy from competing with fossil fuels.

123. Solar energy refers to electricity generated from sunlight using photovoltaic technology. Solar energy is clean and scalable, and it does not impose the negative externalities on users or the State that fossil fuel use does. Under competitive conditions, solar would displace fossil fuel demand across end-use sectors, including in the transportation energy sector: Utility-scale solar farms would erode fossil fuels' dominant share of grid electricity, and consumers would increasingly seek to generate electricity at home—enabling them to power (and heat) not just their houses but also their EVs at an unprecedentedly low cost per kilowatt-hour and with renewable energy.

124. During the 1970s, the Fossil Fuel Defendants acquired or established leading U.S. solar companies and secured control over key photovoltaic innovations before a competitive market could develop. In 1969, Exxon established Solar Power Corporation—one of the first U.S. manufacturers of photovoltaic cells, which introduced these cells commercially in 1973—and launched ambitious internal research programs to improve solar cell efficiency and performance. Just one year later, in 1974, Exxon established a subsidiary called Daystar to manufacture and sell solar collectors. Also in 1974, Mobil (later acquired by Exxon) formed a joint venture with Tyco Laboratories to develop ribbon-silicon photovoltaic cells, which eventually cut solar panel manufacturing costs in half. In 1977, ARCO (later acquired by BP) bought start-up Solar Technology International and rebranded it as

ARCO Solar, which became the world's largest producer of photovoltaic modules by market share. In 1979, Shell entered the solar market, and Amoco (later acquired by BP) purchased a controlling stake in Solarex—a start-up profiled by the *New York Times* as one of America's top innovators, alongside Apple—gaining control of key patents for amorphous silicon solar-cell technology (then regarded as the future of photovoltaics). In 1981, BP formed BP Solar, which became a wholly owned subsidiary several years later and by 1994 controlled nearly 10% of the global photovoltaic market.

125.    By the early 1980s, oil companies dominated the U.S. solar market, controlling approximately 70% of U.S. solar module sales (which accounted for 85% of global supply).

126.    Despite their technical expertise and resources, the Fossil Fuel Defendants acted in concert to dismantle their solar operations and used litigation to deter new market entrants. This coordinated retreat and restraint began shortly after Defendants formed the cartel in 1979. For example, in 1981, Exxon sold off Daystar but was accused of at least initially refusing to transfer its proprietary technology after the deal was signed. By 1984, Exxon had fully exited solar by selling off all its ventures without attempting commercialization. And in 1994, Mobil (later acquired by Exxon) sold its ventures controlling advanced ribbon-silicon solar-cell technologies to a German company, which remains a global leader of the solar industry to this day.

127.    Amoco (later acquired by BP), for its part, used a capture-and-kill approach, deploying its amorphous silicon patents not for development but as tools to stifle other innovators' investments in and commercialization of next-generation solar technologies.  For example, just one year after ARCO Solar built the first utility-scale solar facility and launched the first commercial thin film photovoltaic module in 1986, Amoco used patent litigation to end ARCO's efforts on both fronts. Amoco's patent litigation, which was aimed at suppressing competition and stifling new technology, "contributed to the slow progress in what was a very promising technology."[28]  As a result, and without opportunities to further develop and market key technologies, ARCO was forced to sell ARCO Solar in 1990.  Amoco's lawsuit against ARCO was not an isolated instance:  In 1993, Amoco brought a similar patent suit against United Solar, a smaller start-up working to improve the efficiency of amorphous silicon solar cells.

128.    Similarly, although in the late 1990s BP gained control of Amoco (and, with it, Solarex), it was not long until BP began restricting Solarex's business—as well as BP's other solar programs (which had in the 1980s dominated the solar industry)—by closing plants and selling off assets.  In 2011, BP shut down BP Solarex and exited the solar business altogether.

129.    Likewise, in 2006, Shell—which, for a time, had been the world's fourth largest solar panel manufacturer—abandoned solar manufacturing and sold

---

[28] Shu Sun, *Funding Breakthrough Technology, Case Summary: Photovoltaics*, CAMBRIDGE INTEGRATED KNOWLEDGE CENTER, at 18 (2023), available at https://perma.cc/EZ49-RCRW (created on Dec. 12, 2025).

Shell Solar. Three years later, in 2009, Shell divested of solar entirely, with Shell's head of gas and power brazenly stating "[w]e do not expect material amounts of investment in [wind and solar] going forward."[29]

130. Finally, Chevron irrationally divested of solar companies and investments in 2014, even though they were greatly outperforming the solar profit targets. The timing of this 2014 exit coincided with the Fossil Fuel Defendants' CEOs' formation of OGCI, a joint initiative of Defendants aimed at limiting investments in renewable energy and low-carbon technologies.

131. These coordinated actions confirmed what was apparent to legal scholars as early as 1981: Oil companies acquired solar patents not to develop them, but to suppress disruptive alternatives until fossil fuel assets were fully monetized. This suppression delayed an integrated renewable energy ecosystem that could have reduced Michigan consumers' reliance on gasoline while providing cleaner alternatives at lower costs—a delay that continues to distort markets today.

## 2. Defendants Have Openly Coordinated to Divert "Green" Capital Away from Renewable Energy and Toward Initiatives that Entrench Fossil Fuels.

132. As of 2025, Defendants and their Co-Conspirators are continuing to forestall the development of competing renewable alternatives in the primary and transportation energy markets by collectively diverting investment away from clean primary and transportation energy. In recent years, Defendants have coordinated

---

[29] Tom Bergin, *Shell Goes Cold on Wind, Solar, Hydrogen Energy*, REUTERS (Mar. 17, 2009), available at https://perma.cc/3U8T-MMVP (created on Dec. 12, 2025).

to underfund renewable energy initiatives and instead channel "green" funding toward "low-carbon" projects that, in fact, perpetuate fossil fuel production. This coordination—openly facilitated through OGCI—has restrained the development and scaling of renewable energy alternatives while entrenching fossil fuels in energy markets, including in the markets for primary and transportation energy.

133. This strategy goes back to the 2010s. Between 2010 and 2018, each of the Fossil Fuel Defendants invested fewer than 2.4% of their total average annual capital expenditures in "low-carbon" technologies—which they broadly define to include carbon capture, even though that technology exists solely to bolster fossil fuel production—with Chevron at a mere 0.23% and Exxon at a similarly miniscule 0.22%. These miniscule levels of investment were a part of a coordinated strategy implemented by Defendants.

134. In or around 2014, the Fossil Fuel Defendants and their Co-Conspirators created OGCI to facilitate and reinforce their agreement to curtail investment in renewable energy. OGCI's members—the largest energy companies in the world, including the Fossil Fuel Defendants—publicly pledged to support the goals of the Paris Agreement. But behind that façade they privately conspired to cap renewable energy investments and divert that capital instead toward entrenching fossil fuel's dominance.

135. In November 2016, OGCI formed Climate Investments to manage funds in which OGCI members invest—reportedly, its first fund (launched in 2016 with more than $1 billion in assets) is comprised of equal investments by each of

57

OGCI's twelve member companies. This fund allocated no money toward renewables, instead focusing on natural gas and carbon capture (including investments that enrich OGCI members' own projects).

136. When Climate Investments directs funds toward a technology, OGCI members often—on top of investing in that technology via the fund—independently invest in and deploy that technology. For example, regarding natural gas (which is a fossil fuel responsible for substantial GHG emissions), Exxon announced plans in January 2023 to build "the largest low-carbon hydrogen project in the world"—specifically, a facility that will "produce up to 1 billion cubic feet per day of [blue] hydrogen made from natural gas" (rather than "green hydrogen" made from renewable energy sources).[30] Exxon additionally highlighted that this massive plant for making natural-gas-based hydrogen would include a carbon capture system.

137. Carbon capture, use, and storage ("CCUS") technologies make it possible to collect some GHGs at the source of combustion (*e.g.*, smokestacks). But the volume of GHGs captured are vanishingly small. Moreover, CCUS facilities are known to leak GHGs after capture, and they cannot remove or reduce the level of GHGs already in the atmosphere. Although Defendants publicly describe CCUS as key to the renewable energy transition, in private they have acknowledged that

---

[30] Darren W. Woods, *Low-Carbon Hydrogen: Fueling Our Baytown Facilities and Our Net-Zero Ambition*, EXXONMOBIL (Jan. 30, 2023), available at https://perma.cc/4U5A-2GMZ (created on Dec. 12, 2025).

CCUS merely serves to "extend[] the use of fossil fuels."[31]  An estimated 80% of the $CO_2$ collected by CCUS is used for "enhanced oil recovery"—meaning it is injected into underground oil reservoirs to boost oil and gas production from wells.  As a former Exxon scientist explains:  "[CCUS] is, at its core, a technology for producing more oil."  An internal API document admits CCUS "enables the use of petroleum and natural gas" while appearing to "lower the carbon profile [of] oil and gas production."[32]  Independent experts (including the International Energy Agency) have repeatedly warned that Defendants' promotion of CCUS as a climate solution is not only exaggerated, but affirmatively misleading.

138.  As with natural gas, the Fossil Fuel Defendants' coordinated investments in CCUS have skyrocketed over the past decade.  Eleven of Climate Investments' thirty-six investments are focused on CCUS.  In 2022, the amount of money invested in CCUS grew to almost three times the amount from the previous year.  And in August 2023, Climate Investments began raising another fund, which reportedly would direct $350 million toward technologies including CCUS.

139.  Following OGCI's lead, the Fossil Fuel Defendants have invested heavily in CCUS.  A BP memo authored in 2020 and made public in 2022 shows that despite "concerns" about CCUS' climate consequences, BP viewed CCUS as "needed to compete with continued advances being made in renewable energy

---

[31] Memorandum, *GoM Possible Hot Topics and Issues*, BP (2020), at 45697, available at https://perma.cc/8BWF-U5LY (created on Dec. 12, 2025).
[32] Memorandum, *Carbon Capture, Use, and Storage (CCUS)*, API, available at https://perma.cc/F788-5MGQ (created on Dec. 12, 2025).

sources and energy storage."[33]  And Chevron and Exxon are targeting $10 billion

and $20 billion investments, respectively, toward CCUS and related technologies for

facilities along the Gulf Coast alone.

140.    OGCI actively coordinates these efforts.  The same BP memo that

became public in 2022 reveals how the Fossil Fuel Defendants have been actively

working together to advance CCUS through OGCI and the Energy Advance Center.

In 2023, OGCI issued a public statement noting that although CCUS had struggled

in earlier years due to the declining cost of renewables, industry collaboration was

essential to reestablishing its role (and, by extension, the future of fossil fuels) in

the energy market.  To bolster industry collaboration around CCUS as an

alternative to substituting fossil fuels with renewable energy, OGCI has a CCUS

KickStarter Initiative to help companies combine to set up interconnected regional

CCUS hubs using shared infrastructure and publishes a playbook with guidance for

collaboratively starting a CCUS hub.  Many of those hubs are joint ventures, such

as the Northern Lights CCUS hub that includes Shell as one of its investors.

141.    Even beyond CCUS and natural gas, OGCI facilitates coordination

among purported competitors by providing infrastructure for sharing information.

In June 2025, OGCI's secretariat wrote about how the fossil fuel industry benefits

from the transparency created through OGCI's collection and circulation of data on

members' investments and emissions.  Defendants also used OGCI to establish the

Oil and Gas Decarbonization Charter, which further facilitates coordination

---

[33] BP, *supra* note 31, at 45697.

through its Collaborate & Share Program by "disseminating solutions, promoting peer-to-peer collaboration[,] and encouraging the adoption of best practices."

142. As Defendants have increased investments in fossil fuel-enabling technologies, they have simultaneously restricted investments in renewable energy technologies.

