## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

THE PEOPLE OF THE STATE OF
MICHIGAN,

              Plaintiff,

    v.

BP P.L.C.; BP AMERICA INC.; BP
ENERGY COMPANY; BP ENERGY
RETAIL COMPANY LLC; BP
PRODUCTS NORTH AMERICA
INC.; CHEVRON CORPORATION;
CHEVRON U.S.A. INC.; EXXON
MOBIL CORPORATION;
EXXONMOBIL OIL
CORPORATION; SHELL P.L.C.;
SHELL USA, INC.; SHELL OIL
PRODUCTS COMPANY LLC;
EQUILON ENTERPRISES LLC
D/B/A SHELL OIL PRODUCTS US;
SHELL TRADING (US) COMPANY;
and AMERICAN PETROLEUM
INSTITUTE,

              Defendants.

Case No. 1:26-cv-254

Hon. Jane M. Beckering

Mag. Judge Ray Kent

**ORAL ARGUMENT REQUESTED**

## <u>BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

Page

Introduction ................................................................................................................ 1

Factual Allegations .................................................................................................... 3

    I.      Defendants' Longstanding Commitment to Fossil Fuel Products ......................... 3

    II.     Defendants' Investments in Renewable Energy Products and Alleged Retreat ...... 5

    III.    The Alleged Conspiracy Spanning Nearly 50 Years ........................................... 6

    IV.    Michigan's Alleged Relevant Markets and Claimed Injuries ............................... 6

Legal Standard ........................................................................................................... 9

Argument ................................................................................................................... 9

    I.      Michigan Lacks Antitrust and Article III Standing .............................................. 9

          A.     Michigan Fails to Allege Antitrust Standing ............................................ 10

               1.     Michigan Does Not Allege Antitrust Injury ................................ 11

               2.     Michigan Does Not Allege Proximate Causation ......................... 15

          B.     Michigan Fails to Allege Article III Standing ........................................... 22

    II.     Michigan Fails to Plausibly Allege Any Conspiracy ........................................... 24

          A.     Michigan Does Not Allege Direct Evidence of an Agreement ................. 25

          B.     Michigan Does Not Plausibly Allege Circumstantial Evidence of an Agreement ............................................................................................... 25

               1.     Michigan Fails to Allege Any Parallel Conduct .......................... 26

               2.     Michigan Fails to Plausibly Allege Any Plus Factors ................... 33

    III.    Michigan Fails to Plausibly Allege Anticompetitive Effects in a Relevant Antitrust Market .......................................................................................... 37

          A.     The Rule of Reason Applies to Michigan's Claims ................................. 37

          B.     Michigan Fails to Plausibly Allege a Rule-of-Reason Claim .................. 38

               1.     Michigan Fails to Plausibly Allege a Relevant Antitrust Market . 39

               2.     Michigan Fails to Plausibly Allege Anticompetitive Effects ........ 43

    IV.    Michigan's Claims Are Time-Barred ................................................................. 45

    V.     Michigan's State-Law Claim Is Preempted ........................................................ 51

Conclusion ............................................................................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*,
155 F.4th 795 (6th Cir. 2025) ...............................................................11, 15, 17, 20

*Advanced Tech. Corp. v. Instron, Inc.*,
925 F. Supp. 2d 170 (D. Mass. 2013) ...................................................................32

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988).............................................................................................31

*Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) .............................................................................13

*Am. Elec. Power Co. v. Connecticut*,
564 U.S. 410 (2011)...................................................................................51, 53, 54

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
19 F.4th 127 (2d Cir. 2021) .................................................................................15

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
300 F.3d 620 (5th Cir. 2002) ...............................................................................41

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...............................................................................................9

*Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*,
127 F.4th 178 (10th Cir. 2025) ............................................................................14

*Associated Gen. Contractors v. Cal. State Council*,
459 U.S. 519 (1983)...................................................................................10, 15, 20, 22

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990).......................................................................................11, 13

*Axis, S.p.A. v. Micafil, Inc.*,
870 F.2d 1105 (6th Cir. 1989) .......................................................................11, 12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................9, 24, 25, 32, 33, 34, 35, 44

*Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*,
203 F.3d 1028 (8th Cir. 2000) .............................................................................37

*Bodie-Rickett & Assocs. v. Mars, Inc.*,
957 F.2d 287 (6th Cir. 1992) .........................................................................18, 22

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
691 F. App'x 389 (9th Cir. 2017)........................................................................33

ii

*Brown Shoe Co. v. United States*,
 370 U.S. 294 (1962)......................................................................................................42

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
 429 U.S. 477 (1977)..................................................................................................11, 12

*Burtch v. Milberg Factors, Inc.*,
 662 F.3d 212 (3d Cir. 2011)......................................................................................27, 28

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.*,
 427 F.3d 1008 (6th Cir. 2005) ..................................................................................37, 38

*Cargill, Inc. v. Monfort of Colo., Inc.*,
 479 U.S. 104 (1986)......................................................................................................11

*Carrier Corp. v. Outokumpu Oyj*,
 673 F.3d 430 (6th Cir. 2012) ........................................................................................9

*CBC Cos. v. Equifax, Inc.*,
 561 F.3d 569 (6th Cir. 2009) .......................................................................................15

*In re Citric Acid Litig.*,
 191 F.3d 1090 (9th Cir. 1999) ..................................................................................35, 36

*City of Charleston v. Brabham Oil Co., Inc.*,
 2025 WL 2269770 (S.C. Com. Pl. Aug. 6, 2025)....................................................45, 52, 53

*City of New York v. Chevron Corp.*,
 993 F.3d 81 (2d Cir. 2021)............................................................................................52

*City of New York v. Exxon Mobil Corp.*,
 226 N.Y.S.3d 863 (N.Y. Sup. Ct. 2025) ...............................................................45, 50, 53

*City of Oakland v. Oakland Raiders*,
 20 F.4th 441 (9th Cir. 2021) ........................................................................................20

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
 92 F.4th 381 (2d Cir. 2024) ...................................................................................26, 28, 37

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013)......................................................................................................23

*Com-Tel, Inc. v. DuKane, Corp.*,
 669 F.2d 404 (6th Cir. 1982) ........................................................................................38

*In re Concrete & Cement Additives Antitrust Litig.*,
 2025 WL 1755193 (S.D.N.Y. June 25, 2025) ...............................................................29

*Conservation Council of W. Austl., Inc. v. Aluminum Co. of Am.*,
 518 F. Supp. 270 (W.D. Pa. 1981)................................................................................13

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
 846 F.2d 284 (5th Cir. 1988) ........................................................................................36

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,*
  691 F.2d 1335 (9th Cir. 1982) ...................................................................................20

*Coyne v. Am. Tobacco Co.,*
  183 F.3d 488 (6th Cir. 1999) .......................................................................................9

*In re Crop Input Antitrust Litig.,*
  2026 WL 924130 (8th Cir. Apr. 6, 2026) .............................................................26, 27

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
  2007 WL 2517851 (N.D. Cal. Aug. 31, 2007) ...........................................................17

*Eaton v. Newport Bd. of Educ.,*
  975 F.2d 292 (6th Cir. 1992) .....................................................................................31

*Eidson v. State of Tenn. Dep't of Children's Servs.,*
  510 F.3d 631 (6th Cir. 2007) ...............................................................................46, 47

*Energy Conversion Devices Liquidation Tr. v. Trina Solar Ltd.,*
  833 F.3d 680 (6th Cir. 2016) .....................................................................................54

*Erie Cnty. v. Morton Salt, Inc.,*
  702 F.3d 860 (6th Cir. 2012) ...............................................................25, 33, 34, 35, 36

*Expert Masonry, Inc. v. Boone Cnty.,*
  440 F.3d 336 (6th Cir. 2006) .....................................................................................32

*In re Florida Cement & Concrete Antitrust Litig.,*
  746 F. Supp. 2d 1291 (S.D. Fla. 2010) ......................................................................29

*FTC v. Peabody Energy Corp.,*
  492 F. Supp. 3d 865 (E.D. Mo. 2020).........................................................................41

*G.B. v. U.S. EPA,*
  ___ F.4th ___, 2026 WL 959839 (9th Cir. Apr. 9, 2026)............................................23

*Garelick v. Goerlich's Inc.,*
  323 F.2d 854 (6th Cir. 1963) .....................................................................................47

*In re Generic Pharms. Pricing Antitrust Litig.,*
  605 F. Supp. 3d 672 (E.D. Pa. 2022) .........................................................................11

*Gentry v. The Renal Network,*
  636 F. Supp. 2d 614 (N.D. Ohio 2009)..............................................................46, 48, 49

*Geomatrix, LLC v. NSF Int'l,*
  82 F.4th 466 (6th Cir. 2023) ......................................................................................31

*Gibson v. Cendyn Grp., LLC,*
  148 F.4th 1069 (9th Cir. 2025) ..................................................................................26

*Goldfinch Lab., P.C. v. Iowa Pathology Assocs., P.C.,*
  168 F.4th 500 (8th Cir. 2026) ....................................................................................43

*Grand Rapids Plastics, Inc. v. Lakian*,
    188 F.3d 401 (6th Cir. 1999) ................................................................46, 47, 48, 49

*Greminger v. Seaborne*,
    584 F.2d 275 (8th Cir. 1978) .......................................................................................36

*Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League*,
    491 F.3d 310 (6th Cir. 2007) .....................................................................................45

*Hawaii v. Standard Oil*,
    405 U.S. 251 (1972)....................................................................................................18

*Hillspring Health Care Ctr., LLC v. Dungey*,
    2018 WL 287954 (S.D. Ohio Jan. 4, 2018) ...............................................................48

*Hobart-Mayfield Inc. v. Nat'l Operating Comm'n on Standards for Athl. Equip.*,
    48 F.4th 656 (6th Cir. 2022) ........................................................10, 24, 33, 34, 35, 37

*Hodges v. WSM, Inc.*,
    26 F.3d 36 (6th Cir. 1994) .....................................................................................12, 13

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992)....................................................................................................15

*Huang v. Presbyterian Church (U.S.A.)*,
    346 F. Supp. 3d 961 (E.D. Ky. 2018) .......................................................................46

*Hughes v. Tobacco Inst., Inc.*,
    278 F.3d 417 (5th Cir. 2001) ......................................................................................13

*Hunter v. Meyer*,
    63 F. App'x 990 (9th Cir. 2003) .................................................................................48

*Hyland v. HomeServices of Am., Inc.*,
    771 F.3d 310 (6th Cir. 2014) ...........................................................................24, 25, 34

*HyPoint Tech., Inc. v. Hewlett-Packard Co.*,
    949 F.2d 874 (6th Cir. 1991) ......................................................................................10

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)...............................................................................................16, 17

*Illinois v. City of Milwaukee*,
    406 U.S. 91 (1972)......................................................................................................51

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
    125 F.3d 1195 (9th Cir. 1997) ....................................................................................44

*Indeck Energy Servs., Inc. v. Consumers Energy Co.*,
    250 F.3d 972 (6th Cir. 2000) ........................................................................................1

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)...................................................................................2, 33

*Int'l Paper Co. v. Ouellette*,
  479 U.S. 481 (1987)..........................................................................................................51, 54

*In re Interest Rate Swaps Antitrust Litig.*,
  261 F. Supp. 3d 430 (S.D.N.Y. 2017)......................................................................................33

*State ex rel. Jennings v. BP Am. Inc.*,
  2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024) ................................................................45, 53

*Kansas v. UtiliCorp United, Inc.*,
  497 U.S. 199 (1990)..................................................................................................16, 21, 22

*Kelsey K. v. NFL Enters., LLC*,
  254 F. Supp. 3d 1140 (N.D. Cal. 2017) ...................................................................................29

*Kentucky v. Marathon Petroleum Co., LP*,
  191 F. Supp. 3d 694 (W.D. Ky. 2016)......................................................................................42

*Kesters Merch. Display Int'l, Inc. v. SurfaceQuest, Inc.*,
  163 F.4th 1309 (10th Cir. 2026) ..............................................................................................40

*Kleen Prods. LLC v. Int'l Paper*,
  276 F. Supp. 3d 811 (N.D. Ill. 2017) ...........................................................................27, 32, 36

*Kloth v. Microsoft Corp.*,
  444 F.3d 312 (4th Cir. 2006) ...................................................................................................18

*Kraft v. Detroit Ent., LLC*,
  683 N.W.2d 200 (Mich. Ct. App. 2004) ..................................................................................18

*Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*,
  588 F.3d 908 (6th Cir. 2009) ...................................................................................................39

*Lambrix v. Tesla, Inc.*,
  737 F. Supp. 3d 822 (N.D. Cal. 2024) .....................................................................................40

*Laydon v. Coöperatieve Rabobank U.A.*,
  55 F.4th 86 (2d Cir. 2022) .......................................................................................................21

*State ex rel. Leech v. Levi Strauss & Co.*,
  1980 WL 4696 (Tenn. Ch. Sept. 25, 1980)..............................................................................18

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)...........................................................................................................37, 38

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)..................................................................................................................15

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)............................................................................................................23, 24

*Mayor & City Council of Baltimore v. B.P. P.L.C.*,
  2026 WL 809501 (Md. Mar. 24, 2026) ...............................................................................53, 54

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)..................................................................................25

*Miami Prods. & Chem. Co. v. Olin Corp.*,
    449 F. Supp. 3d 136 (W.D.N.Y. 2020)..................................................................36

*Mich. Div.-Monument Builders v. Mich. Cemetery Ass'n*,
    524 F.3d 726 (6th Cir. 2008) ...........................................................................39, 43

*Morse v. Frederick*,
    551 U.S. 393 (2007)..............................................................................................30

*In re Multidistrict Vehicle Air Pollution*,
    538 F.2d 231 (9th Cir. 1976) ................................................................................13

*Municipality of Bayamón v. Exxon Mobil Corp.*,
    2025 WL 2630671 (D.P.R. Sept. 11, 2025).....................................................45, 53

*Municipality of San Juan v. Exxon Mobil Corp.*,
    2025 WL 2848565 (D.P.R. Sept. 30, 2025).....................................................45, 53

*Murthy v. Missouri*,
    603 U.S. 43 (2024)................................................................................................23

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .........................................................................26, 29

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*,
    419 F.3d 462 (6th Cir. 2005) ................................................................................39

*New York v. Meta Platforms, Inc.*,
    66 F.4th 288 (D.C. Cir. 2023)...............................................................................11

*NicSand, Inc. v. 3M Co.*,
    507 F.3d 442 (6th Cir. 2007) ..............................................................................9, 10

*Oak Distrib. Co. v. Miller Brewing Co.*,
    370 F. Supp. 889 (E.D. Mich. 1973).....................................................................30

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018).....................................................................................3, 41, 43

*Park Ave. Radiology Assocs., P.C. v. Methodist Health Sys., Inc.*,
    1999 WL 1045098 (6th Cir. Nov. 10, 1999)..........................................................20

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
    911 F.3d 505 (8th Cir. 2018) ................................................................................32

*In re Passenger Vehicle Replacement Tires Antitrust Litig.*,
    767 F. Supp. 3d 681 (N.D. Ohio 2025)...........................................................26, 34

*Peck v. Gen. Motors Corp.*,
    894 F.2d 844 (6th Cir. 1990) .......................................................................15, 45, 46

*Pennsylvania v. Nat'l Collegiate Athletic Ass'n*,
948 F. Supp. 2d 416 (M.D. Pa. 2013) ...................................................................................10

*Persian Gulf Inc. v. BP West Coast Products LLC*,
2016 WL 4574357 (S.D. Cal. July 14, 2016) .......................................................................35

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*,
530 F. Supp. 3d 301 (S.D.N.Y. 2021)...................................................................................36

