## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN

THE PEOPLE OF THE STATE OF
MICHIGAN,

      Plaintiff,

v.

BP P.L.C.; BP AMERICA INC.; BP
ENERGY COMPANY; BP ENERGY
RETAIL COMPANY LLC; BP
PRODUCTS NORTH AMERICA INC.;
CHEVRON CORPORATION;
CHEVRON U.S.A. INC.; EXXON
MOBIL CORPORATION;
EXXONMOBIL OIL CORPORATION;
SHELL P.L.C.; SHELL USA, INC.;
SHELL OIL PRODUCTS COMPANY
LLC; EQUILON ENTERPRISES LLC
D/B/A SHELL OIL PRODUCTS US;
SHELL TRADING (US) COMPANY;
and AMERICAN PETROLEUM
INSTITUTE,

      Defendants.

No. 1:26-cv-00254

HON. JANE M. BECKERING

MAG. RAY KENT

**ORAL ARGUMENT REQUESTED**

---

### THE STATE OF MICHIGAN'S MEMORANDUM OF LAW IN
### OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 3

       A.     Defendants' Anticompetitive Conduct ................................................. 5

       B.     Harm to Competition ........................................................................... 7

LEGAL STANDARD ............................................................................................. 8

ARGUMENT ......................................................................................................... 9

    I.    The State's Standing Is Beyond Any Genuine Dispute ................................. 9

       A.     The State has authority to seek all forms of relief it claims ............... 9

       B.     The State plausibly alleges antitrust standing to recover
             damages in its proprietary and *parens patriae* capacities. ................ 13

           1.    The State plausibly alleges antitrust injury. ............................ 13

                a.  The State plausibly alleges the type of injury the
                    antitrust laws were designed to prevent, arising from
                      Defendants' competition-reducing conduct. ......................... 15

                b.  The State's overcharge injuries occurred in the
                      very energy markets where competition was restrained ...... 20

           2.    The State plausibly alleges proximate causation for
               injuries attributable to Defendants' conduct ............................ 23

                a.  The State's claims are neither barred as "indirect"
                      under *Illinois Brick* nor otherwise too attenuated
                      under the governing proximate cause standard. .................. 23

                  b.  The State's damages claims do not create a meaningful
                      risk of duplicative recovery or unmanageable
                      apportionment. ................................................................... 28

       C.     The State plausibly alleges Article III standing. .............................. 30

    II.   The State Plausibly Alleges a Conspiracy Among Defendants .................... 31

i

A.      The State's allegations are governed by the plausibility
        standard, not the heightened standard Defendants propose. ........... 31

B.      The State plausibly alleges parallel conduct by Defendants. ............ 33

        1.      Defendants' acts in furtherance of the conspiracy were
                similar in nature and pattern. ..................................................... 34

        2.      The Complaint places Defendants' parallel acts in a
                factual context that suggests prior agreement. ......................... 37

        3.      Defendants cannot immunize their parallel conduct by
                relabeling it as trade disparagement or protected
                speech. ......................................................................................... 40

C.      The State plausibly alleges multiple plus factors that, when
        considered together, support an inference of conspiracy. .................. 41

III.   The State Plausibly Alleges an Unreasonable Restraint of
       Trade ................................................................................................... 45

A.      The *per se* rule applies to the State's output-restriction
        claim. ................................................................................................ 46

B.      The State also states a claim under the rule of reason. ..................... 48

        1.      The State alleges cognizable relevant markets. ......................... 49

                a.  The State pleads two plausible product markets.................. 50

                b.  The State pleads plausible geographic markets. .................. 53

        2.      The State plausibly alleges direct evidence of
                anticompetitive effects in the relevant markets......................... 56

IV.    The State's Claims Are Timely .................................................................. 59

V.     Defendants Offer No Legal Basis to Preempt the State's MARA
       Claim .................................................................................................. 66

CONCLUSION AND RELIEF REQUESTED .......................................................... 73

CERTIFICATE OF COMPLIANCE ...................................................................... 75

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. FTC,*
1 F.4th 102 (2d Cir. 2021) ................................................................................. 15

*A & M Supply Co. v. Microsoft Corp.,*
252 Mich. App. 580 (2002) .............................................................................. 10

*Academy of Allergy & Asthma in Primary Care v. Amerigroup Tennessee, Inc.,*
155 F.4th 795 (6th Cir. 2025) .............................................................. *passim*

*Advanced Tech. Corp. v. Instron, Inc.,*
925 F. Supp. 2d 170 (D. Mass. 2013) ............................................................. 39

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
458 U.S. 592 (1982) ........................................................................................ 11

*American Electric Power Co. v. Connecticut,*
564 U.S. 410 (2011) ........................................................................................ 71

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................... 8, 31

*Associated Gen. Contractors v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983) ............................................................................. 15, 24, 26

*Atl. Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) ........................................................................................ 13

*Bates v. Dow Agrosciences LLC,*
544 U.S. 431 (2005) ........................................................................................ 68

*Bearing Distribs., Inc. v. Rockwell Automation, Inc.,*
2006 WL 2709779 (N.D. Ohio Sep. 20, 2006) ............................................... 49

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................ *passim*

*Bigelow v. RKO Radio Pictures,*
327 U.S. 251 (1946) ........................................................................................ 30

*Bodie-Rickett & Assocs. v. Mars, Inc.,*
957 F.2d 287 (6th Cir. 1992) .......................................................................... 27

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993) ........................................................................................ 58

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) ........................................................................................... 54

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) ........................................................................... 13, 17, 18

*Burtch v. Milberg Factors, Inc.,*
  662 F.3d 212 (3d Cir. 2011) ............................................................................. 36

*Cal. Dental Ass'n v. FTC,*
  526 U.S. 756 (1999) ..................................................................................... 47, 60

*California v. ARC Am. Corp.,*
  490 U.S. 93 (1989) ............................................................................................. 67

*Care Heating & Cooling, Inc. v. Am. Standard, Inc.,*
  427 F.3d 1008 (6th Cir. 2005) ..................................................................... 46, 48

*Cargill, Inc. v. Monfort of Colo., Inc.,*
  479 U.S. 104 (1986) ........................................................................................... 30

*Cataldo v. U.S. Steel Corp.,*
  676 F.3d 542 (6th Cir. 2012) ........................................................................... 59

*Cates v. Crystal Clear Techs., LLC,*
  874 F.3d 530 (6th Cir. 2017) ........................................................................... 49

*Chamber of Commerce v. Whiting,*
  563 U.S. 582 (2011) ........................................................................................... 71

*City & Cnty. of Honolulu v. Sunoco LP,*
  537 P.3d 1173 (Haw. 2023) ....................................................... 67, 68, 69, 71

*City of Charleston v. Brabham Oil Co.,*
  2025 WL 2269770 (S.C. Ct. Com. Pl. Aug. 6, 2025) ................................... 66

*City of New York v. Chevron Corp.,*
  993 F.3d 81 (2d Cir. 2021) ......................................................................... 69, 70

*City of New York v. Exxon Mobil Corp.,*
  226 N.Y.S.3d 863 (N.Y. Sup. Ct. 2025) ......................................................... 66

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.,*
  92 F.4th 381 (2d Cir. 2024) ............................................................................. 37

*City of Pontiac v. Blue Cross Blue Shield of Mich.,*
  2012 WL 1079895 (E.D. Mich. Mar. 30, 2012) ........................................... 53

*Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy USA, Inc.,*
  586 P.3d 161 (Colo. 2025) ......................................................................... 69, 71

*Connecticut v. Sandoz, Inc.*,
2025 WL 3043397 (D. Conn. Oct. 31, 2025) ............................................... 60, 61, 65

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ........................................................................................ 42, 45

*Crane & Shovel Sales Corp. v. Bucyrus-Erie Co.*,
854 F.2d 802 (6th Cir. 1988) ................................................................................ 48

*Davis v. BetMGM, LLC*,
2025 WL 2054575 (Mich. July 22, 2025) .............................................................. 13

*Delaware ex rel. Jennings v. BP Am. Inc.*,
2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024) .................................................... 66

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
8 F.3d 1217 (7th Cir. 1993) .................................................................................. 47

*District of Columbia v. Exxon Mobil Corp.*,
89 F.4th 144 (D.C. Cir. 2023) .............................................................................. 71

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
100 F.3d 462 (6th Cir. 1996) ................................................................................ 64

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
637 F.3d 435 (4th Cir. 2011) ................................................................................ 53

*Eidson v. State of Tenn. Dep't of Children's Servs.*,
510 F.3d 631 (6th Cir. 2007) .......................................................................... 61, 62

*Ellis v. Salt River Project Agric. Improvement & Power Dist.*,
24 F.4th 1262 (9th Cir. 2022) .............................................................................. 15

*Erie County v. Morton Salt, Inc.*,
702 F.3d 860 (6th Cir. 2012) .......................................................................... passim

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013) ............................................................................ 37, 38

*Expert Masonry, Inc. v. Boone County*,
440 F.3d 336 (6th Cir. 2006) ................................................................................ 47

*Fed. Trade Comm'n v. Hackensack Meridian Health, Inc.*,
30 F.4th 160 (3d Cir. 2022) .................................................................................. 15

*Fenner v. Gen. Motors, LLC*,
113 F.4th 585 (6th Cir. 2024) .............................................................................. 72

*Ford Motor Co. v. Blue Cross Blue Shield of Mich. Mut. Ins. Co.*,
2024 WL 1396264 (E.D. Mich. Mar. 30, 2024) ........................................... 46, 47, 60

v

*Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design,*
244 F.3d 521 (6th Cir. 2001) .................................................................49

*FTC v. Peabody Energy Corp.,*
492 F. Supp. 3d 865 (E.D. Mo. 2020) ....................................................53

*Garelick v. Goerlich's Inc.,*
323 F.2d 854 (6th Cir. 1963) .................................................................63

*Garg v. Macomb Cnty. Cmty. Mental Health Servs.,*
472 Mich. 263 (2005) .............................................................................65

*GEICO Corp. v. Autoliv, Inc.,*
345 F. Supp. 3d 799 (E.D. Mich. 2018)..................................................66

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n,*
744 F.2d 588 (7th Cir. 1984) .................................................................47

*Gentry v. The Renal Network,*
636 F. Supp. 2d 614 (N.D. Ohio 2009).............................................61, 62

*Georgia v. Pennsylvania R.R.,*
324 U.S. 439 (1945) ...............................................................................11

*Goldfinch Laboratory, P.C. v. Iowa Pathology Assocs., P.C.,*
168 F.4th 500 (8th Cir. 2026) ...............................................................56

*Grand Rapids Plastics, Inc. v. Lakian,*
188 F.3d 401 (6th Cir. 1999) .................................................................63

*Greene v. General Foods Corp.,*
517 F.2d 635 (5th Cir. 1975) .................................................................16

*Hawai'i v. Standard Oil Co. of Cal.,*
405 U.S. 251 (1972) .........................................................................10, 30

*Heerwagen v. Clear Channel Commc'ns,*
435 F.3d 219 (2d Cir. 2006)...................................................................54

*Hillspring Health Care Ctr., LLC v. Dungey,*
2018 WL 287954 (S.D. Ohio Jan. 4, 2018) ......................................61, 62

*Hodges v. WSM, Inc.,*
26 F.3d 36 (6th Cir. 1994).................................................................18, 19

*Holmes v. Sec. Inv. Prot. Corp.,*
503 U.S. 258 (1992) .........................................................................23, 28

*Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.,*
353 F. Supp. 3d 678 (M.D. Tenn. 2018)................................................60

*Huang v. Presbyterian Church (U.S.A.)*,
   346 F. Supp. 3d 961 (E.D. Ky. 2018) ...................................................... 61, 62

*Hunter v. Meyer*,
   63 F. App'x 990 (9th Cir. 2003) ............................................................ 61, 62

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977) ................................................................................ 10

*Illinois ex rel. Hartigan v. Panhandle E. Pipe Line Co.*,
   730 F. Supp. 826 (C.D. Ill. 1990) ............................................................ 52

*Illinois v. City of Milwaukee*,
   406 U.S. 91 (1972) .................................................................................. 70

*Impax Labs., Inc. v. FTC*,
   994 F.3d 484 (5th Cir. 2021) ................................................................... 15

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ....................................................... 35

*In re Cardizem CD Antitrust Litig.*,
   200 F.R.D. 326 (E.D. Mich. 2001) ...................................................... 25, 27

*In re Cardizem CD Antitrust Litigation*,
   332 F.3d 896 (6th Cir. 2003) .............................................. 16, 19, 20, 46

*In re Certified Question from U.S. Dist. Ct. for E. Dist. of Michigan*,
   465 Mich. 537 (2002) .............................................................................. 11

*In re Concrete & Cement Additives Antitrust Litig.*,
   2025 WL 1755193 (S.D.N.Y. June 25, 2025) ........................................... 37

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*,
   691 F.2d 1335 (9th Cir. 1982) ................................................................ 26

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) .................................................................... 29

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
   336 F. Supp. 3d 1256 (D. Kan. 2018) ...................................................... 46

*In re Florida Cement & Concrete Antitrust Litig.*,
   746 F. Supp. 2d 1291 (S.D. Fla. 2010) .................................................... 37

*In re Generic Pharms. Pricing Antitrust Litig.*,
   338 F. Supp. 3d 404 (E.D. Pa. 2018) ...................................................... 44

*In re German Automotive Manufacturers Antitrust Litigation*,
   497 F. Supp. 3d 745 (N.D. Cal. 2020) ..................................................... 52

*In re Juul Labs, Inc., Antitrust Litig.,*
　　555 F. Supp. 3d 932 (N.D. Cal. 2021) ...................................................................... 43

*In re K-Dur Antitrust Litig.,*
　　338 F. Supp. 2d 517 (D.N.J. 2004) ......................................................................... 66

*In re Lower Lake Erie Iron Ore Antitrust Litig.,*
　　998 F.2d 1144 (3d Cir. 1993) ............................................................................ 28, 30

*In re Multidistrict Vehicle Air Pollution,*
　　538 F.2d 231 (9th Cir. 1976) .................................................................................. 14

*In re Musical Instruments & Equipment Antitrust Litigation,*
　　798 F.3d 1186 (9th Cir. 2015) ............................................................................... 36

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.,*
　　933 F.3d 1136 (9th Cir. 2019) .................................................................... 46, 47, 60

*In re Packaged Ice Antitrust Litig.,*
　　723 F. Supp. 2d 987 (E.D. Mich. 2010) ................................................................. 32

*In re Pre-Filled Propane Tank Antitrust Litig.,*
　　2019 WL 4796528 (W.D. Mo. Aug 21, 2019) ........................................................ 64

*In re Propranolol Antitrust Litig.,*
　　249 F. Supp. 3d 712 (S.D.N.Y. 2017) ..................................................................... 43

*In re RealPage, Inc. Rental Software Antitrust Litig.,*
　　709 F. Supp. 3d 478 (M.D. Tenn. 2023) ........................................................ *passim*

*In re Se. Milk Antitrust Litig.,*
　　555 F. Supp. 2d 934 (E.D. Tenn. 2008) ................................................. 32, 42, 45, 52

*In re Se. Milk Antitrust Litig.,*
　　739 F.3d 262 (6th Cir. 2014) ................................................................... 46, 53, 54

*In re Skelaxin (Metaxalone) Antitrust Litig.,*
　　2013 WL 2181185 (E.D. Tenn. May 20, 2013) ..................................................... 60

*In re Travel Agent Comm'n Antitrust Litig.,*
　　583 F.3d 896 (6th Cir. 2009) ................................................................. 33, 39, 60, 63

*In re Turkey Antitrust Litig.,*
　　642 F. Supp. 3d 711 (N.D. Ill. 2022) ..................................................................... 44

*Ins. Brokerage Antitrust Litig.,*
　　618 F.3d 300 (3d Cir. 2010) ................................................................................... 40

*International Paper Co. v. Ouellette,*
　　479 U.S. 481 (1987) ................................................................................................ 71

*Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    340 F. Supp. 3d 285 (S.D.N.Y. 2018)......................................................................43

*J & S Oil, Inc. v. Irving Oil Corp.*,
    63 F. Supp. 2d 62 (D. Me. 1999) ...........................................................................54

*Jones v. Varsity Brands, LLC*,
    618 F. Supp. 3d 713 (W.D. Tenn. 2022)............................................................34, 46

*Jones v. Varsity Brands, LLC*, 618 F.,
    618 F.  Supp. 3d 725 (W.D. Tenn. 2022)...................................................................46

*Kansas v. Garcia*,
    589 U.S. 191 (2020) ......................................................................................70, 71

*Kansas v. UtiliCorp United, Inc.*,
    497 U.S. 199 (1990) .............................................................................................11

*Kelsey K. v. NFL Enters., LLC*,
    254 F. Supp. 3d 1140 (N.D. Cal. 2017) ..................................................................37

*Kentucky v. Marathon Petroleum Co., LP*,
    191 F. Supp. 3d 694 (W.D. Ky. 2016) ....................................................................56

*Kentucky v. RealPage, Inc.*,
    2026 WL 919117 (E.D. Ky. Feb. 2, 2026) ..........................................................56, 58

*Kesters Merch. Display Int'l, Inc. v. SurfaceQuest, Inc.*,
    163 F.4th 1309 (10th Cir. 2026)..............................................................................50

*Kleen Prods. LLC v. Int'l Paper*,
    276 F. Supp. 3d 811 (N.D. Ill. 2017) .....................................................................40

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997) ....................................................................... 59, 60, 61, 66

*Kraft v. Detroit Entertainment*,
    683 N.W.2d 200 (Mich. Ct. App. 2004)...................................................................12

*Lambrix v. Tesla, Inc.*,
    737 F. Supp. 3d 822 (N.D. Cal. 2024) ....................................................................51

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007) ........................................................................................47, 48

*Mayor & City Council of Baltimore v. B.P. P.L.C.*,
    353 A.3d 1142 (Md. 2026) ....................................................................................70

