UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff,

v.

BP, P.L.C., et al.,

Defendants.

Case No. 1:26-cv-254

HON. JANE M. BECKERING

**OPINION AND ORDER**

Defendants BP,[1] Chevron,[2] Exxon,[3] and Shell[4] (collectively, the Fossil Fuel Defendants) are four of the largest energy companies in the world. Defendant American Petroleum Institute (API) is the energy industry's largest trade association. The People of the State of Michigan (Michigan) filed this antitrust action alleging that in the 1970s, the Fossil Fuel Defendants realized that renewable energies would replace fossil fuels under normal market conditions. So, Michigan claims, the Fossil Fuel Defendants agreed, through API, to suppress renewable energies to maintain supracompetitive prices in the transportation and primary energy markets. According to Michigan, this conspiracy manifested itself in many ways, from suppressing renewable energy technology to hacking nonprofit climate activism organizations. And the conspiracy allegedly culminated in many harms to Michigan and its residents: among others, overpriced energy, a lack

[1] BP Defendants include BP, P.L.C., BP America, Inc., BP Energy Company, BP Energy Retail Company, LLC, and BP Products North American, Inc.
[2] Chevron Defendants include Chevron Corporation and Chevron U.S.A., Inc.
[3] Exxon Defendants include Exxon Mobil Corporation and ExxonMobil Oil Corporation.
[4] Shell Defendants include Shell, P.L.C., Shell USA, Inc., Shell Oil Products Company, LLC, Equilon Enterprises, LLC, and Shell Trading (US) Company.

of options in the energy market, increased insurance premiums for households and depressing home values, and increased costs to implement measures mitigating the negative externalities of fossil fuel use. Michigan asks for treble damages for these injuries and an injunction to prevent future injuries. Michigan additionally requests the Court to impose civil penalties on Defendants and order them to disgorge the profits they earned from the alleged conspiracy.

Now pending before the Court are Defendants' Joint Motion to Dismiss (ECF No. 30) and API's Motion to Dismiss (ECF No. 32). The Court concludes that even if Michigan has adequately pled a conspiracy, the antitrust laws protect against none of the injuries for which Michigan seeks a remedy, except for overcharges for energy. Moreover, the distance is too great between the alleged conspiracy and Michigan's and its residents' overcharges to find that the conspiracy proximately caused the overcharges. The Court therefore holds that Michigan lacks antitrust standing to pursue its federal antitrust claims. The Court grants in part and dismisses as moot in part the Joint Motion and dismisses as moot API's Motion.

## I. BACKGROUND

### A. Factual Allegations

The Fossil Fuel Defendants are four of the largest energy companies in the world, and API is their industry's largest trade association (Compl. [ECF No. 1] ¶ 2). The Fossil Fuel Defendants produce fossil fuels and have at times invested in clean energy products and related technologies, such as solar power and batteries, that could provide energy to power buildings, infrastructure, and cars as an alternative to fossil fuels (*id.*). But, as Michigan alleges, for decades Defendants have conspired with each other, through API, to forestall meaningful competition from renewable energy and maintain their dominance in the energy market (*id.* ¶ 3).

**1. <u>Energy Markets</u>**

Historically, the energy market has primarily consisted of fossil fuels, which are nonrenewable energy sources like crude oil, natural gas, and coal that emit carbon dioxide and other greenhouse gases (GHGs) when combusted (*id.* ¶ 36). In contrast, "renewable energy" refers to any form of energy from solar, geophysical, or biological sources that is replenished by natural processes at a rate that equals or exceeds its rate of use (*id.* ¶ 37). These energy sources include bioenergy, photovoltaic solar, concentrated solar, geothermal energy, hydropower, ocean or tidal energy, and wind energy, as well as the storage of electricity derived from such sources (*id.*).

The U.S. energy system consists of three components: (1) primary energy sources, (2) secondary energy sources, and (3) end-use sectors (*id.* ¶ 38). Primary energy sources are extracted or captured directly from the environment (*id.* ¶ 39). Examples include fossil fuels (e.g., crude oil, natural gas, and coal), renewable sources (e.g., solar radiation, wind power, hydro power, and geothermal), and nuclear power (*id.*).

Secondary energy sources are forms of energy derived from primary energy sources (*id.* ¶ 40). They do not occur naturally and must be produced for end-use applications (*id.*). Examples include gasoline, fuel oil, and propane (refined typically from crude oil or natural gas, or both), as well as electricity (generated from primary energy sources like nonrenewable fossil fuels and renewable solar radiation, wind, or hydropower) (*id.*). Electricity is delivered to U.S. consumers primarily through regional power grids—interconnected transmission networks that draw electricity from a mix of sources, including from fossil fuel plants and renewable energy facilities (*id.* ¶ 41). As of 2025, no U.S. regional power grid supplies 100% renewable electricity on a continuous basis (*id.*).

End-use energy sectors are segments of the economy where secondary energy sources are consumed, including the transportation, residential, commercial, and industrial sectors (*id.* ¶ 42). The end-use sector with the greatest share of energy consumption is the transportation sector (*id.*). The residential and commercial sectors also demand considerable energy for purposes including heating, cooling, and lighting (*id.*).