143. In 2023, so-called "low-carbon" investments accounted for only 4% of total capital expenditures across the entire energy market. Chevron allocated 4% toward such investments; BP 4.5%; Exxon 6%; and Shell 11%. Even these low figures overstate Defendants' investments in truly clean (*i.e.*, renewable) energy technologies, as much of those "low-carbon" investments were directed toward CCUS. This coordinated restraint and suppression of clean energy investments curbs substitution away from fossil fuels in the primary and transportation energy markets and preserves Defendants' pricing power.

144. Since 2022, the Fossil Fuel Defendants have escalated their investment diversion strategy by defunding or shutting down many of their remaining renewable energy initiatives. For example, in March 2024, Shell scaled back its 2030 emissions targets, explaining it would focus more on CCUS and carbon offsets. In January 2025, BP significantly reduced or removed various emissions-reduction targets and abandoned its goal of growing renewable generation capacity twentyfold by 2030. BP also cut its budget for renewables by $5 billion while increasing annual fossil fuel investments to $10 billion. This increased investment in fossil fuels will enable BP to produce 2.4 million barrels of oil per day

by 2030.  These moves are consistent with BP's comments to investors and the public that the company would "decapitalise the low carbon space."[34]

145.    Exxon and Chevron are likewise increasing investments in and projecting increased output of fossil fuel energy, while avoiding investments in renewables and related technologies.  At an industry event in 2023, Chevron CEO Mike Wirth "unapologetically" defended the company's decision to invest billions in fossil fuels while pulling out of wind and solar entirely.  Similarly, Exxon CEO Darren Woods stated in September 2025:  "We don't do wind and solar."[35]

146.    The Fossil Fuel Defendants' escalated divestments from renewable energy since 2023 (starting when industry investment in CCUS was skyrocketing) have taken diverse forms.  Regarding wind, for example, in 2024, BP announced plans to divest ten U.S.-based onshore wind assets and spin off all its offshore wind projects worldwide into a joint venture.  In 2024, Shell largely halted new offshore wind investments, and in 2025 it sold existing offshore and onshore wind projects.

147.    With respect to solar, a BP subsidiary called Lightsource bp sold two major U.S.-based solar projects in August 2024.  Then, in March 2025, it announced plans to sell half its remaining assets.  That same month, Shell divested solar projects in Brazil.

---

[34] *BP 2025 Capital Markets Update: Webcast Q&A Transcript*, BP, at 12 (Feb. 26, 2025), available at https://perma.cc/X6HJ-D4DX (created on Dec. 12, 2025).
[35] Kevin Crowley, *Exxon CEO Says New Form of Graphite Boosts EV Battery Life, Extends Range*, MINING.COM (Sept. 12, 2025), available at https://perma.cc/DDW2-2KVM (created on Dec. 12, 2025).

148. Likewise, regarding algae biofuels, in 2023, Exxon shut down its biofuel research program after spending just over half its planned commitment— less than 1% of its overall capital investments. In 2024, Shell paused construction on a biofuels plant in Rotterdam in the Netherlands. Chevron and BP likewise abandoned biofuels investments around the same time.

149. By aligning their investment strategies—including by using OGCI as a forum to jointly steer capital—the Defendants have collaboratively diverted resources away from renewables and toward natural gas and CCUS so as to entrench the role of fossil fuels in the energy market and restrict the natural growth of renewable energy output. Demand and output for renewables would have grown substantially more, and more rapidly, absent Defendants' coordination. Defendants' alignment reflects more than shared advocacy; it reflects Defendants' sharing of competitively sensitive information and their coordination to reduce competition in energy markets, including in the U.S. and Michigan markets for primary energy and transportation energy. Defendants have dramatically delayed the availability of EVs, made 100% clean charging stations a rarity, suppressed the advancement of solar technology and its uptake by consumers, and prolonged fossil fuels' dominance in mixed-source electricity generation. Defendants have not only suppressed the rate of substitution among primary and transportation energy products but also inflated prices for those products. As a result, Defendants have dramatically delayed the availability of renewable energy for the primary energy

market and the built environment.  Consumers in Michigan have been overcharged for primary and transportation energy for years because of Defendants' conduct.

### 3. Defendants Have Acted in Concert to Deceive Consumers and Thereby Suppress Demand for Renewable Energy.

150.  Defendants and their Co-Conspirators have orchestrated decades-long campaigns of deception to manufacture continued dependence on fossil fuels and suppress demand for renewable energy alternatives.  They initially deceived the public by concealing their knowledge about the harms of their fossil fuel products.  Next, Defendants launched affirmative disinformation campaigns to sow doubt about climate science and the role of fossil fuels in causing negative externalities.  Recently, and continuing to this day, Defendants have misleadingly portrayed their companies and fossil fuel products as part of the climate change solution in an effort to distract from their products' roles in driving climate change and other negative externalities.  Although Defendants were competitors in the market, they collaborated on these campaigns to stifle public knowledge about the existential harms of their products.  Collectively, these efforts were maintained to maximize sales and profit from fossil fuel consumption and delay the transition to renewable energy substitutes.

151.  By the late 1980s, climate change was becoming an increasingly prominent concern in the public arena.  Defendants realized that accurate public understanding of the negative externalities posed by fossil fuel use would threaten their assets and business models.  Defendants and their Co-Conspirators shifted

from internally researching these harms to launching a coordinated campaign to deceive consumers about the existential externalities of fossil fuels in order to perpetuate continued demand for fossil fuels and thereby suppress demand for renewable energy (both in primary energy and end-use markets like transportation) and for technologies like batteries and EVs that would accelerate substitution of electricity for gasoline in the transportation energy market.

152. An internal Exxon memo from 1988 confirms Exxon's "leadership through API" of this deceptive marketing campaign. The memo—which acknowledged fossil fuels' greenhouse effect, but nevertheless expressly declined to modify Exxon's forecasts to account for possible changes in fossil fuel demand—suggested that API promote the "Exxon Position" and direct the industry to (1) "Emphasize the uncertainty in scientific conclusions regarding the potential enhanced greenhouse effect"; and (2) "Resist the overstatement and sensationaliz[ing] of potential greenhouse effect which could lead to noneconomic development of nonfossil fuel resources."[36]

153. One year later, Defendants and Co-Conspirators formed the Global Climate Coalition (GCC), which they used for more than a decade to coordinate their campaign of anticompetitive deception. The GCC's membership included not only all Fossil Fuel Defendants and/or their predecessors, but also influential trade associations like founding member API, which enabled Defendants to pool resources

---

[36] Memorandum from Joseph M. Carlson, *The Greenhouse Effect* (Aug. 3, 1988), available at https://perma.cc/4CSM-6NCB (created on Dec. 12, 2025).

and amplify disinformation while maintaining deniability.  Through GCC leadership roles, Defendants exercised operational control over GCC's and related front groups' activities—directing priorities and supervising the dissemination of deceptive materials.

154.    In or around 1992, GCC retained a public relations firm and in less than a year secured more than 500 media placements pushing deceptive narratives. By 1995, the public relations firm boasted that GCC had "successfully turned the tide on press coverage of global climate change science, effectively countering the eco-catastrophe message and asserting the lack of scientific consensus on global warming."[37]

155.    Around that same time, GCC affiliates published deceptive educational materials, including a video using interviews with Department of Agriculture scientists to falsely suggest carbon pollution would improve agricultural yields, where the interviews had been edited to omit the scientists' statements contradicting the cartel's false message.  Distributed widely in schools, these materials misled children during a formative period of public opinion development.

156.    In addition, industry-funded astroturf groups like the Information Council for the Environment (ICE) disseminated false advertising and junk science under the guise of independent commentary.  ICE's internal documents explicitly stated its goal was to "[r]eposition global warming as theory (not fact)."  Its

---

[37] Jane McMullen, *The Audacious PR Plot That Seeded Doubt About Climate Change*, BBC (July 22, 2022), available at https://perma.cc/G8HF-CCGS (created on Dec. 12, 2025).

campaigns included newspaper ads falsely proclaiming, "Doomsday is cancelled," and asking, "Who told you the earth was warming . . . Chicken Little?" Both ads contradicted hard facts Exxon scientists had known for a decade, stating:

> There's no hard evidence [global warming] is occurring. In fact, evidence the Earth is warming is weak. Proof that carbon dioxide has been the primary cause is non-existent. Climate models cannot accurately predict far-future global change. And the underlying physics of the climatic change are still wide open to debate.

157. ICE also made its own "science advisory panel"—consisting of just three scientists, whom Defendants and their Co-Conspirators paid more than $1.5 million in current U.S. dollars in the 1980s and 1990s—to contradict the scientific consensus on global warming and Defendants' own internal research.

158. In 1996, API published "Reinventing Energy," a report funded by Defendants that falsely contradicted Exxon and API's own conclusions more than a decade earlier by claiming there was no evidence linking human activity to climate change and that "facts don't support the arguments for restraining oil use." The report included a chapter titled "Should we switch to alternative fuels?", which—just one year before the Prius brought EVs into the public eye—misrepresented EVs as dangerous and environmentally unhelpful, and portrayed any transition to clean energy as economically harmful. The report also sought to undercut the viability of renewable energy, claiming that "[d]espite the massive investment [in renewables from 1980 to 1992], energy production from these sources fell by nearly 10 percent by the end of that period." The report thus served both to deter consumer interest in alternatives and to reinforce Defendants' preferred myth that renewable energy could not scale—even though their failure to scale by that time was the result of

Defendants' own conspiracy to suppress renewable energy, which began just one year before the period in question—thereby distorting consumer perceptions at a critical moment when hybrid-electric vehicles were first entering the market.

159. In 1998, Defendants—through API—established the Global Climate Science Communications Team (GCSCT) to expand and formalize their climate deception efforts. The GCSCT included operatives from Exxon and Chevron, as well as front groups that had previously been used by the tobacco industry to muddy the science about cancer. GCSCT's stated goal was to redefine public understanding of climate science, declaring "victory" would be achieved when "average citizens" accept "uncertainties in climate science" as "conventional wisdom."[38]

160. Through API and GCSCT, the cartel launched another campaign to distort perceptions about fossil fuels and renewable energy. A GCSCT "Action Plan" detailed the strategy:

- "Develop and implement a national media relations program to inform the media about uncertainties in climate science to generate national, regional, and local media coverage on the scientific uncertainties";

- "Identify, recruit, and train a team of five independent scientists to participate in media outreach";

- "Produce . . . a steady stream of op-ed columns"; and

- "Develop a global climate science information kit for media including peer-reviewed papers that undercut the 'conventional wisdom' on climate science."[39]

---

[38] API Global Climate Science Communications Action Plan (April 3, 1998), *archived*, Inside Climate News, available at https://perma.cc/K6KZ-9E7S (created on Dec. 12, 2025).

[39] *Id.*

161.	Another key GCSCT tactic involved tampering with public education nationwide by developing "educational materials" and distributing them "through grassroots organizations" to embed industry messaging in children's classrooms and thereby mislead the next generation.[40]

162.	The Fossil Fuel Defendants also conducted their own independent deceptive advertising campaigns—in concert with those they implemented through trade organizations like API, ICE, GCC, and GCSCT—to suppress competition from renewable energy.  For example, by 2004 Exxon had placed at least thirty-six advertorials (sponsored advertisements designed to resemble editorial content) in major newspapers, including ones titled "Lies they tell our children" (1984), "Apocalypse No" (1993), "Science: what we know and don't know" (1997), and "Unsettled Science" (2000).  Professor Martin Hoffert—a physicist who conducted climate research as an Exxon consultant in the 1980s—testified before Congress in 2019 that the **"advertisements that Exxon ran in major newspapers raising doubt about climate change were contradicted by the scientific work we had done and continue to do.  Exxon was publicly promoting views that its own scientists knew were wrong**, and we knew that because we were the major group working on this."[41]  Approximately 80% of Exxon's pre-2004 advertorials disputed scientific consensus on fossil fuel-driven climate change.