*Pinney Dock & Transport Co. v. Penn Cent. Corp.*,
838 F.2d 1445 (6th Cir. 1988) ........................................................................................20, 21

*Platkin v. Exxon Mobil Corp.*,
2025 WL 604846 (N.J. Super. Ct. Feb. 5, 2025) .................................................................53

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997)..................................................................................................40

*Re/Max Int'l v. Realty One, Inc.*,
900 F. Supp. 132 (N.D. Ohio 1995), *aff'd in relevant part*, 173 F.3d 995 (6th
Cir. 1999) ..............................................................................................................................30

*Reading Indus., Inc. v. Kennecott Copper Corp.*,
631 F.2d 10 (2d Cir. 1980).....................................................................................................19

*In re RealPage, Inc., Rental Software Antitrust Litig.*,
709 F. Supp. 3d 478 (M.D. Tenn. 2023).........................................................................43, 44

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .................................................................................................42

*Regents of Univ. of Cal. v. Bakke*,
438 U.S. 265 (1978)...............................................................................................................32

*Riverview Health Inst. LLC v. Med. Mut. of Ohio*,
601 F.3d 505 (6th Cir. 2010) .................................................................................................54

*Robinson v. Nat'l Collegiate Athletic Ass'n*,
2025 WL 2773123 (E.D. Mich. Sept. 26, 2025)...................................................................49

*Schuylkill Energy Res., Inc. v. Penn. Power & Light Co.*,
113 F.3d 405 (3d Cir. 1997).............................................................................................13, 14

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
22 F.4th 103 (2d Cir. 2021) ...................................................................................................16

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) .................................................................................................38

*Segal v. Amadeus IT Grp., S.A.*,
2026 WL 879583 (N.D. Ill. Mar. 31, 2026)..........................................................................27

*Sheridan v. Marathon Petroleum Co.*,
530 F.3d 590 (7th Cir. 2008) .................................................................................................42

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*,
  431 F.3d 917 (6th Cir. 2005) ...................................................................................44

*Stark v. Visa U.S.A. Inc.*,
  2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004).........................................................10, 17

*State v. Detroit Lumbermen's Ass'n, Inc.*,
  1979 WL 18703 (Mich. Cir. Ct. Oct. 29, 1979).............................................................18

*Static Control Components, Inc. v. Lexmark Int'l, Inc.*,
  697 F.3d 387 (6th Cir. 2012) ...............................................................9, 10, 13, 21, 31

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
  171 F.3d 912 (3d Cir. 1999).................................................................................16

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)...........................................................................................24

*Suncor Energy (U.S.A.) Inc. v. County Comm'rs of Boulder Cnty.*,
  2026 WL 490537 (U.S. Feb. 23, 2026)........................................................................52

*Tennessean Truckstop, Inc. v. NTS, Inc.*,
  875 F.2d 86 (6th Cir. 1989) .................................................................................12

*Tolbert v. State of Ohio Dep't of Transp.*,
  172 F.3d 934 (6th Cir. 1999) ................................................................................47

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
  552 F.3d 430 (6th Cir. 2008) ............................................................................38, 39

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ....................................................................32, 34, 35, 36, 49

*United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v.
  Novartis Pharms. Corp.*,
  902 F.3d 1 (1st Cir. 2018)...................................................................................31

*United States v. Michigan*,
  2026 WL 194031 (W.D. Mich. Jan. 24, 2026) ..................................................................6

*Valleys Prods. Co. v. Landmark*,
  128 F.3d 398 (6th Cir. 1997) ................................................................................11

*VIBO Corp. v. Conway*,
  669 F.3d 675 (6th Cir. 2012) ................................................................................31

*Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*,
  388 F.3d 955 (6th Cir. 2004) ................................................................................41

*Z Techs. Corp. v. Lubrizol Corp.*,
  753 F.3d 594 (6th Cir. 2014) .........................................................................46, 47, 50

**Constitutional Provisions**

Mich. Const., art. I ................................................................................................36

**Statutes**

15 U.S.C. § 15 .....................................................................................................12

15 U.S.C. § 15b ...................................................................................................45

15 U.S.C. § 15c ...................................................................................................17

42 U.S.C. § 7401 et seq .......................................................................................53

42 U.S.C. § 7411 .................................................................................................53

42 U.S.C. § 7521 .................................................................................................53

42 U.S.C. § 7547 .................................................................................................53

42 U.S.C. § 7571 .................................................................................................53

Mich. Comp. Laws § 445.772 .............................................................................37

Mich. Comp. Laws § 445.777 .......................................................................17, 18

Mich. Comp. Laws § 445.778 .............................................................................17

Mich. Comp. Laws § 445.781 .............................................................................45

Mich. Comp. Laws § 445.784 .......................................................................11, 24

**Other Authorities**

Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, 90
  Stat. 1383 (1976) ...............................................................................................18

Tom Bergin, *Shell Goes Cold on Wind, Solar, Hydrogen Energy*, REUTERS
  (Mar. 17, 2009), https://perma.cc/3U8T-MMVP .................................................32

**INTRODUCTION**

This is not an antitrust case.  It is an attempt by Michigan to use the antitrust laws to advance its current policy goals of promoting renewable energy over fossil fuels.  The Complaint alleges that Michigan and its residents have been harmed by negative externalities associated with climate change and that, if not for Defendants' individual business decisions, electric vehicles would be "a common sight in every neighborhood" alongside "ubiquitous" charging infrastructure.  Compl. ¶ 11.  But the antitrust laws require much more than policy preferences and speculation.  To state a claim, Michigan must plausibly plead standing, an actual agreement among Defendants that unreasonably restrains competition in a properly defined relevant market, and actionable conduct within the statute of limitations.  The Complaint pleads none of those things.

As a threshold matter, Michigan lacks standing under the antitrust laws and Article III.  To have statutory standing, litigants must plead a direct antitrust injury—meaning "injury of the type the antitrust laws were intended to prevent," like reduced output—to "ensur[e] that antitrust laws are not trivialized."  *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 976 (6th Cir. 2000) (quotation marks omitted).  Michigan's alleged harms do not arise from reduced competition or otherwise qualify as antitrust injury.  They arise instead from Defendants' vigorous competition in fossil fuels and their investments in such fuels, rather than (as Michigan would have preferred) shifting their businesses to renewable energy.  Although these purported harms may be proper subjects for political debate, they cannot support an *antitrust* claim.  Nor are they directly caused by the conduct Michigan challenges.  They instead depend on long and speculative chains of causation traversing many separate markets: Michigan alleges that different investment choices in different technologies would have spurred innovation and infrastructure buildout, changed consumer behavior, lowered worldwide fossil-fuel demand, and ultimately lowered prices in retail

1

energy markets in Michigan.  This does not plead statutory antitrust standing.  And no order of the Court could redress these alleged injuries, defeating Michigan's Article III standing as well.

Even disregarding Michigan's lack of standing, the Complaint fails to state a claim under either the Sherman Act or the Michigan Antitrust Reform Act ("MARA").  A conspiracy claim requires an actual agreement among the defendants.  Despite asserting a sweeping conspiracy that supposedly spanned nearly half a century, Michigan offers no direct evidence of the claimed conspiracy and relies entirely on circumstantial evidence that is implausible on its face.  Michigan tries to piece together different business decisions by different firms at different times over the course of five decades and asks the Court to infer conspiracy from conduct that is fully consistent with each firm's independent and economically rational self-interest.  Michigan imagines that, absent conspiracy, Defendants would have raced to abandon hundreds of billions of dollars in existing fossil fuel assets and infrastructure.  That these companies may have prioritized the stability of their longstanding, profitable fossil fuel businesses over risky renewable energy investments does not remotely suggest they conspired with each other.  To the contrary, "common economic experience, [and] the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for defendants' common behavior."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) (quotation marks omitted).

Michigan also fails to allege that any such agreement unreasonably restrained trade in any relevant market.  This is not a *per se* case—the narrow category of antitrust cases reserved for evident cartel conduct, like price fixing, market allocations, or group boycotts.  Michigan therefore must proceed under the "rule of reason" and plead two foundational elements: a plausible market and facts showing harm to competition in that market.  Michigan does neither.  It fails to allege "an accurate definition of the relevant market"—including by lumping together products like

2

gasoline and electricity that are not substitutable—and thus leaves "no way to measure [Defendants'] ability to lessen or destroy competition." *Ohio v. Am. Express Co.* ("*AmEx*"), 585 U.S. 529, 543 (2018) (quotation marks omitted).  And Michigan never plausibly alleges harm to competition itself—it does not plead market power, price hikes, or output restriction—and thus its claims fail under a rule-of-reason analysis.

Michigan's claims are time-barred as well.  Although subject to a four-year statute of limitations, Michigan attempts to allege a conspiracy dating back nearly half a century and relies on decades-old conduct, including business decisions in the 1970s and 1980s and investment strategies dating to the 2010s.  Michigan alleges no overt act from January 2022 forward to revive those stale claims.

Michigan's MARA claim fares no better.  Under Michigan law, that claim rises—and, here, falls—with the corresponding Sherman Act claim.  Moreover, because Michigan purports to use state antitrust law to regulate nationwide energy policy, federal law preempts that state-law claim.

For these reasons, Michigan's attempt to use the antitrust laws to implement its preferred energy policy should be dismissed with prejudice.

**FACTUAL ALLEGATIONS**[1]

**I.    Defendants' Longstanding Commitment to Fossil Fuel Products**

Defendants are four global energy companies and their subsidiaries (collectively "Energy Defendants"), as well as the American Petroleum Institute ("API"), the "industry's largest trade association."  Compl. ¶¶ 1–2, 21–26.  Energy Defendants have historically competed in a segment "comprised of fossil fuels, which are nonrenewable energy sources like crude oil, natural gas, and coal that emit carbon dioxide ($CO_2$) and other greenhouse gases (GHGs) when combusted."  *Id.*

---

[1] For purposes of this motion only, Defendants assume, as they must, the truth of Michigan's factual allegations set out in the Complaint, PageID.1–127.

3

¶ 36.  Michigan maintains that Energy Defendants have promoted the use of their fossil fuel products—a central component of their businesses—for over one hundred years.  *Id.* ¶ 62.  Not surprisingly, each of the Energy Defendants has allegedly continued its investments in, and output of, fossil fuels and related technologies.  *Id.* ¶¶ 145, 171.

Michigan alleges that certain Defendants have also petitioned the government and engaged in other forms of protected speech to support and protect their business interests, including by, in Michigan's words: (i) "lobbying against public investments in EV infrastructure and policies promoting EV adoption," *id.* ¶ 218; (ii) engaging in "lobbying, coalition engagement, and political advertising . . . aimed at removing public charging incentives from major federal legislation," *id.*; (iii) "aggressively lobb[ying] against the EPA's proposed greenhouse gas standards for new cars," *id.*; (iv) participating in "standard-setting" industry groups, *id.* ¶¶ 238–45; (v) "organiz[ing] an astroturf campaign opposing an Arizona rule that would require public utilities to build charging stations," *id.* ¶ 218; and (vi) "organiz[ing] campus workshops and debates on climate science" at universities, *id.* ¶ 183.

Most energy in the United States continues to come from fossil fuels.  "As of 2021, fossil fuels accounted for approximately 92% of all U.S. transportation energy consumption, with gasoline comprising more than half."  *Id.* ¶ 221.  Within Michigan, fossil fuels likewise generate the vast majority of the energy that Michigan residents consume.  *Id.* ¶ 53.  By contrast, as Michigan acknowledges, the potential revenue from renewable energy sources is much less predictable, and developing renewables involves challenges such as "high capital costs," "entrenched distribution systems," and "regulatory complexity."  *Id.* ¶ 230.  For example, "[e]lectricity's substitutability for gasoline remains constrained by insufficient charging networks, grid capacity, and battery supply."  *Id.* ¶ 231.

## II.    Defendants' Investments in Renewable Energy Products and Alleged Retreat

Notwithstanding their principal focus on fossil fuels, Energy Defendants were, by Michigan's admission, "early developers of key EV technologies, including lithium and nickel-metal hydride batteries and hybrid gas-electric motors." *Id.* ¶ 90. Energy Defendants allegedly continued to invest in various renewable energy products and technologies over the decades. *See generally id.* ¶¶ 95–143.

The Complaint acknowledges that the level of each Defendant's investment in renewables varied: in 2023, while "'low-carbon' investments accounted for only 4% of total capital expenditures across the entire energy market[,] Chevron allocated 4% toward such investments; BP 4.5%; Exxon[Mobil][2] 6%; and Shell 11%." *Id.* ¶ 143.

Energy Defendants' renewable energy investments also took different forms and occurred at different times. For example, according to the Complaint, ExxonMobil "developed the first hybrid gas-electric vehicle technologies" in "the late 1970s," *id.* ¶ 94; "partnered with Toyota to develop a hybrid gas-electric vehicle" in 1979, *id.* ¶ 95; "developed a new battery film separator technology" in 2007, *id.* ¶ 97; partnered with an "EV battery supplier" to produce a "prototype EV" in 2009 (until it encountered "regulatory speedbumps"), *id.*; and acquired a patent for an EV "charging network" in 2009 and "a similar Japanese patent" in 2012, though ExxonMobil "deliberately refrained from using" those patents, *id.* ¶ 112. Shell, for its part, "began installing charging stations in the UK and the Netherlands in September 2017" and opened a U.S. charging station two years later, *id.* ¶ 116. Chevron gained control of "key patents for [certain] battery packs suitable for EVs" in 2000 and filed patent-infringement litigation in 2001, *id.* ¶¶ 99–100, and

---

[2] Although the Exxon Mobil Corporation did not exist until the 1999 merger between Exxon Corporation and Mobil Corporation, for purposes of this motion, Defendants refer to Exxon Corporation, Exxon Mobil Corporation, and ExxonMobil Oil Corporation as "ExxonMobil."

"announced investments in and partnerships with EV charging companies such as ChargePoint (2018), EVgo (2019), and FreeWire (2022–2024)," *id.* ¶ 115.  And BP has 395 EV charging stalls in the United States, with plans to add more in certain geographic markets.  *Id.* ¶ 117.

Energy Defendants likewise allegedly embarked on varied projects in solar energy technologies.  *See, e.g.*, *id.* ¶ 124.  While ExxonMobil "fully exited solar" by 1984, "Shell entered the solar market" in 1979 and continued to invest in it until 2009, when it "divested of solar entirely."  *Id.* ¶¶ 124, 129.  Meanwhile, BP formed BP Solar in 1981, which "by 1994 controlled nearly 10% of the global photovoltaic market," and Chevron continued to invest in solar until it "divested [its] solar companies and investments in 2014."  *Id.* ¶¶ 124, 126, 130.

## III.    The Alleged Conspiracy Spanning Nearly 50 Years

Michigan alleges that Defendants learned in the 1970s that consumer demand might eventually shift toward renewable energy and away from fossil fuels.  *Id.* ¶¶ 64, 68, 70.  In response, Defendants allegedly launched a conspiracy in 1979—which Michigan claims is ongoing—to "restrain the development, adoption, and output of renewable energy alternatives that posed a competitive threat to gasoline and fossil fuel[s]."  *Id.* ¶¶ 63–64.  To carry out this far-fetched scheme, Energy Defendants, via API, supposedly "exchanged competitively sensitive information" about the potential "competitive threat of a large-scale transition away from fossil fuels," which supposedly "reduced incentives for independent investment in renewable energy."  *Id.* ¶¶ 73–74.

## IV.    Michigan's Alleged Relevant Markets and Claimed Injuries

After soliciting bids from plaintiff firms to "pursue litigation related to the climate change impacts caused by the fossil fuel industry," *United States v. Michigan*, 2026 WL 194031, at *1 (W.D. Mich. Jan. 24, 2026), Michigan filed this Complaint.  Michigan seeks to assert antitrust conspiracy claims "on behalf of itself and as *parens patriae* on behalf of the people of the State" under Section 1 of the Sherman Act and its counterpart under MARA.  Compl. ¶ 1.