*Minnesota v. Am. Petroleum Inst.*,
    2025 WL 562630 (Minn. Dist. Ct. Feb. 14, 2025)....................................................69

*Motor & Equipment Mfrs. Ass'n, Inc. v. E.P.A.,*
627 F.2d 1095 (D.C. Cir. 1979) ................................................................. 72

*Municipality of Bayamón v. Exxon Mobil Corp.,*
2025 WL 2630671 (D.P.R. Sept. 11, 2025) ............................................. 66

*Municipality of San Juan v. Exxon Mobil Corp.,*
2025 WL 2848565 (D.P.R. Sep. 30, 2025)............................................... 66

*Mut. Ins. Co. v. Cantrell Funeral Home, Inc.,*
2019 WL 10379384 (E.D. Mich. Dec. 30, 2019)..................................... 21

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,*
468 U.S. 85 (1984) ...................................................................... 15, 46, 47

*Nat'l Soc'y of Pro. Eng'rs v. United States,*
435 U.S. 679 (1978) ................................................................................. 30

*New York v. Burger,*
482 U.S. 691 (1987) ................................................................................. 15

*New York v. Microsoft Corp.,*
209 F. Supp. 2d 132 (D.D.C. 2002) ........................................................ 11

*Oak Distrib. Co. v. Miller Brewing Co.,*
370 F. Supp. 889 (E.D. Mich. 1973)........................................................ 41

*Ohio v. Am. Express Co.,*
585 U.S. 529 (2018) ................................................................................. 57

*Oneok, Inc. v. Learjet, Inc.,*
575 U.S. 373 (2015) ................................................................................. 68

*Oxygenated Fuels Ass'n Inc. v. Davis,*
331 F.3d 665 (9th Cir. 2003) ................................................................... 72

*Park Irmat Drug Corp. v. Express Scripts Holding Co.,*
911 F.3d 505 (8th Cir. 2018) ................................................................... 36

*Peck v. General Motors Corp.,*
894 F.2d 844 (6th Cir. 1990) ................................................................... 59

*Perkins v. Standard Oil Co.,*
395 U.S. 642 (1969) .......................................................................... 16, 17

*Persian Gulf Inc. v. BP W. Coast Prods. LLC,*
2016 WL 4574357 (S.D. Cal. July 14, 2016)......................................... 45

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.,*
615 F.3d 412 (5th Cir. 2010) ................................................................... 22

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.,*
124 F.3d 430 (3d Cir. 1997)........................................................................51

*Re/Max Int'l v. Realty One, Inc.,*
900 F. Supp. 132 (N.D. Ohio 1995)........................................................40

*Re/Max Int'l, Inc. v. Realty One, Inc.,*
173 F.3d 995 (6th Cir. 1999) ...................................................................42

*Realcomp II, Ltd. v. FTC,*
635 F.3d 815 (6th Cir. 2011) .............................................................57, 58

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.,*
51 F.3d 1421 (9th Cir. 1995)..............................................................55, 56

*Reiter v. Sonotone Corp.,*
442 U.S. 330 (1979) ....................................................................................14

*Robinson v. Nat'l Collegiate Athletic Ass'n,*
2025 WL 2773123 (E.D. Mich. Sep. 26, 2025)......................................63

*Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.,*
113 F.3d 405 (3d Cir. 1997).....................................................................14

*Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.,*
2022 WL 2438934 (D. Del. July 5, 2022)........................................61, 64

*Shoalwater Bay Indian Tribe v. Exxon Mobil Corp.,*
2026 WL 1457441 (Wash. Super. Ct. Apr. 29, 2026) ...........................69

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.,*
431 F.3d 917 (6th Cir. 2005) ...................................................................50

*Starr v. Sony BMG Music, Ent't,*
592 F.3d 314 (2d Cir. 2010)......................................................................38

*State of Mich. ex rel. Kelley v. C.R. Equip. Sales, Inc.,*
898 F. Supp. 509 (W.D. Mich. 1995)......................................................11

*State v. Detroit Lumbermen's Ass'n,*
1979 WL 18703 (Mich. Cir. Ct. Oct. 29, 1979) ...............................11, 12

*Static Control Components, Inc. v. Lexmark Int'l, Inc.,*
697 F.3d 387 (6th Cir. 2012) .......................................................20, 28, 29

*Stratmore v. Goodbody,*
866 F.2d 189 (6th Cir. 1989)....................................................................49

*Todd v. Exxon Corp.,*
275 F.3d 191 (2d Cir. 2001).....................................................................53

*Tolbert v. State of Ohio Dep't of Transp.*,
 172 F.3d 934 (6th Cir. 1999) .................................................................... 61, 62

*Tunis Bros. Co. v. Ford Motor Co.*,
 952 F.2d 715 (3d Cir. 1991)................................................................................ 55

*U.S. Gypsum Co. v. Indiana Gas Co.*,
 350 F.3d 623 (7th Cir. 2003) .............................................................................. 25

*United States Sec. Exch. Comm'n v. Kilpatrick*,
 2014 WL 3767801 (E.D. Mich. July 31, 2014)...................................................... 15

*United States v. Andreas*,
 39 F. Supp. 2d 1048 (N.D. Ill. 1998) ................................................................... 47

*United States v. Apple, Inc.*,
 2025 WL 1829127 (D.N.J. June 30, 2025)............................................................. 49

*United States v. Blue Cross Blue Shield of Mich.*,
 809 F. Supp. 2d 665 (E.D. Mich. 2011) ................................................................ 48

*United States v. Gen. Dynamics Corp.*,
 341 F. Supp. 534 (N.D. Ill. 1972) ........................................................................ 52

*United States v. Live Nation Ent., Inc.*,
 2025 WL 835961 (S.D.N.Y. Mar. 14, 2025) ......................................................... 22

*United States v. Topco Assocs., Inc.*,
 405 U.S. 596 (1972) ........................................................................................... 22

*US Airways, Inc. v. Sabre Holdings Corp.*,
 938 F.3d 43 (2d Cir. 2019)................................................................................... 61

*Verizon Comm'ns Inc. v. L. Off. of Curtis V. Trinko*,
 540 U.S. 398 (2004) ............................................................................................. 1

*Warrior Sports, Inc. v. NCAA*,
 623 F.3d 281 (6th Cir. 2010) ............................................................................... 48

*Watson Carpet & Covering, Inc. v. Mohawk Indus., Inc.*,
 648 F.3d 452 (6th Cir. 2011) ....................................................................... *passim*

*Workers United, Trustee Moore v. Local 181 Workers United*,
 2025 WL 269177 (W.D. Ky. Jan. 22, 2025) ..................................................... 10, 67

*Worldwide Basketball & Sport Tours, Inc. v. NCAA*,
 388 F.3d 955 (6th Cir. 2004) ............................................................................... 53

*Young v. Masci*,
 289 U.S. 253 (1933) ........................................................................................... 68

*Z Techs. Corp. v. Lubrizol Corp.,*
  753 F.3d 594 (6th Cir. 2014) .................................................................. 63, 64

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.,*
  401 U.S. 321 (1971) ....................................................................................... 59

*Zimmerman v. 3M Co.,*
  542 F. Supp. 3d 673 (W.D. Mich. 2021) ............................................... 10, 67

## Statutes

15 U.S.C. § 15 .................................................................................. 10, 11, 14, 59

15 U.S.C. § 26 ............................................................................................. 10, 11

42 U.S.C. § 7401(c) ........................................................................................... 71

M.C.L. § 14.28 ............................................................................................ 11, 12

M.C.L. § 445.777 ........................................................................................ *passim*

M.C.L. § 445.778 .............................................................................. 10, 14, 25, 29

M.C.L. § 445.781 .............................................................................................. 64

M.C.L. § 445.782 .............................................................................................. 12

M.C.L. § 445.784(2) .......................................................................................... 64

M.C.L. § 600.5827 ............................................................................................ 64

## Rules

Fed. R. Civ. P. 8 ................................................................................... 31, 32, 55

Fed. R. Civ. P. 12(b)(6) .................................................................................... 10

Fed. R. Civ. P. 15(a)(2) .................................................................................... 21

## Other Authorities

Mich. H. Legis. Analysis, H.B. 4994 (Nov. 23, 1983) ................................... 11

Maxwell M. Blecher & James Robert *Noblin, The Confluence of Muddied Waters:*
  *Antitrust Consequential Damages and the Interplay of Proximate Cause, Antitrust*
  *Injury, Standing and Disaggregation,*
  13 J. Civ. Rts. & Econ. Dev. 145 (1998) .................................................. 17

**INTRODUCTION**

Defendants have jointly moved to dismiss a pleading, but not the Complaint the State of Michigan filed here.

The State's Complaint challenges collusion among direct ("horizontal") competitors in energy markets and their trade association, the American Petroleum Institute ("API"). Cartel behavior among actual or would-be competitors is what the Supreme Court has called the "**supreme evil of antitrust**." *Verizon Comm'ns Inc. v. L. Off. of Curtis V. Trinko*, 540 U.S. 398, 408 (2004) (Scalia, J.) (emphasis added). Defendants' cartel is an *output and innovation restraint* that has suppressed competition across the U.S. markets for transportation energy and primary energy, including in Michigan. As detailed in the Complaint, Defendants conspired to suppress their own development and output of renewable energy technologies, to impede and foreclose entry by competing renewable energy products, to divert capital away from renewable energy, and to raise barriers to entry and depress demand for renewables through public dissemination of junk science. That restraint has no procompetitive justification and has reduced consumer welfare through fewer choices and higher prices. The antitrust laws condemn such restraints as unlawful *per se*.

Defendants attempt to evade accountability by mischaracterizing or ignoring the Complaint's allegations. They argue that the State has not plausibly alleged standing, a conspiracy, or anticompetitive effects in a relevant market, and that the State's claims are untimely, preempted, or both. Each argument fails.

*First*, Defendants cannot defeat the State's standing to challenge their cartel by recasting this case as one about their "vigorous competition in fossil fuels." ECF

1

No. 31 ("Br.") at PageID.268. As the statutorily designated enforcer of Michigan antitrust law, the State has standing to seek equitable relief and civil penalties under M.C.L. § 445.777 without any additional showing, and Defendants do not contest that authority. Defendants' challenge to the State's standing to seek damages fails because the Complaint alleges paradigmatic antitrust injury: economic harm proximately caused by horizontal competitors agreeing to suppress the output of renewable substitutes that would have otherwise constrained fossil-fuel prices.

*Second*, Defendants invite the Court to dismember the State's conspiracy allegations, to discount them because they are based on circumstantial evidence, and to accept Defendants' competing explanations for their conduct as more plausible than the State's. That is not the Court's role at the pleading stage. Taken as a whole, the Complaint satisfies the plausibility standard applicable here.

*Third*, Defendants seek to dictate the Court's standard of review by declaring that "[t]his is not a *per se* case" and that the State's claims "must proceed under the 'rule of reason.'" Br. at PageID.269. Not so. Long-established precedent applies *per se* analysis to the type of horizontal output restraint alleged here, as the Complaint expressly pleads. ECF No. 1 ("Compl.") PageID.9–10, ¶ 7. Even if the Court were to credit Defendants' effort to force this case into a rule-of-reason analysis, the State has plausibly pleaded the requisite elements of a rule-of-reason claim in the alternative.

*Fourth*, the State seeks relief for harms inflicted by Defendants' ongoing conspiracy during the four-year limitations period. Defendants continue to maintain their restraint, and the State and its residents continue to pay supracompetitive

prices and suffer other harms as a result. Defendants are not absolved of liability for the State's timely claims merely because their conspiracy has endured for decades.

*Finally*, Defendants offer no credible basis for their last-ditch argument that federal law preempts the State's state antitrust claim as an attempt "to regulate nationwide energy policy." Br. at PageID.270. The State brings its claim under the Michigan Antitrust Reform Act ("MARA") to redress economic injury and restore competition in Michigan markets unlawfully restrained by private actors. That relief is grounded in antitrust law, not energy policy. But the Court need not even reach the issue. Defendants' preemption argument contests only the State's recovery of damages for its climate-related fiscal expenditures, but a defense against one remedy is no basis to dismiss an entire claim. The Court can reject it for that reason alone.

Defendants' motion should be denied, and discovery should proceed.

## STATEMENT OF FACTS

By 1979, the Fossil Fuel Defendants (BP, Exxon, Chevron, Shell, and their subsidiaries), and co-Defendant American Petroleum Institute ("API"), the industry's principal trade association, had long understood the link between fossil-fuel combustion, $CO_2$ emissions, and climate change. Compl. PageID.34–36, ¶¶ 64, 69–70. They concluded internally that avoiding irreversible climate and economic harm would require the world to embrace and rapidly scale alternative energy. *Id.* PageID.34–36, ¶¶ 64, 70. They projected that consumers, once aware of these dangers, would increasingly demand renewable energy from sources like wind and solar, making energy markets in the United States and Michigan more competitive.

3

*Id.* Drivers would be able to substitute electricity for gasoline by purchasing hybrid or fully electric vehicles ("EVs"), and residents could substitute renewable energy for fossil fuels like propane to heat their homes. *Id.* PageID.11–12, 26, 28–30, 32–33, 36, ¶¶ 11–13, 43, 51, 54, 60–61, 70. The Fossil Fuel Defendants understood that under this "competitive scenario," declining demand for fossil fuels would threaten their dominance of energy markets. *Id.* PageID.34–36, ¶¶ 64, 68, 70.

The Fossil Fuel Defendants could have responded like lawful, profit-seeking firms: by innovating and competing. *Id.* PageID.36, ¶ 71. They were well-positioned and incentivized to do so, already equipped with (1) early and cutting-edge energy alternatives, *id.* PageID.44–45, 57–58, ¶¶ 90, 124; (2) the capital to develop or acquire key battery and solar technologies, *id.* PageID.34, 45, 57–58, ¶¶ 63, 92–93, 124; and (3) R&D capabilities that had *already* yielded "proven," commercially scalable hybrid vehicle and battery technologies and market-leading solar businesses, *id.* PageID.44–47, 57–58, ¶¶ 90–97, 124–25. *See also id.* PageID.97–99, ¶¶ 218–19.

Instead of competing independently to lead the clean energy transition, the Fossil Fuel Defendants colluded to hobble it. *Id.* PageID.34–35, ¶¶ 63–65. Their multi-decade conspiracy, coordinated through and with API, "neutraliz[ed] renewable energy through suppression, deception, and obstruction," thus distorting competition in the transportation energy and primary energy markets and keeping Michigan consumers "locked into expensive gasoline and other fossil fuels." *Id.* PageID.42, ¶ 86.

4

A.    **Defendants' Anticompetitive Conduct.**

The conspiracy began in 1979, when Exxon's internal studies concluded that gasoline and other fossil fuels would be displaced by renewables under "a competitive scenario." *Id.* PageID.34–35, ¶ 64. In response, and at Exxon's urging, API established a "$CO_2$ and Climate Task Force." *Id.* Through the Task Force, Exxon shared proprietary and competitively sensitive projections with its competitors and colluded with them to eliminate that "competitive scenario." *Id.* PageID.33–35, 37–38, ¶¶ 62, 64–65, 74–75. API was both an active participant in the conspiracy and a critical hub for collusion. *Id.* PageID.33, 38–42, ¶¶ 62, 77–84.

Defendants' coordinated conduct in furtherance of their conspiracy falls into four categories: suppressing EV technologies, suppressing solar technologies, diverting capital away from renewable energy, and depressing demand for renewable substitutes through public dissemination of misinformation and junk science.

Several Fossil Fuel Defendants pioneered promising EV research in the 1970s, then abandoned it after forming the conspiracy. *Id.* PageID.44–46, ¶¶ 90, 94–96.

Each time Defendants had opportunities to capitalize on emerging EV technology, they followed the same pattern: make initial investments and grand public pronouncements, then abandon, underdevelop, or restrict the technology to further their shared goal of preserving fossil fuels' dominance. *Id.* PageID.46–51, ¶¶ 97–110. For example, Chevron acquired battery patents, then used litigation and restrictive licensing to stymie their use in EVs, *id.* PageID.47–50, ¶¶ 98–105, and Exxon abandoned a promising EV battery venture, *id.* PageID.46–47, ¶¶ 96–97.

5

The Fossil Fuel Defendants executed a similar strategy with EV charging technology, acquiring patents, buying chargers, and announcing partnerships with charging companies, only to later abandon them. *Id.* PageID.52–54, ¶¶ 112–17, 225.

The story is much the same with solar. The Fossil Fuel Defendants and other oil companies invested heavily in the development of solar technology in the 1970s, so much so that they collectively controlled roughly "70% of U.S. solar module sales" by the early 1980s. *Id.* PageID.57–58, ¶¶ 124–25. Even as they led the market, however, the Fossil Fuel Defendants began a coordinated retreat from it in furtherance of their conspiracy. *Id.* PageID.58, ¶ 126. One by one, they exited the business they had once led: Exxon by 1984, Shell by 2009, BP by 2011, and Chevron in 2014, shortly before Defendants formed the Oil and Gas Climate Initiative ("OGCI"), a joint initiative aimed at limiting renewable investment. *Id.* PageID.58–60, ¶¶ 126–30. Nor did Defendants simply withdraw; they also "acquired solar patents" to "suppress alternatives." *Id.* PageID.59–60, ¶¶ 127, 131.

Using OGCI as a hub, the Fossil Fuel Defendants jointly diverted investment capital away from renewable energy research and development and toward projects that "perpetuate fossil fuel production." *Id.* PageID.60–66, ¶¶ 132–46.

Finally, Defendants orchestrated a public, "decades-long campaign[] of deception" "to manufacture continued dependence on fossil fuels and suppress demand for renewable energy alternatives." *Id.* PageID.68, ¶ 150. With API as their mouthpiece, Defendants fostered public doubt about the scientific consensus on climate change and the need for development of renewable energy. *Id.* PageID.69–70,

6

¶¶ 152–54. API published misleading reports about EVs and climate change, and Defendants ran misleading advertising campaigns ranging from outright climate denial to "greenwashing" that concealed the role of their fossil-fuel products in contributing to global warming. *Id.* PageID.72, 74–81, ¶¶ 159–60, 163–78. This conduct continues today, including in Michigan. *Id.* PageID.78, ¶ 172.