Defendants have allegedly implemented their conspiracy to target two markets: the U.S. market for transportation energy products such as gasoline, and the U.S. market for primary energy products used to heat and cool residential and public buildings (*id.* ¶ 5). The Complaint further defines the markets (and submarkets) as follows:

- The geographic market is defined as the State of Michigan, or in the alternative, the eighty-three counties that make up the State of Michigan (*id.* ¶ 43).
- The Michigan "transportation energy" market is defined as the market for individual consumer and state retail purchases of energy products for fully or partially enclosed personal ground transportation vehicles (i.e., automobiles, including sedans, vans, sport utility vehicles (SUVs), and small, non-diesel trucks)—where consumers and the state have two principal options: (1) gasoline, used to fuel conventional internal combustion engine vehicles and certain hybrid-electric vehicles; and (2) electricity, used to fuel fully electric vehicles and plug-in hybrid vehicles that draw power from both gasoline and external electricity. "Electric vehicles" (EVs) refers to any vehicle that can be fueled with electricity—including both fully electric vehicles and plug-in hybrid-electric vehicles (*id.*).
- The Michigan "primary energy" market is defined as the market for individual consumer purchases of primary energy products for residential or commercial heating or cooling purposes, and state purchases of primary energy products for use and not for resale, for public heating and cooling purposes, where purchasers have two principal options: (1) primary energy from fossil fuel sources, such as crude oil and natural gas; and (2) primary energy from renewable energy sources, such as solar, wind, hydro power, and geothermal (*id.*).

Relating to the transportation energy market, Michigan alleges that gasoline is widely available at retail gas stations across the country, while public charging stations that supply electricity for automobile transportation use remain limited (*id.* ¶ 47). Only five percent of gas

stations in the United States are owned or operated by companies with large oil refining operations, such as the Fossil Fuel Defendants (*id.* ¶ 49). Instead, the vast majority of branded gas stations are owned and operated by independent retailers, who are often licensees or franchisees of the oil refiners' brands (*id.*). These retailers purchase and resell gasoline from those brands to consumers (*id.*). In Michigan, all Exxon and BP branded gas stations are independently owned (*id.* ¶ 50). However, some TravelCenters of America gas stations in Michigan are owned by BP (*id.*). Gasoline, mixed-source electricity, and clean electricity are substitutes in the U.S. and Michigan transportation energy markets (*id.* ¶ 51).

Relating to the primary energy market, Michigan alleges that most energy that Michiganders consume is generated from fossil fuels (*id.* ¶ 53). Renewable primary energy sources are substitutes for fossil fuel primary energy sources in the Michigan primary energy market and serve the same end-use needs (*id.* ¶ 54). Many of Michigan's municipalities (subdivisions of the state) own public energy utilities (*id.* ¶ 56). There are dozens of electric utilities in the state that are community owned and run as a division of the local government and receive state funding from taxpayers (*id.*). Many of these municipal electric utilities have their own power plants that run with primary energy (including from fossil fuel sources) purchased from big energy companies (including the Fossil Fuel Defendants and other energy companies) (*id.*).

Gasoline, natural gas, fuel oil, and propane create significant negative externalities: fossil fuel combustion accounts for approximately eighty percent of manmade GHGs globally (*id.* ¶ 59). Those GHGs impose negative externalities in the form of environmental harms, economic costs such as rising insurance premiums, and other costs such as the depression of home values in the state (*id.*). The state incurs costs to mitigate these harms (*id.*). According to Michigan, under competitive conditions, electricity—especially clean electricity—would displace a substantial

share of gasoline consumption in the transportation energy market (*id.* ¶ 61). Similarly, renewable sources of primary energy would displace a substantial share of fossil fuel consumption in the primary energy market, including in Michigan (*id.*). But, in Michigan's telling, this displacement has not occurred because Defendants have conspired to artificially eliminate the prerequisite natural competitive conditions, thereby preserving gasoline's and other fossil fuels' dominance despite technological progress and growing consumer interest in cleaner alternatives (*id.*).

**2. <u>Defendants' Alleged Collusion and Coordinated Conduct</u>**

Following the Supreme Court's dissolution of the Standard Oil trust in 1911, Standard Oil's successors and other major oil companies formed API in 1919 to coordinate efforts to promote the proliferation of fossil fuels (*id.* ¶ 62). Michigan alleges that, but for the Fossil Fuel Defendants' coordination through API and other means, competitive market conditions would have cultivated renewable energy output and increased competition in the automobile transportation energy market much earlier than has occurred (*id.* ¶ 63).