---

[40] *Id.*

[41] *Examining the Oil Industry's Efforts to Suppress the Truth About Climate Change: Hearing Before the Subcomm. on C.R. and C.L. of the H. Oversight and Reform Comm.,* 116th Cong. (2019) (statement of Prof. Martin Hoffert), available at https://perma.cc/RV5V-TVVH (created on Dec. 12, 2025).

163. BP also deployed deceptive advertising to create and perpetuate doubt about climate science. In 1996, BP emphasized the uncertainties in climate science by claiming on their website that "[s]cientists admit they can't be sure that human activity is increasing global warming, let alone predict accurately the implications for the environment or for people."[42]

164. Additionally, throughout the 2010s Defendants and their Co-Conspirators funded and deployed front groups to spread climate disinformation and suppress renewable energy. Leaked slides from a 2014 Western States Petroleum Association ("WSPA") presentation reveal the cartel had already launched at least sixteen astroturf front groups to "educate consumers" about fossil fuels and renewables.

165. One of Defendants' many front groups was the George C. Marshall Institute, which the cartel used through API and otherwise for decades to disseminate sham science and economic analyses. In 2015, the Marshall Institute published a statement claiming that "the climate problem . . . is not real."[43] Shortly thereafter, it was shut down and rebranded as the $CO_2$ Coalition, which Defendants still fund to this day and use to disseminate junk science and marketing materials. For example, since at least 2022 Defendants have used the $CO_2$ Coalition to push a new disinformation narrative: that an energy transition from fossil fuels to

---

[42] *Climatic Change*, BP, available at https://perma.cc/3W8S-V5GH (created on Dec. 12, 2025).

[43] William O'Keefe, *Climate Radicalism*, George C. Marshall Inst. (Oct. 5, 2015), available at https://perma.cc/7W95-N3KJ (created on Jan. 15, 2026).

renewable energy would risk "energy poverty" and pose a threat to human health and safety.

166. Defendants have also promoted skepticism about clean energy alternatives, including anti-EV messaging. For example, in 2003, BP shared a quote via a newspaper ad in the USA Today that stated, "Electric cars won't happen overnight. There's got to be a way of making fuels cleaner."[44]

167. In an internal API email from 2018, the Director of Communications stated: "**Completed EV message testing and found that nearly 50 percent of the 73 percent who support EV subsidies are moveable.** Most effective messages include: 1) Taxpayers not being forced to pay more in taxes so someone else can buy an expensive vehicle; 2) Owners of EVs paying the same amount for electricity as everyone else; and 3) The government taking into account the environmental impact of the raw materials used in making electric cars."[45] API has published at least 15 blogs promoting anti-EV messaging, including messaging aligned with these themes. For example, a 2021 blog promoted internal combustion engine cars as 99% cleaner than vehicles in 1970, resulting in similar GHG emissions as other automobile powertrains; and claimed that a quick transition to

---

[44] BP Advertisement, USA Today (Dec. 9, 2003), available at https://perma.cc/P3M3-BT8S (created on Dec. 12, 2025).

[45] *Denial, Disinformation and Doublespeak: Big Oil's Evolving Efforts to Avoid Accountability for Climate Change: Hearing Before S. Comm. on the Budget*, 118th Cong. (2024) (Internal API Email, BPA_HCOR_00208358), available at https://perma.cc/8SW7-G5UF (created on Dec. 12, 2025).

EVs would impact Americans by increasing vehicle inequity, depleting roadway funds, and requiring every driver to pay for EV charging infrastructure.

168.  Defendants have shifted their strategies throughout the decades, adapting their messaging in response to growing public understanding of climate science—not based on scientific developments, but polling data and reputational risks.  While Defendants initially sought to deny and discredit climate science, Defendants later evolved their messaging to other sophisticated forms of deception: touting their own companies as part of the climate solution; promoting nonexistent or inadequate "low-carbon" solutions to entrench fossil fuel use and distract from renewable energy alternatives; shifting blame to the public and other actors while refusing to acknowledge their own part in contributing to the climate crisis; and promoting fossil fuels as inevitable and irreplaceable.

169.  Defendants intentionally greenwash their own brands and their fossil fuel products to maximize profit from fossil fuel consumption.  Greenwashing is designed to increase consumption by portraying positive but false representations of Defendants and their fossil fuel products, and by downplaying or concealing the role of Defendants' products in causing negative externalities including climate harms, rising insurance premiums, and depressed home values.  That false narrative drives brand loyalty and trust among consumers, alters consumer behavior, and thus increases consumption of fossil fuel products.  Defendants' greenwashing campaigns promote a misleading impression that they are actively engaged leaders in the fight against climate change, while in reality they have continued to focus

overwhelmingly on the fight to maximize their profits from fossil fuel production and extraction.

170.    For example, Defendants publicly claimed they were supportive of or operating consistently with the goals of the Paris Agreement.  Chevron's 2023 climate change resilience report states, "[w]e believe the future of energy is lower carbon, and we support the global ambitions of the Paris Agreement."[46]  BP has claimed that it is "[p]ursuing a strategy that is consistent with the Paris goals."[47]  And Exxon's 2020 Annual Report stated it "established new plans that are projected to be consistent with the goals of the Paris Agreement."[48]  Privately, however, Defendants viewed participation and support for the agreement as politically convenient, risk-free, and unburdened by the necessity of any meaningful corresponding action on their part.

171.    Defendants' professed support for the Paris Agreement is also directly contradicted by the fact that they are increasing oil and gas production.  Exxon's 2024 Corporate Plan Update aims to increase oil production, and its 2025 brief titled "Advancing Climate Solutions" espouses that increasing oil and gas production is necessary to alleviate global energy poverty.  Chevron produced record volumes of oil and gas in 2023 and has forecast increasing production each year

---

[46] Chevron, *Advancing Energy Progress: 2023 Climate Change Resilience Report*, at 5, available at https://perma.cc/JG5L-B25D (created on Jan. 14, 2026).

[47] BP, *Annual Report and Form 20-F 2024*, available at https://perma.cc/7J34-3PW5 (created on Dec. 12, 2025).

[48] ExxonMobil, *2020 Annual Report*, available at https://perma.cc/MZY7-T6FX (created on Dec. 12, 2025).

through 2027.  In its 2024 Annual Report, BP stated that it was "resetting" its strategy to "grow[] the upstream:  our oil and gas business."[49]  By misrepresenting their companies as responsible entities working to reduce the negative externalities associated with fossil fuel use, while simultaneously increasing fossil fuel production that exacerbates those harms, Defendants continue to downplay their role in causing these negative externalities.

172.    Defendants have also aired misleading greenwashing ads targeting Michigan consumers.  Chevron aired television ads in Michigan in 2023 and 2024 claiming that it was working toward "affordable, reliable, and ever cleaner energy" and innovating to "responsibly produce oil and gas."[50]  Today, Chevron's website states its "belief that the future is lower carbon" and that Chevron is "working to meet demand today and help build the energy system of tomorrow."[51]  Likewise, Exxon ran ads in Michigan in 2016 representing that it was working to "protect[] biodiversity everywhere . . . improv[e] energy efficiency, develop[] more clean burning natural gas . . . turn[] algae into biofuels . . . [and] mak[e] cars go further with less."[52]

---

[49] BP, *Annual Report and Form 20-F 2024*, *supra* note 48, at 8.

[50] *See, e.g.,* Chevron, *Always Stay Energetic*, aired on WDIV (Apr. 22, 2023); Chevron, *Get the Time*, aired on WXYZ (Oct. 1, 2023); Chevron, *Affordable & Powerful*, aired on WDIV (Apr. 20, 2024).

[51] Chevron, *Sustainability: Climate*, available at https://perma.cc/HQ34-ZJXQ (created on Dec. 12, 2025).

[52] Exxon Mobil, Ad 16798044, aired on WDIV (Dec. 5, 2016).

173.    These ads are misleading because Defendants' actual investments in renewable and low carbon solutions are miniscule relative to their fossil fuel investments.  A recent study found that renewable energy constitutes 0.4% of BP's primary energy production, and none of Exxon's and Chevron's primary energy production.  Between 2010 and 2018, BP spent only 2.3% of total capital spending on low-carbon energy sources, Chevron spent 0.23%, and Exxon spent 0.22%. Meanwhile, Defendants have continued to focus overwhelmingly on fossil fuel production and extraction.  For example, in late 2023, Chevron announced it would invest between $18.5 to $19.5 billion on new oil and gas projects, compared to $2 billion allocated to "lower the intensity of traditional operations and grow new energy business lines."

174.    Defendants have also increasingly sought to portray fossil fuels— especially "natural" gas—as environmentally friendly, even though they have known since at least 2017 that is false.

175.    Natural gas releases less $CO_2$ than other fossil fuels, but it releases a much more potent GHG:  methane.  There is evidence that the lifecycle climate impacts of natural gas are comparable to coal.  Nevertheless, in a 2018 internal presentation acknowledging growing public demand for cleaner energy, BP outlined a marketing strategy to discredit evidence that natural gas is a fossil fuel whose use contributes to and exacerbates negative externalities.  The campaign (budgeted at $1.1 million in its first year) sought to "advance and protect the role of gas—and

BP—in the energy transition" while diverting attention from the renewable alternatives required for a meaningful energy transition.

176.    In 2020, the cartel—through API—urged members to "[e]stablish, [e]xpand, or [p]artner with an oil and gas information sharing network" to promote the narrative that "oil & gas will be part of the long-term energy mix by facilitating technological innovation to lower carbon emissions from the production and use of oil & gas."[53]  In 2020 and 2021, API published advertisements promoting natural gas on Facebook,[54] in *The Washington Post*,[55] and in public spaces like Washington National Airport, falsely asserting that natural gas is climate-friendly and essential for addressing climate change.  These statements about natural gas by API and others were false and misleading, designed not to support an energy transition, but to forestall one.

177.    Over the decades, Defendants have touted other "low-carbon" technologies that they claim can mitigate the negative externalities associated with fossil fuel use.  But, as detailed above, CCUS merely entrenches dependence on fossil fuels, and Defendants' investments in CCUS pale in comparison to their capital expenditures more broadly.

---

[53] *Denial, Disinformation and Doublespeak*, *supra* note 45, (Presentation, BPA_HCOR_00337704), available at https://perma.cc/TQD9-GEEY (created on Dec. 12, 2025).

[54] *See* Am. Petroleum Inst., Facebook Advertisement (July 20–Aug. 23, 2020), available at https://perma.cc/37CP-DADB (created on Dec. 12, 2025).

[55] Geoffrey Supran and Naomi Oreskes, *The Forgotten Oil Ads That Told Us Climate Change Was Nothing*, The Guardian (Nov. 18, 2021), available at https://perma.cc/6X9S-HGXB (created on Dec. 12, 2025).

178. Defendants also deceptively promote "blue" hydrogen as a solution to climate change. "Blue" hydrogen comes from a process that uses steam methane reforming to generate hydrogen from natural gas and then applies carbon capture and storage processes to bury emissions. A 2022 API press release claimed "blue hydrogen delivers significant emissions reductions."[56] BP's website likewise claims, "Hydrogen is abundant and it's key to fueling heavy industry in a net zero world," and that "low carbon CCS-enabled hydrogen will play an important role in allowing industries to decarbonize."[57] However, climate scientists have found that blue hydrogen is so energy intensive, and that there is so much leakage, that any carbon reduction benefits are nearly canceled out, so that ultimately "it's worse for the climate than burning natural gas in the first place."[58]

179. Defendants have also perpetuated deceptive messaging that shifts the blame for climate change from their production of fossil fuel products onto consumer choice. For example, in 2004 BP launched its $100 million per-year "carbon footprint" marketing campaign, a concept that BP introduced before it became a buzzword in order to shift responsibility for emissions onto consumers while

[56] API, *New Study: Hydrogen Produced from Natural Gas Delivers Significant U.S. Emissions Reductions* (Oct. 12, 2022), available at https://perma.cc/4QGA-PGDM (created on Dec. 12, 2025).