6

Michigan proffers two putative relevant antitrust markets in which it alleges injury: (i) the Michigan "'transportation energy' market," defined as "the market for individual consumer and State retail purchases of energy products for . . . personal ground transportation vehicles," where the "principal options" are gasoline and electricity; and (ii) the Michigan "'primary energy' market," defined as "the market for individual consumer purchases of primary energy products for residential or commercial heating or cooling purposes," where the "principal options" are energy from "fossil fuel sources" and "renewable energy sources." *Id.* ¶ 43. Both markets are allegedly defined by and limited to Michigan's state borders.

Michigan does not allege that the State or its residents buy *anything* directly from Defendants. For transportation energy, Michigan alleges no facts establishing that the State or its residents purchase gasoline or any other form of transportation energy directly from Defendants. *Id.* ¶ 49. Rather, Michigan alleges that "the vast majority of branded gas stations are owned and operated by independent retailers," *id.*, and "[i]n Michigan, all Exxon[Mobil] and BP branded gas stations are independently owned," *id.* ¶ 50. Chevron has no "retail gas station[s] in Michigan." *Id.* ¶ 22. Independent retailers—not Defendants—sell gasoline to consumers in the "vast majority" of instances. *Id.* ¶ 49.

Similarly, Michigan does not allege that the State or its residents purchase primary energy directly from Defendants. Rather, "[a]lmost all" the "homes in Michigan" and "buildings owned or leased by the State" obtain "electricity from a regional power grid," not Defendants. *Id.* ¶ 55. Michigan alleges that "[m]any of Michigan's municipalities (subdivisions of the state) own public energy utilities" and that "[m]any of these municipal electric utilities have their own power plants that they run with primary energy (including from fossil fuel sources)," which was, at some point along the supply chain, "purchased from big energy companies (including [Energy] Defendants)."

7

*Id.* ¶ 56.  But the Complaint does not allege any instance in which a municipality (or Michigan resident) purchased primary energy directly from a Defendant.

Nor does Michigan allege that Defendants conspired to fix prices for fossil fuels or their downstream transportation and residential products.  Instead, it claims that the conspiracy has caused the State and its consumers to pay supposed "overcharges" for transportation energy and primary energy.  *Id.* ¶ 281.  Michigan alleges that, had the Energy Defendants not "artificially inflated gasoline demand," *id.* ¶ 119, and "suppress[ed] electricity and other clean alternatives to gasoline," gasoline prices would have been lower, *id.* ¶ 252.  It also alleges that, due to "raised switching costs" and the elimination of "competitive price pressure," "consumption of energy products from fossil fuel sources, such as home heating oil and propane, has remained artificially high, forcing the State and Michigan consumers to pay inflated prices."  *Id.* ¶ 258.

Michigan asserts that the alleged conspiracy also caused climate-related harms.  *Id.* ¶ 261. In particular, Michigan alleges that the purported conspiracy imposed "negative externalities including climate related harms, rising insurance premiums to account for the impacts of climate events, depressed home values in areas of the State most susceptible to climate harms, and damage to Michigan's general economy," as well as harm from "expenses to address or mitigate the[se] negative externalities."  *Id*. ¶¶ 261, 268.  According to the Complaint, Michigan recently began taking steps to mitigate "climate harms" it "has borne."  *Id.* ¶ 262.  For example, in December 2023, Michigan's Governor "issued an Executive Directive to convert the State's light-duty vehicle fleet to zero-emission vehicles by 2033," *id.* ¶ 46, and the State now owns fewer than ten electric vehicles ("EVs"), *id.*  From 2023 to 2024, renewable energy use rose from 7.8% of Michigan's electricity generation to 12%, *id.* ¶ 53, "and Michigan consumers can [now] buy electricity as fuel for about half the cost of gasoline per mile," *id.* ¶ 58.

8

To remedy its purported harms, Michigan seeks sweeping compensatory and injunctive relief. Specifically, it seeks "trebled damages for all harms suffered by the State and its residents" under both federal and state law. *Id*. at 119–20. It also seeks injunctive relief ordering Defendants to stop their purported conspiracy. *See id.* ¶¶ 283, 297. Finally, Michigan seeks civil penalties and disgorgement of profits. *Id*. at 119–20.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[F]ailure to plead sufficient facts will lead to dismissal of the claim." *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 401 (6th Cir. 2012).

To survive a motion to dismiss for lack of Article III standing under Rule 12(b)(1), a plaintiff must "plead . . . with specificity," *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999), sufficient "non-conclusory facts" to "establish that the district court ha[s] jurisdiction," *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 440 (6th Cir. 2012).

## ARGUMENT

### I.    Michigan Lacks Antitrust and Article III Standing.

Michigan's Complaint fails at the threshold because it does not adequately allege either "antitrust standing" or "Article III standing." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007). Michigan does not allege the kind of injury the antitrust laws were intended to redress; it places the alleged restraint and the alleged injury in different markets; and it depends on an attenuated and speculative chain of causation involving multiple intermediary markets and third

parties.  Nor could any order of this Court redress the purported injuries.  Those standing defects foreclose every form of relief Michigan seeks, including damages, injunctive and disgorgement relief, and civil penalties.

> ### A.    Michigan Fails to Allege Antitrust Standing.

"[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the court] must dismiss it as a matter of law."  *NicSand*, 507 F.3d at 450.  The requirement "is not a mere technicality"—"[i]t is the glue that cements each suit with the purposes of the antitrust laws, and prevents abuses of those laws" by ensuring that litigants use the laws "only to deal with the economic problems whose solutions these policies were intended to effect."  *HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991).  This requirement applies even when a state sues in its representative capacity: Michigan "must still show that residents on whose behalf it sues" have "antitrust standing."  *Pennsylvania v. Nat'l Collegiate Athletic Ass'n*, 948 F. Supp. 2d 416, 432 (M.D. Pa. 2013).

The Sixth Circuit has traditionally evaluated antitrust standing using the five-factor test set out in *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983).  Those factors are: "(1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff's alleged injury . . . ; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation."  *Static Control*, 697 F.3d at 402.[3]  The Sixth Circuit recently distilled that five-

---

[3] The *AGC* analysis applies equally to Michigan's federal and state claims.  *See Hobart-Mayfield Inc. v. Nat'l Operating Comm'n on Standards for Athl. Equip.*, 48 F.4th 656, 663 (6th Cir. 2022); *Stark v. Visa U.S.A. Inc.*, 2004 WL 1879003, at *2–4 (Mich. Cir. Ct. July 23, 2004).  And the *AGC* analysis applies regardless of the relief Michigan

factor test into two elements: (1) antitrust injury and (2) proximate causation.  *See Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.* ("*AAAPC*"), 155 F.4th 795, 806–19 (6th Cir. 2025).  Michigan fails to allege either element.

### 1.    Michigan Does Not Allege Antitrust Injury.

Antitrust injury is a "necessary," but not sufficient, condition of antitrust standing.  *Cargill*, 479 U.S. at 110 n.5; *AAAPC*, 155 F.4th at 811.  The Sixth Circuit has been "aggressive in using the antitrust injury doctrine," *Valleys Prods. Co. v. Landmark*, 128 F.3d 398, 403 (6th Cir. 1997), and "regularly reject[s] suits for the lack of antitrust injury alone," *AAAPC*, 155 F.4th at 807.  So whether Michigan seeks "damages" or "injunctive relief," *Axis, S.p.A. v. Micafil, Inc.*, 870 F.2d 1105, 1108 (6th Cir. 1989), it must allege "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Michigan alleges no such injury here for two independent reasons.

### a.    Michigan Alleges No Injury from Competition-Reducing Conduct.

Antitrust injury must arise from a "competition-reducing aspect" of the challenged conduct.  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).  Michigan cannot plausibly claim antitrust injury based on nothing more than conclusory allegations that Michigan and its citizens suffered energy "overcharges."  Compl. ¶ 281.  The Complaint does not allege any

---

requests.  Any request for disgorgement under federal law would necessarily have to proceed as a claim for equitable relief under Section 16 of the Clayton Act, which requires a showing of "threatened . . . antitrust injury."  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986); *see New York v. Meta Platforms, Inc.*, 66 F.4th 288, 298–99 (D.C. Cir. 2023) (concluding that states are subject to Section 16's "equitable constraints").  The Court need not proceed that far, however, because disgorgement is not a permissible equitable remedy under Section 16 of the Clayton Act.  *In re Generic Pharms. Pricing Antitrust Litig.*, 605 F. Supp. 3d 672, 678 (E.D. Pa. 2022) ("[D]isgorgement is not available as a form of 'injunctive relief' under § 16.").  *AGC* also applies to any disgorgement or civil penalties sought under Michigan state law, which directs courts to apply federal "interpretations" of the federal antitrust laws to MARA claims.  Mich. Comp. Laws § 445.784(2).

11

agreement to fix prices, restrict fossil fuel output, or otherwise refrain from vigorously competing in the sale of fossil fuel products in a way that would result in overcharges for transportation or primary energy.  To the contrary, it alleges that Defendants "are *increasing* oil and gas production." *Id.* ¶ 171 (emphasis added).   Increased production is "obviously a proconsumer device." *Tennessean Truckstop, Inc. v. NTS, Inc.*, 875 F.2d 86, 90 (6th Cir. 1989).  At bottom, Michigan's grievance is that Defendants vigorously competed in fossil fuels and declined to abandon what is described as "massive" investments in "capital-intensive assets like refineries, pipelines, and retail fuel locations."  Compl. ¶ 235.  But as the Supreme Court has explained, a plaintiff does not suffer antitrust injury by losing the "benefits" it hoped to gain from reduced competition.  *Brunswick*, 429 U.S. at 488.  The antitrust laws provide no relief if the "sole injury alleged is that" a company was "continued in business," thereby "preserv[ing] competition."  *Id.* at 484, 488.

Nor is it sufficient to assert that Energy Defendants' exit from their existing fossil-fuel business was necessary to enable "new [renewable technology] entrants in the primary and transportation energy markets."  Compl. ¶ 118.  It is black-letter law that an antitrust plaintiff cannot plead antitrust injury by deeming defendants to be an "illegal presence in the market." *Axis*, 870 F.2d at 1108 (quoting *Brunswick*, 429 U.S. at 489).  Absent any "decrease in competition," *Hodges v. WSM, Inc.*, 26 F.3d 36, 39 (6th Cir. 1994), which Michigan has not plausibly pleaded, conclusory overcharge allegations do not suffice to show antitrust injury and at most describe pricing set by independent market dynamics.

Michigan's other alleged injuries—"environmental harms," "negative externalities," and "delayed" decarbonization, Compl. ¶¶ 4, 59, 62, 90, 131—fare no better.  Harms of this sort are not of "concern to the antitrust laws," which redress only economic injury to "'business or property'" caused by a restraint on competition.  *Brunswick*, 429 U.S. at 485, 487 (quoting 15

12

U.S.C. § 15(a)).  The antitrust laws do not apply where "the harm to be alleviated is environmental, not economic in the antitrust sense."  *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 236–37 (9th Cir. 1976).  Thus, although "the environmental quality of energy sources may be a worthwhile concern," it is not "a problem whose solution is found in the Sherman Act."  *Schuylkill Energy Res., Inc. v. Penn. Power & Light Co.*, 113 F.3d 405, 411–14 & n.9 (3d Cir. 1997) (no antitrust injury where plaintiffs alleged that practice "reduce[d] the availability to consumers of power produced using alternative, environmentally pro-active energy sources" because "[d]epriving consumers of 'energy sources' is not . . . cognizable antitrust injury"); *see also Conservation Council of W. Austl., Inc. v. Aluminum Co. of Am.*, 518 F. Supp. 270, 281 (W.D. Pa. 1981) (rejecting attempt to "raise environmental issues under the guise of antitrust laws").

The alleged environmental harms do not result from any "competition-reducing" restraint, *Atl. Richfield*, 495 U.S. at 344, but rather from the production and consumption of fossil fuels themselves.  Such harms would exist whether firms independently chose to produce fossil fuels or did so pursuant to an agreement.  *See Hodges*, 26 F.3d at 39 (no antitrust injury where alleged harm "would have occurred in the absence of the antitrust conduct").

> **b.    The Alleged Injuries Do Not Arise in the Same Markets As the Alleged Restraint.**

Michigan also fails to plead antitrust injury because the alleged restraint and the alleged injuries occur in entirely different markets.  "Antitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained."  *Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999).  Put another way, if a plaintiff "is neither a consumer nor competitor" in the market in which the defendant allegedly *acted* to restrain trade, then the plaintiff cannot show antitrust injury.  *Static Control*, 697 F.3d at 402; *see also Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 423 (5th Cir. 2001) ("Parties whose injuries . . . are experienced

13

in another market [than the one in which the defendant acted] do not suffer antitrust injury.");
*Schuylkill Energy*, 113 F.3d at 415.

Here, the mismatch between Michigan's alleged injuries and the challenged conduct is apparent on the face of the Complaint.  Michigan claims its injuries arise in only two markets: the Michigan transportation energy and primary energy markets.  Those are purported retail markets in which consumers and the State purchase gasoline or electricity for vehicles, and fossil fuels or renewable energy for heating and cooling, respectively.  Compl. ¶¶ 43–44.  And those are the markets in which Michigan and its residents allegedly suffered injury by paying "supracompetitive prices" for "transportation energy and primary energy products."  *Id.* ¶¶ 280, 294.

But Michigan does not allege that the purported agreement originates in those two retail markets at all.  Instead, on Michigan's telling, Defendants acted—and allegedly restrained trade— in other distinct markets, including the "U.S. solar market," *id.* ¶ 125, and the markets for batteries, motors, charging infrastructure, renewable technology licensing, and similar products and technologies, *see id.* ¶¶ 91–94, 101, 120, 149.  Michigan does not purport to be suing as a competitor or customer in any of *those* markets.  Yet it is *that* alleged conduct—at the very beginning of Michigan's attenuated causal chain—that the Complaint says resulted in "downstream anticompetitive effects" in the asserted relevant retail markets far down the chain. *Id.* ¶ 121.  These upstream markets in which the challenged conduct allegedly occurred involve different products, different competitors, different customers, and different technologies than the downstream retail transportation energy and primary energy markets where Michigan claims injury.  "[D]erivative harms" of this sort "are not an antitrust injury."  *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 192 (10th Cir. 2025).

In sum, Michigan has "failed to allege any antitrust injury," dooming its claims at the threshold.  *CBC Cos. v. Equifax, Inc.*, 561 F.3d 569, 571–72 (6th Cir. 2009).

### 2.      Michigan Does Not Allege Proximate Causation.

Even ignoring Michigan's failure to plead antitrust injury, it still lacks antitrust standing because it has not plausibly alleged "proximate causation."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014); *see AAAPC*, 155 F.4th at 811 ("Even if [the plaintiff] suffered such an injury, its suit still fails on proximate-causation grounds.").  Proximate causation requires a direct causal relationship between the challenged conduct and the asserted injury because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."  *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 267–69 (1992); *see also AGC*, 459 U.S. at 538–44.  Standing thus fails, and dismissal is warranted, where the plaintiff's injuries are "derivative" and the "causal link" is "attenuated."  *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 847 (6th Cir. 1990).  That is certainly true here.

### a.      Michigan's Claimed Injuries Are Indirect and Highly Speculative.

The directness requirement "limits antitrust liability beyond a certain point," *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 139 (2d Cir. 2021), because the "general tendency of the law . . . is not to go beyond the first step" in the causal chain, *AGC*, 459 U.S. at 534.  Michigan's alleged injuries—whether asserted in the State's own capacity or as *parens patriae*—lie well beyond that first step.