Defendants also coordinated to influence and control "information-producing institutions," including universities, scientific journals, and international climate bodies, to further entrench fossil fuels' dominance. *Id.* PageID.83–94, ¶¶ 183–208.

## B.     Harm to Competition.

Defendants' output restraint successfully suppressed competition in two Michigan markets: transportation energy, which includes individual consumer and State retail purchases of energy products for automobiles, where the principal options are gasoline and electricity; and primary energy, which includes individual consumer purchases of energy products for residential and commercial heating and cooling, and State purchases for public heating and cooling, where the principal options are fossil-fuel energy, such as propane, and renewable energy. *Id.* PageID.26, ¶ 43.

In both markets, fossil-fuel energy and renewable energy serve the same end uses and are substitutes, but fossil fuels dominate. *Id.* PageID.27–30, ¶¶ 45–51, 54–55. EVs account for only 2% of Michigan-registered vehicles, and public charging stations remain scarce. *Id.* PageID.27–28, ¶¶ 45, 47–48. Michigan also uses more propane for home heating than any other state, and about 85% of home heating comes from fossil-fuel energy. *Id.* PageID.30, ¶ 55. But for the conspiracy, EVs and

7

renewable primary energy would have reached scale years earlier, putting downward pressure on fossil-fuel prices in the relevant energy markets, and the State and Michigan consumers would have avoided billions of dollars in overcharges over the last four years. *Id.* PageID.11–12, 110–114*, ¶¶* 11–15, 247–60. Instead, because the conspiracy remains in operation, the State and Michigan consumers continue to pay supracompetitive prices for fossil-fuel products, and the State continues to bear the costs of adapting to and mitigating the effects of Defendants' artificial entrenchment of fossil-fuel demand and causative contributions to climate change. *Id.* PageID.112–120, 121, ¶¶ 252–54, 258–76, 280–81, 290.

## LEGAL STANDARD

On a motion to dismiss, a court must "construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true." *Erie County v. Morton Salt, Inc.*, 702 F.3d 860, 867 (6th Cir. 2012). A complaint will be sustained if it alleges "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard does not require "that recovery be probable," *Erie County*, 702 F.3d at 867, but rather requires only "more than a sheer possibility that a defendant acted unlawfully," *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.    The State's Standing Is Beyond Any Genuine Dispute.

The State is precisely the plaintiff that Congress and the Michigan legislature authorized to challenge anticompetitive conduct that has harmed the State, Michigan consumers, and Michigan markets. And the Complaint alleges the very type of injuries antitrust law was designed to redress: supracompetitive prices paid by consumers in the energy markets where Defendants restrained trade through their horizontal conspiracy to suppress output and stifle innovation. The Complaint also alleges that those injuries, and other economic harms suffered by the State, bear a sufficiently direct and foreseeable relationship to the challenged conduct to satisfy both antitrust and Article III standing. Defendants' contrary arguments repackage merits disputes, factual disagreements, and damages questions as threshold standing objections. Each fails as a matter of law at the pleading stage.

### A.    The State has authority to seek all forms of relief it claims.

The State asserts federal and state antitrust claims under § 1 of the Sherman Act and § 2 of MARA in three distinct capacities: (i) as the statutorily designated enforcer with express sovereign authority to bring actions for equitable relief and civil penalties for violations of Michigan antitrust law; (ii) in its proprietary capacity for injuries to the State's own business or property caused by Defendants' conspiracy; and (iii) as *parens patriae* on behalf of Michigan residents injured by the same conspiracy and to vindicate the State's quasi-sovereign interests. The State's standing to pursue these forms of relief for harms caused by Defendants' conspiracy

9

is well-established and handily withstands Defendants' attacks, largely buried in footnotes. *See* Br. at PageID.277–278, 284–286, 290, n.3, n.4, n.5, n.6, n.7, n.8.

*First*, M.C.L. § 445.777 expressly authorizes the State to pursue "injunctive or other equitable relief and civil penalties" for violations of MARA, without any additional showing of standing. Accordingly, to the extent Defendants argue or imply that the State's *entire* MARA claim fails for lack of standing, they are mistaken. Even if the Court were to accept all Defendants' standing arguments, the State would still have standing to seek equitable relief and civil penalties under M.C.L. § 445.777.[1]

*Second*, section 4 of the Clayton Act authorizes the State to sue in its proprietary capacity for treble damages for injuries to its business or property arising from an antitrust violation. 15 U.S.C. § 15; *see Hawai'i v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972). MARA also independently authorizes the State to recover actual damages for injuries to its business or property caused "directly *or indirectly*" by an antitrust violation. M.C.L. § 445.778(1) (emphasis added).[2]

---

[1] Defendants' challenge to disgorgement as an equitable remedy under M.C.L. § 445.777, Br. at PageID.277–278 n.3, should not be addressed on this motion. *See Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 682 (W.D. Mich. 2021) (refusing to "trim remedies from Plaintiffs' complaint at the pre-answer stage"); *Workers United, Trustee Moore v. Local 181 Workers United*, 2025 WL 269177, at *5 (W.D. Ky. Jan. 22, 2025) (defendant "cannot use a Fed. R. Civ. P. 12(b)(6) motion to attack Plaintiff's requested remedies"). To the extent the Court considers Defendants' argument, however, MARA's express authorization of claims by the Attorney General for "other equitable relief" in M.C.L. § 445.777 is distinct from the "injunctive relief" provision of section 16 of the Clayton Act, 15 U.S.C. § 26, and thus not constrained by its interpretation.

[2] The use of "indirectly" in M.C.L. § 445.778(1) reflects Michigan's explicit departure from the federal bar on indirect-purchaser damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). *See A & M Supply Co. v. Microsoft Corp.*, 252 Mich. App. 580, 583 (2002) (discussing similar language in M.C.L. § 445.778(2)); Mich. H. Legis.

10

*Third*, section 4C of the Clayton Act expressly authorizes state attorneys general to bring actions "as *parens patriae* on behalf of natural persons residing in such State" to "secure monetary relief" for injuries to their business or property from Sherman Act violations. 15 U.S.C. § 15c(a); *see Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 218–19 (1990). It is also "beyond dispute" that the State may bring a *parens patriae* action for injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26, provided the State demonstrates a "quasi-sovereign interest" in the litigation. *New York v. Microsoft Corp.*, 209 F. Supp. 2d 132, 150 (D.D.C. 2002) (citing *Georgia v. Pennsylvania R.R.*, 324 U.S. 439, 447 (1945)). Defendants do not contest that the State's interests in competitive energy markets and the economic well-being of its residents are quintessential quasi-sovereign interests—"interests that the State has in the well-being of its populace"—at stake in this litigation. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 601–02 (1982); *see also id.* at 607 ("a State has a quasi-sovereign interest in the [economic well-being] of its residents in general").

Michigan law independently authorizes the Attorney General to "initiate actions" and "litigate on behalf of the people of the state." *In re Certified Question from U.S. Dist. Ct. for E. Dist. of Michigan*, 465 Mich. 537, 544 (2002) (citing M.C.L. § 14.28). And Michigan courts have recognized that the Attorney General's *parens patriae* authority is "derived from the common law." *State v. Detroit Lumbermen's Ass'n*, 1979 WL 18703, at *6 (Mich. Cir. Ct. Oct. 29, 1979); *see also State of Mich. ex*

---

Analysis, H.B. 4994 (Nov. 23, 1983) ("[MARA] would permit governmental agencies or individuals to bring actions if they are only *indirectly* injured or threatened with injury. This is at variance with federal law.").

*rel. Kelley v. C.R. Equip. Sales, Inc.*, 898 F. Supp. 509, 513–14 (W.D. Mich. 1995) (Attorney General possesses "statutory and common law authority to act on behalf of the people of the State of Michigan," which is "liberally construed").

Defendants' arguments contesting the State's standing to seek *parens patriae* damages under MARA cannot withstand the weight of this plain authority. Relying on *Kraft v. Detroit Entertainment*, 683 N.W.2d 200 (Mich. Ct. App. 2004), Defendants argue that MARA displaces any common-law authority to seek *parens patriae* damages because M.C.L. § 445.777 lists certain remedies available to the Attorney General without identifying damages. Br. at PageID.285, n.6. But *Kraft* held only that a statute displaces common law when it "provides for an *exclusive* remedy or otherwise limits or bars application of other laws." 683 N.W.2d at 206 n.5 (emphasis added). MARA does no such thing. Section 445.777 states only that the Attorney General "may" seek the listed relief; it does not make that relief exclusive. And MARA elsewhere expressly provides that its remedies are "cumulative." M.C.L. § 445.782.

Defendants' argument that the Michigan legislature's decision not to enact a verbatim analogue to section 4C of the Clayton Act in MARA "extinguished any conceivable common law right to *parens patriae* damages," Br. at PageID.285, n.6, conveniently elides that the Attorney General's *parens* authority already existed when MARA was enacted, so there was no need to restate it. *See* M.C.L. § 14.28; *Lumbermen's*, 1979 WL 18703, at *5–6. And because the legislature expressly made MARA's remedies "cumulative," M.C.L. § 445.782, and not exclusive, its clear intent was to preserve remedies that are otherwise available, including through the

12

Attorney General's *parens* authority. *See Davis v. BetMGM, LLC*, 2025 WL 2054575, at *9 (Mich. July 22, 2025) ("We presume that the Legislature knows of the existence of the common law when it acts" and "the Legislature should speak in no uncertain terms when it exercises its authority to modify the common law.") (cleaned up).

### B.   The State plausibly alleges antitrust standing to recover damages in its proprietary and *parens patriae* capacities.

As Defendants acknowledge, to establish antitrust standing at the pleading stage, a plaintiff need only plausibly allege antitrust injury and proximate causation. *See* Br. at PageID.277–278 (citing *Academy of Allergy & Asthma in Primary Care v. Amerigroup Tennessee, Inc.*, 155 F.4th 795, 806–19 (6th Cir. 2025) ("*AAAPC*")). The State pleads both, and Defendants' contrary arguments fail to identify any shortfall.

### 1.   The State plausibly alleges antitrust injury.

Defendants recognize that antitrust injury is "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,'" and that "arise[s] from a 'competition-reducing aspect' of the challenged conduct." Br. at PageID.278 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990)).

Because the Complaint meets that standard, Defendants' attempt to recast it as somehow challenging the Fossil Fuel Defendants' "vigorous competition in fossil fuels" or seeking redress for "environmental harms" untethered to anticompetitive conduct, Br. at PageID.268, 278–280, collapses upon inspection.

13

The Complaint alleges that Defendants' collusive suppression of renewable energy innovation and output reduced the availability of renewable substitutes and thereby prolonged fossil-fuel dependence, forcing the State to expend substantial public funds on climate adaptation, resiliency, mitigation, and related responses that would have been unnecessary or materially reduced absent the conspiracy. Compl. PageID.6-9, 34–35, 38, 42–43, 56, 96–99, 100–101, 110–116, ¶¶ 3–5, 63–64, 76, 86–87, 121, 215–19, 222–23, 247–68. Such expenditures are *economic* harms to the State's treasury—that is, to its "business or property" within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and MARA, M.C.L. § 445.778. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339–40 (1979) (injury to "business or property" in this context encompasses all manner of economic injury, as distinguished from personal injuries like pain and suffering).[3] Even if the Court were to conclude that the State cannot recover *damages* for these fiscal harms, the State's allegations—and all supporting evidence subsequently adduced in discovery—are germane to the

---

[3] Defendants cite *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 236–37 (9th Cir. 1976), for the proposition that antitrust law does not redress harms that are "environmental, not economic in the antitrust sense." Br. at PageID.280. However, the plaintiff States in that case expressly *conceded* that the equitable relief they sought was not directed at restoring competitive conditions (the conduct had already ceased pursuant to a consent decree) and *admitted* that "the harm to be alleviated is environmental, not economic in the antitrust sense." 538 F.2d at 236–37 & n.10. The Ninth Circuit thus held that the requested relief would serve no antitrust function. *Id.* at 236.

Defendants' citation to *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 411–14 & n.9 (3d Cir. 1997), fares no better. The Third Circuit held only that environmental harm falls outside the antitrust laws "when an antitrust defendant's conduct *cannot* be linked to antitrust injury." *Id.* at n.9 (emphasis added).

14

calculation of civil penalties, as well as equitable relief such as disgorgement. *See* M.C.L. § 445.777; *see also, e.g.*, *United States Sec. Exch. Comm'n v. Kilpatrick*, 2014 WL 3767801, at *3 (E.D. Mich. July 31, 2014) (courts have "broad discretion in calculating the disgorgement amount"); *New York v. Burger*, 482 U.S. 691, 692 (1987) ("A State can address a major social problem" with "penal sanctions.").

<blockquote>

a.    **The State plausibly alleges the type of injury the antitrust laws were designed to prevent, arising from Defendants' competition-reducing conduct.**

</blockquote>

Restrictions on output are among the "paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107–08 (1984). Collusive conduct that interferes with consumers' ability to make "free choices between market alternatives" is likewise "inherently destructive of competitive conditions," *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983) ("*AGC*"); *see also Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1274 (9th Cir. 2022), as is conduct that suppresses innovation, *see, e.g., Fed. Trade Comm'n v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 172 (3d Cir. 2022) (anticompetitive harm can include "reduced product quality, product variety, service, or innovation"); *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021). Eliminating or delaying potential competition is also anticompetitive "by definition." *Impax Labs., Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir. 2021). Injuries caused by such conduct are the types of injuries that the antitrust laws were designed to prevent.

15

Courts have also recognized that consumers suffer antitrust injury when competitors collude to prevent lower-cost or technologically superior alternatives from entering the market. In *In re Cardizem CD Antitrust Litigation*, 332 F.3d 896 (6th Cir. 2003) ("*Cardizem II*"), the Sixth Circuit found antitrust injury where consumers claimed that a horizontal agreement delayed generic competition and forced them to continue buying a higher-priced branded drug. *Id.* at 910–11. Those consumers, who were "deprived" of a lower-cost substitute, suffered precisely the type of injury the Sherman Act was designed to prevent. *Id.*

The State alleges exactly that type of conduct and injury: (i) Defendants agreed to suppress innovation and restrain the development, market entry, adoption, and output of substitute renewable energy technologies so they could not develop into viable competitive constraints on fossil-fuel demand and prices in the transportation energy and primary energy markets; (ii) Defendants acted in furtherance of that agreement; and (iii) the State and its residents suffered economic harm as a result, including by overpaying for fossil-fuel products in those very markets. Compl. PageID.9–10, 34–35, 38, 42, 44–47, 56–59, 96–114, 119–120, ¶¶ 7–9, 63–64, 76, 86, 89–97, 121–27, 215–60, 280–81. Those allegations adequately plead antitrust injury.

It is well-settled that a plaintiff who adequately pleads antitrust injury may seek damages for consequential economic harms flowing from the same anticompetitive conduct, even if those harms would not themselves grant the plaintiff standing to sue. *See Perkins v. Standard Oil Co.*, 395 U.S. 642, 649–51 (1969); *Greene v. General Foods Corp.*, 517 F.2d 635, 663–64 (5th Cir. 1975). Once a plaintiff

16

establishes antitrust standing, the scope of its recoverable damages is determined by the reach of proximate causation, not by re-running the antitrust injury analysis for each type of alleged harm. *See* Maxwell M. Blecher & James Robert Noblin, *The Confluence of Muddied Waters: Antitrust Consequential Damages and the Interplay of Proximate Cause, Antitrust Injury, Standing and Disaggregation*, 13 J. Civ. Rts. & Econ. Dev. 145, 170 (1998) ("Once a plaintiff has satisfied [the antitrust injury and standing] requirements, her entitlement to consequential damages" should be "determined by the proximate cause doctrine."). The scope of recovery is a fact-intensive question that should be decided on a full record, not a threshold pleading requirement. *See Perkins*, 395 U.S. at 650–51 (plaintiff with antitrust standing was "entitled to present evidence of all of his losses to the jury").

Confronted with the State's plausible allegations of a naked anticompetitive restraint and paradigmatic antitrust injuries flowing from its competition-reducing effects, Defendants contend instead that the harms suffered by the State and Michigan consumers stem from the Fossil Fuel Defendants' "vigorous competition in fossil fuels." Br. at PageID.268, 278–279. That argument, which rests primarily on *Brunswick*, 429 U.S. at 488, misrepresents both that case and the Complaint.

*Brunswick* rejected antitrust claims by bowling alleys that alleged injury because a larger competitor had acquired failing rivals that otherwise would have left the market. *Id.* at 479–81. The plaintiffs sought the profits they claimed to have lost because those rivals *remained in business*. *Id.* at 487–88. Their theory therefore

17

depended on competition being preserved rather than reduced, *id.*, and their injury thus did not "flow[] from that which ma[de] defendants' acts unlawful." *Id.* at 489.

Here, the State does not allege that Defendants harmed the State and its residents merely by continuing to compete in fossil fuels, but rather by agreeing *not* to compete in the development, commercialization, and sale of emerging renewable substitutes that threatened their dominance. *See* Compl. PageID.34–35, 44–47, 56–60, 112–114, 119–120, ¶¶ 63–64, 89–97, 121–31, 252–60, 280–81. By suppressing the output of those substitutes and forestalling their market entry, Defendants reduced competition in Michigan's transportation energy and primary energy markets and thwarted the downward pressure on fossil-fuel prices that such competition would have generated. *Id.* PageID.10, 56, 99, 101, 112–114, ¶¶ 9, 121, 219, 224–25, 252–60. The overcharges the State and Michigan consumers paid in those markets thus flow directly from the competition-reducing effects of Defendants' conduct. The core error in Defendants' reasoning lies in their refusal to acknowledge that the Fossil Fuel Defendants compete with respect to *both* fossil-fuel energy *and renewable energy*—an incontrovertible fact alleged in the Complaint. *Id.* PageID.35, 68, ¶¶ 65, 150.