Defendants' alleged conspiracy to suppress competition from renewable energy began to take shape in 1979, when Defendant Exxon's internal studies concluded that to avoid catastrophic global warming it would be necessary to have renewable energy sources supply at least fifty percent of global energy by 2010 (*id.* ¶ 64). Instead of using this information to gain a competitive advantage, Exxon shared it with competitors, including the other Fossil Fuel Defendants, through the API (*id.* ¶ 71). Around the same time, Exxon and the other Fossil Fuel Defendants began retreating from renewable energy investments and instead adopting climate denial strategies (*id.* ¶ 74). Defendants expanded the alleged conspiracy through other industry groups and other means throughout the 1980s and 1990s (*id.* ¶¶ 77–81). Michigan claims the conspiracy continues to this day (*id.* ¶ 82).

In addition to sharing information, Defendants engaged in a range of activities that Michigan alleges targeted the transportation and primary energy markets (*id.* ¶ 87). For instance, starting in the early 1980s, the Fossil Fuel Defendants stopped internal research on advanced battery chemistries and hybrid electric motors, withheld market-ready prototypes, and engaged in patent litigation related to renewable energy development (*id.* ¶ 89).

With respect to the transportation energy market, Exxon and companies later acquired by Chevron were early developers of key EV technologies, including lithium and nickel-metal hydride batteries and hybrid gas-electric motors (*id.* ¶ 90). But instead of advancing these innovations, they delayed their development (*id.* ¶¶ 90–110). Also, Defendants withheld investments in charging networks and limited the ability of other market entrants to develop them, while prioritizing investments in fossil fuel infrastructure such as new fueling stations and refinery upgrades (*id.* ¶¶ 111–19).

With respect to the primary energy market, Michigan alleges that Defendants suppressed solar panel technology and invested to foreclose renewables from competing in the primary energy market; engaged in marketing campaigns to undermine the popularity of renewable energies; influenced educational and information-producing institutions; and used hackers to surveil and intimidate watchdogs, advocates, and attorneys general (*id.* ¶¶ 120–214).

**3. <u>Anticompetitive Effects and Injuries</u>**

Michigan's Complaint states that in a competitive transportation energy market, EVs would have entered the market sooner, achieved broader adoption, and been supported by more accessible charging infrastructure, and that clean electricity sources like solar would have reduced charging costs and increased convenience (*id.* ¶ 247). This transition would have shifted vehicle power sources significantly toward electricity, reducing gasoline demand and prices (*id.* ¶ 248).

However, between 1980 and 1992, renewable primary energy production declined by nearly ten percent nationally (*id.* ¶ 250). Moreover, charging infrastructure remains inconsistent across the United States and Michigan, limiting access for consumers without home-charging systems (*id.* ¶ 251). As a result, EV adoption in the United States lags behind EV adoption in many other countries (*id.*), further eliminating competitive price pressure on gasoline (*id.* ¶ 252).

Similarly, Michigan alleges that in a competitive primary energy market, other primary energy types, such as solar energy, would have entered the market sooner, achieved broader adoption, and been supported by more accessible infrastructure (*id.* ¶ 255). Clean electricity sources like solar power for homes would have reduced costs and increased convenience, offering the state and consumers meaningful alternatives to fossil fuels (*id.*). This transition would have shifted primary energy sources significantly toward renewables, such as solar and wind, reducing demand for fossil fuels and lowering prices of renewable energy for Michigan and consumers (*id.* ¶ 256). Instead, Michigan uses more propane in the residential sector than any other state in the country and an estimated 320,000 Michigan households must rely on propane as their primary heating fuel (*id.* ¶ 257). According to Michigan, in a competitive market, even modest reductions in demand for primary energy from fossil fuels would have lowered prices in not just the primary energy market, but also in downstream end-use sectors (*id.* ¶ 259).

Michigan claims that Defendants' conduct has led to negative externalities including climate related harms, rising insurance premiums to account for the impacts of climate events, depressed home values in areas of the state most susceptible to climate harms, and damage to Michigan's general economy (*id.* ¶ 261). Michigan incurs expenses to address or mitigate the negative externalities allegedly resulting from Defendants' conduct (*id.*). Additionally, Michiganders face rising home and automobile insurance premiums, which are increasing to

account for the risks, uncertainties, and increasingly harmful weather events associated with climate impacts that insurers have been seeing (*id.* ¶ 263). Michigan alleges that it has incurred and will incur substantial costs to implement measures to address and mitigate the negative externalities allegedly resulting from Defendants' conduct (*id.* ¶ 268).

**B. Procedural Posture**

On January 23, 2026, Michigan filed a Complaint (ECF No. 1) against Defendants, claiming that they violated § 1 of the Sherman Act (Count I) and § 2 of the Michigan Antitrust Reform Act (MARA) (Count II) (Compl. ¶¶ 272–99). Michigan seeks compensatory and treble damages for harms suffered by it and its residents, a permanent injunction, civil penalties, and disgorgement of profits (*id.* at PageID.123–124).

On May 1, 2026, Defendants filed their Motions (ECF Nos. 30, 32[5]), in support of which the United States filed a Statement of Interest (ECF No. 35). The Court issued an Order directing Michigan to either file an amended complaint or respond to the Motions (ECF No. 34). Michigan did not file an amended complaint, instead filing Responses in Opposition to the Motions (ECF Nos. 36, 37) and a Response to the United States' Statement of Interest (ECF No. 45). Defendants filed Replies (ECF Nos. 42, 43). Having considered the parties' submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d).