[57] BP, *What We Do: Hydrogen*, available at https://perma.cc/6EJU-4YK4 (created on Dec.12, 2025).

[58] Alejandro de la Garza, *Fossil Fuel Companies Say Hydrogen Made from Natural Gas is a Climate Solution. But the Tech May Not Be Very Green*, Time Magazine (Sept. 22, 2021), https://time.com/6098910/blue-hydrogen-emissions/ (citing Robert W. Howarth, *How Green is Blue Hydrogen?*, 9 ENERGY SCI. AND ENG'G 1676 (Aug. 12, 2021), available at https://perma.cc/M6KX-6FPV (created on Dec. 12, 2025)).

obscuring Defendants' role limiting consumer choice. As recently as 2019, BP continued marketing with a focus on the consumer's carbon footprint.

180. Similarly, BP has deceptively marketed its products as "carbon neutral" based on BP's purchases of carbon credits, without disclosing that caveat to consumers. In 2024, a German court ordered BP to stop using that deceptive marketing.

181. This campaign of suppression by means of deception worked: it reshaped public understanding of climate science and created lasting confusion about fossil fuel risks despite mounting scientific consensus. In 1997, a nationwide Pew Research poll found that only one in four Americans reported worrying "a great deal" about global warming—down from 30% in a 1990 Gallup survey. By 2024, only 22% believed climate science was correct while more than 40% believed threats from climate change were overstated. The consistency of these statistics across several decades is a testament to the enduring success of Defendant's decades-long campaign to reduce output of renewable energy (including in transportation energy markets) not by offering better products, but by misleading the public about the dangers of fossil fuels and viability of alternatives.

4. **Defendants Have Acted in Concert to Protect the Dominance of Fossil Fuels by Influencing Information-Producing Institutions.**

182. In addition to their direct deceit of consumers, Defendants also act in concert and expressly collaborate to influence critical information-producing institutions—such as universities, scientific journals and other media, and

international climate committees—so as to exacerbate the confusion they have manufactured about climate change and energy options.

### a. Defendants Infiltrate and Control Academic Institutions and Research.

183. As part of their broader effort to suppress competition from renewable energy, Defendants exerted substantial influence over the primary institutions responsible for producing new academic research and training scientists: universities. A 1998 plan developed by Exxon, Chevron, and distributed by API to its members, set out clear instructions for cartel members to keep in mind when involving themselves with universities, including the following:

- seek and cultivate "scientists whose research in this field supports our position;"

- use academic collaborations as an "early warning system for scientific developments" that could threaten the cartel's interests;

- organize campus workshops and debates on climate science;

- "recruit and train" academic scientists that the industry could "offer" to the media;

- use academic collaborations to "maximize the impact [on the media and others] of scientific views consistent with [the fossil fuel industry's views];" and

- "undercut the 'conventional wisdom' on climate science."

184. Following that directive, Defendants launched sustained funding and manipulation campaigns at prestigious universities to advance their anticompetitive goals, sowing doubt about the scientific consensus on climate change and energy products (including by presenting "natural gas" as a climate

solution), while benefitting from recruitment opportunities and the introduction of cartel ideas under the guise of respected institutions.  For example, Exxon's chief climate scientist founded MIT's Joint Program on the Science and Policy of Global Change, directing researchers in the program to embrace and emphasize climate uncertainty.  Similarly, Exxon's Haroon Kheshgi leveraged affiliations with the University of Chicago and the Max Planck Institute to inject industry ideas into peer-reviewed literature exploiting the prestige of these institutions.

185.    Defendants have funded, influenced, and at times even directly controlled climate- and energy-focused research centers at well-known universities including Princeton, Georgia Tech, MIT, the University of California Berkeley, and Stanford (where multiple industry-funded climate research centers exist, including some where Exxon has contractually retained legal control and approval rights over research projects), among many others.

186.    A 2010 investigation revealed at least 55 distinct relationships between universities and fossil fuel companies, representing an estimated $1.3 to $2.2 billion in industry funding over ten years.  As of 2019, Exxon alone was funding more than 80 universities.  This funding gave Defendants influence and at times direct control over research agendas, supporting the cartel's goal of suppressing renewable energy innovation and maintaining fossil fuel supremacy.

187.    These industry-funded programs predictably generated results and conclusions favorable to Defendants.  For example, between 2001 and 2012, Exxon, API, and others paid over $1.2 million to Wei-Hock Soon—a key cartel-aligned

climate denialist based at the Harvard-Smithsonian Center for Astrophysics—to muddy the consensus on fossil fuels' role in climate change. As a contractual condition of this funding, Exxon retained the right to review Soon's work prior to submission to any peer-reviewed publication. Exxon also demanded that its sponsorship remain secret. Consistent with Exxon's demands, Soon failed to disclose this conflict of interest in at least eleven papers—even as he privately referred to those papers as "deliverables" for his corporate sponsors. Exxon's clandestine control over this output allowed it to disseminate junk science through academic channels under the guise of scholarly independence.

188. Recent scholarship shows that fossil fuel industry involvement in universities remains extensive and structurally embedded across many institutions. A 2024 peer-reviewed study of fossil fuel industry influence in higher education found widespread patterns of financial dependence, governance entanglement, and agenda-setting that continue to shape the direction of climate and energy research in ways that favor fossil fuel interests. For example, as of 2021, a member of Exxon's Sustainability Advisory Council directed the Corporate Responsibility Initiative at Harvard University. As of 2024, BP sponsors Princeton University's Mitigation Initiative. BP has also been advising universities in the UK such as Oxford, Edinburgh, and University College London on degree courses in geoscience and engineering.

189. The 2024 peer-reviewed study states as follows:

Our literature review shows that partnerships between fossil-fuel companies and universities can grant substantial material and

reputational benefits to the industry. Materially, they often result in research that favors the industry's interests, such as reports supportive of fossil-fuel-friendly litigation and policies. They also afford opportunities to train and recruit future fossil fuel industry employees. Reputationally, fossil fuel sponsors inherit, by association, some of the public trust and academic credibility of universities, which helps position those companies as key players in addressing the climate crisis. The authors of several reviewed articles expressed concern over the normalization—even flouting—of industry influence in higher education. Carroll, Graham, Lang, et al. (2018) argued that these partnerships thus institutionalize a "new climate denialism." Whereas previously, fossil-fuel companies denied basic climate science and its implications, today, they have shifted to primarily spreading more subtle "discourses of climate delay."[59]

190. By infiltrating universities and knowingly misdirecting the conversation about climate change and energy products, Defendants have been able not only to sow doubt about climate change and renewable energy, but also to limit the potential universe of climate- and energy-related ideas in academic discourse. Defendants control the research, so they can control public perception consistent with the cartel's anticompetitive objective to suppress competition.

### b. Defendants Infiltrate and Control Scientific Journals.

191. Defendants' misinformation campaign extended into peer-reviewed research publications. Defendants interfered with scientific research by attempting to discredit studies documenting the severity of climate change and by

---

[59] *See* Sofia Hiltner et al., *Fossil Fuel Industry Influence in Higher Education: A Review and a Research Agenda*, WIRES CLIMATE CHANGE, at 10–11, 15 (Sept. 5, 2024), https://wires.onlinelibrary.wiley.com/doi/10.1002/wcc.904 (internal citations omitted).

disseminating so-called research—funded by Defendants themselves—that failed to meet the rigorous standards of peer-reviewed science.

192.    These tactics muddied and derailed scientific discourse on climate change and the need for renewable alternatives to fossil fuels, allowing Defendants to preserve fossil fuel dominance even as the prevailing scientific consensus counseled otherwise.

193.    Defendants' strategy mirrored the tobacco industry's campaign to sow doubt about the health effects of smoking.  Indeed, they employed many of the same operatives—Fred Singer, Fred Seitz, Robert Jastrow, and William Nierenberg—who had led tobacco's earlier effort.  Funded by Defendants and supported through front groups and think tanks they created, these figures presented climate denialism as a legitimate position in a scientific debate, giving false credibility to climate-denialist claims and undermining the system of peer-reviewed publication.

194.    As described by James Hoggan in *Climate Cover-Up*, Defendants' campaign took an artificial "controversy," removed it from scientific forums where individuals without qualifications cannot speak, and inserted it into public debate. There, charismatic speakers and well-known figures maintained the issue in an echo chamber of "thinktanks, blogs, and ideologically sympathetic media outlets" that continuously amplified misinformation, keeping public confusion alive and preserving Defendants' control over the narrative.

195.    For example, in 2005, Benny Peiser, a sports lecturer at John Moores University and former director of fossil-fuel-funded policy group, published baseless attacks on Dr. Naomi Oreskes's research demonstrating the climate risks of fossil fuels.  Despite Peiser's lack of expertise and the obvious falsity of his assertions, his claims have been repeatedly cited as legitimate criticism by Defendants.

196.    In another example, Penn State research team led by paleoclimatologist Dr. Michael Mann famously produced a graph known as the Mann hockey stick, which showed 900 years of stable global temperatures followed by a sharp 20th-century rise.  When a fossil-fuel-funded think tank author published a critique in *Geophysical Research Letters* pointing to minor clerical and technical errors that did not affect Dr. Mann's fundamental conclusions about the anthropogenic causes of climate change, Defendant-funded interests seized upon the opportunity to label the study an "intellectual swindle."  *Nature* subsequently reaffirmed Dr. Mann's findings and refused to publish the criticisms of it, and no credible replication has produced materially different results.

197.    Defendants also attempted to distort the work of Roger Revelle, whose research focused on strategies to mitigate the worst impacts of climate change. Defendant-funded denialist Fred Singer persuaded Revelle to co-author a *Washington Post* piece while simultaneously drafting his own climate-denial article. The authors disagreed on the severity of temperature increases caused by climate change—Revelle argued that warming would be between one and three degrees Celsius, while Singer suggested an increase of less than one degree.  In the final

version, Singer falsely portrayed Revelle as agreeing that climate change would cause only "a modest average warming in the next century well below the normal year to year variation." Revelle's death shortly after publication prevented him from correcting Singer's misrepresentations and misattributed quotes.

198. Through their funding and manipulation of scientific research and publication, Defendants distorted the information available to the public, reinforcing the false impression that renewable energy development was unnecessary. Their influence over academic and scientific discourse also allowed Defendants to infiltrate and interfere with non-governmental fact-finding bodies.

### c. Defendants Infiltrate and Obstruct International Fact-Finding Bodies.

199. At API's 1996 annual meeting, Lee Raymond (then API Chair and Exxon CEO) warned that emerging global climate efforts to initiate scientific and policy processes that would undercut fossil fuel dominance represented "the greatest long-term threat to our industry."[60] That sentiment echoed concerns expressed in former Exxon Senior Executive Duane LeVine's 1990 memo as Chair of IPIECA to IPIECA's hundreds of member corporations urging them to join together and fight international efforts to phase out fossil fuels by coordinating to disseminate false information downplaying fossil fuels' dangers. And that is exactly what the cartel did: Defendants escalated their coordinated efforts to obstruct

---

[60] Benjamin Franta, *Weaponizing Economics: Big Oil, Economic Consultants, and Climate Policy Delay,* 31 ENV'T POL. 555 (Aug. 25, 2021) (citation omitted), available at https://perma.cc/M9JR-8T4U (created on Jan. 15, 2026)

global climate bodies and other information-producing institutions, thereby limiting the risk of competitive pressure from renewable energy.

200. Specifically, Defendants targeted U.N. climate bodies—especially the Intergovernmental Panel on Climate Change (IPCC) and the Conference of the Parties (COP) to the U.N. Framework Convention on Climate Change—to prevent the adoption of scientific conclusions that would support electrification and other non-fossil alternatives to gasoline in transportation. Rather than engage these bodies in good faith, the cartel undermined these bodies by: (1) attacking the credibility and integrity of IPCC scientists in order to discredit IPCC findings and undermine confidence in its institutional legitimacy; (2) submitting false evidence, including junk science and fabricated economic models, to taint and mislead U.N. technical bodies' fact-finding processes; and (3) embedding cartel agents into U.N. advisory roles and authorship positions so they could influence outcomes. These tactics delayed recognition of the climate crisis and progress that would foster substitution in the transportation and primary energy market.