The first step in Michigan's alleged causal chain is Defendants' purported agreement "to reduce the production and distribution of electricity from renewable sources and to restrain the emergence of electric vehicles (EV) and renewable primary energy technologies."  Compl. ¶ 3.

The injuries Michigan claims—higher fossil fuel prices and "the immense costs of externalities caused by fossil fuel products," including "climate change impacts, rising insurance premiums, depressed home values, and damage to Michigan's economy," *id.* ¶¶ 15–16—arise many steps downstream, at the end of a long causal chain, "far removed from Defendants' [alleged] conduct," *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 117 (2d Cir. 2021). On Michigan's telling, but for the alleged conspiracy, Energy Defendants would have invested heavily in renewables while drawing down or exiting the business of extracting "primary" fossil fuels such as crude oil, natural gas, and coal. Compl. ¶¶ 39, 63, 87. Those upstream changes then would have worked their way through "secondary" energy markets for gasoline, fuel oil, and electricity before ultimately affecting the alleged relevant retail markets for both fossil-fuel and renewable energy products in Michigan. *Id.* ¶¶ 40, 54–55, 87, 121, 259. That type of "tortured path" is exactly what "the proximate cause requirement is intended to weed out." *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 930 (3d Cir. 1999).

The same is true of Michigan's alleged "overcharges," Compl. ¶ 281, which are impermissibly indirect and speculative. As an initial matter, black-letter law bars Sherman Act damages claims by "indirect purchasers" (meaning those who purchased from an entity downstream of a defendant, such as an independent retailer), including States suing as *parens patriae. Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 219 (1990); *see Illinois Brick Co. v. Illinois*, 431 U.S. 720, 746–47 (1977). That principle bars Michigan from pursuing Sherman Act claims on behalf of indirect purchasers. Michigan is instead limited to bringing such federal claims on behalf of *direct* purchasers. In an effort to circumvent this limitation, Michigan purports to seek damages under the Sherman Act only for "direct[]" purchases, Compl. ¶ 281, while seeking damages for both "direct[]" *and* "indirect[]" purchases under MARA, *id.* ¶ 295.

16

The problem for Michigan—which is fatal to its attempt to seek damages for direct purchases under *either* claim—is that it does not plausibly plead any such purchases. Far from alleging that Michigan or its residents directly purchased transportation energy from Defendants, the Complaint concedes that the "vast majority" of gas stations (95% in the United States) are "owned and operated by independent retailers," not Defendants. Compl. ¶ 49. The Complaint nowhere alleges facts sufficient to plead any direct purchases of transportation energy. Nor does it allege direct purchases of "primary energy" from Defendants by its residents or for State buildings, "almost all" of which use electricity for heating and cooling. *Id*. ¶ 55. This omission is unsurprising because primary energy is ordinarily sold through intermediaries like "regional power grid[s]," not directly by Defendants. *Id.* "Derivative harms" of this sort cannot satisfy the "proximate causation" requirement. *AAAPC*, 155 F.4th at 811–12.[4]

Nor does MARA permit Michigan to recover alleged overcharges or other damages of *any* sort, direct or indirect, incurred by Michigan residents. Under the statute, Michigan can seek damages only for injuries to "*its* business or property." Mich. Comp. Laws §§ 445.777–445.778 (emphasis added).[5] Like other state antitrust statutes, MARA does not "expressly authorize[] a suit by the Attorney General for monetary damages on behalf of natural persons," and "there is no broadly recognized common law parens patriae right to pursue monetary damages claims." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2007 WL 2517851, at *8–10 (N.D.

---

[4] Although MARA permits "indirect[]" claims, Mich. Comp. Laws § 445.778(1), it otherwise left in place the "[*AGC*] standing requirements," including the "'analytically distinct'" question whether "'persons have sustained injuries too remote to give them standing to sue,'" *Stark*, 2004 WL 1879003, at *4 (quoting *Illinois Brick*, 431 U.S. at 728 n.7).

[5] If Michigan's legislature intended to authorize the State to seek *parens patriae* damages under MARA, it could have adopted language similar to the Clayton Act, which allows state attorneys general to pursue *parens patriae* damages for violations of federal antitrust law. *See* 15 U.S.C. § 15c ("Any attorney general of a State may bring a civil action in the name of such State, as *parens patriae* on behalf of natural persons residing in such State . . . to secure monetary relief."). Instead, the annotations to MARA confirm that Section 445.778 "adopted" the "private right of action for injury to business or property . . . found in section 4 of the Clayton Act (15 U.S.C.A § 15)," while omitting reference to Section 15c. Mich. Comp. Laws § 445.778 (editor's note).

Cal. Aug. 31, 2007) (dismissing New York's "parens patriae claim for monetary damages" under state law); *see also State ex rel. Leech v. Levi Strauss & Co.*, 1980 WL 4696, at \*5 (Tenn. Ch. Sept. 25, 1980) (dismissing the "portion of the complaint seeking damages as parens patriae" under Tennessee law as "a drastic departure from accepted practice").[6]

In addition to being predicated on indirect purchases, Michigan's attenuated overcharge theory is astoundingly speculative, dooming both its Sherman Act and MARA claims.  Antitrust law does not permit claims that require courts to engage in "highly speculative" calculations or confront "situations of complexity that would foreclose an equitable determination and apportionment of damages."  *Bodie-Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287, 292 (6th Cir. 1992).  Nor does the law allow courts to "create in hindsight a technological universe that never came into existence" and then speculate about the "relevant benefits and detriments that [other] products would have brought to the market and the relative monetary value to a diffuse population of end users."  *Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (quotation marks omitted).

To get from the alleged restraint to the overcharges Michigan claims, the Court would have to accept, among many other things, that absent the alleged conduct:

---

[6] Although an unpublished Michigan trial-court decision (pre-dating MARA) identified a common law right to "maintain a *parens patriae* suit for damages," *State v. Detroit Lumbermen's Ass'n, Inc.*, 1979 WL 18703, at \*5 (Mich. Cir. Ct. Oct. 29, 1979), that case was incorrectly decided, *see Leech*, 1980 WL 4696, at \*5 (referring to *Lumbermen's* as an "exception" to most courts' refusal to "exten[d] the concept of *parens patriae* to permit suits by the State to collect damages for individual citizens").  *Lumbermen's* relied on *Hawaii v. Standard Oil*, 405 U.S. 251 (1972), to reach its erroneous conclusion.  *Lumbermen's*, 1979 WL 18703, at \*5.  But the cases cited by the Supreme Court in *Standard Oil* that "establish the right of a State to sue as *parens patriae* to prevent or repair harm to its 'quasi-sovereign' interests" encompassed only suits for injunctive relief, not suits for damages.  *Standard Oil*, 405 U.S. at 258–59.  Because common law does not create a right to *parens patriae* damages, Congress specifically authorized *parens patriae* damages under federal antitrust law.  *See* Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, 90 Stat. 1383 (1976).  Not only did the Michigan legislature decline to follow suit, it limited the *parens patriae* remedies under MARA to "injunctive or other equitable relief and civil penalties."  Mich. Comp. Laws § 445.777.  That legislative act extinguished any conceivable common law right to *parens patriae* damages because "if a statute provides for an exclusive remedy . . . , any conflicting common law simply cannot apply."  *Kraft v. Detroit Ent., LLC*, 683 N.W.2d 200, 206 n.5 (Mich. Ct. App. 2004).

18

1. Energy Defendants would have invested materially more and materially earlier in renewable energy technologies;

2. such investments would have accelerated the development and deployment by Energy Defendants and third parties of renewable energy and EV technologies;

3. charging networks, grid capacity, battery supply chains, and related infrastructure would have expanded sufficiently at an early date to support large-scale EV adoption by the public and electrification of heating and cooling;

4. battery, hybrid motor, and electricity costs would have fallen;

5. consumers would have been willing and financially able to rapidly switch in vast numbers from internal-combustion vehicles to EVs or electrified heating and cooling, notwithstanding vehicle turnover rates and infrastructure constraints;

6. EV adoption and/or electrification of heating and cooling in Michigan and nationwide would have increased as a result;

7. increased EV adoption and/or electrification of heating and cooling would have materially reduced fossil fuel demand;

8. refiners and producers (and their customers, such as independent gasoline retailers) would have scaled down their fossil fuel businesses at the "primary" and "secondary" levels;

9. any net change in supply and demand would have resulted in lower fossil fuel prices in global energy markets; and

10. those lower prices would have been transmitted through refiners and independent retailers to Michigan consumers.

*See* Compl. ¶¶ 125, 129, 149, 222, 251.[7]

Simply stated, Michigan's damages theory is "hopeless[ly] speculat[ive]," with "countless . . . market variables" at play. *Reading Indus., Inc. v. Kennecott Copper Corp.*, 631 F.2d 10, 13–14 (2d Cir. 1980). Michigan asks the Court to construct an alternative economic and technological history spanning nearly five decades—one in which Energy Defendants made

---

[7] Moreover, the Complaint alleges no causal connection at all between some of Michigan's decisions regarding renewable energy sources and Defendants' conduct. For example, the Complaint alleges that out of the 14,761 vehicles the State owns or leases, fewer than ten are EVs, *see* Compl. ¶ 46, but does not (and cannot) allege that low number is Defendants' fault. Nor does Michigan explain how Energy Defendants' investments in fossil fuels caused Michigan to purchase only 0.005% of the 180,000 available EVs in the State. *Id.* ¶ 45. The Complaint also does not plead that Defendants prevented Michigan from "convert[ing] the State's light-duty vehicle fleet to zero-emission vehicles" or encouraging the development of EV infrastructure or other renewables in Michigan earlier than December 2023. *Id.*

19

different investment choices, technologies and consumer preferences evolved differently, and global energy markets followed entirely different trajectories—and then assign a monetary value to the difference between that imagined world and the real one.  Michigan would have to "produce evidence" on each of these contingencies, and the Court would be "saddled" with "sifting through massive evidence" to resolve inherently uncertain questions about how markets and technologies would have developed over that 50-year period and what damages should result.  *Pinney Dock & Transport Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1464 (6th Cir. 1988).  There are simply "too many speculative links," *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 460 (9th Cir. 2021), and too many "independent factors," *AGC*, 459 U.S. at 542–43, to plead proximate causation. Courts have rejected far less attenuated claims by retail gasoline purchasers against oil refiners because the "obstacles to intelligent inquiry" were "nearly insurmountable" given the "multi-tiered" chain of distribution and intervening pricing decisions of "numerous" non-conspirators.  *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1340–41 (9th Cir. 1982).

So too here.  Michigan's asserted injuries are "two or more steps removed from the [alleged] antitrust violator," *AAAPC*, 155 F.4th at 813, 815–16 (quotation marks omitted), and thus impermissibly indirect.

     **b.**  **Michigan's Theory Creates a Risk of Duplicative Recovery and Unmanageable Apportionment.**

Courts also are hesitant to find standing where the claims create a "potential for duplicative recovery or complex apportionment of damages."  *Park Ave. Radiology Assocs., P.C. v. Methodist Health Sys., Inc.*, 1999 WL 1045098, at *3 (6th Cir. Nov. 10, 1999) (per curiam).  That risk is obvious where "[t]he existence of [a] clear class of direct victims"—here, the entities that directly purchased transportation and primary energy products from Energy Defendants—"increases the

danger of duplicative recovery." *Static Control*, 697 F.3d at 406.  If Defendants' alleged conduct harmed competition in renewable energy markets, EV markets, gasoline markets, or any of the adjacent technology markets Michigan invokes, then firms participating directly in those markets would have their own claims for their own injuries.  That would result in multiple plaintiffs seeking to recover for overlapping effects of the same asserted conduct.

Apportionment issues would also be unmanageable.  This Court would have to disentangle which portion of any alleged injury belonged to renewable energy firms, which to EV manufacturers, which to other technology firms, which to direct purchasers, which to indirect purchasers, and which—if any—to Michigan or its residents.  That is exactly the sort of problem that makes it "an extremely complex, if not impossible task for the district court to cope with the problems of computation and apportionment of damages."  *Pinney Dock*, 838 F.2d at 1464; *see Laydon v. Coöperatieve Rabobank U.A.*, 55 F.4th 86, 100 (2d Cir. 2022) ("indirect and imprecise" causal theory makes apportionment of damages "difficult" and "risk[s] . . . duplicative recovery").

Michigan's *parens patriae* theory compounds the problem.  Even if Michigan "could represent consumers residing in [Michigan]," it cannot represent "consumers from other States." *Kansas*, 497 U.S. at 213.  Yet Michigan's theory posits nationwide or global effects on energy markets, climate, and technology adoption, without plausibly separating Michigan's alleged harms from anyone else's.  Allowing this suit to proceed would risk piecemeal litigation by different categories of plaintiffs in different jurisdictions, each seeking to recover some portion of the same alleged nationwide and global injury.

       **c.**      **Under Michigan's Own Theory, Other Potential Plaintiffs Are Better Positioned to Sue.**

The antitrust laws confer standing only on a limited group that is best situated to seek redress for antitrust injury.  *Kansas*, 497 U.S. at 208, 218.  This factor, too, cuts against standing

and demands dismissal because any injuries that Michigan or its residents allegedly suffered from Defendants' supposed failure to prioritize renewable energy are purely "derivative" of harm allegedly inflicted first on other participants in the supposedly restrained markets. *AGC*, 459 U.S. at 541 n.46. "The existence of an identifiable class of persons whose self-interest would normally motivate them" to sue—*e.g.*, Energy Defendants' direct customers—defeats any "justification for allowing a more remote party" to assert a claim. *Id.* at 542. Here, under Michigan's own "view of the events," the more "direct victims"—the "intended targets of [the] alleged conspiracy"—are third parties. *Bodie-Rickett*, 957 F.2d at 290–91. Those third parties include the entities that directly purchased energy products from Energy Defendants and firms whose competitive opportunities were allegedly curtailed in the development, manufacture, and commercialization of alternative-energy products and technologies, including developers of solar, wind, and other renewable energy technologies, EV manufacturers, battery and charging-infrastructure firms, technology inventors and licensors, primary energy wholesalers, and similar market participants.

Michigan and its residents, by contrast, are at most downstream claimants asserting only "incidental" effects of the alleged restraints. *Id.*; *cf. Kansas*, 497 U.S. at 208, 218 (holding that states representing consumers lack antitrust standing as indirect purchasers even in "cases involving regulated public utilities that pass on 100 percent of their costs to their customers"). Hence, Michigan, whether in its own capacity or as *parens patriae*, is "merely an indirect victim and, as such, is not the ideal private party to 'vindicate the public interest in antitrust enforcement.'" *Bodie-Rickett*, 957 F.2d at 290–91 (quoting *AGC*, 459 U.S. at 542).

### B.      Michigan Fails to Allege Article III Standing.

Michigan also lacks Article III standing to seek any of the requested relief because it does not plausibly allege that any of its purported injuries are likely to be *redressed* by a favorable decision here—an independent requirement not satisfied even if Michigan could plead injury or

22

proximate causation. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).[8] A plaintiff must show that a decision would "likely" remedy its alleged injury. *Id.*; *see G.B.*, 2026 WL 959839, at *14 (plaintiff's "redressability burden is to show the predictable chain of events that would likely result from judicial relief and redress [its] injury" (quotation marks omitted)).

Here, Michigan seeks relief for alleged environmental harms, an asserted delay in alternative-energy development, and purportedly higher retail energy prices. *See* Compl. ¶¶ 59, 62, 280–81. But Michigan pleads no facts showing that monetary relief would reduce emissions, expand renewable infrastructure, or lower future retail prices. Nor would an injunction against Defendants do so. An injunction forcing Defendants to change course would not itself result in the technological, regulatory, and consumer conditions that Michigan claims would accelerate the transition to renewable energy. Those conditions instead depend on the independent decisions of myriad "third part[ies] not before the court." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quotation marks omitted).