Defendants' reliance here on *Hodges v. WSM, Inc.*, 26 F.3d 36 (6th Cir. 1994), is misplaced. In *Hodges*, the plaintiffs were competitors who alleged they were excluded from providing shuttle services to Opryland by a horizontal market-allocation conspiracy among shuttle operators, which the defendants allegedly policed by refusing entry to Opryland by the plaintiffs and other non-conspiring operators. *Id.* at 37. The Sixth Circuit held that the plaintiffs' injury did not flow from

18

any competition-reducing aspect of the conspiracy because they would have suffered the same injury in its absence: the defendants independently possessed, and lawfully exercised, the right to deny the plaintiffs access to their private property. *Id.* at 38–39. The conspiracy thus did not prevent the plaintiffs from operating a shuttle service to Opryland, that lawful refusal of access did. *Id.*[4]

The Sixth Circuit's reasoning in *Cardizem II* illustrates the distinction between *Brunswick* and *Hodges*, on one hand, and the State's case here, on the other. In *Cardizem II*, the consumer plaintiffs alleged that horizontal pharmaceutical companies agreed to delay the market entry of a lower-cost generic drug, forcing them to pay supracompetitive prices for the branded version. 332 F.3d at 911. Unlike in *Brunswick* and *Hodges*, there was "no question" that the plaintiffs' injury—"paying higher prices for a product due to a lack of competition in the market"—"flow[ed] from the anticompetitive effects" of the alleged agreement. *Id.* The defendants' argument that the plaintiffs would have suffered the same injury even in its absence, because the generic drug would not have entered the market for other reasons, "create[d] a disputed issue of fact, not appropriately resolved on a motion to dismiss." *Id.*

So too here, where the State alleges injuries in the form of paying higher prices for fossil-fuel products due to reduced competition in the markets for transportation energy and primary energy. As in *Cardizem II*, those injuries flowed from the anticompetitive effects of Defendants' conspiracy, and any argument that the State

---

[4] *See also Cardizem II*, 332 F.3d at 914 (explaining that the "actual, indisputable, and sole cause" of the plaintiffs' injury in *Hodges* was the defendants' lawful refusal of access to their private property, not the alleged conspiracy).

and its residents would have suffered the same injuries in its absence merely "creates a disputed issue of fact, not appropriately resolved on a motion to dismiss." *Id.*

### b.   The State's overcharge injuries occurred in the very energy markets where competition was restrained.

Defendants next argue that the overcharge injuries suffered by the State and its residents arose in a market different than the market in which they allegedly restrained competition. Br. at PageID.280–282. Based on that flawed premise, Defendants contend that a supposed market mismatch defeats the State's claims because "a plaintiff [who] 'is neither a consumer nor competitor' in the market in which the defendant allegedly *acted* to restrain trade . . . cannot show antitrust injury.*" Id.* at PageID.280 (quoting *Static Control Components, Inc. v. Lexmark Int'l, Inc.*, 697 F.3d 387, 402 (6th Cir. 2012)) (additional citations omitted). Again, Defendants mischaracterize Sixth Circuit law and the Complaint.

The relevant market for antitrust injury is the market where competition was restrained, also referred to as the "market affected by the anticompetitive conduct," *AAAPC*, 155 F.4th at 810, or the "injured market," *Static Control*, 697 F.3d at 404. The Sixth Circuit's recent decision in *AAAPC* treated the plaintiff's status as a consumer or a competitor in the restrained (or injured) market as a factor that makes antitrust injury more likely, not a bright-line requirement. 155 F.4th at 809–11.

Whether the test is framed as a factor or as a requirement, the State satisfies it here because the transportation energy and primary energy markets where the State and Michigan consumers suffered overcharge injuries are the same markets

where Defendants restrained competition. The Complaint alleges that Defendants' conspiracy "target[ed] two markets: the United States market for transportation energy products such as gasoline, and the United States market for primary energy products used to heat and cool residential and public buildings," Compl. PageID.7, ¶ 5,[5] that fossil-fuel products and renewable energy products compete within those markets as the principal options available to consumers, *id.* PageID.26, ¶ 43; and that the State and its residents were consumers in those markets who paid supracompetitive prices for fossil-fuel products as a result of the conspiracy, *id.* PageID.112–114, 119–120, ¶¶ 252–60, 280–81.

Defendants manufacture a market mismatch by relabeling different distribution levels and sectors of those same energy markets as entirely separate markets, Br. at PageID.281, but the Complaint does not allege a conspiracy in a standalone battery market, charging-network market, technology-licensing market, or any other market separate from the transportation energy and primary energy markets. Rather, it alleges a conspiracy to suppress competing renewable energy products *within* those very markets, carried out in part through conduct occurring at

---

[5] The Complaint's reference to "geographic submarkets" where Michigan-based retail and end-use purchases occurred, Compl. PageID.26, ¶ 43, merely identifies the downstream levels of the U.S. transportation energy and primary energy markets where the State and Michigan consumers made the relevant purchases. It does not redefine the relevant product markets, as the first sentence of that same paragraph makes clear. *Id.* If the Court concludes that these market allegations require clarification, the State could promptly amend the Complaint to clarify them without changing the nature of its claims. *See* Fed. R. Civ. P. 15(a)(2); *Fed. Mut. Ins. Co. v. Cantrell Funeral Home, Inc.*, 2019 WL 10379384, at *2 (E.D. Mich. Dec. 30, 2019) (granting leave to amend to clarify allegations).

the producer level of those markets.[6] That distinction matters. Antitrust markets are defined by products that compete with one another, not by the particular distribution level at which defendants act. *See PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 (5th Cir. 2010) ("the relevant market definition must focus on the product rather than the distribution level"). Like most product markets, the transportation energy and primary energy markets have multiple distribution levels: producers who create or obtain the product; intermediate firms that finish, package, or distribute the product; and retail firms that sell it to end users. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (explaining product market structure and the horizontal and vertical relationships between different levels in that structure). Defendants' use of "upstream" and "downstream" nomenclature underscores the point: there is a single stream of commerce running from the producer level, where crude oil and other products are generated, to the middle distribution levels where those products are refined, transported, and resold, and finally to the gas pump and other points of retail sale. The Complaint's allegations largely concern Defendants' conduct at the producer level, *see, e.g.*, Compl. PageID.44–47, 56–59, ¶¶ 89–97, 122–27, which the State alleges targeted the

---

[6] Even if the Court were to conclude that the State and Michigan consumers did not participate in the markets where the challenged conduct took place, it could still hold that their overcharges are antitrust injuries. *See United States v. Live Nation Ent., Inc.*, 2025 WL 835961, at *4–5 (S.D.N.Y. Mar. 14, 2025) (in state enforcement action, consumers suffered antitrust injury despite not participating "in th[e] markets where the alleged anticompetitive acts took place" because they purchased "the thing [] the [anticompetitive] conduct was focused on").

markets for transportation energy and primary energy and had "downstream effects in all end-use sectors." *Id.* PageID.42–43, ¶ 87.

These allegations place the restraint and the resulting injuries in "the market[s] affected by the anticompetitive conduct," satisfying the antitrust-injury requirement at the pleading stage. *AAAPC*, 155 F.4th at 810.

### 2. The State plausibly alleges proximate causation for injuries attributable to Defendants' conduct.

Defendants rely on shifting theories, concerns about administrability, and out-of-context adjectives—"indirect" or "derivative" or "highly speculative"—to argue the State has not alleged proximate causation. Br. at PageID.282–289. Conspicuously absent from their discussion is the Sixth Circuit's simple requirement for proximate cause: a sufficiently "direct relation . . . between the injury asserted and the injurious conduct alleged." *AAAPC*, 155 F.4th at 808, 812 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). The Complaint satisfies the governing *AAAPC* test.

### a. The State's claims are neither barred as "indirect" under *Illinois Brick* nor otherwise too attenuated under the governing proximate cause standard.

Defendants' invocation of *Illinois Brick* cannot defeat the State's entire indirect-purchaser overcharges theory as "impermissibly indirect." Br. at PageID.283. *Illinois Brick* bars indirect purchasers from bringing *federal damages claims* for passed-on overcharges (with limited exceptions). 431 U.S. at 746–47. The State *has not brought* a claim for damages for indirect purchases under the Sherman Act. The State brings its indirect-purchaser damages claim under MARA, which

23

expressly authorizes such claims. M.C.L. § 445.778(1); *see supra* Part I.A. Defendants concede as much. Br. at PageID.284, n.4 ("MARA permits 'indirect[]' claims."). The categorical rule of *Illinois Brick* thus has no application to the State's MARA claim.

With *Illinois Brick* set aside, Defendants invite the Court to find the State's claims somehow too "indirect" anyway. But the State need only demonstrate the requisite reasonable connection to the pleaded antitrust violation, and "no single formula captures the required proximity." *AAAPC*, 155 F.4th at 814 (cleaned up). The Sixth Circuit recognizes that there are very few types of claims that fail to demonstrate proximate causation at the pleading stage as a matter of law, specifically identifying: (1) claims by plaintiffs whose harms are fully derivative of another, more direct victim's; and (2) "highly speculative" damages claims, such as those by *potential* purchasers who did not actually pay any supracompetitive price. *Id.* at 813–15. Defendants' arguments related to each category miss the mark.

While Defendants label the State's overcharges as "derivative harms" and contend they are insufficient for proximate causation, their argument is nothing more than an assertion that those injuries are impermissibly indirect under *Illinois Brick*—and indeed it is the *Illinois Brick* discussion in *AAAPC* that Defendants cite. Br. at PageID.284 (citing 155 F.4th at 811–12). As explained above, that rule presents no obstacle to the State's claim for overcharges under MARA, and Defendants make no attempt to demonstrate that the harms to the State are otherwise derivative, like those of "'employees with merely derivative injuries' that arise from harms inflicted on their employers." *AAAPC*, 155 F.4th at 814 (citation omitted).

24

Defendants also fail to shoehorn the Complaint into the "highly speculative" category. They portray the State's claims as having to traverse a purported "tortured path" of steps across markets and actors. Br. at PageID.283 (citation omitted). But conspiracy cases ordinarily follow a causal path like that pleaded in the Complaint, which is non-speculative and charted by basic antitrust principles and economics.

When a cartel restrains trade at one point in a market, the resulting harm is felt downstream by other participants. Here, Defendants' output restraint has affected each sale, to the detriment of buyers all the way down the chain. *See U.S. Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003) (when a cartel cuts output, it "elevates price throughout the market"). Indeed, a "cartel almost always targets the end consumers," meaning it "almost always *knowingly* causes injury to these indirect purchasers" in the form of higher retail prices that it anticipates will flow from higher wholesale prices. *AAAPC,* 155 F.4th at 817 (cleaned up). While a third party's actions *may* mitigate the harm at some point along the chain, cartel members cannot invoke hypothetical third parties and hypothetical interruptions in the chain of commerce to escape liability for a plausibly alleged conspiracy. Nor may they avoid liability for harms to purchasers down the chain who seek relief under state laws, like MARA, that expressly authorize recovery of damages by indirect purchasers. *See* M.C.L. §§ 445.778; *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 330 n.3 (E.D. Mich. 2001) ("*Cardizem I*"); *supra* Part I.A.

Whether a Michigan consumer bought gasoline at an independently operated gas station or one operated by a Defendant, each purchase at a supracompetitive price

25

was a natural and foreseeable result of the conspiracy. The State need not allege that Defendants dictated the retail price at every station or controlled every link in the chain of commerce, because the State *does* allege that the *express aim* of Defendants' restraint was to preserve supracompetitive fossil-fuel prices market-wide. Compl. PageID.26–27, 56, 99–101, 112–114, 119–120 ¶¶ 43–44, 121, 219–25, 252–60, 280–81.

Defendants' enumerated list of the "steps" they claim the Court must traverse to get from their restraint to the State's overcharges, Br. at PageID.286, is a rhetorical trick. The same sequence collapses to far fewer, and far more logical, steps: first, Defendants colluded to reduce the availability of renewable energy alternatives; second, the reduced availability of those substitutes entrenched consumer demand for fossil-fuel products that otherwise would have eroded; and third, that entrenched demand sustained supracompetitive fossil-fuel prices. There is thus no need for elaborate tracing of effects through multiple intermediary transactions governed by separate contractual arrangements. *Cf. AGC,* 459 U.S. at 540-42 (injuries depended first on harms to contractors, subcontractors, and other market participants); *AAAPC*, 155 F.4th at 811, 814–15 (injuries depended first on harms to providers).[7]

---

[7] Defendants rely on *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 691 F.2d 1335, 1340–41 (9th Cir. 1982), to argue that "[c]ourts have rejected far less attenuated claims by retail gasoline purchasers." Br. at PageID.287. But they fail to mention that the plaintiffs, unlike the State here, sought to recover damages for overcharges under a "price umbrella" theory, meaning their claims rested solely on purchases made from non-conspiring competitors whose prices were allegedly affected by the price fixing engaged in by conspiring competitors under the same market "umbrella." *Petroleum Products*, 691 F.2d at 1338–41.

More fundamentally, the questions embedded in each of Defendants' "steps"—what they did, how it affected competition and the forces of supply and demand, and who was harmed—are mixed questions of fact and law that cannot be resolved before discovery. Antitrust plaintiffs routinely establish these predicates through fact and expert discovery, and courts recognize that overcharge damages may be estimated by economic modeling that compares actual prices to those that would have prevailed in a competitive but-for world. *E.g.*, *Cardizem I*, 200 F.R.D. at 344–45 (discussing economic modeling and noting that courts "routinely" reject defendants' "attempt[s] to characterize the market as too complex for common proof of injury"). Indeed, "the determination of a 'but for' price by indirect purchasers in price-fixing cases may be even simpler than in many other instances because the violation itself directly affects price in an obvious way." *Id.* at 344 (rejecting challenge to MARA indirect-purchaser damages calculations at class certification stage).

The precise measure of damages may be uncertain at this stage, but the fact of the State's injuries flows from basic economic principles and a standard overcharge theory.[8] *See* Compl. PageID.112–114 ¶¶ 252–60. Any uncertainty about the timing or pace of renewable-energy adoption in the but-for world goes to the *quantification* of damages, not to the existence of proximate cause. Because Defendants are the ones

---

[8] Defendants' selective quotations come from cases premised upon true speculation, not the laws of supply and demand applied to a cartel like theirs. For example, in *Bodie-Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287 (6th Cir. 1992), the plaintiff's damages model depended on conjectural assumptions of the creation of an unprecedented new statewide brokerage arrangement and the maintenance of that arrangement indefinitely despite at-will termination rights. *Id.* at 292.

27

who impeded the development of competing technology, they should be "responsible for any uncertainty concerning when market entry would have been accomplished." *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1171 (3d Cir. 1993).

### b.    The State's damages claims do not create a meaningful risk of duplicative recovery or unmanageable apportionment.

Defendants' remaining administrability arguments likewise fail. The principal concern animating the proximate-cause doctrine is avoiding duplicative recovery and unmanageable apportionment among multiple independently injured plaintiffs. *See Holmes*, 503 U.S. at 269–70. That concern is at best theoretical here, where the State and Michigan consumers suffered overcharge injuries as consumers in the restrained energy markets themselves, *see supra* Part I.B.1.b, and where the State seeks not only damages but also other forms of relief unavailable to other plaintiffs.

Defendants' reliance on *Static Control* for the proposition that a "'clear class of direct victims . . . increases the danger of duplicative recovery,'" Br. at PageID.287–288 (quoting 697 F.3d at 406), is inapt for two reasons. First, the language Defendants invoke was the Sixth Circuit's response to a present, concrete risk of duplicative recovery because the direct victims had actually already litigated and settled their claims in the same proceeding. *See Static Control*, 697 F.3d at 405–06. Here, Defendants merely conjure abstract categories of potential future plaintiffs (renewable energy developers, EV manufacturers, technology licensors), Br. at PageID.289, none of whom has raised a claim that would overlap with the State's.

28

Second, the entities that Defendants conjure could not have been injured in the same way as the State was here. In *Static Control*, the concern was that both the direct victims (remanufacturers and consumers) and the indirect victim (Static Control, their supplier) would recover for the same underlying loss in the same market. 697 F.3d at 406 (framing the concern as "requiring a defendant to pay treble damages to parties both directly and indirectly injured from the same antitrust violation"). Many of the hypothetical litigants Defendants invoke here, by contrast, would have been excluded from technology development, *see* Br. at PageID.289, with injuries, if any, that are categorically distinct from the State's and Michigan consumers' overcharges in the transportation energy and primary energy markets. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009) (rejecting similar duplicative recovery argument because "the defendants' competitors, unlike the plaintiffs, would be seeking lost profits, not overcharges").

In any event, MARA expressly authorizes recovery by persons injured "directly or indirectly" by antitrust violations. M.C.L. § 445.778(1); *see supra* Part I.A. That reflects a legislative determination that indirect-purchaser claims may proceed, notwithstanding the fact that some overcharges are transmitted through ordinary distribution chains. The relevant proximate-cause inquiry is not whether every purchase occurred one distribution step closer to or farther from Defendants, but whether the alleged injuries here are too remote, derivative, or speculative to permit manageable adjudication. The State has plausibly alleged they are not.

29

Finally, even if duplicative recovery and apportionment of damages were valid concerns, the State is the *only* litigant who can seek equitable relief and civil penalties under M.C.L. § 445.777.[9] In any event, litigation of the State's request for monetary relief should not be avoided solely because it might be difficult to ascertain damages. "Injured parties cannot be penalized and left without recourse because measurement of their damages is difficult." *Lower Lake Erie Iron Ore*, 998 F.2d at 1169; *see also Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

## C.     The State plausibly alleges Article III standing.

Defendants' argument that the State lacks Article III standing rehashes their speculations concerning what *might not* happen if they were enjoined from conspiring, and a conclusion that an injunction *might not* "bring about the changes necessary to remedy the asserted injuries." Br. at PageID.291. With respect to injunctive relief, this Court will be "empowered to fashion appropriate restraints on [Defendants'] future activities both to avoid a recurrence of the violation and to eliminate its consequences." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 697 (1978) (citations omitted). That is, this Court is fully capable of curtailing

---

[9] The State's request for equitable relief under section 16 of the Clayton Act also "raises no threat of multiple lawsuits or duplicative recoveries" because "'100 injunctions are no more effective than one.'" *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 111 n.6 (1986) (quoting *Hawai'i*, 405 U.S. at 261).