[5] API joined Defendants' omnibus Motion to Dismiss in full (ECF No. 30) and filed its own Motion (ECF No. 32) to address what it deems to be particular deficiencies in Michigan's claims against API.

## II. ANALYSIS

### A. Motion Standard[6]

Defendant's Motions are filed under Federal Rule of Civil Procedure 12(b)(6), which authorizes a court to dismiss a claim for relief in any pleading if it "fail[s] to state a claim upon which relief can be granted . . . ." FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the non-movant and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

[6] Defendants move under Federal Rule of Civil Procedure 12(b)(1) and (6) (Defs.' Mot., ECF No. 30 at PageID.253). Because the Court does not reach Defendants' argument that the Court lacks Article III jurisdiction, the Court sets forth only the standard under Rule 12(b)(6).

**B. Discussion**

Defendants argue that Michigan fails to state a claim for relief in Counts I and II because (1) Michigan lacks antitrust and Article III standing, (2) Michigan fails to plausibly allege a conspiracy or anticompetitive effects in a relevant antitrust market, and (3) Michigan's claims are time barred and preempted (Defs.' Br. Supp., ECF No. 31 at PageID.258). Defendant API additionally asserts that (1) Michigan does not allege that API joined any conspiracy, (2) its conduct is legitimate pro-competitive activity, and (3) its petitioning activity is immune under the *Noerr–Pennington* doctrine (API's Memo. Supp., ECF No. 33 at PageID.329). The United States supports Defendants' argument on antitrust standing and preemption (U.S. Statement of Interest, ECF No. 35 at PageID.352). Michigan resists dismissal on any ground (Pl.'s Memo. Opp., ECF No. 36 at PageID.370–371).

The Court concludes that Michigan lacks antitrust standing under federal law to seek any relief requested in the Complaint. "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc) (affirming dismissal on antitrust standing alone). The Court therefore does not address any argument in Defendants' or API's Motions except for antitrust standing. Moreover, because the Court dismisses the Sherman Act claim in Count I, the Court declines to exercise supplemental jurisdiction over Michigan's MARA claim in Count II, which the Court dismisses without prejudice.

**1. <u>Michigan Lacks Antitrust Standing</u>**

Under the Clayton Act, Michigan may seek monetary and injunctive relief for violations of the antitrust laws on its own behalf and on behalf of its resident natural persons. 15 U.S.C. §§ 15c(a)(1), 26; *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 (1972) (authorizing a state to sue

"in its proprietary capacity for three times the damages it has suffered"); *id.* at 261 ("[T]he governments of each State . . . may . . . sue for injunctive relief against violations of the antitrust laws . . . ."); *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 216 (6th Cir. 1990) (citing 15 U.S.C. § 15c(a)(1)). Defendants do not contest Michigan's authority in this respect (Defs.' Br. Supp., ECF No. 31 at PageID.278–289). The parties also agree that Michigan must nevertheless prove antitrust standing to sue for itself and its residents (*id.* at PageID.277–278; Pl.'s Memo. Opp., ECF No. 36 at PageID.395).

The doctrine of antitrust standing springs from §§ 4 and 16 of the Clayton Act. Under § 4, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ." 15 U.S.C. § 15(a). Section 16 similarly provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ." *Id.* at § 26.

Notwithstanding these seemingly expansive authorizations for private rights of action, the Supreme Court has interpreted the Clayton Act to require that plaintiffs demonstrate "antitrust standing." *See Associated Gen. Contractors, Inc. v. Cal. State Council of Carpenters (AGC)*, 459 U.S. 519, 529–46 (1983) (interpreting § 4); *Cargill, Inc. v. Monfort, Inc.*, 479 U.S. 104, 109–13 (1986) (interpreting § 16). Plaintiffs must (plausibly) plead antitrust standing to state a claim for relief. *NicSand, Inc. v. 3M Co.*, 507 F.3d at 450. The Sixth Circuit has distilled the antitrust standing inquiry into two elements: antitrust injury and proximate causation. *Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc. (AAACP)*, 155 F.4th 795, 808 (6th Cir. 2025). The Court analyzes each element in turn.

*(a) Michigan Plausibly Alleges Just One Antitrust Injury: Overcharges for Energy*

The antitrust-injury element comes from the general principle "that Congress enacts legislation with knowledge of the presumption that only plaintiffs who 'fall within the zone of interests protected by' a law may invoke its protections." *Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)). Thus, a plaintiff's injury must grow out of the rationale for why the antitrust laws made the challenged conduct illegal. *Id.* (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990)).

The antitrust laws are aimed at protecting consumer welfare by prohibiting anticompetitive business practices that increase price and reduce output. *Id.* As a result, consumers suffer antitrust injury when they purchase overpriced products from a cartel or monopolist. *Id.* at 808–09. Courts have been more cautious when evaluating asserted antitrust injuries suffered by a defendant's competitors or other businesses less connected to the market. *Id.* at 809–10. "When third-party harm is mere 'collateral damage' to (or 'a tangential byproduct of') the anticompetitive conduct, the harm does not count as an antitrust injury." *Id.* at 110 (citations omitted).