201. **Discrediting IPCC Scientists:** In 1995, when the IPCC circulated a pre-publication draft document concluding for the first time that "the balance of evidence suggests a discernible human influence on global climate,"[61] the cartel preemptively attacked both the report and its authors through a GCC memo falsely accusing climate scientist Dr. Ben Santer of manipulating peer-review processes

---

[61] IPCC, *IPCC Second Assessment: Climate Change 1995*, at 22 (1995), available at https://perma.cc/4H6D-2NLK (created on Jan. 15, 2026).

and altering the report's conclusions.[62]  The memo alleged that Dr. Santer's edits raised "very serious questions" about whether the IPCC had "compromised, or even lost, its scientific integrity."[63]  Around the same time, Frederick Seitz—co-founder of the cartel-linked Marshall Institute—amplified this attack in a *Wall Street Journal* op-ed, accusing the IPCC of corruption and editorial misconduct.  Although refuted by IPCC leadership, these strategically calculated attacks cast doubt on the IPCC's forthcoming findings at a critical moment for building global consensus on climate change and the need for a transition to renewable energy.

202.  **Submitting Fabricated Technical Materials:**  Also in the 1990s, API hired Charles River Associates to present at multiple annual U.N. summits deceptive economic models purporting to forecast severe economic losses under emissions-reduction scenarios.  Unbeknownst to the recipients that would rely on those models, the models were deceptive by design:  Rather than reflect the reality that fossil fuels would be replaced with cleaner sources of energy, the models unrealistically assumed that emissions would be reduced by dramatically restricting overall energy use—leading to a great reduction in economic growth.[64]  One of API's economic consultants later admitted:  "I think the API knew that if

---

[62] GCC, *The IPCC: Institutionalized "Scientific Cleansing,"* at 1 (1996) (memorandum to public), available at https://perma.cc/7BTZ-UADT (created on Dec. 12, 2025).

[63] *Id.*

[64] Franta, *Big Carbon's Strategic Response to Global Warming*, *supra* note 15, at 193–199, available at https://perma.cc/SGJ2-VZAH (created on Dec. 12, 2025).

they had Charles River Associates run these models, it would produce the results the API wanted, namely that it would show a cost to [climate] policy."[65]

203.    Similarly, much of the junk science funded by the industry and put out under Wei-Hock Soon's name in association with prestigious universities, *see* Section VI(B)(4)(a), has been strategically fed to international fact-finding bodies by agents of the industry in order to muddy the science and obstruct their proceedings. For example, at least seven of Soon's Exxon-funded "deliverables" are referenced in IPCC reports.  Thus, Exxon and API were able to tamper with and dilute the IPCC's fact-finding processes by secretly tainting deliberations with industry-controlled pseudoscience.

204.    **Infiltration of U.N. Scientific Bodies:**  A 1997 GCC memo revealed that cartel members were actively seeking nominations of oil industry employees to serve as authors and contributors for IPCC technical reports.  Once installed, these agents of the industry used their positions to mold IPCC reports' language and conclusions favorably to fossil fuel interests.

205.    For example, when an IPCC report concluded climate change posed a public health risk, Exxon cherrypicked junk researchers to embed in the IPCC and persuaded IPCC authors to include in the report studies minimizing those health

---

[65] *Id.* at 205 & n.624 (citing September 18, 2017 interview with Paul Bernstein).

risks—a strategy that internal GCC meeting minutes called "100% successful in obtaining a revised" version aligned with industry interests.[66]

206.    Similarly, in 2022, employees of Chevron and other cartel members held influential author and reviewer roles in the drafting of Part III of the IPCC's Sixth Assessment Report, which focused on climate change mitigation.  Shortly before publication, those agents of the cartel removed references in the report to the fossil fuel industry's "vested interests" in delaying climate action.

207.    And the intensity of Defendants' obstruction has only grown over time: At the 2023 COP28 summit, 2,456 fossil fuel lobbyists were in attendance—nearly double the number at COP27, and far more than the combined delegations of the most climate-vulnerable countries—representing unprecedented access to global climate governance institutions.  At that summit, COP28 President Sultan Ahmed Al Jaber—also CEO of Abu Dhabi National Oil Company—dismissed fossil fuel phase-out proposals as "alarmist," falsely arguing they are supported by "no science" and would "take the world back to caves."  Around the same time, OPEC Secretary General Haitham Al Ghais struck a similar note, denouncing the International Energy Agency's net-zero roadmap.  Delivered in the lead-up to a global climate summit by individuals occupying positions of institutional power, these statements amplified cartel narratives long used to deflect support for

---

[66] GCC, September 19, 1996 Science and Technology Assessment Committee Meeting Minutes, at PDF page 5, available at https://perma.cc/77PP-BF6H (created on Dec. 12, 2025).

renewable alternatives to fossil fuels and to obstruct electrification of energy markets, including the Michigan transportation and primary energy markets.

208.    Defendants' multifaceted campaign, detailed above, helped unnaturally prolong the dominance of fossil fuels in energy markets, including the Michigan markets for transportation and primary energy, by reducing output of renewables and thereby delaying the energy transition.  This output reduction harmed the State and Michigan consumers—who rely on transportation and primary energy products shaped by national and international standards, such as gasoline and propane—by reducing consumer choice and inflating prices for transportation and primary energy products in Michigan.

### 5.    Exxon Operatives Engaged in Criminal Hacking to Suppress Investigations into Defendants' Anticompetitive Conduct and Evade Accountability.

209.    In 2025, U.S. Department of Justice (DOJ) filings revealed Exxon's involvement in a "hack-for-hire operation" from 2015 to at least 2018 targeting at least 128 individuals affiliated with ten nonprofit climate activism organizations investigating Exxon's role in misleading the public about climate science and suppressing competition to fossil fuels.

210.    The hacking operation deployed "spear phishing" tactics, including emails targeting particular climate activists (and sometimes their minor family members) by impersonating their trusted contacts (including attorneys) and using background research to gain targets' trust and elicit sensitive information.  Other tactics included fake news alerts mimicking Google News and spoofed Twitter

messages targeting key individuals and their family members.  Reports estimate approximately 28,000 malicious URLs were deployed during this campaign, with over 100 phishing attempts directed at high-value targets.

211.    In late 2024, press reports linked the hacking campaign to DCI Group (DCI), Exxon's public relations and lobbying firm at the time.  Evidence shows DCI provided lists of targets (climate activists) to Israeli investigator Amit Forlit, who subcontracted the phishing operation to "Dark Basin," run by an Indian firm called BellTroX.  The FBI reportedly found that DCI also orchestrated strategic leaks of the hacked documents and, in some cases, shared that information with Exxon **before** disseminating it publicly.  Between 2013 and 2018, DCI paid approximately $16 million to Forlit-affiliated entities.

212.    In May 2024, Forlit was arrested in London.  DOJ extradition filings confirmed that DCI acted "on behalf of one of the world's largest oil and gas corporations, centered in Irving, Texas."  According to the DOJ, that corporation— which was confirmed in a January 2025 court filing to be Exxon—sought to "discredit individuals or entities in connection with" climate change litigation.  The DOJ also disclosed possession of a November 2015 memo sent from DCI to Exxon and forwarded to Forlit, which explicitly referred to "going on the offense" in response to "attacks" on Exxon "over climate change," and identified specific individuals who were later targeted in the hacking campaign.  The DOJ's extradition request was granted on April 30, 2025.

213.    DOJ filings noted that the timing and content of the phishing attempts and strategic leaks were tailored to disrupt state attorney general enforcement litigation, chill climate and renewable energy advocacy, and frustrate accountability efforts focused on Defendants' deceptive and anticompetitive conduct.  One of the infiltrated nonprofits—the Union of Concerned Scientists—reported that its email servers were compromised in 2017 while coordinating with state attorneys general on potential lawsuits against Exxon.  And as recently as April 2024, in an amicus brief urging dismissal of Honolulu's climate deception suit against fossil fuel companies, an industry trade group funded by Exxon cited a hacked confidential litigation strategy memo from climate advocates.

214.    Details of this operation—including Exxon's role directing and financing it—were not publicly known until January 2025 and could not reasonably have been discovered earlier.

## VII.    Plus Factors Supporting the Inference of Defendants' Explicit Coordination.

215.    As described above in Section III, Defendants' coordinated anticompetitive conduct included:

- Acting in concert to suppress the development of EV battery and engine technologies.

- Acting in concert to restrain the buildout of charging infrastructure necessary to substitute electricity for gasoline.

- Acting in concert to suppress the development and deployment of solar technologies in the primary energy market.

- Acting in concert to divert capital away from renewable energy and towards the entrenchment of fossil fuels.

- Acting in concert to deceive consumers and suppress demand for renewable energy.

- Acting in concert to protect the dominance of fossil fuels by infiltrating academic institutions, scientific journals, and international fact-finding bodies.

216.    Above and beyond this coordinated conduct, there are several plus factors that further establish the anticompetitive conspiracy.  "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," and therefore support an inference of collusion.[67]

217.    Here, four plus factors reinforce the conclusion that Defendants' long-running pattern of coordinated conduct was the product of explicit coordination, not independent decisions.

### A.    Defendants' Conduct Inconsistent with Independent Action.

218.    Defendants have repeatedly engaged in coordinated conduct that defies independent economic logic but aligns with a shared strategy to restrain competition.  Examples include:

- Exxon's abrupt decision to shut down its battery and hybrid vehicle programs despite internal projections showing significant market potential for clean energy technologies—and shortly after its research identified renewable energy as a competitive threat.[68]

_____

[67] William E. Kovacic, et al., *Plus Factors and Agreement in Antitrust Law*, 110 MICH. L. REV. 393, 393 (2011).

[68] *See supra* Section VI(A)(1)(a).

93

- Chevron's acquisition and subsequent suppression of NiMH battery technologies, described internally as "ideal" for EVs, by using aggressive patent litigation and imposing restrictive licensing terms and volume thresholds to effectively block any entity from accessing the technology in the United States.[69]

- ConocoPhillips' decision to abandon key EV technology patents and instead invest in propane-powered vehicles that help in preserving the dominance of fossil fuels in transportation energy.

- Fossil Fuel Defendants' collective refusal to install EV charging stations at their retail gas locations, foregoing opportunities to profit from electricity sales in an effort to hinder EV adoption.[70]

- Defendants' institutionally-orchestrated lobbying against public investments in EV infrastructure and policies promoting EV adoption—which would run primarily on grid electricity generated largely by Defendants' primary energy products—including by funding and directing trade associations and astroturf groups to create false narratives of public opposition.[71] Defendants' lobbying, coalition engagement, and political advertising was at times aimed at removing public charging incentives from major federal legislation (*e.g.*, the Bipartisan Infrastructure Law (2021), the Inflation Reduction Act (2022), One Big Beautiful Bill (2025)). In 2023 and 2024, Defendants and Defendant-funded groups aggressively lobbied against the EPA's proposed greenhouse gas standards for new cars, which were aimed to promote EV adoption, characterizing the proposal as a Biden-Harris "car ban" and pushing Congress to prohibit EPA from enacting it. Defendants also targeted local policies. For example, in 2019, Chevron organized an astroturf campaign opposing an Arizona rule that would require public utilities to build charging stations.

---

[69] *See supra* Section VI(A)(1)(b).

[70] *See supra* Section VI(A)(2).

[71] For example, the Western States Petroleum Association has deployed more than a dozen astroturf groups (with names like "Fed Up at the Pump") to create the false impression that the public does not want policies that would reduce gasoline sales and related carbon emissions while shifting consumer preferences toward electricity as fuel and promoting the use of renewables to generate that electricity. *See* Union of Concerns Scientists, *How Fossil Fuel Lobbyists Used "Astroturf" Front Groups to Confuse the Public* (Oct. 11, 2017), available at https://perma.cc/9CQ3-EJUP (created on Jan. 15, 2026).