The Complaint's allegations illustrate the point. Michigan alleges that electricity can substitute for gasoline only if "EVs, charging infrastructure, and electricity generation" develop together. Compl. ¶ 222. But an injunction against Defendants would not require, for instance, automakers to produce EVs that consumers want at prices they will pay, or necessarily induce consumers to absorb the "significant upfront investments" Michigan concedes are needed to switch vehicles and install home charging. *Id.* ¶ 225. Michigan likewise alleges that EV adoption remains constrained by "insufficient charging networks, grid capacity, and battery supply," *id.* ¶ 231, but enjoining Defendants would not compel utilities, grid operators, or charging providers to ease

---

[8] The attenuated causal chain outlined above, *see supra* at 18–19, also defeats Article III traceability, *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413–14 (2013); *cf. G.B. v. U.S. EPA*, ___ F.4th ___, 2026 WL 959839, at *9–10 (9th Cir. Apr. 9, 2026) (causal link between alleged "environmental harms" and challenged conduct "too speculative and tenuous" to satisfy traceability requirement).

those constraints. And to the extent Michigan relies on allegedly unused patents or divested renewable projects, *id.* ¶¶ 111–13, 126–31, 146–47, there is no basis to conclude that an injunction now would cause third parties to commercialize those technologies or develop those assets in a way that would lower Michigan energy prices. It is therefore entirely "speculative" whether an injunction would bring about the changes necessary to remedy the asserted injuries. *Lujan*, 504 U.S. at 560. And "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998).

## II.    Michigan Fails to Plausibly Allege Any Conspiracy.

Even disregarding Michigan's lack of standing, its claims fail because Michigan has not adequately alleged an agreement among Defendants. The Sherman Act and MARA prohibit unreasonable restraints of trade "'effected by a contract, combination, or conspiracy.'" *Twombly*, 550 U.S. at 553.[9] The "crucial question" is whether the alleged conduct stems "from independent decision or from an agreement" among Defendants. *Id.* (quotation marks omitted).

To state a conspiracy claim, Michigan must plausibly allege "direct or circumstantial evidence" of an agreement among Defendants to restrain trade. *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014). Despite recounting allegations that span nearly 50 years, Michigan has failed to identify *any* direct evidence of such an agreement. Nor does it allege circumstantial evidence of one. Michigan fails to allege that Defendants engaged in "parallel" conduct, much less parallel conduct that "exclude[s] the possibility of independent action." *Twombly*, 550 U.S. at 554. In fact, the Complaint's allegations undermine the existence of any

---

[9] "Michigan Antitrust Reform Act claims prevail or fail in tandem with . . . Sherman Act claims." *Hobart-Mayfield*, 48 F.4th at 663; *see* Mich. Comp. Laws § 445.784(2) (requiring courts to "give due deference to interpretations given by the federal courts to comparable antitrust statutes"). Michigan admits that "[t]he allegations in support of Count Two are largely the same as those in support of Count One because the MARA is modeled on the Sherman Act." Compl. ¶ 286 n.88.

agreement and point only to rational, self-interested business decisions: Defendants independently chose to continue investing in fossil fuels over alternative-energy sources.

### A.   Michigan Does Not Allege Direct Evidence of an Agreement.

Michigan fails to identify any direct evidence of a supposed agreement among Defendants to restrain renewable energy.  Direct evidence consists of an "explicit" agreement that "requires no inferences to establish the proposition or conclusion being asserted." *Hyland*, 771 F.3d at 318 (quotation marks omitted).  Such evidence is "tantamount to an acknowledgment of guilt," *id.*— the classic "smoking gun," like "a recorded phone call in which two competitors agreed to fix prices at a certain level," *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013).

Michigan does not allege any "explicit" agreement among Defendants.  *Hyland*, 771 F.3d at 318.  At most, the Complaint offers only "legal conclusions" that "rest[]" on other, indirect allegations of a purported agreement.  *Twombly*, 550 U.S. at 564; *see, e.g.*, Compl. ¶ 63 ("agree[ment] upon a different strategy"); *id.* ¶ 134 ("agreement to curtail investment in renewable energy"); *id.* ¶ 238 ("agree[ment] on messaging and delay[ing] investment needed for widespread adoption of those emerging alternatives").  These conclusory allegations identify "no specific time, place, or person involved in the alleged conspirac[y]," *Twombly*, 550 U.S. at 565 n.10, much less evidence "tantamount to an acknowledgment of guilt," *Hyland*, 771 F.3d at 318.

### B.   Michigan Does Not Plausibly Allege Circumstantial Evidence of an Agreement.

Absent direct evidence of an agreement, Michigan must allege "circumstantial evidence of conduct that, in the context, negates the likelihood of independent action and raises an inference of coordination." *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012).  This evidence must include both (1) "'parallel conduct'" *and* (2) "plus factors" that plausibly suggest "'a preceding agreement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556–57).  Michigan fails to allege either.

25

**1.      Michigan Fails to Allege Any Parallel Conduct.**

Michigan does not allege that Defendants engaged in "parallel conduct"—for instance, that they "adopt[ed] similar policies at or around the same time," such as by "implementing a series of coordinated and parallel price increases." *In re Passenger Vehicle Replacement Tires Antitrust Litig.*, 767 F. Supp. 3d 681, 699 (N.D. Ohio 2025) (cleaned up); *see also In re Crop Input Antitrust Litig.*, 2026 WL 924130, at *3 (8th Cir. Apr. 6, 2026) ("Parallel conduct generally consists of acts that are similar in substance, executed under similar circumstances, and close in time."); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("Allegations of such slow adoption of similar policies [over a period of several years] does not raise the specter of collusion."); *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1083 (9th Cir. 2025) (defining "parallel conduct" as adopting "the same" or "similar policies around the same time").

Instead, Michigan attempts to shoehorn six categories of supposedly "coordinated anticompetitive conduct" into a conspiracy claim. Compl. ¶ 215. But Michigan's allegations do not identify parallel conduct that could support a plausible inference of an agreement. To the contrary, the Complaint alleges that different Defendants took different actions at different times spanning nearly 50 years. *See City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 403 (2d Cir. 2024) (rejecting "theory of conspiracy" that required court to "connect dots far flung among isolated episodes involving different subsets of defendants over two decades"). Indeed, much of the alleged conduct is facially inconsistent with the conspiracy Michigan posits and undermines—rather than supports—any inference of agreement.

***Alleged suppression of EV battery and engine technologies.*** Michigan's lead theory is that Defendants agreed to "suppress the development of EV battery and engine technologies." Compl. ¶ 215. Although the Complaint describes individual decisions to divest EV and battery projects spanning many years, *see id.* ¶¶ 97, 108, it lacks allegations that Defendants agreed

collectively to underinvest in, and thereby suppress the growth of, EV technologies.  Indeed, Michigan undermines any inference of parallel conduct by alleging that some Defendants continued investing when others reduced their investments.  *See, e.g.*, *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228 (3d Cir. 2011) (plaintiffs failed to allege concerted refusal to extend credit where some alleged conspirators "were extending at least some credit").  For example, the Complaint alleges that ExxonMobil invested in EV technology in 1979, 1981, 2007, and 2009, only "abandon[ing]" its 2009 investment after encountering "regulatory speedbumps," *id.* ¶¶ 91–97, and that purported co-conspirator ConocoPhillips participated in a joint venture from 2011 to 2014 that *increased* investments in renewables, including EV technology, *id.* ¶¶ 107–10. Michigan does not allege that any of the other alleged co-conspirators took disciplinary action against ExxonMobil or ConocoPhillips for their apparent deviations from the purported conspiracy, further weighing against the existence of any agreement.  *See Segal v. Amadeus IT Grp., S.A.*, 2026 WL 879583, at *6 (N.D. Ill. Mar. 31, 2026) (noting "[t]he implausibility of a price stabilization cartel lacking a means of enforcement"); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017) (explaining "a cartel cannot survive absent some enforcement mechanism" and "[w]ith no punishment, or even a mechanism to punish, the inference tends toward no agreement" (quotation marks omitted)).

The Complaint also fails to allege that other Defendants adopted "similar" policies "close in time." *Crop Input*, 2026 WL 924130, at *3.  For instance, while Michigan alleges that Chevron acquired EV battery technology and asserted patent rights from 2001 "until their expiration in 2020," Compl. ¶¶ 98–105, it does not bother to explain what role, if any, other Defendants—including BP, API, and Shell—had in connection with EV technology.

***Allegedly restraining the buildout of EV charging infrastructure.***  Michigan likewise fails to identify any parallel conduct in Defendants' supposed conspiracy to "withhold investment in [EV] charging networks" and prevent others from developing necessary infrastructure.  *Id.* ¶ 111. Rather than describe similar conduct taken at similar times, the Complaint alleges that each Defendant pursued a fundamentally different approach to EV charging over more than 15 years. ExxonMobil allegedly acquired patents for developing public charging networks in 2009 and 2012, one of which "lapsed in 2021 due to nonpayment of fees."  *Id.* ¶ 112.  Chevron, by contrast, allegedly "announced investments in and partnerships with EV charging companies" between 2018 and 2024, but did not implement "meaningful expansion of EV charging" at its own stations. *Id.* ¶ 115.  Shell, for its part, allegedly began installing EV chargers in 2017, now operates thousands of chargers in the United States, and is pursuing "aggressive expansion overseas."  *Id.* ¶ 116.  And BP operates 395 charging stalls in the United States, with plans to add more in "a few geographic markets."  *Id.* ¶ 117.

These alleged decisions lack any similarity in time or kind.  More fundamentally, Defendants' varied affirmative efforts to *invest* in charging infrastructure "do not fit [Michigan's] conspiracy theory" at all, *BNP Paribas*, 92 F.4th at 403, and indeed contradict any purported agreement to *suppress* charging infrastructure, *see, e.g.*, *Burtch*, 662 F.3d at 228.

***Allegedly suppressing development and deployment of solar technologies.***  Michigan also fails to allege parallel conduct with respect to the purported suppression of solar technology. According to the Complaint, "Defendants acquired or established leading U.S. solar companies" in the 1970s and divested them at widely different times between 1981 and 2014—including a 30-year gap between ExxonMobil's "full[] exit" from solar in 1984 and Chevron's "divest[ing] of solar companies and investments in 2014."  Compl. ¶¶ 124–30.  BP allegedly formed BP Solar in

1981, which "by 1994 controlled nearly 10% of the global photovoltaic market," *id.* ¶ 124, while Shell "entered the solar market" in 1979 and did not "divest[] of solar" until 2009, *id.* ¶¶ 124, 129. Such a long passage of time between alleged parallel acts does not "raise the specter of collusion." *Musical Instruments*, 798 F.3d at 1196; *see In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, at *16 (S.D.N.Y. June 25, 2025) (holding "a ten-month period during which most of the Defendants raised prices does little to establish parallel conduct [because] [t]en months is a long time"). Nor does the mere sale of Defendants' assets to other companies—including "a global leader of the solar industry," Compl. ¶ 126—reflect "suppression" of solar technology, *id.* ¶ 131.

***Allegedly diverting capital from renewables to fossil fuels.*** Michigan claims that Defendants conspired to divert capital away from renewable energy by "increas[ing] investments in fossil fuel-enabling technologies" while "restrict[ing] investments in renewable energy technologies." Compl. ¶ 142. But the Complaint alleges that Defendants invested in low-carbon energy at varying rates that were in line with or above the alleged rate of "4% of total capital expenditures across the entire energy market." *Id*. ¶ 143. Specifically, it alleges that "Chevron allocated 4% toward such investments; BP 4.5%; Exxon[Mobil] 6%; and Shell 11%," nearly three times the industry-wide allocation. *Id.* Those different alleged rates defeat any suggestion that Defendants acted in parallel. *See Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1146 (N.D. Cal. 2017) (no parallel conduct supporting wage suppression where compensation varied by at least 20%), *aff'd*, 757 F. App'x 524 (9th Cir. 2018); *In re Florida Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1309–10 (S.D. Fla. 2010) (discounting parallel conduct where "the amounts [of the price increases] sometimes differed"); *Concrete & Cement*, 2025 WL 1755193, at *15 (no parallel conduct where allegations did not show "Defendants' price increases were

29

generally commensurate with one another in either percentage or amount").  And on Michigan's own allegations, Defendants invested as much or *more* than certain non-conspirators into low-carbon energy—a concession fatal to Michigan's theory that Defendants agreed to suppress such investments.

***Allegedly disparaging renewable energy.***  Michigan alleges that Defendants engaged in a public campaign to "sow doubt about climate science," Compl. ¶ 150, and to disparage renewable energy by, among other things, "misrepresent[ing] EVs as dangerous and environmentally unhelpful, and portray[ing] any transition to clean energy as economically harmful," *id.* ¶ 158; *see also id.* ¶ 166 (alleging "anti-EV messaging").  But those allegations again span over 30 years and concern a variety of actions by different Defendants at different times, from "[a]n internal Exxon[Mobil] memo from 1988" addressing "'the uncertainty in scientific conclusions regarding the potential enhanced greenhouse effect,'" *id.* ¶ 152, to status reports in the 2020s "profess[ing] support for the Paris Agreement," *id.* ¶ 171.  In any event, alleged "business disparagement [is] not the type of injur[y] to competition that the antitrust laws were designed to prevent."  *Re/Max Int'l v. Realty One, Inc.*, 900 F. Supp. 132, 159 (N.D. Ohio 1995), *aff'd in relevant part*, 173 F.3d 995, 1026 (6th Cir. 1999); *see also Oak Distrib. Co. v. Miller Brewing Co.*, 370 F. Supp. 889, 898 (E.D. Mich. 1973) ("[A]ctual disparagement . . . does not constitute a violation of the Sherman Act, even if it were to constitute a common law tort.").

Moreover, Defendants' alleged public statements—along with other associational and petitioning conduct referenced in the Complaint—are protected by the First Amendment and the Michigan Constitution.  *See, e.g.*, Compl. ¶¶ 218, 238–45; *see also* API Mot. to Dismiss.  The Supreme Court has long held that "[p]olitical speech . . . is at the core of what the First Amendment is designed to protect."  *Morse v. Frederick*, 551 U.S. 393, 403 (2007) (quotation marks omitted).

30

And under the *Noerr-Pennington* doctrine, "business interests may combine and lobby to influence the legislative, executive, or judicial branches of government or administrative agencies without violating the antitrust laws, because such activities are protected by the first amendment right of petition." *Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992). *Noerr-Pennington* similarly protects other conduct at issue in the Complaint, such as "indirect petitioning of the government through the media or other avenues," *Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 480 (6th Cir. 2023); "vigorously arguing accurate scientific evidence before a nonpartisan private standard-setting body," *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 510 (1988); "enforcing one's intellectual property rights in court," *United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Novartis Pharms. Corp.*, 902 F.3d 1, 5 (1st Cir. 2018); "fil[ing] court documents," *VIBO Corp. v. Conway*, 669 F.3d 675, 684 (6th Cir. 2012); and "filing suit," *Static Control*, 697 F.3d at 408. Accordingly, Michigan is barred from seeking relief based on these protected activities.[10]

*Allegedly infiltrating academic institutions, scientific journals, and international fact-finding bodies.* Michigan also alleges that Defendants attempted to influence a variety of prestigious universities, scientific journals, and international fact-finding bodies in different manners and at different times since "the late 1980s, [when] climate change was becoming an increasingly prominent concern in the public arena"—including through funding, research, advertisements, publications, education initiatives, and advisory roles. *See, e.g.*, Compl. ¶¶ 150–51, 162, 182, 184–89, 191, 200. But such "sporadic, not simultaneous," conduct "explicable by individual self-interest" is not sufficient to plead a conspiracy. *Advanced Tech. Corp. v. Instron,*

---

[10] The Complaint recognizes these activities are protected, stating that Michigan does not seek to challenge Defendants' "petitioning efforts or any First-Amendment protected conduct." Compl. ¶ 26 n.6. Defendants reserve all rights to make appropriate objections to the extent Michigan attempts to do so.