Defendants' collusion and redressing the artificial constraints it has imposed on Michigan's transportation energy and primary energy markets.

Regardless, there can be no dispute that awarding damages for past overcharges and incurred climate-related fiscal expenditures would compensate the State and Michigan consumers for harms that have already occurred, rendering moot any generalized argument made by Defendants as to redressability.

## II.    The State Plausibly Alleges a Conspiracy Among Defendants.

### A.    The State's allegations are governed by the plausibility standard, not the heightened standard Defendants propose.

The Supreme Court has firmly held that a pleading filed pursuant to Rule 8 of the Federal Rules of Civil Procedure 8 is judged by the *plausibility* of its allegations, not the *probability* that those allegations will ultimately prevail at the merits stage. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556. In defiance of this well-established rule, Defendants seek a merits-based decision that their preferred explanations for any harm suffered by Michigan and its residents—the exercise of "independent business judgment" by each Defendant—is more likely than the allegations of decades-long collusion as asserted by the State. *See, e.g.*, Br. at PageID.291–292, 299–304. No such ruling is appropriate on the instant motion. "Ferreting out the most likely reason for [] defendants' actions is not appropriate at the pleading stage," and the plausibility of Defendants' explanation "does not render all other reasons implausible." *Watson Carpet & Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011).

By straying from the standard of plausibility and attempting to substitute a different, heightened standard, Defendants materially misstate the law.

First, Defendants insist that the lack of direct evidence of collusion, such as recorded calls between executives, is a detriment to the State's pleading. Br. at PageID.292. The Complaint is built primarily on circumstantial evidence, as in most cases where no public exposé has revealed secret communications among cartel members. Because such smoking-gun evidence is difficult for antitrust plaintiffs to come by before discovery, "the element of agreement . . . is nearly always established by circumstantial evidence." *In re RealPage, Inc. Rental Software Antitrust Litig.*, 709 F. Supp. 3d 478, 501 (M.D. Tenn. 2023) ("*RealPage I*") (cleaned up). The Sixth Circuit has rejected the suggestion that the absence of direct evidence is a defect. While a "smoking gun" would be valuable, "its absence does not render implausible that a business continued to adhere to the conspiratorial plan." *Watson,* 648 F.3d at 458.

Second, Defendants misstate *Twombly* to require pleading of the "specific time, place, or person involved in the alleged conspirac[y]." Br. at PageID.292. Even if such details elude a plaintiff early in the litigation, a complaint satisfies Rule 8 and *Twombly* when it "put[s] defendants on notice concerning the basic nature of their complaints . . . and the grounds upon which their claims exist." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943–44 (E.D. Tenn. 2008) ("*Se. Milk I*"); *see also In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1005–08 (E.D. Mich. 2010) (rejecting identical argument as a misconstruction of *Twombly*).

Third, Defendants incorrectly suggest that *Twombly*'s pleading requirement demands allegations of circumstances "so unusual" as to preclude any probability of chance or independent action. Br. at PageID.300. But the language Defendants quote from *Twombly* to support that suggestion comes from a treatise that the Supreme Court cited, in a footnote, as an *example* of a pleading that likely would survive a motion to dismiss, not a requirement. *See* 550 U.S. at 556 n.4.

Finally, Defendants conflate the pleading standard with the merits standard by insisting that the State allege facts tending to "exclude the possibility of independent action." Br. at PageID.291. The Sixth Circuit has decisively resolved that question: "[I]n order to state a [Sherman Act] Section One claim, a plaintiff *need not* allege a fact pattern that 'tends to exclude the possibility' of lawful, independent conduct." *Erie County*, 702 F.3d at 869 (emphasis added) (citations omitted).

### B.      The State plausibly alleges parallel conduct by Defendants.

The State satisfies the plausibility standard by pleading "circumstantial evidence of conduct that, in the context, negates the likelihood of independent action and raises an inference of collusion." *Erie County*, 702 F.3d at 867–68 (citations omitted). That is typically done by alleging parallel conduct and "plus factors" that, together, raise a plausible inference of conspiracy. *RealPage I*, 709 F. Supp. 3d at 502 (citing *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 907 (6th Cir. 2009)).

The Complaint identifies specific, mutually reinforcing parallel conduct from which collusion can be inferred. It alleges that Defendants, through a series of coordinated acts, suppressed the development and commercialization of EV and solar

33

technologies and infrastructure, Compl. PageID.44–51, 52–55, 56–61 ¶¶ 90–110, 112–119, 122–134; blocked or delayed entry by potential competitors, *id.* PageID.47–50, 58–59 ¶¶ 98–106, 126–27; and publicly disseminated misinformation to mislead consumers about the harms of fossil fuels and depress demand for renewable substitutes. *Id.* PageID.68–92 ¶¶ 150–204. *See also supra* Statement of Facts. These allegations show Defendants acting in similar ways to further their shared objective, and place that conduct in a factual context that suggests collusive rather than independent decision-making. That is enough to satisfy the plausibility standard.

### 1.    Defendants' acts in furtherance of the conspiracy were similar in nature and pattern.

Defendants first try to disqualify their alleged acts as "parallel conduct" altogether, arguing that they do not fit the mold of lockstep price increases or identical policies, and that they occurred over too long a span. Br. at PageID.293–294. But parallel conduct is not limited to any particular conduct, nor is there a rigid timing rule. It is also not the case that every act must involve every defendant. *See Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 713, 724 (W.D. Tenn. 2022). As Defendants concede, the concept encompasses conspiratorial acts "that are similar in substance, executed under similar circumstances, and close in time." Br. at PageID.293 (citation omitted). "Similar" is the operative term. Defendants' conduct may vary in form or timing and still be parallel; indeed it "is more than plausible that conspirators would leave the precise means of [carrying out the conspiracy] up to each

conspirator, where multiple options would accomplish the intended goal." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 791–92 (N.D. Ill. 2017).

It is also entirely plausible that conspiracies with long-term goals will have long-term tenures, as the Sixth Circuit recognized in *Watson*. *See* 648 F.3d at 459 (citing successful cases involving 5-, 7-, and 25-year-long conspiracies). There, an entrenched carpet dealer and supplier waged an extended campaign to exclude a rival, and the court held that the nine years between the agreement and the defendants' most recent refusal to sell to the plaintiff "certainly" did not render the plaintiff's claims implausible because "[n]othing about the parties' relationship . . . suggest[ed] that a conspiracy would have proceeded more rapidly." *Id*. at 454–56, 459; *see also Broiler Chicken,* 290 F. Supp. 3d at 790–91 (rejecting argument that parallel acts must occur "all at once" or within a short period).

The State alleges that Defendants engaged in conduct that was similar in nature and pattern. As to EVs, Exxon, Chevron, and co-conspirator ConocoPhillips each acquired or developed promising EV technology, then restricted or abandoned it without apparent commercial justification. Compl. PageID.44–51 ¶¶ 90–110. The technologies differed (a hybrid engine prototype in one case, battery patents in another), as did the means of suppression, but the *pattern* is unmistakable: each Defendant controlled technology that could have increased substitution away from gasoline, and each acted to prevent it from reaching its competitive potential. Likewise, in the solar context, each Fossil Fuel Defendant acquired, developed, or controlled significant solar assets and then followed a pattern of retreat by selling

35

assets, closing plants, and abandoning commercially promising solar businesses, despite economic incentives to continue competing in solar. *Id.* PageID.57–60 ¶¶ 124–31. That is a fundamentally *similar* approach, not a "fundamentally *different* approach." Br. at PageID.295.

The intervals between Defendants' parallel acts are also consistent with the conspiracy's duration and complexity. Many of the challenged acts involved winding down complex ventures or transactions, *see, e.g.,* Compl. PageID.59, 65–68 ¶¶ 127, 144–49, while others involved long-term commitments to refrain from acting, such as Exxon's decision to leave viable EV charging station patents unused for nearly 15 years, *id.* PageID.52 ¶ 112.

The cases Defendants cite where courts found parallel acts too far apart in time or too different in kind, Br. at PageID.293–96, are inapposite. None of the courts rejected the notion that parallel acts can occur over an extended period; rather, each examined the specific context before it and found the alleged conspiracy implausible. In *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228–30 (3d Cir. 2011), the plaintiff's flagrantly self-contradictory allegations undermined their plausibility; in *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512–15, 516–17 (8th Cir. 2018), the defendant was enforcing a valid contract with the plaintiff; and *In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186, 1192, 1195–97 (9th Cir. 2015), involved a common pattern found in many markets: manufacturers capitulating to the demands of a powerful common retail customer. Properly contextualized, these cases bear little resemblance to the State's.

Defendants' remaining cases fare no better. Three were price-fixing cases with no suspicious pricing pattern whatsoever, *see In re Concrete & Cement Additives Antitrust Litig.*, 2025 WL 1755193, \*13–14 (S.D.N.Y. June 25, 2025); *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1146–47 (N.D. Cal. 2017); *In re Florida Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1309–10 (S.D. Fla. 2010), and a fourth involved "unspecific activities" by the conspirators and acts occurring outside the alleged conspiratorial period, *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 402–04 (2d Cir. 2024). Defendants identify no comparable flaws in the Complaint.

**2.    The Complaint places Defendants' parallel acts in a factual context that suggests prior agreement.**

Defendants' second argument, that their independent business judgment is an "obvious" explanation for their actions, Br. at PageID.293–297, improperly invites the Court to choose between competing factual inferences at the pleading stage. *Twombly* does not permit dismissal merely because a defendant offers a lawful explanation for parallel conduct; rather, it holds that a complaint cannot rest solely on parallel conduct and conclusory allegations of agreement. *See* 550 U.S. at 554–57. The State's Complaint stands because it pleads parallel conduct alongside other allegations that plausibly suggest collusion. *See id.*

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F.3d 33 (1st Cir. 2013), is instructive. Evergreen, which had developed recycling technology for food packaging, alleged a conspiracy among packaging manufacturers and their trade

37

associations to block its novel technology, including by refusing to deal with its recycling program, disparaging it, and promoting a sham competitor. *Id.* at 38–41. The district court dismissed, finding "legitimate business reasons that c[ould] *as easily* explain" the conduct. *Id.* at 42. The First Circuit reversed, holding that under *Twombly*, courts may not weigh competing factual explanations, and an alternative account that is "just as plausibl[e]" as the plaintiffs is a matter for "later stages in the litigation." *Id.* at 50–51; *see also Starr v. Sony BMG Music Ent't*, 592 F.3d 314, 326–27 (2d Cir. 2010) (allegations that defendants raised prices despite market pressure to lower them, and against apparent self-interest, supported plausibility of conspiracy notwithstanding defendants' independent-business-judgment explanation).

The State's Complaint does what the law requires: it alleges parallel conduct and "plac[es] [it] in a context that raises a suggestion of a preceding agreement." *Erie County*, 702 F.3d at 867–68 (citation omitted). First, the Complaint supplies an origin story starting in 1979, when the Fossil Fuel Defendants all faced the same "competitive scenario": each could compete to develop renewable technology, or they could coordinate to delay or suppress that competition. Compl. PageID.34–35 ¶¶ 63–65. The first course was available to each Defendant independently; the second, *by its nature*, required concerted action, a fact the Complaint pleads expressly. *Id.* PageID.95, 99, 101, 105 ¶¶ 219 ("By jointly declining to compete . . ."), 223 ("No single Defendant could safely defect from this scheme without destabilizing industry-wide profits."), 237 ("The risks of unilateral action were high; the rewards of joint inaction were higher."). The Complaint then alleges that Defendants continued to coordinate

directly after 1979 in ways that furthered the conspiracy's objectives, including by forming the Global Climate Coalition to run a joint disinformation campaign, *id.* PageID.69–70 ¶¶ 153–55, and developing and distributing a joint plan to influence university research, *id.* PageID.83 ¶ 183. The Complaint also alleges acts in furtherance of the conspiracy that occurred close in time to conspiratorial meetings or events marking new phases of Defendants' scheme. For example, Defendants formed the API Task Force in 1979, the year the conspiracy began, *id.* PageID.34–35 ¶ 64; Exxon halted its EV research program and began dismantling its solar investments shortly after delivering a functional hybrid prototype in 1981, *id.* PageID.46, 58 ¶¶ 95–96, 126; and Chevron's 2014 solar divestment coincided with the Fossil Fuel Defendants' creation of OGCI, *id.* PageID.60 ¶ 130. Together, these allegations provide a rich factual context: Defendants were in the same rooms, used common coordinating bodies, and took joint action at moments that were meaningful to the conspiracy's formation and evolution.

Defendants may dispute these characterizations, but a motion to dismiss is not the proper vehicle for resolving those disputes. At the pleading stage, all reasonable inferences must be drawn in the State's favor. *See Watson*, 648 F.3d at 456.

None of Defendants' cases requires a different result. Many involved pleadings with no comparable factual context for the alleged conspiracy, only conclusory statements and neutral facts. *See, e.g.*, *Travel Agent*, 583 F.3d at 905–06; *Advanced Tech. Corp. v. Instron, Inc.*, 925 F. Supp. 2d 170, 179 (D. Mass. 2013). Others involved allegations of mere "independent self-interested failure to compete," Br. at

PageID.303–304, such as declining to bid for a contract or ceding an area of competition. *See, e.g.*, *Erie County*, 702 F.3d at 870–71. The State alleges a very different context: that the Fossil Fuel Defendants recognized the competitive pressures to develop renewable energy, *began such projects* at great expense, then *abandoned* them in ways that, in context, are not readily explained by economics. And unlike the plaintiffs in cases involving unilateral refusals to pursue a business opportunity, the State alleges that Defendants could not have achieved the same market-wide suppression by acting alone. *Cf. In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 349–50 (3d Cir. 2010).[10]

### 3.    Defendants cannot immunize their parallel conduct by relabeling it as trade disparagement or protected speech.

Defendants' speech-based arguments do not contest the conduct allegations the State actually pleads. Their observation that trade disparagement is not itself a Sherman Act violation, Br. at PageID.297, holds no weight. The State does not plead disparagement as a standalone antitrust harm, as in Defendants' cases. *See Re/Max*

---

[10] Defendants also argue that the State's allegations of a conspiracy are implausible because the Complaint does not plead an enforcement mechanism or any disciplinary action against defecting conspirators. Br. at PageID.294. No such pleading requirement exists; whether a cartel could police defection is an argument about *proof*, as Defendants' own authorities show. *See Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 815 (N.D. Ill. 2017) (granting summary judgment based on a full evidentiary record). In any event, the Complaint *does* allege the mechanisms that sustained the conspiracy: mutual monitoring of output, pricing, and investment decisions through public data sources and industry forums, *see* Compl. PageID.42, 101–102, 109, ¶¶ 85, 226–27, 246, and a market structure in which no Defendant "could safely defect from [their] scheme without destabilizing industry-wide profits," *id.* PageID.101 ¶ 223.

*Int'l v. Realty One, Inc.*, 900 F. Supp. 132, 159 (N.D. Ohio 1995); *Oak Distrib. Co. v. Miller Brewing Co.*, 370 F. Supp. 889, 898 (E.D. Mich. 1973). Instead, the State alleges that Defendants' coordinated misinformation campaigns were one form of conduct in furtherance of their conspiracy, aimed at depressing demand for renewable energy and preserving fossil-fuel dominance. Compl. PageID.68–96 ¶¶ 150–214.

Nor can Defendants establish that the public-facing conduct alleged in the Complaint is categorically protected by the First Amendment or immune under *Noerr-Pennington*. *See* Br. at PageID.297–298. As the State explains in its opposition to API's separate motion, API Opp. at 16–19, the Complaint does not seek liability for First Amendment-protected conduct. *See* Compl. PageID.19 ¶ 26 n.6. It focuses instead on Defendants' coordinated market conduct, including public statements aimed at manipulating consumers' private energy choices, suppressing demand for renewable substitutes, and distorting supply and demand in the transportation energy and primary energy markets. *Noerr-Pennington* does not bar those allegations.

C.   **The State plausibly alleges multiple plus factors that, when considered together, support an inference of conspiracy.**

Once a plaintiff alleges parallel conduct, the final piece of its circumstantial case is to allege at least one "plus factor" supporting the inference that the challenged conduct resulted from agreement rather than independent action. *See Watson*, 648 F.3d at 457. "Courts review these plus factors holistically rather than in isolation." *RealPage I*, 709 F. Supp. 3d at 502. Defendants do the opposite, isolating each plus factor and treating it as a separate referendum on the State's claims. That approach

41

is "legally flawed." *Id.* at 510; *see also Se. Milk I*, 555 F. Supp. 2d at 943–44 (rejecting defendants' "attempt to parse and dismember the complaints" because a conspiracy is "'not to be judged by dismembering it and viewing its separate parts'") (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

The Complaint pleads *four* reinforcing plus factors: actions against self-interest, common motive, opportunities to collude, and market conditions conducive to collusion. Taken together, these plus factors support an inference of conspiracy.

***Actions against self-interest***. The Complaint alleges that the Fossil Fuel Defendants acted against their individual economic interests by suppressing, abandoning, or underdeveloping renewable energy technologies, Compl. PageID.44–68 ¶¶ 90–149, despite their own conclusions that they each needed to compete in renewable energy or fall behind, *id.* PageID.97–99 ¶¶ 218–19. It also identifies specific acts facially inconsistent with self-interest. *E.g.*, *id.* PageID.34–35, 36 ¶¶ 64, 70–71 (Exxon shared proprietary information about competitive threats), 118–19 (Fossil Fuel Defendants collectively declined to build EV charging infrastructure despite being well positioned to profit from electricity sales), 130 (Chevron divested solar assets that were outperforming profit targets); *see also id.* PageID.97–99 ¶ 218 (summarizing actions against self-interest). Such allegations strongly support an inference of collusion. *See RealPage I*, 709 F. Supp. 3d at 502 (citing *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999)).