Michigan has plausibly pled just one antitrust injury: overcharges for energy. According to Michigan, Defendants conspired to artificially preserve market dominance by suppressing renewable energy (Compl. ¶¶ 3–5, 63–64, 76, 86–87, 120–21, 215–19, 222–25). This conspiracy (if plausible and then proven) is the type of anticompetitive conduct—leveraging market power to reduce product variety and quality and consequently increase price—that the antitrust laws sought to outlaw. *See In re Cardizem CD Antitrust Litigation (Cardizem)*, 332 F.3d 896, 911 (6th Cir. 2003) (holding that horizontal agreement not to compete caused antitrust injury because it "reduc[ed] competition in the market" and increased price). Furthermore, Michigan has alleged that Defendants' conspiracy not only reduced the mix of products available to Michigan and its residents in the transportation and primary energy markets, but also increased energy prices in

these markets (Compl. ¶¶ 252–54, 258–60). Price hikes are paradigmatic antitrust injuries. *See AAACP*, 155 F.4th at 808.

Nevertheless, Michigan seeks an antitrust remedy for many harms that do not qualify as antitrust injuries. Michigan alleges that Defendants' conspiracy decreased the EV supply, delayed infrastructure for other EVs and renewable energies, increased insurance premiums for households, depressed home values, and caused Michigan to expend resources to address negative externalities associated with fossil fuel use (Compl. ¶ 279). These harms are, at most, "collateral damage" with respect to the markets in which Michigan alleges Defendants conspired: the transportation and primary energy markets. Therefore, Michigan cannot invoke the antitrust laws to remedy these harms, lest "the list of harmed parties . . . go on and on." *AAACP*, 155 F.4th at 806. Michigan's only antitrust injuries are the overcharges that it and its residents allegedly paid in the transportation and primary energy markets.

Both Michigan and Defendants disagree with this conclusion. Michigan believes that it has suffered an antitrust injury besides overcharges: output reduction (Pl.'s Memo. Opp., ECF No. 36 at PageID.397 (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 107–08 (1984)). Although Michigan has alleged a reduction in renewable energy output (*see, e.g.*, Compl. ¶¶ 247–52, 255–58), it has not alleged an output reduction in the markets it defined: the transportation and primary energy markets, which include both renewable energy and fossil fuel based energy (*id.* ¶ 43). Consequently, Michigan cannot claim output reduction as an antitrust injury.

Michigan additionally asserts that it has suffered antitrust injury because Defendants' conspiracy reduced product variety and innovation (Pl.'s Memo. Opp., ECF No. 36 at PageID.397). But even if Defendants' alleged conspiracy had this effect, Michigan has cited no

case where reduction in product variety and innovation qualified as an antitrust injury absent an overcharge or output reduction. For example, *Cardizem* did not hold that lack of competition alone constituted an antitrust injury; rather, it found an antitrust injury from "*paying higher prices* for a product due to lack of competition in the market." 332 F.3d at 911 (emphasis added). Thus, Michigan is double counting when it claims antitrust injury from both overcharges and suppression of competition.

With respect to the remaining harms for which Michigan seeks a remedy, Michigan contends that they are recoverable as consequential damages (Pl.'s Memo. Opp., ECF No. 36 at PageID.398–399), conceding that they do not independently qualify as antitrust injuries. *See Am. Elec. Power Serv. Corp. v. Fitch*, No. 22-3005, 2022 WL 3794841, at *6 (6th Cir. Aug. 30, 2022) ("[A] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point."). Hence, Michigan has allegedly suffered just one antitrust injury: overcharges in the transportation and primary energy markets.

Defendants, on the other hand, argue that not even the alleged overcharges qualify as an antitrust injury (Defs.' Br. Supp., ECF No. 31 at PageID.278). According to Defendants, Michigan's overcharge allegations are "conclusory" (*id.*). The Court disagrees. Michigan has plausibly alleged that Defendants' actions—among others, underinvesting in renewables, leaving promising patents fallow, and diverting resources away from green energies (Compl. ¶¶ 87–214)—stifled innovation in and adoption of renewable energies, a substitute for fossil fuels (*id.* ¶¶ 51, 54). It is not conclusory or implausible that energy prices would increase as a result. *See Cardizem*, 332 F.3d at 911 ("[H]ere there is no question that the alleged injury—paying higher prices for a product due to a lack of competition in the market—is the type of injury that can, and

the plaintiffs have alleged did, flow from the anticompetitive effects of the Agreement (a horizontal market allocation agreement).").