- Fossil Fuel Defendants' coordinated abandonment of promising solar ventures since the 1980s, despite their technical leadership and rising investor interest in renewables, and Defendants' deliberate suppression of technological advancements in solar energy through, for example, patent litigation.[72]

- Fossil Fuel Defendants' often institutionally-orchestrated diversion of purportedly "green" investments away from renewables and instead toward carbon capture and natural gas technologies designed to prolong fossil fuel reliance, despite forecasts projecting high returns from electrification and clean energy technologies.[73]

- Defendants' lobbying against public clean energy subsidies that would have created demand for their own clean energy offerings.

219. In competitive markets, Defendants' suppression of renewables and clean energy technologies would be irrational; firms would face pressure to capitalize on emerging technologies and policy signals by investing in substitutes. However, in the structurally concentrated U.S. transportation and Michigan primary energy markets—where Defendants had both motive and opportunity to collude—this pattern persisted.  By jointly declining to compete, even when doing so could have opened new markets or increased demand for their own clean energy products, Defendants prolonged consumer dependence on gasoline.  Their actions are best understood not as individual responses to market forces, but as mutually reinforcing steps in a coordinated campaign to suppress competition and delay the transition away from gasoline and other fossil fuels.

---

[72] *See supra* Section VI(B)(1).
[73] *See supra* Section VI(B)(2).

**B.** **Energy Markets Have Structural Features Conducive to Defendants' Sustained Coordination.**

220. The U.S. transportation energy market and the Michigan transportation energy market exhibit structural features that facilitate sustained collusion among Defendants and their Co-Conspirators. Chief among these are high market concentration and the technological interdependence of clean alternatives to gasoline—particularly EVs, charging infrastructure, and clean electricity generation—which enabled Defendants to jointly restrain viable substitutes while preserving gasoline's dominance.

221. As of 2021, fossil fuels accounted for approximately 92% of all U.S. transportation energy consumption, with gasoline comprising more than half. This dominance reflects deliberate market design by a small number of vertically integrated fossil fuel producers, namely BP, Exxon, Chevron, and Shell, who control supply through infrastructure ownership, exclusive supply agreements, and branding arrangements. These features allow the Fossil Fuel Defendants to monitor one another's output, pricing, and investment decisions, making coordinated restraints both feasible and economically rational.

222. Electricity's viability as a transportation energy source depends on simultaneous investment in three interdependent elements: EVs, charging infrastructure, and electricity generation. Each element reinforces the others: EV adoption requires accessible charging infrastructure powered by affordable electricity; infrastructure deployment depends on EV uptake; and investment in electricity generation is justified only if charging creates demand. Defendants

exploited this interdependence by collectively restraining progress across all three elements.

223. Any meaningful investment in one element risks triggering growth in others and catalyzing substitution away from gasoline. No single Defendant could safely defect from this scheme without destabilizing industry-wide profits. By mutually holding back and actively suppressing investments in EVs, charging stations, and non-fossil electricity generation, Defendants avoided competitive displacement.

224. Gasoline's short-run demand is highly inelastic: Consumers cannot easily reduce consumption or switch to alternatives, even when prices rise sharply. Suppressing electricity as a viable alternative ensured that switching remained impractical, which in turn enabled Defendants to preserve their pricing power and maintain supracompetitive prices without risking market share.

225. High switching costs have further locked consumers into gasoline dependence. Transitioning to electricity requires consumers to make significant upfront investments in new vehicles and home charging infrastructure—costs that have been artificially inflated by Defendants' suppression of public charging networks and clean energy technologies.

226. The U.S., and by inclusion the Michigan, transportation energy market enables fossil fuel producers to monitor each other's behavior through public data sources like pricing indices, inventory reports, patent filings, and Securities and Exchange Commission disclosures. Industry groups such as API and OGCI further

enhance transparency of market information and facilitate coordination by convening members to discuss strategies and priorities.

227. Similarly, the primary energy market is also structured to facilitate collusion among Defendants and their Co-Conspirators—these features include high market concentration, and the technological interdependence of clean alternatives to fossil fuels used for heating and cooling, such as propane. As of 2021, fossil fuels accounted for 79% of the consumption of primary energy in the United States. This dominance reflects the intentional market design by a small number of vertically integrated fossil fuel producers, namely BP, Exxon, Chevron, and Shell, who control primary energy supply through their infrastructure ownership, exclusive supply agreements, and branding arrangements. The Fossil Fuel Defendants can easily monitor one another's output, pricing and investment decisions, enabling coordinated restraint.

228. The Michigan primary energy market is likewise structured to facilitate collusion. Michigan uses more propane—a fuel derived from natural gas and crude oil—for residential heating and/or cooling than any other state in the United States. More than 300,000 Michigan homes use propane as their primary energy source for heating fuel. A small number of fossil fuel producers, namely BP, Exxon, Chevron, and Shell, control the primary energy supply in Michigan through their infrastructure ownership, exclusive supply agreements, and branding arrangements.

229. By foreclosing the development of competing renewable energy technologies, infrastructure, and storage, Defendants avoided competitive displacement.

230. Barriers to entry for renewables and clean energy technology challengers include high capital costs, entrenched distribution systems, regulatory complexity, and intellectual property controlled by Defendants. These barriers limited competition from substitutes like electricity, allowing Defendants to prolong fossil fuel's dominance despite growing consumer demand for renewable alternatives.

231. Electricity's substitutability for gasoline remains constrained by insufficient charging networks, grid capacity, and battery supply—practical barriers that prevent consumers from switching even when electricity is cost-competitive. In Michigan, limited public charging stations and reliance on fossil fuels for electricity have limited consumers' ability to substitute electricity for gasoline, keeping cross-elasticity of demand low.

232. Where sufficient infrastructure exists, EV adoption rises in response to high gasoline prices due to conditional cross-elasticity between gasoline and electricity—a dynamic Defendants suppressed in Michigan through coordinated actions against necessary investments.

233. Despite technological progress and consumer demand for cleaner alternatives, gasoline continues to dominate U.S. and Michigan transportation

energy consumption due to deliberate actions taken by Defendants to withhold investment in substitutes while reinforcing barriers to entry.

## C. Defendants' Economic Incentives Favoring Coordinated Restraint.

234. The Fossil Fuel Defendants shared a common motive to oppose competition from electricity, facing an economic landscape where coordination was the only rational strategy. Each would have been forced to compete in the primary and transportation energy markets by continuing to invest in EV and renewable technology, as new entrants in these markets would place competitive pressure on the Fossil Fuel Defendants and inevitably reduce their market share. Instead, coordinated restraint offered a safer strategy that preserved profits and avoided the competitive risks associated with leading an industry-wide transition.

235. Massive fossil fuel infrastructure costs made electrification particularly threatening to the Fossil Fuel Defendants' business models, which rely on continued throughput across capital-intensive assets like refineries, pipelines, and retail fuel locations. Rapid substitution toward electricity would reduce utilization of this infrastructure, strand investments, and place competitive pressure on Fossil Fuel Defendants' dominance and share of the energy markets. Analysts estimate that even moderate acceleration of the energy transition could impose hundreds of billions of dollars in stranded asset costs on fossil fuel producers. Preserving their dominance in the primary and transportation energy

markets required Defendants to delay competition from electricity and other clean alternatives.

236.    A 2006 National Renewable Energy Laboratory report projected that widespread EV adoption would significantly reduce gasoline consumption—posing a direct threat to fossil fuel market share.  By then, Defendants' shared incentive to suppress electricity was no longer speculative:  It was confirmed by their own forecasts projecting rapid erosion of gasoline's dominance under what they called a "competitive scenario."

237.    These aligned incentives demanded coordination in the interdependent Michigan transportation and primary energy markets, where each Defendant would have faced substantial risks and costs by acting alone to advance the energy transition, but all benefitted from maintaining their market share and fossil fuel dominance through mutual restraint.  The risks of unilateral action were high; the rewards of joint inaction were higher.  Rather than compete as rivals, Defendants jointly wielded their dominant market power to suppress the infrastructure, technologies, and demand threatening gasoline's dominance—with the shared goal of preventing competition from emerging altogether.

## D.    Institutionalized Opportunities for Defendants' Coordination.

238.    Defendants exploited a dense web of trade associations, working groups, and closed-door industry events to coordinate strategy, align market conduct, and suppress competition from renewables.  Organizations such as API, IOGP, and OGCI provided regular forums for executives to share proprietary

outlooks and co-develop policies under the guise of standard-setting. The Fossil Fuel Defendants' executives frequently held overlapping leadership roles, enabling joint strategic planning at the highest levels. Public records show that these forums were used to align responses to emerging threats like clean electricity and EVs, allowing Defendants to agree on messaging and delay investment needed for widespread adoption of those emerging alternatives.

239.    Each Fossil Fuel Defendant played a sustained leadership role in API, IPIECA, and IOGP—three organizations central to their coordination efforts. These groups were governed by boards chaired and vice chaired by senior executives from Exxon, Chevron, BP, and Shell who used their positions to plan mutual strategies and coordinate responses to the energy transition.

240.    For example, as of June 2025, Chevron CEO Mike Wirth serves as the Chair of API's Board of Directors, and Chevron alumnus Aaron Padilla serves as API's Vice President of Corporate Policy.[74] Other current API board members include Exxon CEO Darren Woods, former BP President David Lawler, and Shell USA President Gretchen Watkins. Additionally, API's Senior Vice President for Government Relations, Kristin Whitman, previously spent 17 years working for Shell in a variety of policy and lobbying roles.[75]

---

[74] Am. Petroleum Inst., *Aaron Padilla*, available at https://perma.cc/CD5S-5XHF (created on Dec. 12, 2025).

[75] Amelia Davidson, *Ex-Hill staffer named API senior vice president,* Politico Pro (Jan. 13, 2025), available at https://perma.cc/YA82-P2AP (created on Dec. 12, 2025).

241.    At IPIECA, Exxon's Paul Krishna served as Vice Chair of the Board of Directors from December 2021 to April 2024.[76]  He currently serves as Chair of the Executive Committee, alongside Vice Chair Karen Westley of Shell.[77]  As Chair of the Board, Krishna oversees a number of IPIECA committees and groups, including the Marine Spill Group, which Chevron's Maria Hartley has chaired since January 2023.[78]

242.    Fossil Fuel Defendants also run IOGP.  Chevron Vice President Kim McHugh chaired the group from 2022 to October 2024, overseeing a Board of Directors that included executives from Exxon (Vice President Carman Mullins in 2022 and Vice President Bryan Wesley in 2023) and BP (Senior Vice President Giovanni Cristofoli in 2022 and 2023).  BP's Cristofoli took over as Chair in October 2024, overseeing board members including Chevron Vice President John Sanclemente, Shell Vice President of Asset Management & Standards Mark Wildon, and Exxon Vice President Cory Quarles (who serves as Cristofoli's Vice Chair).[79]

243.    Meanwhile, executives from all four Fossil Fuel Defendants lead IOGP committees shaping CCUS policy and industry-wide operational standards.  These

---

[76] Paul Krishna, *LinkedIn,* available at https://perma.cc/KSN7-2ETD (created on Dec. 12, 2025).

[77] IPIECA, *How we are organised*, available at https://perma.cc/U45R-YGTM (created on Dec. 12, 2025).

[78] Maria Hartley, *LinkedIn*, available at https://perma.cc/V5XX-CP2L (created on Dec. 12, 2025).