*Inc.*, 925 F. Supp. 2d 170, 179 n.54 (D. Mass. 2013) (dismissing conspiracy claims based on public statements and "standard-setting behavior" taken "at different times over the course of fifteen years"). And again, the alleged conduct is firmly protected under the First Amendment and similar protections in the Michigan Constitution. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) ("Academic freedom, though not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment.").

\*      \*      \*

In short, Michigan's attempt to cobble together a conspiracy relies on purported activities that are too different and "too remote in time to support a plausible inference of agreement." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 911 (6th Cir. 2009). Michigan fails to identify any uniform plan or policy that Defendants executed at the same time or any attempt to keep each other in line when one or more Defendants departed from the purported aims of the conspiracy. *See, e.g.*, *Kleen Prods.*, 276 F. Supp. 3d at 842. Instead, the more "natural explanation" for the conduct alleged in the Complaint is that Defendants acted independently in their own economic self-interest, *Twombly*, 550 U.S. at 568—adapting their individual investment priorities in response to "regulatory speedbumps," technological change, differing geographic opportunities, variations in patent portfolios, and the emergence of renewables that were "a better fit with [their] core oil and gas operations,"[11] *see, e.g.*, Compl. ¶¶ 97, 109, 112, 116–17, 119; *see infra* at 34. Such independent "business judgment"—even if controversial—is "not a concern of the antitrust laws." *Expert Masonry, Inc. v. Boone Cnty.*, 440 F.3d 336, 347–48 (6th Cir. 2006).

Because Michigan fails to plead parallel conduct, the Court need look no further to dismiss its claims. *See, e.g.*, *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 517

---

[11] *See* Tom Bergin, *Shell Goes Cold on Wind, Solar, Hydrogen Energy*, REUTERS (Mar. 17, 2009), https://perma.cc/3U8T-MMVP (cited in Compl. ¶ 129 n.29).

(8th Cir. 2018) (explaining actions "executed under dissimilar circumstances and separated by six months[] did not constitute parallel conduct" and thus "no discussion of any 'plus factors' is necessary" to dismiss claims); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 391 (9th Cir. 2017) ("'Plus factors' are relevant only if the complaint adequately alleges parallel conduct among the defendants.").

### 2. Michigan Fails to Plausibly Allege Any Plus Factors.

Even if Michigan had adequately alleged parallel conduct (it has not), it still would have to plead "plus factors" that plausibly support the inference that the parallel conduct was undertaken pursuant to an agreement. *Hobart-Mayfield*, 48 F.4th at 664–65; *see Erie Cnty.*, 702 F.3d at 868 ("[T]he bare fact that defendants engaged in parallel conduct is not sufficient to establish a Sherman Act violation."). Plus factors must point to circumstances so unusual that they create the inference that "'parallel behavior . . . would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding.'" *Twombly*, 550 U.S. at 556 n.4. Michigan alleges nothing of the sort.

Michigan first asserts that a conspiracy must exist because "Defendants' suppression of renewables and clean energy technologies would be irrational" in competitive markets, Compl. ¶ 219, and Defendants had "economic incentives favoring coordinat[ion]," including an incentive to "preserve[] profits," *id.* ¶ 234. But Michigan itself alleges that Defendants have made "[m]assive" investments in "capital-intensive assets like refineries, pipelines, and retail fuel locations" and that rushing to embrace an "energy transition could impose hundreds of billions of dollars in stranded asset costs on fossil fuel producers." *Id.* ¶ 235. It is not irrational or suggestive of a conspiracy that Defendants might have "no desire" to incur those stranded costs, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 349, or to "encourage . . . development" of alternatives that may disrupt their businesses, *In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 464

33

(S.D.N.Y. 2017); *see Twombly*, 550 U.S. at 568.  Because "all businesses" seek to maximize profits, the alleged "motive to maximize profits cannot support an inference of a conspiracy." *Hyland*, 771 F.3d at 321 (quotation marks omitted); *see, e.g.*, *Hobart-Mayfield*, 48 F.4th at 668 (allegations of "strong incentives" and "motive to conspire" are insufficient (quotation marks omitted)).

Michigan's related allegation that "Defendants shared a common motive to oppose competition from electricity," Compl. ¶ 234, likewise does not support an inference of agreement. Although Energy Defendants allegedly declined "opportunities to profit from electricity sales," Compl. ¶ 218, the Complaint contains no allegations showing how their independent decisions in this regard resulted in economic losses or were in any way irrational or suggestive of a conspiracy, *see Travel Agent Comm'n*, 583 F.3d at 908 (travel agents failed to plausibly allege irrational, concerted conduct by airlines to reduce agent commissions because "reasonable, independent economic interest" explained their behavior).  The purported conspiracy also resulted in continued fierce competition in fossil fuels, Compl. ¶ 36, with Energy Defendants increasing their production of oil and gas, *id.* ¶ 171, and being unable to charge supra-competitive prices, *see Passenger Vehicle Replacement Tires*, 767 F. Supp. 3d at 707–09 (simply describing motive to increase profits in connection with price increases, without accounting for "the pressures of an interdependent market," is not sufficient to plead plus factor (quoting *Musical Instruments*, 798 F.3d at 1195)).

Michigan next alleges that conditions were conducive to collusion by pointing to structural features of the alleged markets—including "highly inelastic" short-run demand for gasoline, "high market concentration," and "technological interdependence."  Compl. ¶¶ 220, 224.  But these are "simply descriptions of the market, not allegations of anything that the defendants did." *Erie Cnty.*,

34

702 F.3d at 870.  Merely "[b]eing ripe for collusion, or having a market where collusion is simply possible, is not evidence of collusion." *Hobart-Mayfield*, 48 F.4th at 668.  As the court concluded in *Persian Gulf Inc. v. BP West Coast Products LLC*, alleged market characteristics like high concentration and inelastic demand for gasoline do "not necessarily suggest an illegal agreement, because the structure of the market could also have contributed to permissible parallel conduct."  2016 WL 4574357, at *5 (S.D. Cal. July 14, 2016); *see also Erie Cnty.*, 702 F.3d at 870 (concluding that stable market shares, high incumbency, and high prices and profits "do not give rise to an inference of an unlawful agreement").

The same is true here.  Michigan's own allegations underscore that economic and structural obstacles, not any agreement among Defendants, account for the pace of the transition away from fossil fuels.  As the Complaint alleges, "[e]lectricity's viability as a transportation energy source depends on simultaneous investment in three interdependent elements: EVs, charging infrastructure, and electricity generation."  Compl. ¶ 222.  It also alleges that "[h]igh switching costs have further locked consumers into gasoline dependence," including the need for "significant upfront investments in new vehicles and home charging infrastructure."  *Id.* ¶ 225.  Such obstacles are the "obvious alternative explanation" for why renewable energy has not advanced at the rate Michigan prefers.  *Twombly*, 550 U.S. at 567.

Finally, Michigan alleges that Energy Defendants' participation in various trade associations gave them "extraordinary opportunities to collude."  Compl. ¶ 246.  But it is well settled that "presence at . . . trade meetings" "does not, standing alone, plausibly suggest an illegal agreement."  *Travel Agent Comm'n*, 583 F.3d at 911; *see also Twombly*, 550 U.S. at 567 n.12 (competitors' membership in trade association, even when those competitors had the same prices, does not raise plausible inference of conspiracy); *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th

Cir. 1999) ("Gathering information about pricing and competition in the industry is standard fare for trade associations.  If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action."); *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293–94 (5th Cir. 1988) (similar). Rather, the complaint must include factual allegations that connect trade association activities to the alleged conspiracy, such as by alleging that defendants raised prices in concert shortly after trade association meetings, *see Miami Prods. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 164–65 (W.D.N.Y. 2020), or used those meetings to adopt specific anticompetitive policies, *see PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 336–37 (S.D.N.Y. 2021); *see also Kleen Prods.*, 276 F. Supp. 3d at 834.

Michigan alleges nothing of the sort.  Its allegations regarding API, the International Petroleum Industry Environmental Conservation Association, the Oil and Gas Climate Initiative, and the International Association of Oil and Gas Producers (and public information about those meetings) involve nothing more than "standard fare for trade associations."  *Citric Acid*, 191 F.3d at 1098; *see Travel Agent Comm'n*, 583 F.3d at 911 (the "mere opportunity to conspire" does not plausibly support a conspiracy).  Further, the associational and petitioning conduct that Michigan challenges is independently protected by the First Amendment and the Michigan Constitution. *See, e.g.*, *Greminger v. Seaborne*, 584 F.2d 275, 278 (8th Cir. 1978); Mich. Const., art. I, §§ 3, 5.

*    *    *

Far from pleading an agreement among Defendants, Michigan alleges conduct "in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Travel Agent Comm'n*, 583 F.3d at 903; *see Erie Cnty.*, 702 F.3d at 871 ("[A]n independent self-interested failure to compete . . . does not violate Section One.").

Defendants have a "vested interest in protecting" the growth of their fossil fuel businesses—"[t]o do anything contrary would undermine [their] core mission." *Hobart-Mayfield*, 48 F.4th at 667; *see BNP Paribas*, 92 F.4th at 403 (no conspiracy where "[r]ational economic self-interest provides a ready explanation for . . . supposed failure to patronize or invest in enterprises that could disrupt their business model"). Where there is an "independent business justification for the defendants'[] behavior," "no inference of conspiracy can be drawn." *Blomkest Fertilizer, Inc. v. Potash Corp. of Sask.*, 203 F.3d 1028, 1037 (8th Cir. 2000). Michigan's claims thus should be dismissed.

## III. Michigan Fails to Plausibly Allege Anticompetitive Effects in a Relevant Antitrust Market.

Even ignoring Michigan's failure to plausibly allege the existence of an agreement among Defendants to restrain renewable energy development, its claims still fail because the Complaint does not plausibly allege that any such agreement "unreasonably restrains trade" by harming competition in a relevant antitrust market. *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1012 (6th Cir. 2005). Courts assess whether a restraint is unreasonable using either the *per se* rule—reserved solely for "practices that completely lack redeeming competitive rationales"—or the rule of reason, which is the "automatic presumption." *Id.* Because the rule of reason applies here, Michigan must plead "adverse anticompetitive effects" of the alleged conduct in "relevant product and geographic markets." *Id.* at 1014.[12] Michigan's claims fail at both steps.

### A. The Rule of Reason Applies to Michigan's Claims.

Michigan's attempt to frame this case as a *per se* unlawful conspiracy is foreclosed by settled precedent. The *per se* rule is limited to "restraints . . . that would always or almost always tend to restrict competition and decrease output." *Leegin Creative Leather Prods., Inc. v. PSKS,*

---

[12] The same analysis applies to Michigan's MARA claim. *See Hobart-Mayfield*, 48 F.4th at 663. Indeed, the MARA provision under which Michigan brings its claim, Mich. Comp. Laws § 445.772, expressly requires an agreement that restrains "trade or commerce in a relevant market."

*Inc.*, 551 U.S. 877, 886 (2007) (quotation marks omitted).  It does not extend to restraints with which courts lack "considerable experience."  *Id.*  In such cases, courts apply an "automatic presumption in favor of the rule of reason standard," using the *per se* rule "only in clear cut cases of trade restraints that are so unreasonably anticompetitive that they present straightforward questions for reviewing courts."  *Care Heating & Cooling*, 427 F.3d at 1012 (quotation marks omitted).

Michigan's novel theory of coordinated underinvestment in renewable energy is nowhere near such a clear-cut case.  Michigan does not allege an agreement to fix prices, allocate customers, divide markets, or impose any other "'naked restraints of trade with no purpose except stifling competition.'"  *Com-Tel, Inc. v. DuKane, Corp.*, 669 F.2d 404, 409 (6th Cir. 1982) (quoting *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963)).  And determining whether Defendants' conduct restrained trade would require exactly the sort of market inquiry and economic analysis the rule of reason demands.  The "default" framework of the rule of reason thus applies here.  *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 273 (6th Cir. 2014).

## B.    Michigan Fails to Plausibly Allege a Rule-of-Reason Claim.

Under the rule of reason, a court "weighs all of the circumstances of a case"—including the relevant market and the history, nature, and effect of the challenged practice—to determine whether the alleged restraint has the requisite anticompetitive effects.  *Leegin*, 551 U.S. at 885 (quotation marks omitted).  A plaintiff must plausibly plead, *inter alia*, that "the combination or conspiracy produced adverse, anticompetitive effects within relevant product *and* geographic markets."  *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008) (quotation marks omitted and emphasis added); *see Se. Milk*, 739 F.3d at 270.  Michigan fails to plausibly allege the existence of either of its purported relevant markets, let alone

38

adequately plead anticompetitive effects within them. Each of these defects is an independent basis for dismissal.

### 1. Michigan Fails to Plausibly Allege a Relevant Antitrust Market.

A plaintiff asserting a rule-of-reason claim must plead enough facts to allow the court to determine "the boundaries of the relevant . . . market." *Total Benefits*, 552 F.3d at 437. The Sixth Circuit routinely affirms dismissals "on the basis of an insufficiently pled or totally unsupportable proposed market." *Mich. Div.-Monument Builders v. Mich. Cemetery Ass'n*, 524 F.3d 726, 733 (6th Cir. 2008); *Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 473 (6th Cir. 2005) (affirming dismissal because "alternative markets proposed by Plaintiffs must fail"). Here, Michigan fails to plausibly allege a well-defined product or geographic market.

### a. Michigan Fails to Plead a Plausible Product Market.

"[T]he reasonable interchangeability standard [is] the essential test for ascertaining the relevant product market." *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 917 (6th Cir. 2009) (quotation marks omitted). Courts assess whether a market consists of reasonably interchangeable products "by considering (1) product uses (whether substitute products can perform the same function) and/or (2) consumer response (also known as 'cross-elasticity'), defined as consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." *Id.* (quotation marks omitted).

Michigan alleges product markets for (i) transportation energy (consisting of gasoline and electricity) and (ii) primary energy (consisting of energy from fossil fuels and renewable sources). Compl. ¶ 43. But it fails to allege that the products within these markets are reasonably interchangeable, and it ignores obvious substitutes. That is fatal to Michigan's claims.

***Transportation Energy Market***. Michigan's alleged "transportation energy" market— which it defines as the retail purchase of gasoline and electricity used to power personal ground

transportation vehicles—is implausible on its face.  *Id.*  Gasoline and electricity are not reasonably interchangeable because consumers' individual energy choices are constrained by the type of vehicle they own: an internal-combustion vehicle requires gasoline, while an EV requires electricity.  Gasoline and electricity would not "work effectively" for the same consumer seeking to fuel her vehicle and are not properly within the same antitrust product market.  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 437 (3d Cir. 1997).  Indeed, courts have already recognized that EVs and internal-combustion vehicles occupy different product markets because, among other reasons, "EVs have peculiar characteristics and uses," with "separate manufacturing processes and production facilities."  *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822, 838 (N.D. Cal. 2024).  If the vehicles themselves occupy distinct markets due to functional and production differences, the fuels that power those vehicles are not interchangeable either.

Michigan's own allegations confirm as much.  Michigan alleges that "cross-elasticity of demand [is] low" between gasoline and electricity and that "[e]lectricity's substitutability for gasoline remains constrained by insufficient charging networks, grid capacity, and battery supply."  Compl. ¶ 231; *see also id.* ¶ 11 (alleging EVs are "a fringe technology or a luxury alternative").  This "low cross-elasticity," by Michigan's own pleading, means that gasoline and electricity are "not substitutes and, as a result, do not compete in the same market" as a matter of law.  *Kesters Merch. Display Int'l, Inc. v. SurfaceQuest, Inc.*, 163 F.4th 1309, 1313 (10th Cir. 2026) (citation omitted).