Defendants respond that it was rational for each company to protect established fossil-fuel profits rather than hasten its own displacement, Br. at

42

PageID.300–301, but the Complaint alleges more than a failure to abandon fossil fuels. It alleges that the Fossil Fuel Defendants were competitors *in renewable energy* who recognized the competitive pressure to innovate and nevertheless suppressed their own renewable energy efforts in ways that made sense only if they all did the same. Compl. PageID.5, 34, 36 ¶¶ 2, 63, 69–71. That is precisely the sort of irrational behavior that raises the specter of collusion. *See In re Juul Labs, Inc., Antitrust Litig.*, 555 F. Supp. 3d 932, 960 (N.D. Cal. 2021) (allegation that defendant engaged in "large scale" R&D spending to compete with co-conspirator, then abruptly pulled its products from the market, suggested agreement not to compete); *Iowa Pub. Emps.' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 304, 329 (S.D.N.Y. 2018) ("purchase and non-use of [competitors'] intellectual property" was plausibly pleaded as "anticompetitive conduct that lacked a legitimate business purpose") (cleaned up).

*Common motive*. Defendants' shared motive cannot be reduced to "all companies like money." *See* Br. at PageID.300–301. The Complaint alleges a specific market-based motive: Each Fossil Fuel Defendant had massive fossil-fuel assets at risk, faced the same threat from renewable energy substitutes, and benefited from coordinated restraint that delayed competition from those substitutes. Compl. PageID.34–35, 104–105 ¶¶ 64, 234–37. When a plaintiff "allege[s] facts, specific to the market at issue, suggesting that the defendants had an incentive" to restrain trade in a particular way, it pleads a plausible motive beyond a desire to "make more money." *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 719 (S.D.N.Y. 2017);

43

*see also, e.g., RealPage I*, 709 F. Supp. 3d at 510–11 (alleged common motive to optimize rents supported inference of conspiracy); *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 448 (E.D. Pa. 2018) (same with alleged common motive to raise drug prices).

***Opportunities to collude***. Defendants dismiss the State's trade association allegations as mere "participation" and "standard fare," Br. at PageID.302–303, but the Complaint alleges more than just membership. It alleges that the Fossil Fuel Defendants *dominated* the leadership of key trade organizations, Compl. PageID.105–108 ¶¶ 238–43; *created* groups within them to coordinate strategy, *id.* PageID.34–35, 36–37, 39, 61–62 ¶¶ 64, 72, 80, 134–35; and *used* those forums to share proprietary information, align responses to renewable-energy threats, and monitor adherence, *id.* PageID.36, 37–38, 105–106, 109–110 ¶¶ 71, 73–76, 238, 246. Courts have found similar allegations sufficient "to fill-out the picture of an alleged conspiracy." *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 727 (N.D. Ill. 2022) (cleaned up).

***Market conditions conducive to collusion***. Defendants' only response to the State's market conditions allegations, Compl. PageID.100–110 ¶¶ 220–46, is that a market "ripe for collusion" does not, by itself, prove collusion. Br. at PageID.302 (citation omitted). That is true but unhelpful. Market structure matters when, as here, it is tied to allegations explaining how Defendants used that structure to coordinate. In *RealPage I*, for example, the court held that the plaintiffs' allegation that the multifamily-housing market was structured to give landlords unusual

freedom to raise prices without losing demand, when viewed together with the plaintiffs' other allegations, "support[ed] a 'reasonable expectation that discovery will reveal evidence of [an] illegal agreement.'" 709 F. Supp. 3d at 511 (quoting *Twombly*, 550 U.S. at 556). Here, for example, the Complaint alleges that electricity could become a viable transportation fuel only if EVs, charging infrastructure, and electricity generation developed together, creating three interdependent targets that no one Defendant could suppress acting alone. Compl. PageID.100–101 ¶¶ 222–23. It also alleges high barriers to entry in the primary energy market that made suppression of renewable substitutes easier and more effective. *Id.* at PageID.102 ¶¶ 227–28. Those allegations provide market-structure context suggesting collusion. *See Erie County*, 702 F.3d at 870; *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 2016 WL 4574357, at *5 (S.D. Cal. July 14, 2016).

Defendants' motion is exactly the kind of improper "dismembering" of a conspiracy pleading that courts reject. *Se. Milk I*, 555 F. Supp. 2d at 943–44 (quoting *Cont'l Ore*, 370 U.S. at 699). Viewed as a whole, the State's allegations support a plausible inference that Defendants' parallel conduct was the product of a conspiracy.

## III.    The State Plausibly Alleges an Unreasonable Restraint of Trade.

The State alleges a horizontal output restriction conspiracy, which black-letter antitrust law treats as a species of horizontal price-fixing and therefore classifies as *per se* unlawful. The Court should reject Defendants' request for a fact-intensive, rule-of-reason analysis at the pleading stage. But even if the Court were to reach the rule of reason, the State has adequately pleaded a rule-of-reason claim in the alternative.

45

### A.    The *per se* rule applies to the State's output-restriction claim.

The Supreme Court has interpreted the Sherman Act § 1 bar against "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce" to reach only *unreasonable* restraints, which courts analyze under either the *per se* rule or the rule of reason. *See NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 88 n.1, 98 (1984); *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014) ("*Se. Milk II*"). Although a court *may* decide at the pleading stage which framework applies, it need not do so. *See Jones v. Varsity Brands, LLC*, 618 F.  Supp. 3d 725, 746 (W.D. Tenn. 2022) ("[W]hether [plaintiffs] can satisfy the rule of reason or *per se* approach . . . is premature at the pleading stage."), *on reconsideration*, 2023 WL 5662590 (W.D. Tenn. Aug. 31, 2023); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1297 n.8 (D. Kan. 2018) ("the court need not decide what rule to apply to analyze the reasonableness of the alleged restraints of trade" at pleading stage).

The *per se* rule applies to horizontal agreements among competitors that are "entirely void of redeeming competitive value," such as price-fixing cartels, group boycotts, and output restrictions. *See Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1013 (6th Cir. 2005); *see also Ford Motor Co. v. Blue Cross Blue Shield of Mich. Mut. Ins. Co.*, 2024 WL 1396264, at *6 (E.D. Mich. Mar. 30, 2024); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150 n.5 (9th Cir. 2019). For such restraints, courts do not consider "the intent behind the restraint, [] any claimed pro-competitive justifications, or [] the restraint's actual effect on competition." *Se. Milk II*, 739 F.3d at 271 (quoting *Cardizem II,* 332 F.3d at 906–07).

46

Nor must a plaintiff plead "actual or likely impact on a [relevant] market." *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1221 (7th Cir. 1993); *see also Expert Masonry, Inc. v. Boone County*, 440 F.3d 336, 342 (6th Cir. 2006) ("anticompetitive effects within a relevant geographic and product market are implied" for *per se* claims); *Ford Motor*, 2024 WL 1396264, at *6 (a *per se* violation "mak[es] an analysis into the anticompetitive effects of the agreement unnecessary").

The State alleges a horizontal agreement among Defendants to restrict their own output of renewable energy products and suppress output by others. Compl. PageID.6, 7–9, 9–10, 35, 42–44, 117, 118 ¶¶ 3, 5, 7–9, 65, 87–90, 273, 277. Output restraints are "functionally indistinguishable" from price-fixing conspiracies. *NFL Sunday Ticket*, 933 F.3d at 1158 (citing *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 777 (1999)). As the Supreme Court has explained, firms can raise price by restricting output because reduced supply causes prices to rise until demand matches output. *Cal. Dental*, 526 U.S. at 777. Because raising prices and reducing output "have the same anticompetitive effects," *id.* (quotation omitted), "[o]utput restrictions are classic per se violations," *United States v. Andreas*, 39 F. Supp. 2d 1048, 1059 (N.D. Ill. 1998), *aff'd*, 216 F.3d 645 (7th Cir. 2000); *see also NCAA*, 468 U.S. at 100 (output limitations "are ordinarily condemned as a matter of law under an 'illegal per se' approach").

Defendants' reliance on *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007), is misplaced. In *Leegin*, the Supreme Court declined to apply the *per se* rule to a *vertical* agreement setting minimum resale prices because such

47

agreements "can have either procompetitive or anticompetitive effects." *Id.* at 894. But the Court reaffirmed the rule that matters here: "A *horizontal* cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful." *Id.* at 893 (emphasis added). Because the State alleges a horizontal cartel that restricted output to protect fossil-fuel prices, *Leegin* supports application of the *per se* rule here.[11]

### B.      The State also states a claim under the rule of reason.

Under the rule of reason, a plaintiff must allege that the challenged conspiracy "produced adverse, anticompetitive effects within relevant product and geographic markets." *Warrior Sports, Inc. v. NCAA*, 623 F.3d 281, 286 (6th Cir. 2010) (citation omitted); *accord United States v. Blue Cross Blue Shield of Mich.*, 809 F. Supp. 2d 665, 671–72 (E.D. Mich. 2011); *RealPage I*, 709 F. Supp. 3d at 521. The State has done so. The Complaint identifies the relevant products, the Michigan geography where the State and its residents purchase them, and the ways Defendants' conduct reduced output and inflated prices in those markets. Compl. PageID.26, 110-114, 118-119, ¶¶ 43, 247–60, 279–80.

Defendants' contrary arguments, Br. at PageID. 305-311, demand evidentiary precision *Twombly* does not require, because market definition is a fact-intensive inquiry and a "full analysis under the rule of reason is not appropriate" on a motion

---

[11] *Care Heating* turns on the same horizontal-vertical distinction. *See* 427 F.3d at 1012–13. The Sixth Circuit declined to apply the *per se* rule to a vertical restraint, contrasting it with horizontal agreements among "competitors at the same level of market structure," which present the "clear cut" cases for *per se* treatment. *Id.*

48

to dismiss. *RealPage I*, 709 F. Supp. 3d at 521 (cleaned up); *see also Found. for Interior Design Educ. Rsch. v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery."); *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 535 (6th Cir. 2017) (relevant market inquiry is "fact-intensive" because it "requires considering both the attributes of the product that make it unique from others and the geographic market within which consumers may seek comparable products"); *United States v. Apple, Inc.*, 2025 WL 1829127, at *6–8 (D.N.J. June 30, 2025) (in federal and state enforcement action, explaining that "proper market definition" requires "factual inquiry into the commercial realities faced by consumers") (cleaned up).

Pleadings that fail on market-definition grounds typically do so because the markets are "so narrowly drawn that they facially excluded substitute products," not because they are drawn to include multiple competing products. *Bearing Distribs., Inc. v. Rockwell Automation, Inc.*, 2006 WL 2709779, at *9 (N.D. Ohio Sep. 20, 2006).

### 1.    The State alleges cognizable relevant markets.

"The starting point in a rule of reason case is to identify the relevant product and geographic markets." *Stratmore v. Goodbody*, 866 F.2d 189, 194 (6th Cir. 1989). The Complaint alleges two product markets: (1) the transportation energy market, consisting of energy products for personal ground transportation vehicles, where the principal options are gasoline and electricity; and (2) the primary energy market, consisting of energy products for residential, commercial, and public heating and cooling, where purchasers principally choose between fossil-fuel energy and

49

renewable energy. Compl. PageID.26, ¶ 43. It alleges that the relevant geographic market is Michigan or, in the alternative, the 83 counties that make up the State. *Id.*

### a.    The State pleads two plausible product markets.

"The boundaries of a product market are 'gauged by . . . the product uses, i.e., whether the substitute products . . . can perform the same function . . . .'" *RealPage I*, 709 F. Supp. 3d at 521 (quoting *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 933 (6th Cir. 2005)). The State's alleged product markets satisfy that standard.

*The transportation energy market.* Consumers need energy to power their personal vehicles, and the principal options are gasoline, electricity, or a combination of both. Compl. PageID.26, 28, ¶¶ 43, 51. Where sufficient infrastructure exists, EV adoption rises in response to rising gasoline prices because of "conditional cross-elasticity between gasoline and electricity." *Id.* PageID.103, ¶ 232.[12]

Defendants argue that gasoline and electricity cannot occupy the same market because "consumers' individual energy choices are constrained by the type of vehicle

---

[12] Defendants invoke the Complaint's allegation that cross-elasticity between gasoline and electricity "remains" low. Br. at PageID.307 (citing Compl. PageID.103, ¶ 231). But the Complaint alleges that the observed low cross-elasticity is the artificial product of the challenged restraint: substitution of electricity for gasoline "remains constrained by insufficient charging networks, grid capacity, and battery supply," Compl. PageID.103, ¶ 231—barriers Defendants created and maintained— while "[w]here sufficient infrastructure exists, EV adoption rises in response to high gasoline prices due to conditional cross-elasticity between gasoline and electricity," Compl. PageID.103, ¶¶ 231–32; *see also id.* PageID.101, ¶ 225. Defendants cannot define the relevant market by reference to the very foreclosure their conspiracy produced. *Kesters Merch. Display Int'l, Inc. v. SurfaceQuest, Inc.*, 163 F.4th 1309 (10th Cir. 2026), a false advertising case decided at the summary judgment stage, does not hold otherwise. *See id.* at 1312–14 (affirming summary judgment where plaintiff offered no evidence of cross-elasticity of demand).

they own," Br. at PageID.307, but the Complaint refutes that premise. As defined in the Complaint, the transportation energy market includes plug-in hybrid vehicles, which "draw power from both gasoline and external electricity." Compl. PageID.26, ¶ 43 & n.9. For owners of such vehicles, gasoline and electricity are substitutes in the same vehicle. And for other drivers, substitution decisions occur when they purchase or replace vehicles, at which point gasoline-powered, electric, and plug-in hybrid vehicles are available alternatives. Defendants' argument may raise factual questions about the degree and timing of substitution, but it does not render the pleaded transportation energy market implausible.

Defendants' cases are inapposite. In *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), the Third Circuit rejected an artificially narrow market that excluded interchangeable ingredients outside the Domino's system, *id.* at 436–41. That reasoning applies to markets drawn to exclude genuine substitutes; it does not help Defendants challenge a market defined to *include* substitutes (gasoline and electricity). Defendants may have cited *Lambrix v. Tesla, Inc.*, 737 F. Supp. 3d 822 (N.D. Cal. 2024) by mistake, as the court there *sustained* the pleaded market, reiterating that dismissal based on market definition is appropriate only where "it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect," *id.* at 837–39 (citation omitted). And the market was a market for *vehicles*, not *energy*. *See id.* The fact that EVs and combustion vehicles may occupy distinct *vehicle* markets says nothing about the transportation *energy* market pleaded

51

here.[13] The suggestion "that other relevant markets may likewise exist is of no consequence" at the pleading stage. *Se. Milk I*, 555 F. Supp. 2d at 946.

*__The primary energy market.__* For residential, commercial, and public heating and cooling, purchasers principally choose between fossil-fuel energy and renewable energy. Compl. PageID.26, 29, ¶¶ 43, 54. Courts recognize that different energy sources may belong in a single market. *See Illinois ex rel. Hartigan v. Panhandle E. Pipe Line Co.*, 730 F. Supp. 826, 868 (C.D. Ill. 1990) ("Because gas competes directly with alternate fuels and energy conservation products, and because the demand for gas is affected by the relative price of gas and alternate fuels, the sales of alternate fuels and of energy conservation products must be included in the definition of the relevant product market."); *cf. United States v. Gen. Dynamics Corp.*, 341 F. Supp. 534, 539, 555–56 (N.D. Ill. 1972) (rejecting coal-only market as "untenable" because coal competes with other energy sources), *aff'd*, 415 U.S. 486 (1974).

Defendants' challenge to the primary energy market fails for the same reason as their challenge to the transportation energy market. They point to technological, regulatory, infrastructure, or cost constraints that may affect switching, Br. at PageID.308, but to the extent there is an economic distinction between switching costs and substitution costs, such distinction does not impact market definition. In

---

[13] Even analyzed at the vehicle level, vehicles powered by different energy sources easily fit in the same market. In *In re German Automotive Manufacturers Antitrust Litigation*, 497 F. Supp. 3d 745 (N.D. Cal. 2020), the court rejected a product market limited to diesel passenger vehicles, reasoning that they "compete with (at least) other environmentally friendly vehicles," which had the "potential ability to deprive diesel passenger vehicles of significant levels of business." *Id.* at 757 (cleaned up).

any event, those supposed constraints raise factual questions about substitution; they do not defeat market definition on the pleadings. Defendants' own cases were decided on developed records. *See Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 962 (6th Cir. 2004) (assessing evidence of market definition after trial); *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 874 (E.D. Mo. 2020) (similar).

Defendants are also wrong that the State "ignores" nuclear power. Br. at PageID.308. The Complaint identifies nuclear power as a primary energy source, Compl. PageID.24, ¶ 39, but it defines the primary energy market by reference to the products purchasers actually buy for heating and cooling: fossil-fuel energy and renewable energy, *id.* PageID.26, 29–30, ¶¶ 43, 54.

The State has alleged the products at issue and why they are substitutes. That is enough. "Relevant product or geographic markets are sufficiently alleged as long as the complaint bears a 'rational relation to the methodology courts prescribe to define a market.'" *City of Pontiac v. Blue Cross Blue Shield of Mich.*, 2012 WL 1079895, at *8 (E.D. Mich. Mar. 30, 2012) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199–200 (2d Cir. 2001)). Dismissals at the pleading stage "remain relatively rare and are generally limited to certain types of *glaring deficiencies*, such as failing to allege a relevant market" at all. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 444 (4th Cir. 2011) (emphasis added) (cleaned up).