Defendants also contend that Michigan cannot suffer an antitrust injury in a different market from the market in which Defendant allegedly formed a conspiracy (Defs.' Br. Supp., ECF No. 31 at PageID.280). To be sure, Michigan and its residents overpaid for transportation and primary energy in markets that Defendants, as participants in primary and secondary energy markets, did not directly restrain (Compl. ¶¶ 36–43, 49, 53–56). Nonetheless, the Sixth Circuit has instructed that an injury's directness should be analyzed under the proximate cause element, not the antitrust injury element. *AAACP*, 155 F.4th at 808 (quoting *Holmes v. Secs. Inv. Prot. Corp.*, 503 U.S. 258, 268–69 (1992)) ("[T]he Supreme Court has since made clear that these directness questions form part of the proximate-cause calculus."). Thus, the Court next analyzes whether Defendants' alleged conspiracy proximately caused Michigan's alleged overcharges.

*(b) Michigan Fails to Plausibly Allege that Defendants' Conspiracy Proximately Caused the Overcharges Michigan and Its Resident Paid for Energy.*

The proximate cause element comes from "the common-law rule that plaintiffs may recover only if a defendant 'proximately caused' their injuries" and the Clayton Act's requirement that injury occur "by reason of" an antitrust violation. *AAACP*, 115 F.4th at 811 (citations omitted). "Antitrust causation is much more limited than Article III standing." *Static Control*, 697 F.3d at 405. Generally, a defendant's conduct does not proximately cause a plaintiff's injury if the defendant could not reasonably foresee the plaintiff's injury, a superseding cause separates the defendant's conduct and the plaintiff's injury, or the defendant's conduct did not "directly" cause the plaintiff's injury. *AAACP*, 115 F.4th at 811–12. In some circumstances, a defendant does not proximately cause derivative harms that flow out of a third party's injury. *Id.*; *S. Pac. Co. v.*

*Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918) (Holmes, J.) ("The general tendency of the law, in regard to damages at least, is not to go beyond the first step.").

In the antitrust context, only direct purchasers can recover damages for overcharges paid because of a cartel's or monopolist's restraint in a vertical chain of distribution. *AAACP*, 155 F.4th at 812–13; *see also Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977). The Supreme Court established this bright-line rule in *Illinois Brick* because permitting recovery by a participant at each level of the distribution chain would result in multiple liability for defendants, damages allocation problems, and long and complicated proceedings to sort out damages. *Ill. Brick Co.*, 431 U.S. 736–47.

However, *Illinois Brick* does not bar multiple liability that is unrelated to passing an overcharge down a chain of distribution. *AAACP*, 155 F.4th at 813 (citing *Apple Inc. v. Pepper*, 587 U.S. 273, 287 (2019)). For example, when a defendant contracts with two parties in a vertical chain of distribution, *Illinois Brick* bars neither party's antitrust suit. *Id.* Moreover, some courts have recognized exceptions to *Illinois Brick* when a defendant owns, controls, or conspires with its direct purchasers and when an overcharged indirect purchaser had a pre-existing cost-plus contract with the direct purchaser. *See In re Auto. Parts Antitrust Litig.*, 997 F.3d 677, 683 (6th Cir. 2021); *Ill. Brick Co.*, 431 U.S. at 724 n.2, 736 n.16 (citations omitted); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1158 (9th Cir. 2019).

Even if *Illinois Brick* does not preclude an antitrust suit, a plaintiff may still fail to allege proximate cause for antitrust standing. *AAACP*, 155 F.4th at 813–14. Injured parties escaping *Illinois Brick* but failing the proximate-cause test include employees whose injuries derive from harm to their employers, plaintiffs who would have purchased a product if the market price were unhindered by anticompetitive conduct, and businesses that would have started but for monopoly

prices. *Id.* at 814. "In sum, '[n]o single formula captures the required proximity.'" *Id.* (citing IIA AREEDA & HOVENKAMP, ANTITRUST LAW § 339a (5th ed. 2021)).

Michigan correctly concedes that *Illinois Brick* defeats much of its overcharge theory under federal law (Pl.'s Memo. Opp., ECF No. 36 at PageID.405, 406). As alleged, the transportation and primary energy markets are retail markets in vertical distribution chains (Compl. ¶¶ 36–43). Michigan alleges that the Fossil Fuel Defendants conspired to restrain trade not in these retail markets, but in the wholesale markets in which the direct purchasers are usually transportation and primary energy retailers, generally not Michigan or its residents (*id.* ¶¶ 36–43, 49, 53–56). Michigan has neither plead nor asserted any exception to *Illinois Brick*. Hence, as indirect purchasers from the Fossil Fuel Defendants, *Illinois Brick* bars Michigan and its residents from recovering most of the overcharge damages Michigan seeks from Defendants under federal law.

Nonetheless, Michigan also alleges that the Fossil Fuel Defendants own some retailers in the transportation energy market in Michigan (*id.* ¶ 49) and that many of Michigan's municipalities purchased primary energy directly from the Fossil Fuel Defendants (*id.* ¶ 56). In these transactions, Michigan and its residents are direct, not indirect, purchasers from the Fossil Fuel Defendants. Therefore, *Illinois Brick* does not preclude Michigan from recovering overcharge damages for these purchases.