[79] IOGP, *Board of Directors*, available at https://perma.cc/D5FU-5HY3 (created on Dec. 12, 2025).

committees decide whether to promote investment in clean energy technologies (which advance electrification) or in technologies like CCUS (which preserves fossil fuel dominance). For instance, as of December 2025, Chevron's Jason Ashurst chairs the Carbon Capture and Storage Committee, while Exxon's Jamie White serves as Vice Chair; BP's Rob Kelly chairs the Digital Transformation Committee, while Chevron's Keith Johnston serves as Vice Chair; Exxon's Cecilie Haarseth chairs the Standards Committee, while Chevron's Lokesh Kalra serves as Vice Chair; Exxon's Oleg Esenkov chairs the Metocean Committee, while Chevron's Amy Guan, BP's Oliver Jones, and Shell's Jason McConochie serve as Vice Chairs; and Exxon's John Gillies and BP's Joe Leask chair the Decommissioning Committee. In addition, BP executive Steve Shaw chairs the Strategic Communications Panel, which "[l]everag[es] existing resources and expertise from within Member companies" to "ensure a clear, consistent, and compelling voice for IOGP."[80]

244.    OGCI has further facilitated coordination among the Fossil Fuel Defendants' CEOs through its Executive Committee and annual strategy summits. As of December 2025, Bob Dudley, the former CEO of BP who retired from the company in 2020, is the Chairman of OGCI.[81] Through OGCI, the Fossil Fuel Defendants have adopted coordinated investment positions favoring fossil fuel infrastructure over electrification. From at least 2021 through 2024, their investor

---

[80] IOGP, *Our Main Committees and Groups*, available at https://perma.cc/PXX2-XARJ (created on Jan. 16, 2026).
[81] OGCI, *Leadership*, available at https://perma.cc/QZ48-KYXW (created on Dec. 12, 2025).

materials mirrored OGCI reports by promoting net-zero targets limited to operational emissions (as opposed to emissions from consumption of fossil fuels) while emphasizing carbon capture over a transition to renewable energy.[82] In March 2024, Exxon CEO Woods and BP CEO Auchincloss participated in an OGCI roundtable promoting members' "powerful role" in "advancing a Net Zero future."[83]

245. Additionally, since the late 2010s, various Fossil Fuel Defendants have been members of the International Emissions Trading Association (IETA) Board of Directors, under whose direction the IETA advocates for emissions-trading schemes that invite continued fossil fuel production via offsets or credits rather than promoting a transition to renewable alternatives.[84] IETA also plays a central role in international climate negotiations. Since 2003, it has received more than 2,700 delegate badges to UN climate conferences, making it one of the largest non-governmental delegations at annual COP summits.

246. These forums gave Defendants extraordinary opportunities to collude through repeated contact in institutionalized settings where executives exchanged information, monitored conduct, and aligned strategic responses. This network functioned as a mechanism for Defendants to create and sustain consensus even as

---

[82] OGCI, *Resources*, available at https://perma.cc/F8TX-CEUC (created on Dec. 12, 2025).

[83] OGCI, *Strategic Roundtable at CERAWeek 2024*, LinkedIn, available at https://perma.cc/FKJ6-D93N (created on Dec. 12, 2025).

[84] IETA, *About*, available at https://perma.cc/Z353-AB4J (created on Dec. 12, 2025).

rising demand for renewables threatened fossil fuel dominance—a classic plus factor supporting an inference of agreement under antitrust law.

## VIII. Anticompetitive Effects: Defendants' Conspiracy Suppressed Competition in the U.S. Transportation and Michigan Primary Energy Markets, Leading to Supracompetitive Prices for Energy Products and Reduced Consumer Choice.

### A. But for the Conspiracy, EVs Would Have Reached Scale Years Earlier and Michigan and Its Consumers Would Have Avoided Billions of Dollars in Overcharges on Transportation Energy.

247. In a competitive transportation energy market, EVs would have entered the market sooner, achieved broader adoption, and been supported by more accessible charging infrastructure. Clean electricity sources like solar would have reduced charging costs and increased convenience, offering the State meaningful alternatives to gasoline for public use and consumers meaningful alternatives to gasoline for both daily commutes and longer trips.

248. This transition would have shifted vehicle power sources significantly toward electricity, reducing gasoline demand and prices. Investment in supporting technologies such as battery storage and grid modernization would have scaled earlier in response to demand, accelerating the transition away from gasoline in the U.S. transportation energy market.

249. Michigan's car-dependent communities—shaped by long commutes, winter weather, and low density—would have particularly benefited from earlier access to affordable EVs. Cold-weather battery technologies and residential solar

options would have advanced more quickly, making EV ownership feasible for more residents.

250.    However, this competitive scenario did not materialize due to Defendants' anticompetitive conduct.  Between 1980 and 1992—the first twelve years of the conspiracy—renewable primary energy production **declined** by nearly 10 percent nationally.

251.    Charging infrastructure remains inconsistent across the United States and Michigan, limiting access for consumers without home-charging systems.  As a result, EV adoption in the United States lags behind many other countries.  Whereas in the U.S., fewer than 8% of new vehicles sold in 2024 were fully electric, in Norway, nearly 90% of new cars sold that year were fully electric.  In China, nearly half of the cars sold in 2024 were EVs.  In 2025, EV sales increased by 31% in Europe and 25% worldwide.  During this same period, EV sales in the United States grew by only 6%.  As noted in a June 2025 *New York Times* article, sales of EVs in the United States "have grown at a much slower rate than automakers once expected."[85]  The consequence is that only 1.4% of cars on the road in the U.S. in 2024 were fully electric.  Drivers in Michigan continue to rely on gasoline not because it is superior or cheaper, but because cleaner alternatives have been restrained.

---

[85] Neal E. Boudette, *Hybrid Cars Once Derided and Dismissed, have Become Popular*, N.Y. Times (June 20, 2025), available at https://perma.cc/6ATS-VBZD (created on Dec. 12, 2025).

252.     Defendants' conspiracy restrained competition in the transportation energy market by suppressing electricity and other clean alternatives to gasoline. This conduct denied the State and Michigan consumers meaningful choices, raised switching costs, and eliminated competitive price pressure.  As a result, gasoline consumption has remained artificially high, forcing the State and Michigan consumers to pay inflated prices for an inferior product that many would have otherwise abandoned.

253.     In a competitive market, even modest reductions in gasoline demand would have lowered price.[86]  These price effects align with established patterns showing how gasoline prices have historically responded to shifts in demand.

254.     In a but-for world where EV adoption was not suppressed by Defendants' conspiracy, these price shifts had happened sooner, and Michigan consumers would not have been subject to years of substantial fuel overcharges. Instead, overcharges represent real financial harm to Michigan drivers who relied on gasoline during the period of the conspiracy.  This injury is quantifiable, directly traceable to Defendants' anticompetitive conduct, and precisely the type of harm antitrust law is designed to redress.

---

[86] Etienne Latulippe, Kun Mo, *Outlook for Electric Vehicles and Implications for the Oil Market, Staff Analytical Notes,* Bank of Canada (June 2019), available at https://perma.cc/ZL4U-QAW9 (created on Dec. 12, 2025) ("Our analysis shows that for every additional 100 million EVs on the road in 2030, gasoline consumption would fall by about one million barrels of oil per day and oil prices would be 4 percent lower.").

**B. But for the Conspiracy, Primary Energy Types, Such as Solar and Wind Energy, Would Have Reached Scale Years Earlier and Michigan and Its Consumers Would Have Avoided Billions of Dollars in Overcharges.**

255.    In a competitive primary energy market, other primary energy types, such as solar energy, would have entered the market sooner, achieved broader adoption, and been supported by more accessible infrastructure.  Clean electricity sources like solar power for homes would have reduced costs and increased convenience, offering the State and consumers meaningful alternatives to the fossil fuels currently used like home heating oil and propane.

256.    This transition would have shifted primary energy sources significantly toward renewables, such as solar and wind, reducing demand for fossil fuels and lowering prices of renewable energy for the State and consumers. Investment in supporting technologies such as solar cell and solar panel development would have scaled earlier in response to demand, accelerating the transition away from fossil fuels in the primary energy market, including in Michigan.

257.    This competitive scenario did not materialize due to Defendants' anticompetitive conduct.  Instead, Michigan uses more propane in the residential sector than any other state in the country and an estimated 320,000 Michigan households must rely on propane as their primary heating fuel.

258.    Defendants' conspiracy restrained competition in the primary energy market by suppressing renewable alternatives like solar and wind power in favor of fossil fuels.  This conduct denied the State and Michigan consumers meaningful

choices, raised switching costs, and eliminated competitive price pressure. As a result, consumption of energy products from fossil fuel sources, such as home heating oil and propane, has remained artificially high, forcing the State and Michigan consumers to pay inflated prices for inferior products that many would have otherwise abandoned.

259. In a competitive market, even modest reductions in demand for primary energy from fossil fuels would have lowered prices in not just the primary energy market, but also in downstream end-use sectors. According to research from Rewiring America, at least 35 percent of Michigan households—or 1.4 million households—could save a total of $710 million per year on energy bills if they were using modern heat pump space heaters and heat pump water heaters instead of their current appliances, which use electric resistance, fuel oil, or propane. This equates to an average savings per household of $460 each year.

260. These overcharges represent real financial harm to the State and to Michigan consumers who during this period purchased primary energy and/or end-use energy products like propane, home heating oil, and electricity, not to mention gasoline. This injury is quantifiable, directly traceable to Defendants' anticompetitive conduct, and precisely the type of harm antitrust law is designed to redress.

### C. As a Result of the Conspiracy, Michigan Has Suffered, Is Suffering, and Will Continue to Suffer Injuries.

261. Defendants' conspiracy has resulted in significant harms to Michigan in the form of negative externalities including climate related harms, rising insurance premiums to account for the impacts of climate events, depressed home values in areas of the State most susceptible to climate harms, and damage to Michigan's general economy. Moreover, the State has been forced to incur and continues to incur expenses to address or mitigate the negative externalities resulting from Defendants' conspiracy.

262. The State has borne the costs of climate harms, including damaged roads due to extreme rainfall, ecological impacts, damages due to rising lake levels, and significant property damage.

263. Michiganders face rising home and automobile insurance premiums, which are increasing to account for the risks, uncertainties, and increasingly harmful weather events associated with climate impacts that insurers have been seeing.

264. In addition, home values in the State are dropping as homebuyers are less likely to purchase homes in regions of the State susceptible to extreme climate events.

265. The State's economy has seen record-breaking crop loss events and decreased tourism dollars due to climate effects.

266. The State has incurred, and will continue to incur, significant costs to withstand harms associated with these climatic changes.

267. Many of these costs have been incurred between 2022 and today.[87]

**D.      Michigan's Mitigation, Adaptation, and Resiliency Measures.**

268.    Michigan has incurred and will incur substantial costs to implement measures to address and mitigate the negative externalities resulting from Defendants' conspiracy.  State agencies have already deployed significant resources to develop programs to harden infrastructure to withstand rising temperatures, storms, and flooding; make Michigan economies more resilient; and address the public health impacts associated with climate harms.

269.    The State has already budgeted for resiliency and adaptation measures, such as energy sector improvements to reduce power outages, investment of over $500 million in the FY2024 supplemental and FY2025 budgets to support development and affordability of rooftop solar for households, investment in climate-resilient infrastructure, investment in and deployment of EV charging infrastructure, and millions of dollars to repairing and weatherizing homes.

270.    Because of Defendants' conspiracy, the State has also been forced to invest in resiliency measures for Michigan's agriculture sector, equip young people with career skills for a clean energy economy, and invest in transitional training for workers moving into the clean energy economy.

---

[87] The State only seeks costs incurred in the last four years, and future damages.

271.   As a result of Defendants' conspiracy, Michigan has expended and will continue to expend significant resources to mitigate and abate the projected adverse harms of climate change.

## CLAIMS FOR RELIEF

### COUNT ONE
### Conspiracy in Restraint of Trade Under Section 1 of the Sherman Act (15 U.S.C. § 1) and Equitable Remedies Under the Clayton Act (15 U.S.C. §§ 15, 26)

272.   The State repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

273.   During the relevant period, Defendants and their Co-Conspirators— energy companies ostensibly in direct competition with one another, and related industry trade associations and other entities—have conspired to artificially preserve the market dominance of their inferior fossil fuel products by suppressing and delaying competition from superior renewable energy alternatives, thereby substantially restricting output of (and increasing prices for) energy for transportation and primary energy sources in Michigan.