***Primary Energy Market***.  Michigan's "primary energy" market—consisting of crude oil, natural gas, geothermal energy, solar, and wind sources—is facially inadequate as well.  Compl. ¶ 43.  Michigan's own allegations demonstrate that there is no substitutability or cross-elasticity between the fundamentally different energy sources it includes in the market, which are allegedly

subject to different constraints. *Cf. FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 901 (E.D. Mo. 2020) (rejecting proposed all-fuels energy market and concluding that "standard analytical and economic tools . . . overwhelmingly support[ed]" a "distinct" coal market). As the Complaint alleges, renewable energy sources face "high capital costs," "entrenched distribution systems," and "regulatory complexity," Compl. ¶ 230, while hundreds of thousands of Michigan homes "must rely on propane" for heating, *id.* ¶ 257. Michigan also improperly lumps together distinct classes of purchasers—individual consumers, commercial entities, and the government, *see id.* ¶ 43 (defining "the market for individual consumer and State retail purchases")—despite material differences in their product demands, *cf. Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 961 (6th Cir. 2004) (reversing judgment where "the relevant market is not readily apparent and the Plaintiffs have failed to adequately define a relevant market").

Moreover, although Michigan concedes that nuclear power is a source of primary energy separate from either fossil fuels or renewable sources, Compl. ¶ 39, the Complaint ignores nuclear power when defining the alleged relevant market, *id.* ¶¶ 43–44. This arbitrary exclusion of nuclear energy from the proposed primary energy product market is significant, as it ignores a substantial portion (approximately 18% in 2024) of primary energy usage in the State, *see id.* ¶ 53 (accounting for only 82% of Michigan's 2024 electricity market). Because Michigan "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor," its alleged market is fatally deficient. *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002).

**b.     Michigan Fails to Allege a Plausible Geographic Market.**

Michigan also fails to plead a plausible geographic market, another standalone reason to dismiss its claims. "[T]he relevant market is defined as the area of effective competition." *AmEx*,

41

585 U.S. at 544 (quotation marks omitted).  Michigan asserts that there is a "Michigan market" for both transportation and primary energy, Compl. ¶ 278, but the Complaint provides no support for drawing the relevant geographic markets to align with the State's borders.

First, the alleged statewide market is too narrow for the conduct Michigan challenges, which is nationwide or worldwide in scope.  In fact, the Complaint refutes the statewide market by pleading that transportation and primary energy are *globally* traded, undermining any claim that Michigan is a self-contained arena.  *See, e.g.*, *id.* ¶¶ 125, 207.  It also repeatedly describes national and global production, distribution, and pricing dynamics.  *See, e.g.*, *id.* ¶ 125 (referencing "the U.S. solar market" and "global supply"); *id.* ¶ 129 ("Shell . . . for a time, had been the world's fourth largest solar panel manufacturer."); *id.* ¶ 149 (referencing "the U.S. and Michigan markets for primary energy and transportation energy").  Those allegations are consistent with the reality that crude oil prices—the primary input cost for gasoline—are set on global commodity exchanges, and natural gas is traded on national and regional markets extending far beyond Michigan.  Michigan's proposed single-state market thus fails to "correspond to the commercial realities of the industry," as it must.  *See Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962) (quotation marks omitted).

Second, Michigan's alleged statewide market is simultaneously too broad given the retail purchases for which Michigan claims injury.  Geographic markets for retail gasoline are invariably local because competition occurs at the pump level, and consumers ordinarily consider only nearby stations as substitutes.  *See Kentucky v. Marathon Petroleum Co., LP*, 191 F. Supp. 3d 694, 697, 701 (W.D. Ky. 2016) (analyzing Louisville and Northern Kentucky market for reformulated gasoline); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432 (9th Cir. 1995) (analyzing Las Vegas retail gasoline market); *Sheridan v. Marathon Petroleum Co.*, 530 F.3d 590, 595 (7th Cir.

2008) (requiring market share allegations for "local gasoline markets").  A commuter in Detroit simply would not elect to fill her gas tank or charge her EV in Lansing.  *See Goldfinch Lab., P.C. v. Iowa Pathology Assocs., P.C.*, 168 F.4th 500, 506 (8th Cir. 2026) (defining geographic markets for retail gas sales requires consideration of practical alternatives "close to home" or, at most, "slightly farther from home").  Michigan does not explain why competition for retail gasoline— or the other alleged retail energy products—operates at the level of an entire state rather than in localized markets.  And its one-line reference to an "alternative" market made up of Michigan's 83 counties does not suffice.  Compl. ¶ 43.

These geographic defects flow directly from Michigan's overbroad product markets.  By aggregating disparate products into a single "transportation energy" or "primary energy" market, Michigan collapses distinct competitive areas into one artificial geography.  This failure independently warrants dismissal of Michigan's claims.  *Mich. Div.-Monument*, 524 F.3d at 733.

### 2.    Michigan Fails to Plausibly Allege Anticompetitive Effects.

Even setting aside its failure to define the relevant markets, Michigan does not plausibly allege "[d]irect evidence" or "[in]direct evidence" that the alleged conduct had any anticompetitive effects in those markets.  *AmEx*, 585 U.S. at 542.  This failure provides yet another independent ground for dismissal.

### a.    Michigan Pleads No Direct Evidence of Anticompetitive Effects.

To plead direct evidence of anticompetitive effects, a plaintiff must plausibly allege evidence of "reduced output, increased prices, or decreased quality," *id.*, that "cannot be explained by normal market forces," *In re RealPage, Inc., Rental Software Antitrust Litig.*, 709 F. Supp. 3d 478, 525 (M.D. Tenn. 2023).  Michigan pleads no such direct evidence.

The Complaint lacks any well-pleaded allegation that prices for the relevant products increased during the purported conspiracy period or that market-wide output of any relevant

product decreased.  To the contrary, the Complaint's allegations that Energy Defendants "are increasing oil and gas production," Compl. ¶ 171, and that renewable energy use has increased significantly in Michigan—rising from 7.8% of Michigan's electricity generation in 2023 to 12% in 2024, *id.* ¶ 53—undermine any claim of direct evidence of anticompetitive effects.  The Complaint further acknowledges that Michigan has set ambitious renewable energy targets, that EV registrations in the State number approximately 180,000, and that "Michigan consumers can buy electricity as fuel for about half the cost of gasoline per mile."  *Id.* ¶¶ 45, 58.  These concessions are fundamentally inconsistent with any claim that Defendants' alleged conspiracy produced anticompetitive effects in the alleged relevant markets.

**b.    Michigan Pleads No Indirect Evidence of Anticompetitive Effects.**

Michigan also fails to plead indirect evidence of anticompetitive effects because it does not plausibly allege that Defendants have (or had) market power in the relevant markets—which is necessary to state a claim under the rule of reason.  *See, e.g.*, *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 931 (6th Cir. 2005).  Indeed, Michigan does not make *any* allegations regarding Defendants' combined market share, let alone come close to pleading the "overwhelming market share" required to show market power.  *Id.*; *see Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power.").  Conclusory allegations of "dominant market power," Compl. ¶ 237, absent "further factual enhancement," do not suffice, *Twombly*, 550 U.S. at 557.  Michigan's failure to plead Defendants' shares in its purported relevant markets is dispositive because when (as here) a plaintiff fails to plausibly allege market power, it cannot sustain a rule-of-reason claim via indirect evidence of anticompetitive effects.  *See RealPage*, 709 F. Supp. 3d at 531.

44

\*      \*      \*

Because Michigan pleads neither direct evidence of anticompetitive effects nor facts plausibly showing market power in its alleged markets, Michigan's rule-of-reason theory fails as a matter of law.  Michigan has failed to state an antitrust conspiracy claim.

## IV.    Michigan's Claims Are Time-Barred.

Michigan's claims also fail for another independent reason: the conduct on which they are based—dating back to the 1970s—falls well outside the four-year statute of limitations.  Courts across the country have consistently and correctly dismissed suits as untimely based on similar asserted conduct.  *See, e.g.*, *Municipality of San Juan v. Exxon Mobil Corp.*, 2025 WL 2848565, at \*4 (D.P.R. Sept. 30, 2025); *Municipality of Bayamón v. Exxon Mobil Corp.*, 2025 WL 2630671, at \*24–34 (D.P.R. Sept. 11, 2025); *City of Charleston v. Brabham Oil Co., Inc.*, 2025 WL 2269770, at \*14 (S.C. Com. Pl. Aug. 6, 2025); *City of New York v. Exxon Mobil Corp.*, 226 N.Y.S.3d 863, 879–80 (N.Y. Sup. Ct. 2025); *State ex rel. Jennings v. BP Am. Inc.*, 2024 WL 98888, at \*19 (Del. Super. Ct. Jan. 9, 2024).  This Court should do the same.

Antitrust claims under both federal and Michigan law are "forever barred unless commenced within four years after the cause of action accrued."  15 U.S.C. § 15b; Mich. Comp. Laws § 445.781.  A cause of action accrues "when a defendant commits an act that injures a plaintiff's business."  *Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League*, 491 F.3d 310, 315 (6th Cir. 2007).  Accrual thus focuses on the defendant's acts, not the "effects" of those acts.  *Peck v. Gen. Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990).  Michigan's attempt to save its untimely claims by invoking the "continuing violation" doctrine fails because it does not plausibly allege an "overt act" within the limitations period.  *Id.* (quotation marks omitted).  Indeed, courts have refused to adopt an "overly expansive view of the continuing violations doctrine" because otherwise "almost any claim could easily be renewed, thereby rendering all applicable statutes of

45

limitations effectively useless." *Gentry v. The Renal Network*, 636 F. Supp. 2d 614, 619 (N.D. Ohio 2009); *see also Huang v. Presbyterian Church (U.S.A.)*, 346 F. Supp. 3d 961, 978 (E.D. Ky. 2018) ("The continuing violation doctrine is strictly construed and rarely applied in the Sixth Circuit." (quotation marks omitted)).

As a result, alleging an overt act sufficient to restart the limitations period under the continuing violation doctrine is a high bar. "Passive inaction does not support a continuing violation theory." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007). Instead, there must be an "act" that satisfies two additional requirements: "(1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999). These requirements are not satisfied, for example, by an act that simply adheres to the terms of an earlier agreement and is thus "only a manifestation of the previous agreement." *Id.* The same goes for acts that are "merely the abatable but unabated inertial consequences of some pre-limitations action." *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014) (quotation marks omitted); *see Peck*, 894 F.2d at 849 (conduct causing "a rippling effect into the future" is not an overt act).

Here, the four-year statute of limitations bars Michigan's claims because those claims accrued before January 23, 2022, and Michigan has not plausibly alleged a "new and independent" overt act that inflicted a "new and accumulating injury on" Michigan within the limitations period. *Grand Rapids Plastics*, 188 F.3d at 406. According to the Complaint, the purported "conspiracy to suppress competition from renewable energy began to take shape in 1979"—almost *half a century* ago. Compl. ¶ 64; *see also id.* ¶ 39 (alleging "the inception of the cartel [was] in 1979").

46

Michigan has not plausibly alleged a single, sufficiently recent overt act to bring its claims within the limitations period.

Michigan's strained effort to describe recent conduct related to EV technology, solar energy, investment decisions, and consumer deception cannot save its time-barred claims. Starting with Michigan's allegations that Defendants suppressed EV technology and the buildout of accompanying infrastructure, the Complaint traces these alleged efforts to "the 1970s" and "early 1980s" and pleads no recent overt act. *Id.* ¶¶ 89–90; *see also id.* ¶¶ 92–117. Michigan's generalized assertions that Defendants have "continue[d] suppressing EV demand," *id.* ¶ 110; "consistently ha[ve] deferred meaningful investment in . . . technologies for EVs," *id.* ¶ 96; and have "continue[d] to refrain from investments in EV charging infrastructure," *id.* ¶¶ 113, 115–17, are not "new" or "independent" acts. As alleged, they "were simply acts that reflected that defendant[s] continued in [allegedly] refusing" to develop EV technologies and the accompanying charging infrastructure. *Garelick v. Goerlich's Inc.*, 323 F.2d 854, 855–56 (6th Cir. 1963). This alleged continued "inaction" in the EV space cannot count as an overt act. *See Eidson*, 510 F.3d at 635; *see also Tolbert v. State of Ohio Dep't of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999) (holding in discrimination case that "failure to provide a public amenity" alleges only "[p]assive inaction" and "does not support a continuing violation theory"). Nor can Michigan rely on its allegations that Defendants started, but then later abandoned, EV charging projects within the limitations period as overt acts. *See* Compl. ¶¶ 115–17. These alleged acts were not "new and independent," but rather recommitments to an agreement Defendants allegedly entered in "the 1980s" to "withhold investment in charging networks." *Id.* ¶¶ 111, 116–17; *see Z Techs.*, 753 F.3d at 600; *Grand Rapids Plastics*, 188 F.3d at 406 (payments made pursuant to prior agreement did

47

"not constitute a new and independent act, as required to restart the statute of limitations" (quotation marks omitted)).

Moreover, the Complaint's barebones allegations that Defendants supposedly "continued" to suppress EV technology are far too vague and conclusory to plead an overt act. *See, e.g.*, *Hunter v. Meyer*, 63 F. App'x 990, 991 n.1 (9th Cir. 2003). If Michigan's paltry allegations of continued inaction sufficed to extend the limitations period, the statute of limitations would be "effectively useless." *Gentry*, 636 F. Supp. 2d at 619; *see Hillspring Health Care Ctr., LLC v. Dungey*, 2018 WL 287954, at *11 (S.D. Ohio Jan. 4, 2018) ("To allow Defendants' continued adherence to its decision to constitute a continuing violation would effectively eliminate any time bar on actions arising from the denial of Medicaid benefits because a new violation would occur every day that the denial stays in place.").

By the same token, Michigan's allegations related to solar technology also cannot extend the limitations period. Michigan alleges that Energy Defendants established their solar companies "[d]uring the 1970s," Compl. ¶ 124, and all exited the solar business by *2014*—almost a decade before the start of Michigan's limitations period, *id.* ¶¶ 126–31. Michigan's assertion that a non-Defendant "BP subsidiary called Lightsource bp sold two major U.S.-based solar projects" in 2024 and that Shell divested solar projects in Brazil in 2025, *id.* ¶ 147, alleges nothing to suggest that these actions are "new and independent." *Grand Rapids Plastics*, 188 F.3d at 406. They are, at most, reaffirmations of Defendants' alleged "early 1970s" agreement to "suppress[]" solar technologies. Compl. ¶ 122. And Michigan fails to connect any of these alleged international or worldwide solar projects to any new and accumulating harm suffered in *Michigan*—the purported focus of this suit, *see id.* ¶ 1.[13]

---

[13] For these same reasons, allegations that Defendants recently "abandoned" wind and biofuel investments are not overt acts. *See* Compl. ¶¶ 145–46, 148.