### b.    The State pleads plausible geographic markets.

A geographic market is "the region in which the seller operates, and to which the purchaser can practicably turn for supplies." *Se. Milk II*, 739 F.3d at 277 (cleaned up). Like the product-market inquiry, the geographic-market inquiry is "fact-

53

intensive and focused on the 'commercial realities of the industry.'" *Id.* (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 336 (1962)).

The State alleges that the relevant geographic market is Michigan or, in the alternative, each of its 83 counties. Compl. PageID.26, ¶ 43. Both the statewide and county-level markets are plausible because Michigan consumers buy transportation energy and primary energy for heating and cooling from local sources throughout the State. *Id.* PageID.27–31, ¶¶ 45–56; *see J & S Oil, Inc. v. Irving Oil Corp.,* 63 F. Supp. 2d 62, 68 (D. Me. 1999) ("[T]he geographic market for retail gasoline depends on how far individuals are willing and able to travel to purchase the product.").

Defendants attack the statewide market from both directions, arguing that it is too narrow because Defendants' conduct is nationwide or global in scope, and too broad because retail energy competition is more localized. Br. at PageID.309–310. These two arguments undermine each other and confirm that the geographic-market definition is a question of fact. Each argument also fails on its own terms.

Defendants' "too narrow" argument conflates the scope of the alleged conspiracy and markets for upstream inputs with the markets where the State and Michigan consumers buy the products at issue. Defendants contend that, because energy is "globally traded," and because crude oil is priced on global exchanges and natural gas trades on national and regional markets, Michigan cannot be a self-contained competitive arena. Br. at PageID.309. But the relevant inquiry is where Michiganders can "practically turn" for the products they buy. *Se. Milk II*, 739 F.3d at 277; *see also Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 228 (2d Cir.

54

2006) (geographic market for goods sold nationwide "need not be" the entire country "if purchasers cannot practicably turn . . . outside their own area for supply of the relevant product"); *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991).[14] When Michiganders buy gasoline, they turn to one of Michigan's roughly 5,000 gas stations, not one in California. Compl. PageID.26, 28–29, ¶¶ 43, 48–52. For heating and cooling, they depend on the energy sources and delivery infrastructure available where their homes and businesses are located. *Id*. PageID.26, 29–31, ¶¶ 43, 54–56. That infrastructure is fixed and local: electricity reaches Michigan homes, businesses, and public buildings through a regional power grid and municipal utilities that operate as divisions of local governments. *Id*. PageID.30–31, ¶¶ 55–56. Michiganders cannot draw electricity from a utility in another state.

Defendants' "too broad" argument fares no better. The State agrees that some retail energy competition may be localized, which is why the Complaint pleads Michigan's 83 counties as alternative geographic markets. *Id*. PageID.26, ¶ 43.[15] In any event, the fact that a Detroit commuter would not drive to Lansing to fill her tank or charge her vehicle, Br. at PageID.310, does not render the statewide market implausible. A geographic market is not bounded by the distance one consumer will travel for one purchase. It is the area of effective competition, built from overlapping local trading areas, within which sellers can deprive one another of significant

---

[14] Defendants' authority, *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995), is illustrative: the gasoline at issue was refined in Los Angeles, yet no one disputed that the relevant geographic market was Las Vegas, where the consumers bought it and competing retailers vied for their business. *Id*. at 1430.

[15] Rule 8 expressly permits alternative pleading. Fed. R. Civ. P. 8(d)(2)–(3).

business. *See Rebel Oil*, 51 F.3d at 1436. Defendants' lead authority makes the State's case. In *Goldfinch Laboratory, P.C. v. Iowa Pathology Assocs., P.C.*, the Eighth Circuit defined the relevant geographic market as "the narrowest market which is wide enough so that products from adjacent areas cannot compete on substantial parity." 168 F.4th 500, 505–06 (8th Cir. 2026). Indeed, the court held that, even where consumers "prefer to buy gasoline close to home, that doesn't mean they can't practically turn to alternatives slightly farther from home." *Id.* at 506. That reasoning widens an artificially narrow market by crediting practical alternatives in adjacent areas; it lends no support to shrinking a market a defendant calls too broad. Defendants' other cases confirm that localized retail energy markets are cognizable. *See Kentucky v. Marathon Petroleum Co., LP*, 191 F. Supp. 3d 694, 697 (W.D. Ky. 2016) (relevant geographic market was Louisville and Northern Kentucky); *Rebel Oil*, 51 F.3d at 1434 (relevant geographic market was Las Vegas).

At most, Defendants identify a factual question about the precise level of granularity, statewide or county-level, that best captures where Michigan consumers practicably turn for energy. That question cannot be resolved on the pleadings. *See Kentucky v. RealPage, Inc.*, 2026 WL 919117, at *19 (E.D. Ky. Feb. 2, 2026) ("*RealPage II*") ("Specific nuances of the markets . . . are better suited for discovery.").

## 2.    The State plausibly alleges direct evidence of anticompetitive effects in the relevant markets.

A plaintiff may establish anticompetitive effects through direct evidence of "actual detrimental effects [on competition]," such as "reduced output, increased prices, or decreased quality," or through indirect evidence of market power plus likely

56

anticompetitive effects. *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) (citations omitted). The State alleges direct evidence of anticompetitive effects, so "inquiry into market power is unnecessary." *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 827 (6th Cir. 2011).[16]

The Complaint alleges the classic forms of anticompetitive harm: reduced output and supracompetitive prices. It alleges that Defendants suppressed competition from lower-cost renewable substitutes, sustaining artificial demand for fossil-fuel products and causing the State and Michigan consumers to pay inflated prices for gasoline and fossil-fuel primary energy. Compl. PageID.112–114, 118–119, ¶¶ 252–54, 258–60, 279–80. It also alleges that Defendants' own internal studies from 1979 projected that fossil fuels' share of energy markets would be cut in half by 2010 due to competition from renewable substitutes, a market shift that still has not occurred today. *Id.* PageID.34–35, 37–38, ¶¶ 64, 75. Those allegations directly support the conclusion that Defendants' conspiracy reduced renewable output and preserved supracompetitive fossil-fuel prices.

Defendants' argument that some fossil-fuel output increased during the conspiracy, Br. at PageID.310–311, misunderstands the State's theory. The State

---

[16] Although the Court need not reach the market-power issue, *see Realcomp*, 635 F.3d at 827, the Complaint also alleges facts bearing on the Fossil Fuel Defendants' market power in the relevant energy markets, *see, e.g.,* Compl. PageID.28–29, 102, 105, ¶¶ 52 (fossil fuels supply more than 90% of transportation energy end use), 228 (BP, Exxon, Chevron, and Shell control primary energy supply in Michigan through infrastructure ownership, exclusive supply agreements, and branding arrangements), 237 ("Defendants jointly wielded their dominant market power" in the transportation energy and primary energy markets).

does not allege that the conspiracy reduced fossil-fuel output; it alleges that Defendants suppressed the output and availability of renewable substitutes, preserving fossil-fuel dominance and keeping fossil-fuel prices higher than they otherwise would have been. Compl. PageID.112–114, ¶¶ 252–54, 258–60. Increased fossil-fuel production is consistent with that theory because renewable alternatives otherwise would have displaced fossil-fuel demand.

Nor does recent growth in some renewable output defeat the State's claims. A conspiracy need not eliminate all competition or fully achieve its objective to cause anticompetitive effects. Anticompetitive effects exist where output of substitutes is suppressed below the level that otherwise would have prevailed. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 233 (1993) (evidence that output "expanded at a slower rate than it would have absent [the challenged conduct]" would support inference of anticompetitive effects); *Realcomp*, 635 F.3d at 829–34 (treating suppression of lower-cost *substitute* as the relevant output restriction and finding actual anticompetitive effects from the decline in substitute's market share, even without proof of reduced transaction volume or increased prices).

*RealPage II* is instructive. The court there rejected the argument that alleged growth in the multifamily housing market in Kentucky defeated the plaintiffs' output-restriction claim at the pleading stage. 2026 WL 919117, at *21–22 ("Discovery will show whether the housing output . . . did or did not increase, but at this stage, there is enough in the Complaint to plausibly allege anticompetitive effects."). This Court should do the same. Even if some substitution occurred despite

58

Defendants' conduct, that fact does not refute the State's theory that Defendants suppressed output of renewable energy substitutes *below competitive levels.*

## IV.    The State's Claims Are Timely.

That Defendants' conspiracy has been far-reaching and long-running does not shield it from scrutiny. "A motion under Rule 12(b)(6) . . . is generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations," and dismissal is only appropriate when "the allegations in the complaint affirmatively show that the claim is time-barred." *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012). Here, the State alleges ongoing conduct that caused the State and Michigan consumers to pay supracompetitive prices in the four years before suit. Compl. PageID.110–114, 119–120, 121–123, ¶¶ 247–60, 280–81, 287–95. Under the rule governing continuing antitrust violations, each sale at a supracompetitive price is a new act that inflicts new injury and restarts the limitations period.

In a continuing antitrust violation, "a cause of action accrues each time a plaintiff is injured by an act of the defendants," and the four-year limitations period for federal damages claims, 15 U.S.C. § 15b, runs from the act causing the injury. *Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6th Cir. 1990) (citations omitted); *see also Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). Thus, when a conspiracy "brings about a series of unlawfully high priced sales over a period of years," each sale is an "overt act" that "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (cleaned up). Put simply, "the antitrust laws recognize continuing violations and, more precisely, that a new

59

§ 1 claim arises each time a company sells a price-fixed product." *Travel Agent*, 583 F.3d at 902 (citing *Klehr*, 521 U.S. at 188).

The same rule applies here, where the State alleges that Defendants preserved supracompetitive fossil-fuel prices in Michigan's transportation energy and primary energy markets by suppressing the output of renewable alternatives. Compl. PageID.110–114, 119–120, ¶¶ 247–60, 280–81. Because output-restricting conspiracies like this one are "functionally indistinguishable" from price-fixing conspiracies, *NFL Sunday Ticket*, 933 F.3d at 1158 (citing *California Dental*, 526 U.S. at 777), courts in this Circuit have applied the same limitations rule to overcharges caused by conspiracies to restrict output or suppress entry of competitive alternatives, like this one. *See, e.g.*, *Ford Motor,* 2024 WL 1396264, at *8 (where plaintiffs alleged a horizontal conspiracy to limit competitive market entry and restrict output, each sale at a supracompetitive price was an overt act that restarted the limitations period); *Hosp. Auth. of Metro. Gov't of Nashville v. Momenta Pharms., Inc.*, 353 F. Supp. 3d 678, 694 (M.D. Tenn. 2018) (same for conspiracy to block market entry); *In re Skelaxin (Metaxalone) Antitrust Litig.*, 2013 WL 2181185, at *29 (E.D. Tenn. May 20, 2013) (damages claims were timely where conspiracy to delay market entry caused plaintiffs to pay overcharges "well into the limitations period").

This "separate accrual rule" is a subset of the continuing violations doctrine that "applies most often in the federal antitrust context when each injury is separately actionable, *i.e.*, each overcharge stemming from a price-fixing conspiracy inflicts an actionable injury on the plaintiff." *Connecticut v. Sandoz, Inc.*, 2025 WL

60

3043397, at *15 (D. Conn. Oct. 31, 2025) (citing *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 67 (2d Cir. 2019); *Klehr*, 521 U.S. at 189). Courts have held that the same rule applies when the overcharges stem from an output-restricting conspiracy. *See Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, 2022 WL 2438934, at *9 (D. Del. July 5, 2022) (finding "no reason" to distinguish output-restricting conspiracy from a price-fixing conspiracy for statute of limitations purposes, and applying separate accrual rule to hold claims timely). The State does *not* rely on the "entirety rule," a different variant often applied in hostile-work-environment and discrimination cases (and rarely in antitrust cases), where a single act may not be actionable alone. *See Sandoz*, 2025 WL 3043397, at *15. Under that rule, the "serial nature of the alleged antitrust violations over a period of years" allows a plaintiff to seek relief for *all* injuries suffered throughout the entire alleged conspiracy if *any* overt act was committed within the limitations period. *Id.*

Again, misdirection by Defendants: the six non-antitrust cases they cite, Br. at PageID.313–316, applied the entirety rule, not the antitrust-specific separate accrual rule implicated here.[17] The cases are also readily distinguishable. In *Hunter*, for

---

[17] *See Gentry v. The Renal Network*, 636 F. Supp. 2d 614, 618–19 (N.D. Ohio 2009) (discrimination case declining to apply variant of the continuing violations doctrine that "typically applies only to employment discrimination claims") (citation omitted); *Huang v. Presbyterian Church (U.S.A.)*, 346 F. Supp. 3d 961, 976 (E.D. Ky. 2018) (civil rights case applying variant of the continuing violations doctrine that is "most commonly" applied in Title VII cases and also "rarely" extended to § 1983 actions) (quotations omitted); *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634–37 (6th Cir. 2007) (due process case); *Tolbert v. State of Ohio Dep't of Transp.*, 172 F.3d 934, 940–41 (6th Cir. 1999) (racial discrimination case); *Hillspring Health Care Ctr., LLC v. Dungey*, 2018 WL 287954, at *11 (S.D. Ohio Jan. 4, 2018)

example, the plaintiff failed to allege any act that caused injury during the limitations period. 63 F. App'x at 991 n.1. In the other five cases, the plaintiffs' injuries were caused by single, discrete acts completed before the limitations period: a treatment termination, *see Gentry*, 636 F. Supp. 2d at 618–19; a release of academic information to a third party, *see Huang*, 346 F. Supp. 3d at 975; a child's removal, *see Eidson*, 510 F.3d at 636–37; a government planning decision, *see Tolbert*, 172 F.3d at 940–41; and an administrative benefits denial, *see Hillspring*, 2018 WL 287954, at \*11. The plaintiff in each case tried to reach that completed wrong years later by pointing to its lingering effects, or to the defendant's continued adherence, rather than to any new act that inflicted new injury within the limitations period. Not so here.

Defendants *do* cite a series of Sixth Circuit antitrust cases to argue that the State has failed to allege a "new and independent act" that inflicted "new and accumulating injury" within the limitations period, Br. at PageID.313–316, but properly applied, that test *supports* the State's timeliness theory. Each within-period sale at a supracompetitive price is a "new and independent" market transaction, not a mere reaffirmation of a past act, and each inflicts "new and accumulating injury" on the State and its residents in the form of an overcharge. In each of Defendants' cases, by contrast, the claim failed because the only act that injured the plaintiff was completed outside the limitations period, and the conduct the plaintiff pointed to within the period was a mere continuation, manifestation, or effect of that completed

---

(administrative benefits denial case); *Hunter v. Meyer*, 63 F. App'x 990, 991 n.1 (9th Cir. 2003) (civil rights case).

act, not a new injurious act. *See Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 405–06 (6th Cir. 1999) (manifestations of agreement executed more than four years before suit); *Garelick v. Goerlich's Inc.*, 323 F.2d 854, 855–56 (6th Cir. 1963) (continuation of competitor exclusion completed more than four years before suit); *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599–600 (6th Cir. 2014) ("inertial consequences" of acquisition completed more than four years before suit); *Robinson v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 2773123, at *8 (E.D. Mich. Sep. 26, 2025) (manifestations of agreement signed more than four years before suit); *Travel Agent*, 583 F.3d at 901–02 (maintenance of policy adopted more than four years before suit).

*Z Technologies* illustrates the point. There, the defendant bought a competitor, obtained a monopoly, and then raised prices. 753 F.3d at 596. The Sixth Circuit held that post-acquisition sales at the inflated price did not restart the limitations period because the merger itself created the market power that allowed the higher prices, making the later increases "inertial consequences" of the completed acquisition, not new independent acts. *Id.* at 600–02. The court's reasoning underscores the critical distinction here: in a merger case, "the cause of harm is the merger itself," and "subsequent price increases do not further the company's monopoly because the company has already obtained the monopoly." *Id.* at 599. In a conspiracy case like this one, by contrast, "each price increase requires further collusion between multiple parties to maintain the monopoly." *Id.* The State does not allege a completed merger whose price effects persisted after the fact, but rather an ongoing horizontal conspiracy requiring continued coordination to suppress substitutes and sustain

63

supracompetitive prices. Compl. PageID.60–61, 64–65, 119–120, ¶¶ 132, 141, 280–81. By extracting the phrase "inertial consequences" from the merger context that gave it meaning and seeking to apply it to the very type of conspiracy case the Sixth Circuit expressly distinguished, Defendants move the goalposts. Each sale at a conspiracy-inflated price is a *new and independent act* that inflicts a *new and independent overcharge injury* and, thus, restarts the limitations period on the State's Sherman Act claim. And, unlike the entirety rule, applying the separate accrual rule creates no risk of the "infinite" limitations period Defendants invoke, Br. at PageID.316, because it permits recovery only for injuries incurred during the four years preceding suit—here, in the context of an ongoing conspiracy at a time when competitive forces remain distorted by the output restraint. *See Seroquel XR*, 2022 WL 2438934, at \*9 (rejecting defendants' argument that applying the separate accrual rule would render the limitations period "never-ending").

The State's MARA claim is timely for the same reasons. As under federal antitrust law, MARA's four-year limitations period, M.C.L. § 445.781, begins to run "at the time the wrong upon which the claim is based was done," M.C.L. § 600.5827. MARA's statute of limitations is construed in harmony with federal antitrust law. *See In re Pre-Filled Propane Tank Antitrust Litig.*, 2019 WL 4796528, at \*4, 10 (W.D. Mo. Aug 21, 2019). Because federal antitrust law recognizes separate accrual for recurring overcharge injuries, the State's MARA claim is likewise timely. *See Z Techs.*, 753 F.3d at 605 (explaining that, due to M.C.L. § 445.784(2), MARA claims "rise and fall" with federal antitrust claims on statute of limitations issues); *DXS, Inc.*

64

*v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467–68 (6th Cir. 1996) (applying federal antitrust continuing violations doctrine, *i.e.*, the separate accrual rule, to claims under federal antitrust law and MARA and finding them both timely).[18]

Because the State's within-period overcharge injuries suffice to defeat Defendants' limitations challenge, the Court need look no further. The State's allegations of other collusive conduct within the limitations period only reinforce that conclusion. For example, the State alleges that as recently as 2025, Defendants took affirmative steps to prevent electricity from displacing gasoline: Shell dismantled a U.S. charging network it had acquired, and BP curtailed its charging operations. Compl. PageID.54–55, ¶¶ 116–18; *see also id.* PageID.65–67, ¶¶ 144–48. The Fossil Fuel Defendants also continued to use OGCI to exchange competitively sensitive information about their energy investments. *Id.* PageID.64–65, ¶ 141. These allegations further support an inference that Defendants' ongoing fossil-fuel sales are not inertial consequences of completed conduct, but sales made while the conspiracy remains in force.