Furthermore, it is unclear whether *Illinois Brick* forecloses Michigan's request for injunctive relief under § 16 of the Clayton Act. The Supreme Court has explained that "because standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16." *Cargill*, 479 U.S. at 111 n.6 (citing *Ill. Brick Co.*, 431 U.S. 720). Several circuit courts have accordingly held that *Illinois Brick* does not apply to injunctive relief under

§ 16, and that courts should tailor their proximate cause analysis to the injunction context. *See McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 856 (3d Cir. 1996); *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1172 (8th Cir. 1998); *Or. Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 185 F.3d 957, 966 (9th Cir. 1999); *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 80 (2d Cir. 2025). But the Sixth Circuit has not decided whether *Illinois Brick* forecloses a request for injunctive relief under § 16 of the Clayton Act. *See Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tenn., Inc.*, 164 F.4th 529, 544 (6th Cir. 2026) (Murphy, J. concurring from denial of rehearing en banc) (citation omitted) ("Perhaps there are good reasons to extend *Illinois Brick*'s rule to the injunction context because that rule flows out of the proximate-causation requirement that the Court presumptively reads into all private rights of action. But that question must await a case in which the parties litigate it."). Because *Illinois Brick* does not bar Michigan from recovering overcharge damages for indirect purchases and may not prevent an injunction, the Court evaluates proximate cause for these forms of relief without considering *Illinois Brick*.

To start, the "chain of causation between [Michigan's injury] and the alleged restraint in" the transportation and primary energy markets "contains several somewhat vaguely defined links." *AGC*, 459 U.S. at 540. The alleged conspiracy is Defendants' agreement, first made in 1979, "to reduce the production and distribution of electricity from renewable sources and to restrain the emergence of [EVs] and renewable primary energy technologies" (Compl. ¶¶ 3, 64). Michigan and its residents are allegedly injured by overpaying for transportation and primary energy in the 2020s. To connect the causal chain from the 1979 agreement to overpayments for energy decades later, Michigan asks the Court to infer that because Defendants agreed to reduce renewable

energies, they succeeded in doing so, and that "entrenched demand [for fossil fuels] sustained supracompetitive fossil-fuel prices" for decades (Pl.'s Memo. Opp., ECF No. 36 at PageID.408).

But the alleged conspiracy's success at entrenching supracompetitive fossil fuel prices depends on numerous market forces besides Defendants, such as technological developments, other investors, and the public's interest in renewable energy, as well as the supply of fossil fuels. To award Michigan monetary relief, the Court would need to disentangle these market forces from Defendants' decades-old conspiracy to determine how much lower energy prices would be if Defendants had not engaged in the conspiratorial conduct Michigan alleges. *See Kloth v. Microsoft Corp.*, 444 F.3d 312, 325 (4th Cir. 2006) (citation omitted) ("It would be entirely speculative and beyond the competence of a judicial proceeding to create in hindsight a technological universe that never came into existence."); *cf. Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)) ("[W]e have 'been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.'"). For example, the Court would need to measure how much higher gas prices are in the 2020s because Defendants "abruptly hit the brakes on . . . EV and clean energy technology research and development programs" in 1981 (Compl. ¶ 96). The Court would further need to determine the marginal primary energy price increase from the "55 distinct relationships between universities and fossil fuel companies, representing an estimated $1.3 to $2.2 billion in industry funding over ten years" (*id.* ¶ 186). For each alleged conspiratorial act, the Court would need to make a similar calculation, while simultaneously integrating other market forces into the analysis.[7]

[7] The Court declines Michigan's invitation to defer its analysis of the chain of causation until after discovery has taken place (Pl.'s Memo. Opp., ECF No. 36 at PageID.409–410). *See NicSand, Inc.*, 507 F.3d at 442 ("[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law . . . .").

The Court concludes that these damages calculations are sufficiently speculative to suggest that Defendants' alleged conspiracy did not proximately cause Plaintiff's overcharges. *See Bodie-Rickett & Assocs. v. Mars, Inc.*, 957 F.2d 287, 292 (6th Cir. 1992). Moreover, the tenuous causal connection described above similarly cuts against proximate cause for an injunction, especially as nearly thirty years have passed since the alleged 1979 agreement, and most of Defendants' conduct alleged in the Complaint occurred decades ago. *See Cargill, Inc.*, 479 U.S. at 112 ("It would be anomalous, we think, to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred.").

Additionally, there exist "[several] identifiable class[es] of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement" against Defendants. *AGC*, 459 U.S. at 542. Most obviously, Defendants' direct customers would be motivated to sue Defendants for violating antitrust laws if Defendants were overcharging them because of a conspiracy to suppress renewable energies. Also, the developers of and investors in renewable energy technology and infrastructure would have a strong incentive to recover damages from Defendants for suppressing their business, and to enjoin them from continuing to do so. Michigan correctly notes that these potential plaintiffs may bring damages claims that do not perfectly overlap with Michigan's damages claims (*see* Pl.'s Memo. Opp., ECF No. 36 at PageID.411). But these plaintiffs can sue to enjoin the same conspiracy that Michigan sues to enjoin. *See Standard Oil Co.*, 405 U.S. at 262 ("[T]he fact is that one injunction is as effective as 100, and, concomitantly, that 100 injunctions are no more effective than one."). Hence, the existence of other potential plaintiffs to challenge Defendants' alleged conspiracy indicates that Michigan and its residents' injuries were not proximately caused by Defendants' conduct.