274.   The transportation and primary energy products at issue are sold in interstate commerce.  The unlawful activities alleged herein have occurred in and substantially affected interstate commerce.

275.   Defendants and their Co-Conspirators put their conspiracy into effect by means of a wide range of related anticompetitive conduct, including but not limited to the various categories of anticompetitive conduct detailed (with respect to the markets for transportation energy and for primary energy) in Paragraph 5.

276. Defendants' conspiracy and associated conduct in furtherance of the conspiracy constitutes a continuing violation of Section 1 of the Sherman Act. Overt acts in furtherance of the conspiracy have occurred at various times in the past four years.

277. Defendants' conspiracy and associated conduct are *per se* unlawful in violation of the Sherman Act's prohibition on unreasonable agreements in restraint of trade. *See* 15 U.S.C. § 1.

278. Alternatively, Defendants' conspiracy and associated conduct are unlawful under either the rule of reason or the quick-look mode of analysis. For purposes of a rule-of-reason or quick-look analysis, the relevant markets are the Michigan market for transportation energy and the Michigan market for primary energy.

279. Defendants' conspiracy has substantially harmed competition in the Michigan market for transportation and Michigan market for primary energy products—and the State of Michigan and its residents who rely on those products—by directly and proximately causing the following anticompetitive effects:

- Depriving consumers in Michigan of competitive alternatives in the transportation energy market, forcing them to rely on fossil fuels which pose significant negative externalities, instead of cheaper and substitutable renewable energy options;

- Increasing the cost of renewable energy alternatives such as solar and wind power, and thereby reducing supply of clean and even mixed-source electricity;

- Increasing the cost and reducing the supply of EV batteries, and thereby increasing the cost and reducing the supply of EVs;

- Increasing the cost and reducing the supply of clean energy technologies, such as solar power, that could have replaced primary energy sources used by Michigan consumers, such as propane and home heating oil;

- Suppressing and delaying the availability of infrastructure needed to make the widespread use of sustainable energy sources possible, such as by suppressing the development of EV charging networks and infrastructure;

- Raising switching costs for transportation and primary energy consumers;

- Increasing insurance premiums for households and depressing home values; and

- Increasing the cost of implementing measures to address and mitigate the negative externalities associated with fossil fuel use.

280. Most significantly for purposes of this Complaint, as a direct and proximate result of this ongoing conspiracy, Michigan (in its own capacity as a purchaser of transportation energy and primary energy products) and consumers in Michigan who purchased transportation and primary energy products have been injured in their business or property because they have had to purchase primary and transportation energy products at supracompetitive prices.

281. Michigan is entitled to treble damages for the overcharges it paid for transportation energy and for primary energy products purchased in its own capacity directly from the Fossil Fuel Defendants. Michigan, as *parens patriae*, is also entitled to treble damages for the overcharges consumers paid for transportation energy and for primary energy products purchased directly from the

Fossil Fuel Defendants. The State is further entitled to all other relief detailed in the Prayer for Relief Section at the end of this Complaint.

282. Unless Defendants' unlawful conduct is enjoined, the people of Michigan will continue to suffer economic injury and deprivation of the benefits of free and fair competition.

283. Pursuant to Section 14 of the Clayton Act, Plaintiff seeks an injunction ordering Defendants, their affiliates, successors, transferees, assignees, and any of their officers, directors, agents, employees, or other persons acting or claiming to act on their behalf to cease and desist (1) from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and (2) from in any manner engaging in anticompetitive conduct having a similar purpose or effect as the anticompetitive conduct alleged in this Complaint.

284. Defendants' conspiracy does not integrate any economic functions that could plausibly create any economic efficiencies or economies of scale. The conspiracy has no procompetitive justification; any proffered justifications, to the extent legitimate, could be achieved through less restrictive means. Any procompetitive effects are substantially outweighed by the anticompetitive effects.

285. The conduct of Defendants in furtherance of the unlawful conspiracy described herein was authorized, ordered, or executed by their officers, directors,

agents, employees, or representatives while actively engaging in the management of the affairs of Defendants.

## COUNT TWO
### Conspiracy in Restraint of Trade Under
### Section 2 of the MARA (Mich. Comp. Laws § 445.772)

286. The State repeats and incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.[88]

287. During the relevant period, Defendants have conspired to substantially restrict output of (and thereby inflate prices for) primary and transportation energy in Michigan.

288. The transportation and primary energy products at issue are sold in Michigan and the unlawful activities alleged herein occurred in, and have substantially affected, commerce in Michigan.

289. Defendants put their conspiracy into effect by means of a wide range of related anticompetitive conduct, including but not limited to the various categories of anticompetitive conduct detailed (with respect to the markets for transportation energy and for primary energy) in Paragraph 5.

290. Defendants' conspiracy and associated conduct in furtherance of the conspiracy constitute a continuing violation of Section 2 of the MARA. Overt acts in furtherance of the conspiracy have occurred at various times in the past four years.

---

[88] The allegations in support of Count Two are largely the same as those in support of Count One because the MARA is modeled on the Sherman Act. This section briefly lays out additional allegations to support Count Two without excessive duplication.

291.	Defendants' conspiracy and associated conduct are *per se* unlawful in violation of the MARA's prohibition on unreasonable agreements in restraint of trade.  *See* Mich. Comp. Laws § 445.772.

292.	Alternatively, Defendants' conspiracy and associated conduct are unlawful under either the rule of reason or the quick-look mode of analysis.  For purposes of a rule-of-reason or quick-look analysis, the relevant markets are the Michigan market for transportation energy and the Michigan market for primary energy.

293.	Defendants' conspiracy has substantially harmed competition in the Michigan transportation energy and the Michigan market for primary energy products—and the State of Michigan and its residents who rely on those products— by directly and proximately causing the anticompetitive effects listed in Paragraph 5.

294.	Most significantly for purposes of this Complaint, as a direct and proximate result of this ongoing conspiracy, Michigan (in its own capacity as a purchaser of transportation energy and primary energy products) and consumers in Michigan who purchased transportation and primary energy products have been injured in their business or property because they have had to purchase transportation and primary energy products at supracompetitive prices.

295.	Michigan is entitled to damages for the overcharges it paid for transportation and primary energy products purchased in its own capacity directly or indirectly from Fossil Fuel Defendants.  Michigan, as *parens patriae*, is also

entitled to damages for the overcharges consumers paid for transportation energy and primary energy products purchased directly or indirectly from Fossil Fuel Defendants. The State is further entitled to all other relief in the Section below.

296. Unless Defendants' unlawful conduct is enjoined, the people of Michigan will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

297. Plaintiff seeks an injunction like that described in Paragraph 282.

298. Defendants' conspiracy does not integrate any economic functions that could plausibly create any economic efficiencies or economies of scale. The conspiracy has no procompetitive justification; any proffered justifications, to the extent legitimate, could be achieved through less restrictive means. Any procompetitive effects are substantially outweighed by the anticompetitive effects.

299. The conduct of Defendants in furtherance of the unlawful conspiracy described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of the affairs of Defendants.

## PRAYER FOR RELIEF

The State seeks judgment against Defendants, jointly and severally, for the following relief:

a) A determination that the conduct set forth herein is unlawful as a *per se* violation (or, alternatively, is illegal as a quick look or rule of reason violation) under Section 1 of the Sherman Antitrust Act and Section 2 of the MARA;

b) An award, pursuant to 15 U.S.C. § 15, of compensatory and trebled damages for all harms suffered by the State and its residents resulting from Defendants' violations of the Sherman Act;

c) A determination that the conduct set forth herein constitutes a flagrant violation of Section 2 of the MARA;

d) An award, pursuant to Mich. Comp. Laws § 445.778, of compensatory and trebled damages for all harms suffered by the State and its residents resulting from Defendants' violations of the MARA;

e) Permanent injunctive relief as set forth above in Paragraphs 283 and 297;

f) Civil penalties in the maximum amount allowable by law for each violation of the MARA;

g) Disgorgement of all profits obtained as a result of the anticompetitive conspiracy;

h) An award of reasonable attorneys' fees and costs;

i) An award of pre- and post-judgment interest on all amounts awarded at the highest legal rate dating from and after the date of service of this Complaint, to the extent provided by law; and

j) Such other and further relief as the case may require and as the Court deems just and equitable under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff requests a trial by jury of all claims asserted in this Complaint.

Respectfully submitted,

/s/ *Polly A. Synk*
Polly A. Synk (P63473)
Margaret A. Bettenhausen (P75046)
Elizabeth A. Morrisseau (P81899)
Assistant Attorneys General
Michigan Department of Attorney General
Environment, Natural Resources, and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
517-335-7554
SynkP@michigan.gov
BettenhausenM@michigan.gov
MorrisseauE@michigan.gov

| | |
|---|---|
| Victor M. Sher*<br>Matthew K. Edling*<br>Ashley Campbell*<br>Special Assistant Attorneys General<br>Heather Kryczka*<br>Brittany Dutton*<br>Sher Edling LLP<br>100 Montgomery Street, Suite 1410<br>San Francisco, CA 94104<br>628-231-2500<br>vic@sheredling.com<br>matt@sheredling.com<br>ashley@sheredling.com<br>heather@sheredling.com<br>brittany@sheredling.com | Katie R. Beran*<br>Special Assistant Attorney General<br>Timothy L. Kelly*<br>Hausfeld LLP<br>325 Chestnut Street, Suite 900<br>Philadelphia, PA 19106<br>215-985-3270<br>kberan@hausfeld.com<br>tkelly@hausfeld.com |
| Adam J. Levitt*<br>Daniel Rock Flynn*<br>Anna Claire Skinner*<br>Special Assistant Attorneys General<br>Elizabeth Carpenter*<br>James Crisafulli*<br>DiCello Levitt LLP<br>Ten North Dearborn Street, Sixth Floor<br>Chicago, IL 60602 | James Gotz*<br>Special Assistant Attorney General<br>Hausfeld LLP<br>One Marina Park Drive, Suite 1410<br>Boston, MA 02210<br>617-207-0600<br>jgotz@hausfeld.com |

| | |
|---|---|
| 312-214-7900<br>alevitt@dicellolevitt.com<br>dflynn@dicellolevitt.com<br>askinner@dicellolevitt.com<br>ecarpenter@dicellolevitt.com<br>jcrisafulli@dicellolevitt.com | |
| Gregory S. Asciolla*<br>Carrie Syme*<br>Jonathan S. Crevier*<br>DiCello Levitt LLP<br>485 Lexington Avenue, Suite 1001<br>New York, NY 10017<br>646-933-1000<br>gasciolla@dicellolevitt.com<br>csyme@dicellolevitt.com<br>jcrevier@dicellolevitt.com | Michael D. Hausfeld*<br>Richard S. Lewis*<br>Special Assistant Attorneys General<br>Hausfeld LLP<br>1200 17th Street NW, Suite 600<br>Washington, DC 20036<br>202-540-7200<br>mhausfeld@hausfeld.com<br>rlewis@hausfeld.com |
| Kartik S. Madiraju*<br>Special Assistant Attorney General<br>Scott A. Martin*<br>Hausfeld LLP<br>33 Whitehall Street, 14th Floor<br>New York, NY 10004<br>646-357-1100<br>smartin@hausfeld.com<br>kmadiraju@hausfeld.com | Emma Blake*<br>Special Assistant Attorney General<br>Hausfeld LLP<br>580 California Street, 12th Floor<br>San Francisco, CA 94104<br>415-633-1908<br>eblake@hausfeld.com |

Attorneys for the State of Michigan, acting by and through the Attorney General

*Motions for admission *pro hac vice* to be filed