Michigan next points to investment-related conduct but pleads no recent overt act. Michigan merely alleges that, within the limitations period, Energy Defendants have *continued* investing in fossil fuels and have reduced investments in various renewable energy initiatives. *See, e.g., id.* ¶¶ 113, 115–17, 132–49, 173. These are not "new" acts "independent" of the alleged agreement to "underfund renewable energy initiatives and instead" direct capital to projects that "perpetuate fossil fuel production," which Michigan dates "back to the 2010s" at the latest. *Id.* ¶¶ 132–33; *see also id.* ¶ 111 (alleging that conspiracy to "prioritize investments in fossil fuel[s]" dates back to "at least the 1980s"). The later alleged investments can be interpreted only as adhering to that earlier alleged agreement and, as such, cannot restart the limitations period. *See, e.g., Grand Rapids Plastics*, 188 F.3d at 406; *Robinson v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 2773123, at *7–9 (E.D. Mich. Sept. 26, 2025) (holding that "Defendants' alleged continued commercial use of Plaintiffs' NIL rights" pursuant to an earlier contract was not "a new and independent act that restarts the statute of limitations"). And continuing to allegedly underfund renewable energy initiatives, even increasingly, pursuant to an agreement supposedly reached before the limitations period expired, *see* Compl. ¶ 144, is not a "new" overt act, *see Gentry*, 636 F. Supp. 2d at 619 (refusing to find continuing violation "merely by alleging Defendants repeatedly refused to treat her"). To conclude otherwise would yet again nullify the statute of limitations. If any alleged "fossil fuel investment[]" by any "Fossil Fuel Defendant[]" sufficed to restart the clock, Compl. ¶ 144, "the applicable limitations period for a § 1 claim would be infinite"—an antitrust plaintiff would have a timely claim unless and until Energy Defendants ceased their fossil fuel businesses altogether, *Travel Agent Comm'n*, 583 F.3d at 902 (continuing to "maintain" 0% commission policy was not an overt act).

49

Lastly, Michigan concocts a deception-and-influence scheme by Defendants, but the conduct upon which the Complaint relies allegedly occurred decades ago.  According to Michigan, Defendants agreed to this "deceptive marketing campaign" by *1989*, *see* Compl. ¶¶ 151–53, and developed their purported plan to "influence" universities and other research institutions in *1998*, *id.* ¶ 183.  Michigan does not plausibly plead any new and independent acts within the limitations period.  It offers a laundry list of alleged statements, advertisements, and related activities it says contribute to Defendants' so-called "misleading greenwashing."  *Id.* ¶¶ 165, 169–72, 178, 188–89, 206–07.  But these more recent deception-and-influence allegations concern activity protected by the First Amendment and Michigan Constitution, *supra* at 30–31, and so cannot qualify as overt acts.

In any event, the continuing violation doctrine cannot apply to "allegations of corporate greenwashing" based on "a mosaic of statements from different platforms and at different points in time [to] misle[a]d . . . consumers."  *Exxon Mobil*, 226 N.Y.S.3d at 884.  "Such a theory implicitly does not allege independent acts of wrongdoing."  *Id.*  Rather, each of these allegedly misleading statements (whether direct-to-consumer or via the academy) demonstrates nothing more than continued allegiance to the alleged coordinated deception-and-influence campaign Defendants purportedly launched in the 1980s and 1990s.  *See* Compl. ¶¶ 151–53, 183.  Such alleged adherence to the terms of a pre-existing agreement is not new or independent overt action.  And any alleged "effects" that these statements have had on consumer sentiment, *see, e.g.*, *id.* ¶ 181 (results of consumer surveys regarding climate change), are simply the "consequences" of that prior conduct, not independent overt acts, *Z Techs.*, 753 F.3d at 599 (quotation marks omitted).

Despite the Complaint's length and bluster, Michigan has not alleged any recent overt act that can save its untimely claims.  It cannot overcome the fact that—by its own telling—the

50

purported conspiracy began 47 years ago, and Defendants' alleged anticompetitive conduct occurred far beyond the four-year statute of limitations. The Complaint should be dismissed as time-barred.

## V. Michigan's State-Law Claim Is Preempted.

On top of the pleading failures above, federal law preempts and precludes Michigan's attempt to use state law to address harms from global greenhouse gas emissions, as a nearly unanimous set of federal and state courts have held. Most fundamentally, the Constitution precludes and preempts state-law claims seeking relief for injuries allegedly caused by out-of-state and international emissions. A state cannot apply its own law to claims dealing with "air and water in their ambient or interstate aspects"; in those contexts, "borrowing the law of a particular State would be inappropriate" because, under "the basic scheme of the Constitution," these disputes are not "'matters of substantive law appropriately cognizable by the states.'" *Am. Elec. Power Co. v. Connecticut* ("*AEP*"), 564 U.S. 410, 421–22 (2011) (quotation marks omitted). Rather, the "basic interests of federalism . . . deman[d]" that the "law of the individual States" not be used to resolve such disputes. *Illinois v. City of Milwaukee*, 406 U.S. 91, 105 n.6, 107 n.9 (1972) (quotation marks omitted); *see Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 488 (1987) ("interstate . . . pollution is a matter of federal, not state, law").

Here, Michigan seeks to use state antitrust law to hold Defendants liable for harms stemming from the alleged effects of global greenhouse gas emissions. The Complaint expressly alleges harms that "go beyond the traditional injuries of higher prices and reduced output." Compl. ¶ 10. Specifically, Michigan alleges that it "suffers and will continue to suffer negative externalities *in the form of climate change impacts*, rising insurance premiums, depressed home values, and damage to Michigan's economy." *Id.* ¶ 16 (emphasis added); *see also id.* ¶¶ 261–71 (detailing Michigan's alleged injuries related to "negative externalities including climate related

51

harms" and its attempts "to address and mitigate th[ose] negative externalities"). Michigan's state-law claim thus seeks to impose liability on Defendants for injuries Michigan allegedly suffered due to the emissions resulting from the burning of fossil fuels produced, marketed, and sold by those companies around the globe.

A "growing chorus of state and federal courts across the United States" have concluded that federal law preempts state-law claims seeking relief for the alleged impacts of worldwide emissions and global climate change. *Charleston*, 2025 WL 2269770, at *2 (quotation marks omitted). In fact, the Second Circuit has squarely rejected a local government's attempt to use state law against certain energy companies (including some Defendants here) for alleged injuries caused by global climate change because of their "production, promotion, and sale of fossil fuels." *City of New York v. Chevron Corp.*, 993 F.3d 81, 88 (2d Cir. 2021). The court held that such "sprawling" claims seeking relief "for the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet" were "simply beyond the limits of state law." *Id.* at 92. Applying state law also would "risk upsetting the careful balance that has been struck between the prevention of global warming, a project that necessarily requires national standards and global participation, on the one hand, and energy production, economic growth, foreign policy, and national security, on the other." *Id.* at 93. For that reason, "[f]or over a century, a mostly unbroken string of [Supreme Court] cases has applied federal law to disputes involving interstate air or water pollution." *Id.* at 91.[14]

Similarly, the Supreme Court of Maryland recently held that because the plaintiffs sought

---

[14] The Supreme Court recently granted a writ of certiorari in *Boulder*, a similar climate change lawsuit. In that case, the Court agreed to consider "[w]hether federal law precludes state-law claims seeking relief for injuries allegedly caused by the effects of interstate and international greenhouse-gas emissions on the global climate." Order at 2, *Suncor Energy (U.S.A.) Inc. v. County Comm'rs of Boulder Cnty.*, 2026 WL 490537 (U.S. Feb. 23, 2026). If the Supreme Court holds that federal law precludes such state-law claims, that decision would dispose of Michigan's state-law claim here seeking similar relief for climate change.

to "impose damages on the Defendants for injuries allegedly caused by the effect of interstate and international greenhouse gas emissions on global climate change," their state-law claims fell "squarely within the inherently federal areas of interstate pollution and foreign affairs" and were therefore barred.  *Mayor & City Council of Baltimore v. B.P. P.L.C.*, 2026 WL 809501, at *21 (Md. Mar. 24, 2026).  The same is true here.  A state's "police powers do not extend beyond their respective borders, and certainly do not authorize the policing of global conduct."  *Id.* at *20.[15]

In addition to the constitutional concerns, Michigan's MARA claim is also preempted by the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq., which "preempts state law to the extent a state attempts to regulate air pollution originating in other states," *Jennings*, 2024 WL 98888, at *10.  The CAA "does not authorize" state-law claims seeking remedies for out-of-state emissions, like Michigan's.  *Baltimore*, 2026 WL 809501, at *24.

Through the CAA, Congress evaluated and balanced the societal harms and benefits associated with extraction, production, processing, transportation, sale, and use of fossil fuels.  And it has already comprehensively regulated fossil fuels and greenhouse gas emissions through an "informed assessment of competing interests," including the "environmental benefit potentially achievable" and "our Nation's energy needs and the possibility of economic disruption."  *AEP*, 564 U.S. at 427.  For instance, the CAA authorizes EPA to determine whether to establish emissions standards for both the transportation sector, 42 U.S.C. §§ 7521(a)(1)–(2), (a)(3)(E), 7547(a)(5), 7571(a)(2)(A), and stationary sources, such as power plants and refineries, *id.* § 7411(b)(1)(A)–(B), (d).

---

[15] *Accord Charleston*, 2025 WL 2269770, at *3, *5 (holding that "South Carolina law cannot constitutionally apply here" because "the structure of the U.S. Constitution precludes state-law claims seeking damages for injuries allegedly caused by out-of-state and international emissions"); *State ex rel. Jennings v. BP Am. Inc.*, 2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024); *Platkin v. Exxon Mobil Corp.*, 2025 WL 604846 (N.J. Super. Ct. Feb. 5, 2025); *Municipality of Bayamón v. Exxon Mobil Corp.*, 2025 WL 2630671 (D.P.R. Sept. 11, 2025); *Municipality of San Juan v. Exxon Mobil Corp.*, 2025 WL 2848565 (D.P.R. Sept. 30, 2025); *City of New York v. Exxon Mobil Corp.*, 226 N.Y.S.3d 863 (N.Y. Sup. Ct. 2025).

Because Michigan's state-law claim seeks remedies for harms allegedly caused by cumulative worldwide greenhouse gas emissions over more than a century, those remedies would necessarily regulate out-of-state emissions.  Granting such remedies would upset the careful balance Congress struck through the comprehensive CAA regime overseen by EPA.  As the Supreme Court has explained, the "appropriate amount of regulation in any particular greenhouse gas-producing sector" requires "informed assessment of competing interests," and the CAA "entrusts such complex balancing to EPA in the first instance, in combination with state regulators." *AEP*, 564 U.S. at 427.  There is "no room for a parallel track" of state court regulation.  *Id*. at 425. Relying on *AEP*, the Maryland Supreme Court affirmed dismissal of similar claims and held: "Allowing each of the 50 states (and the countless individual local governments located within them) to impose their own preferred policy solutions for climate change—with each state naturally focused on *local* rather than national or international impacts, would create a plainly 'irrational system of regulation' that would lead to 'chaotic confrontation between sovereign states.'" *Baltimore*, 2026 WL 809501, at *22 (quoting *Ouellette*, 479 U.S. at 496).

Michigan's MARA claim is thus preempted and precluded by the Constitution and CAA.

## CONCLUSION

The many deficiencies in Michigan's Complaint are not the product of inartful pleading, but fundamental defects that cannot be cured by amendment.  *See Energy Conversion Devices Liquidation Tr. v. Trina Solar Ltd.*, 833 F.3d 680, 691 (6th Cir. 2016) (dismissals under Rule 12(b)(6) are "presumptively with prejudice"); *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 520 (6th Cir. 2010) (no need to permit filing of amended complaint if it "could not withstand" a motion to dismiss (quotation marks omitted)).  Defendants respectfully request that the Court dismiss Michigan's claims in their entirety with prejudice.

54

May 1, 2026

Respectfully submitted,

/s/ *Jennifer L. McManus*
Jennifer L. McManus (P68976)
Erin K. Lane (P75822)
MILLER JOHNSON
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, MI 49503
616.831.1700
mcmanusj@millerjohnson.com
lanee@millerjohnson.com
Thomas W. Cranmer (P25252)
Matthew P. Allen (P57914)
MILLER, CANFIELD, PADDOCK &
STONE, PLC
840 W. Long Lake Rd., Ste. 150
Troy, MI 48098
248.879.2000
cranmer@millercanfield.com
allen@millercanfield.com

Joshua D. Dick*
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
415.393.8200
jdick@gibsondunn.com

Theodore J. Boutrous, Jr.*
Daniel G. Swanson*
Samuel Liversidge*
Christopher D. Dusseault*
Sarah Akhtar*
Zachary B. Copeland*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
213.229.7000
tboutrous@gibsondunn.com
dswanson@gibsondunn.com
sliversidge@gibsondunn.com
cdusseault@gibsondunn.com
sakhtar@gibsondunn.com
zcopeland@gibsondunn.com

K. Winn Allen, P.C.
Caroline Milner

/s/ *Boris Bershteyn (w/consent)*
Boris Bershteyn
Karen M. Lent
Michael H. Menitove
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Manhattan West
New York, NY 10001-8602
212.735.3000
boris.bershteyn@skadden.com
karen.lent@skadden.com
michael.menitove@skadden.com

John C. Hueston
Moez M. Kaba
Douglas J. Dixon
HUESTON HENNIGAN, LLP
523 West 6th Street, Ste 400
Los Angeles, CA 90014
213.788.4340
jhueston@hueston.com
mkaba@hueston.com
ddixon@hueston.com

Charles M. Denton (P33269)
Scott M. Watson (P70185)
Aaron D. Lindstrom (P72916)
BARNES & THORNBURG LLP
171 Monroe Avenue NW, Suite 1000
Grand Rapids, MI 49503
616.742.3931
charles.denton@btlaw.com
scott.watson@btlaw.com
aaron.lindstrom@btlaw.com

*Counsel for Defendants Exxon Mobil
Corporation and ExxonMobil Oil Corporation*

/s / *Josh A. Cohen (w/consent)*
Josh A. Cohen
David Sarratt*
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, CA 94108

55

KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202.389.5000
winn.allen@kirkland.com
caroline.milner@kirkland.com

Devora Allon, P.C.*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
212.446.4800
devora.allon@kirkland.com

Christopher Stackhouse
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
312.862.2000
chris.stackhouse@kirkland.com

*Counsel for Chevron Corporation and Chevron U.S.A. Inc.*

_____

/s/ *Thomas M. Schehr (w/consent)*
Thomas M. Schehr (P54391)
DYKEMA GOSSETT PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304
248.203.0700
TSchehr@dykema.com

Richard C. Pepperman II
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
212.558.4000
peppermanr@sullcrom.com

Amanda Flug Davidoff
SULLIVAN & CROMWELL LLP
1700 New York Ave., N.W. Suite 700
Washington, D.C. 20006
202.956.7500
davidoffa@sullcrom.com

415.738.5700
jacohen@debevoise.com
dsarratt@debevoise.com

Michael Schaper
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
212.909.6000
mschaper@debevoise.com

*Counsel for Shell p.l.c., Shell USA, Inc., Shell Oil Products Company LLC, Equilon Enterprises LLC d/b/a Shell Oil Products US, and Shell Trading (US) Company*

_____

/s/ *Joel Fauson (w/consent)*
Joel Fauson (P77446)
RHOADES MCKEE PC
55 Campau Avenue NW, Suite 300
Grand Rapids, MI 49503
616.233.3500
jfauson@rhoadesmckee.com

Brian D. Schmalzbach
MCGUIREWOODS LLP
800 East Canal Street
Richmond, VA 23219
804.775.4746
bschmalzbach@mcguirewoods.com

*Counsel for American Petroleum Institute*

*Counsel for Defendants BP p.l.c., BP*
*America Inc., BP Energy Company, BP*
*Energy Retail Company LLC, and BP*
*Products North America Inc.*

\* Application for admission forthcoming

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the word limit of Local Civil Rule 7.2(b), as revised by this Court's Order Regarding Word Limitations, Dkt. No. 29, because it contains 17,759 words, excluding the portions of the brief exempted from the word count under Local Civil Rule 7.2(b)(i). The word count was generated using Microsoft Word for Microsoft 365 MSO Version 2603.

*/s/ Jennifer L. McManus*