---

[18] Although Michigan courts have abrogated the *entirety rule*, which they refer to as the "continuing violations" or "continuing wrongs" doctrine, in civil rights cases and in trespass and nuisance actions, *see Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 472 Mich. 263, 290 (2005), the *separate accrual rule* applied in antitrust cases remains untouched, *see id.* at 282 (reasoning that plaintiff could not recover for "*injuries outside the limitations period*" (emphasis added)); *see also Sandoz*, 2025 WL 3043397, at *41 (post-*Garg* decision stating that "Michigan no longer recognizes the entirety rule" but holding that MARA claims were "subject to the separate accrual rule" and antitrust plaintiffs could thus seek relief for "*injuries incurred within the limitations period*" (emphasis added)).

65

The State's climate-related fiscal harms do not require a separate accrual analysis. Those harms include costs the State has incurred and continues to incur to fund climate mitigation, adaptation, and resiliency measures, *id.* PageID.115–116, ¶¶ 261–68, and they flow from the same conspiracy and the same within-period sales that make the State's claims timely. *Id.* PageID.115–116, ¶¶ 261–70. Whether those costs are recoverable, and in what amount, is a damages question for later in the litigation. *See GEICO Corp. v. Autoliv, Inc.*, 345 F. Supp. 3d 799, 837 & n.7 (E.D. Mich. 2018); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 551 (D.N.J. 2004).[19]

## V.       Defendants Offer No Legal Basis to Preempt the State's MARA Claim.

The State's MARA claim targets Defendants' conspiracy to restrain trade in Michigan energy markets. The Complaint alleges that Defendants effected this conspiracy not by polluting the environment, but by acquiring and shelving competing technologies, coordinating investments away from renewable energy, disseminating junk science and misinformation, and otherwise suppressing

---

[19] Defendants try equating this case to five climate-related cases that were dismissed as untimely, Br. at PageID.312, but the comparison fails. Three of those cases did not involve antitrust claims and did not apply the separate accrual rule governing recurring antitrust injuries. *See City of New York v. Exxon Mobil Corp.*, 226 N.Y.S.3d 863 (N.Y. Sup. Ct. 2025); *City of Charleston v. Brabham Oil Co.*, 2025 WL 2269770 (S.C. Ct. Com. Pl. Aug. 6, 2025); *Delaware ex rel. Jennings v. BP Am. Inc.*, 2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024). The remaining two cases did include antitrust claims, but the plaintiffs did not seek relief for overcharge injuries incurred during the limitations period, as the State does here. *See Municipality of Bayamón v. Exxon Mobil Corp.*, 2025 WL 2630671, at *28 (D.P.R. Sept. 11, 2025) (holding separate accrual rule inapplicable) (citing *Klehr*, 521 U.S. at 189–90); *Municipality of San Juan v. Exxon Mobil Corp.*, 2025 WL 2848565, at *3–5 (D.P.R. Sep. 30, 2025) (incorporating *Bayamón*'s limitations reasoning in full).

innovation and competition. *See supra* Statement of Facts. *Nothing* in the Complaint seeks to regulate or hold Defendants liable for greenhouse gas emissions as such, and thus no federal law preempts the State's clear-cut state antitrust claim. Defendants' invocation of the preemption doctrine is another unsuccessful attempt to dodge state-law claims *ab initio. See, e.g., City & Cnty. of Honolulu v. Sunoco LP*, 537 P.3d 1173, 1201 (Haw. 2023) (rejecting similar preemption argument by many of the same defendants because "nothing in [the] lawsuit incentivizes—much less compels—Defendants to curb their fossil fuel production or greenhouse gas emissions").

As a threshold matter, Defendants' preemption argument challenges only one requested remedy and thus cannot support dismissal of the State's MARA claim, let alone the entire case. Although Defendants broadly assert that "Michigan's state-law claim is preempted," their argument by its own terms attacks only the State's recovery of its climate-related fiscal expenditures under MARA. Br. at PageID.318. They do not argue that preemption bars recovery of overcharges, for example. A defense to one *remedy* is not a basis to dismiss a *claim*, and a Rule 12(b)(6) motion cannot be used "to trim remedies from Plaintiffs' complaint at the pre-answer stage." *Zimmerman*, 542 F. Supp. 3d at 684; *see also Workers United*, 2025 WL 269177, at *5. The Court can reject Defendants' preemption argument for that reason alone.

Defendants' argument also fails on its merits. "Congress has not pre-empted . . . state antitrust remedies." *California v. ARC Am. Corp.*, 490 U.S. 93, 97, 101–02 (1989). To the contrary, "[s]tates have a long history of providing common-law and statutory remedies against monopolies and unfair business practices," and "state-law

67

antitrust suits rel[y] on this well-established state power." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 388 (2015) (cleaned up). Nor is there any rule that state law cannot remedy in-state harms caused by broader misconduct. *See Young v. Masci*, 289 U.S. 253, 258–59 (1933) ("The cases are many in which a person acting outside the state may be held responsible according to the law of the state for injurious consequences within it.").

Unable to identify any general preemption of state antitrust law, Defendants mischaracterize the State's MARA claim as an effort to regulate global emissions. *See* Br. at PageID.318–321. That mischaracterization is fatal because the State's MARA claim targets Defendants' *suppression of competition*, not their emissions. *See, e.g.*, Compl. PageID.121–122, ¶¶ 287–92. Preemption turns on an examination of the "duty at issue." *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 445 (2005). The duty at issue here is the duty imposed by MARA to compete and refrain from collusion. MARA will impose liability for the State's climate-related fiscal harms only if the State proves that Defendants violated that duty and proximately caused such harms. The resulting damages award would not regulate emissions. Under Defendants' unfounded alternative theory, corporations would be able to preempt state-law claims related to any federally regulated industry, such as transportation, health care, or telecommunications. That cannot be the law. *See Honolulu*, 537 P.3d at 1202–03 ("[T]he operative question is whether Plaintiffs' state law claims are preempted by federal law[,] . . . not whether a potential damages award in this case could regulate

68

air pollution. If [the latter] were true, then any case with a potentially large damage award must be dismissed because it *might* regulate a field.").

The Hawaiʻi and Colorado Supreme Courts and numerous other courts have rejected Defendants' similar mischaracterizations of claims based on their deceptive promotion of fossil fuels, which, like this one, predicate liability on conduct other than emissions. *See Honolulu*, 537 P.3d at 1201; *Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy USA, Inc.*, 586 P.3d 161, 171 (Colo. 2025), *cert. granted*, 2026 WL 490537 (Feb. 23, 2026); *Minnesota v. Am. Petroleum Inst.*, 2025 WL 562630, at *11 (Minn. Dist. Ct. Feb. 14, 2025), *review denied in relevant part*, 2025 WL 1203047 (Minn. Ct. App. Apr. 22, 2025); *Shoalwater Bay Indian Tribe v. Exxon Mobil Corp.*, 2026 WL 1457441 (Wash. Super. Ct. Apr. 29, 2026). The same reasoning applies here. The State's claims do not run afoul of federal law merely because emissions are a "link in the causal chain connecting Plaintiffs' alleged injuries and Defendants' unrelated liability-incurring behavior." *Honolulu*, 537 P.3d at 1207; *accord Boulder*, 586 P.3d at 171.

Defendants' reliance on *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021), is inapt. That case sought to impose liability on fossil-fuel producers for otherwise lawful and profitable conduct, "effectively impos[ing] strict liability" and requiring them "to develop new means of pollution control" or "ceas[e] global [fossil-fuel] production altogether." *Id.* at 93 (cleaned up). The defendants' production of

69

fossil fuels was the liability-triggering conduct. Here, the liability-triggering conduct is Defendants' horizontal agreement to restrain competition in energy markets.[20]

Defendants' mischaracterization of the State's MARA claim is fatal, and the Court need not consider Defendants' underlying preemption theories.[21] Regardless, those theories misstate the law and fail on their own merits.

First, Defendants invoke the Constitution, Br. at PageID.317–318, but identify no constitutional text nor any case holding that the Constitution preempts state antitrust claims. *See Kansas v. Garcia*, 589 U.S. 191, 202 (2020) ("'[t]here is no federal preemption *in vacuo*,' without a constitutional text" or precedent) (citation omitted).

Second, Defendants rely on cases concerning the *former* federal common law of interstate pollution. Br. at PageID.318.[22] That law governed "suits brought by one

---

[20] The only state-court appellate decision Defendants cite, *Mayor & City Council of Baltimore v. B.P. P.L.C.*, 353 A.3d 1142 (Md. 2026), suffers from a confused legal analysis. There, the plaintiffs brought state-law nuisance, failure to warn, and trespass claims seeking liability for the defendants' deceptive marketing of fossil fuel products. The court held those claims were preempted by federal law relating to emissions and adopted the Second Circuit's analysis in *City of New York* without appreciating the distinction between claims grounded in the state's historic police powers—like claims based on deception or antitrust violations—and claims seeking to control out-of-state emissions that historically have been grounded in federal law. *Id.* at 1172–82. As the dissent admonished, the majority improperly "stripped out the fraud allegations in the complaints [and] replaced them with an emissions regulation theory Plaintiffs expressly disclaimed." *Id.* at 1193 (Killough, J., concurring and dissenting, joined as to preemption by Watts, J.).

[21] The United States filed a Statement of Interest ("SOI") less than 24 hours before the State's response deadline. *See* ECF No. 35, PageID.351. The State is still evaluating the SOI, may seek leave to further respond, and can address any questions the Court may have. As the Court is aware, the United States unsuccessfully sought to enjoin the State from bringing this lawsuit. *See United States v. Michigan*, No. 1:25-cv-00496-JMB-SJB, ECF No. 22, PageID.269.

[22] *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972), held that federal common law governed interstate water pollution before the modern Clean Water Act ("CWA"). *Id.*

70

State to abate pollution emanating from another State" and never would have limited state antitrust remedies like those the State seeks here. *AEP*, 564 U.S. at 421. In any event, that federal common law was extinguished when Congress enacted the Clean Air Act ("CAA"). *Id.* at 415, 423–29. It is black-letter law that once Congress displaces federal common law, "the statute governs the extent to which state law is preempted," and "the question of preemption [is] entirely [] a matter of *statutory* interpretation." *District of Columbia v. Exxon Mobil Corp.*, 89 F.4th 144, 152–53 (D.C. Cir. 2023).

Third, Defendants' statutory preemption theory fails because the CAA "does not concern itself in any way with the acts that trigger liability" here. *Honolulu*, 537 P.3d at 1205; *accord Boulder*, 586 P.3d at 170–71. A finding of liability under MARA would impose no emissions-control requirement, set no emissions standard, and frustrate none of the CAA's "pollution prevention" objectives. 42 U.S.C. § 7401(c). Mere "overlap" in subject matter does not meet the "high threshold" for preemption. *Kansas v. Garcia*, 589 U.S. 191, 211–12 (2020); *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011). True, EPA considers "harms and benefits" when setting emissions standards, Br. at PageID.320, but that authority does not include deciding whether companies may collude to suppress competition in energy markets. Courts routinely reject preemption arguments, where, as here, the challenged state-law duty does not conflict with the CAA, even where a claim is somehow related to emissions.

---

at 101–08. *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987), held that the CWA displaced that federal common law. *Id.* at 487–97. *American Electric Power Co. v. Connecticut*, 564 U.S. 410 (2011) *("AEP")*, held that the Clean Air Act displaced federal common law as to interstate airborne emissions. *Id.* at 423–29.

*See, e.g.*, *Fenner v. Gen. Motors, LLC*, 113 F.4th 585, 597, 602 (6th Cir. 2024) (CAA did not preempt state marketing claims regarding vehicle emissions); *Oxygenated Fuels Ass'n Inc. v. Davis*, 331 F.3d 665, 673 (9th Cir. 2003) (CAA did not preempt state ban of gas additive that affected emissions; CAA is not designed to achieve "a smoothly functioning gasoline market"); *Motor & Equipment Mfrs. Ass'n, Inc. v. E.P.A.*, 627 F.2d 1095, 1119 (D.C. Cir. 1979) ("The [CAA] does not have its genesis in congressional concern about business competition or antitrust matters," and regulated entities "enjoy no exemption from the antitrust laws.").

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, the State respectfully requests that the Court deny Defendants' motion. In the alternative, to the extent the Court grants Defendants' motion in part or in full, the State respectfully requests leave to amend.


Dated: June 30, 2026

Respectfully submitted,

/s/ Margaret A. Bettenhausen
Polly A. Synk (P63473)
Margaret A. Bettenhausen (P75046)
Elizabeth A. Morrisseau (P81899)
Assistant Attorneys General
Michigan Department of Attorney General
Environment, Natural Resources, and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
517-335-7554
SynkP@michigan.gov
BettenhausenM@michigan.gov
MorrisseauE@michigan.gov

Victor M. Sher
Matthew K. Edling
Ashley Campbell
Special Assistant Attorneys General
Sher Edling LLP
100 Montgomery Street, Suite 1410
San Francisco, CA 94104
628-231-2500
vic@sheredling.com
matt@sheredling.com
ashley@sheredling.com

Katie R. Beran
Special Assistant Attorney General
Timothy Kelly
Hausfeld LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
215-985-3270
kberan@hausfeld.com
tkelly@hausfeld.com

Adam J. Levitt
Daniel Rock Flynn
Anna Claire Skinner
Special Assistant Attorneys General
DiCello Levitt LLP
Ten North Dearborn Street, 6th Floor
Chicago, IL 60602
312-214-7900
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
askinner@dicellolevitt.com

James Gotz
Special Assistant Attorney General
Hausfeld LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
617-207-0600
jgotz@hausfeld.com

Gregory S. Asciolla
Carrie Syme
Jonathan S. Crevier
DiCello Levitt LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
646-933-1000
gasciolla@dicellolevitt.com
csyme@dicellolevitt.com
jcrevier@dicellolevitt.com

Michael D. Hausfeld
Richard S. Lewis
Special Assistant Attorneys General
Hausfeld LLP
1200 17th Street NW, Suite 600
Washington, DC 20036
202-540-7200
mhausfeld@hausfeld.com
rlewis@hausfeld.com

Kartik S. Madiraju
Special Assistant Attorney General
Scott A. Martin
Hausfeld LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
646-357-1100
kmadiraju@hausfeld.com
smartin@hausfeld.com

Emma Blake
Special Assistant Attorney General
Hausfeld LLP
580 California Street, 12th Floor
San Francisco, CA 94104
415-633-1908
eblake@hausfeld.com

*Attorneys for the State of Michigan, acting by and through the Attorney General*

74

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of W.D. Mich. L.Civ.R. 7.2(b)(i) because, excluding the part of the document exempted, this Memorandum of Law in Opposition to Defendants' Motion to Dismiss contains 19,991 words.

Dated:  June 30, 2026

Respectfully submitted,

*/s/ Margaret A. Bettenhausen*
Polly A. Synk (P63473)
Margaret A. Bettenhausen (P75046)
Elizabeth A. Morrisseau (P81899)
Assistant Attorneys General
Michigan Department of Attorney General
Environment, Natural Resources, and Agriculture Division
P.O. Box 30755
Lansing, MI 48909
517-335-7554
SynkP@michigan.gov
BettenhausenM@michigan.gov
MorrisseauE@michigan.gov

Victor M. Sher
Matthew K. Edling
Ashley Campbell
Special Assistant Attorneys General
Sher Edling LLP
100 Montgomery Street, Suite 1410
San Francisco, CA 94104
628-231-2500
vic@sheredling.com
matt@sheredling.com
ashley@sheredling.com

Katie R. Beran
Special Assistant Attorney General
Timothy Kelly
Hausfeld LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
215-985-3270
kberan@hausfeld.com
tkelly@hausfeld.com

Adam J. Levitt
Daniel Rock Flynn
Anna Claire Skinner
Special Assistant Attorneys General
DiCello Levitt LLP
Ten North Dearborn Street, 6th Floor
Chicago, IL 60602
312-214-7900
alevitt@dicellolevitt.com
dflynn@dicellolevitt.com
askinner@dicellolevitt.com

Gregory S. Asciolla
Carrie Syme
Jonathan S. Crevier
DiCello Levitt LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
646-933-1000
gasciolla@dicellolevitt.com
csyme@dicellolevitt.com
jcrevier@dicellolevitt.com

Kartik S. Madiraju
Special Assistant Attorney General
Scott A. Martin
Hausfeld LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
646-357-1100
kmadiraju@hausfeld.com
smartin@hausfeld.com

James Gotz
Special Assistant Attorney General
Hausfeld LLP
One Marina Park Drive, Suite 1410
Boston, MA 02210
617-207-0600
jgotz@hausfeld.com

Michael D. Hausfeld
Richard S. Lewis
Special Assistant Attorneys General
Hausfeld LLP
1200 17th Street NW, Suite 600
Washington, DC 20036
202-540-7200
mhausfeld@hausfeld.com
rlewis@hausfeld.com

Emma Blake
Special Assistant Attorney General
Hausfeld LLP
580 California Street, 12th Floor
San Francisco, CA 94104
415-633-1908
eblake@hausfeld.com

*Attorneys for the State of Michigan, acting by and through the Attorney General*

76