Michigan points to several factors it claims support a proximate cause finding. For one, Michigan argues that Defendants could reasonably foresee that conspiring to suppress renewable energy alternatives would increase energy prices (Pl.'s Memo. Opp., ECF No. 36 at PageID.407–408). For another, Michigan contends that the Complaint alleges Defendants' express aim to preserve supracompetitive prices (*id.* at PageID.408). It is true that reasonable foreseeability and alleged intent to cause harm indicate that Defendants' alleged conspiracy may have proximately caused Michigan and its residents' overcharges. *See AAACP*, 155 F.4th at 812; *Static Control*, 697 F.3d at 402. Nevertheless, "improper motive . . . is not a panacea that will enable any complaint to withstand a motion to dismiss," *AGC*, 459 U.S. at 537, and ultimately, the Court must account for "all the facts," *AAACP*, 155 F.4th at 813 (citation omitted). Thus, while the Court considers the factors Michigan highlights, it does not consider them dispositive. Instead, the Court finds that other proximate cause factors—the indirectness of the injury, the uncertain causal chain, and the existence of other potential plaintiffs—outweigh the factors in favor of proximate cause. The Court therefore determines that Michigan has not plausibly alleged that Defendants' alleged conspiracy proximately caused Michigan's and its residents' injuries resulting from overcharges. Michigan lacks antitrust standing to pursue an injunction or to recover damages for overcharges, regardless of *Illinois Brick*.

In sum, Michigan has alleged just one antitrust injury—overcharges for transportation and primary energy—and *Illinois Brick* bars Michigan from recovering damages as indirect purchasers under federal law. Nor can Michigan recover damages for the direct purchases it and its residents made from Defendants or enjoin them from continuing any alleged conspiracy because Michigan fails to plausibly plead that this conspiracy proximately caused and continues to cause overcharges.

Because Michigan lacks antitrust standing to pursue any remedy under federal antitrust law, the Court dismisses Count I in Michigan's Complaint for failure to state a claim for relief.

**2. Supplemental Jurisdiction**

Having dismissed Michigan's federal antitrust claim, the Court, in its discretion, declines to exercise supplemental jurisdiction over Michigan's remaining state-law claim under MARA. *See* 28 U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim under subsection . . . if . . . the district court has dismissed all claims over which it has original jurisdiction"); *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims...."); *see, e.g.*, *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) ("Upon dismissing Brooks' federal claims, the district court properly declined to exercise supplemental jurisdiction over Brooks' remaining state-law claims.").

**3. Amendment**

"Ordinarily, if a district court grants a defendant's 12(b)(6) motion, the court will dismiss the claim without prejudice to give parties an opportunity to fix their pleading defects." *CNH Am. LLC v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers (UAW)*, 645 F.3d 785, 795 (6th Cir. 2011). However, the Sixth Circuit has repeatedly held that a "request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend." *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014) (quoting *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010)); *id.* at 444 (examining the phrase "Plaintiffs request leave to amend the Complaint in the event that the Court finds that it falls short of the applicable pleading standards in any respect," which the plaintiffs included in their response to a motion to dismiss, and finding

no abuse of discretion by the district court in refusing to allow the plaintiffs to amend their complaint where the plaintiffs did not present an adequate motion and did not attach a copy of their proposed amended complaint).

In a footnote in its Memorandum in Opposition, Michigan states that "[i]f the Court concludes that [its] market allegations require clarification, the State could promptly amend the Complaint to clarify them without changing the nature of its claims" (Pl.'s Memo. Opp., ECF No. 36 at PageID.403 n.5). The Court finds that this footnote is the type of "throwaway language," *Kuyat*, 747 F.3d at 444, "almost as an aside, to [the Court] in its memorandum in opposition to [Defendants'] motion[s] to dismiss," that the Sixth Circuit has held is "not a motion to amend." *Id.* Furthermore, the Court gave Michigan an opportunity to amend its Complaint (ECF No. 34), which Michigan declined (Pl.'s Memo. Opp., ECF No. 36). Therefore, the Court dismisses Michigan's federal antitrust claims with prejudice.

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (ECF No. 30) is GRANTED in part and DISMISSED in part as moot; specifically, the Motion is GRANTED with respect to Count I, which is DISMISSED with prejudice, and the Motion is otherwise DISMISSED as moot.

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over Michigan's MARA claim in Count II, which is DISMISSED without prejudice.

**IT IS FURTHER ORDERED** that Defendant API's Motion to Dismiss (ECF No. 32) is DISMISSED as moot.

Because this Opinion and Order resolves all pending claims, the Court will also enter a Judgment to close this case. *See* FED. R. CIV. P. 58.

Dated: September 22, 2026

/s/ Jane M. Beckering
JANE M. BECKERING
United States District Judge